## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Amanda June Kolle, | ) | Case No. 17-41701-CAN |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| DeAnn Michelle Gould, | ) | Case No. 17-42125-DRD |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Justin Mantez Mackey, | ) | Case No. 17-42465-BTF |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Melissa Maxine Long, | ) | Case No. 17-43023-BTF |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Lateisha Jenee Robinson, | ) | Case No. 17-43094-CAN |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Ernestine Richetta Franklin, | ) | Case No. 17-43313-BTF |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Leona Tenelle Harvey, | ) | Case No. 18-40087-CAN |
| | ) | |
| Debor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Nechol Mutesa Washington, | ) | Case No. 18-40264-CAN |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Angel Marie Demeturis Anderson, | ) | Case No. 18-40723-DRD |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| Kenneth Darwin Cook, | ) | Case No. 18-41222-DRD |
| | ) | |
| Debtor. | ) | |

## JASON C. AMERINE'S RESPONSE TO THE
## BANKRUPTCY COURT'S AMENDED ORDER TO SHOW CAUSE

## TABLE OF CONTENTS

INDEX OF EXHIBITS .............................................................................................. iii

I.    BACKGROUND ................................................................................................1

II.    EVIDENCE FOR THE AMENDED ORDER TO SHOW CAUSE ..........................3

    A.    BK Billing's Program for Factoring Law Firm Account Receivable Debts for Post-Petition Services ................................................................................3

    B.    Jason Amerine's Due Diligence ...............................................................8

    C.    Castle Law's Two-Contract Process ........................................................11

        1.    Pre-Petition: The Initial Consultation Meeting ...................................11

        2.    Pre-Petition: The Shell Appointment Meeting ...................................13

        3.    Post-Petition: The First Client Meeting................................................14

        4.    Post-Petition: Castle Law Firm's Post-Petition Legal Services ..........15

    D.    Performance of the Two-Contract Process ..............................................19

    E.    Evolution of the Two-Contract Process ..................................................20

        1.    The Western District of Missouri U.S. Trustee Office ......................20

        2.    Discussions With The Kansas U.S. Trustee Office ............................22

        3.    The Attorney Compensation Disclosure Form ...................................23

        4.    The Amount of Attorneys' Fee ...........................................................25

        5.    The Bankruptcy Expenses .................................................................26

        6.    The *Rights and Responsibilities Agreement* Form ...........................27

III.    RESPONSE TO THE AMENDED ORDER TO SHOW CAUSE ..........................29

    A.    Bankruptcies Were Not Filed as "Emergency" or "Quick File" Cases ............29

    B.    Compensation Disclosures Showed A Lower Attorney Fee .................................29

    C.    The Post-Petition Accounts Receivables Were Not Factored for a 25% Fee ........30

    D.    The Absence of a Pre-Petition Fee Was Not Part of a "Sham" .........................31

    E.    The Actual Compensation Was Disclosed Prior to the Settlement List .............33

        1.    *In re Kolle*: ...................................................................................35

2.   *In re Gould*: ..................................................................................38

3.   *In re Mackey*: ...............................................................................40

5.   *In re Robinson*: ............................................................................42

6.   *In re Franklin*: .............................................................................44

7.   *In re Harvey*: ...............................................................................45

8.   *In re Washington*: .........................................................................46

9.   *In re Anderson*: ............................................................................47

10.    *In re Cook*: ...............................................................................49

F.   The Source of the Attorneys' Fees Was Not BK-Billing ........................................50

G.   The Text of Local Rule 2016-1 and the *Rights and Responsibilities Agreement* Did Not Prohibit Use of Two Agreements ........................................55

1.   The Text of Local Rule 2016-1 ........................................55

2.   The Terms Within the *Rights and Responsibilities Agreement* ........................58

3.   Incorrect Assumptions About Deadlines Referenced Within the *Rights and Responsibilities Agreement* ........................................60

4.   Incorrect Assumptions About Payment Terms Within the *Rights and Responsibilities Agreement* ........................................63

I.   The Clients Did Not Pay "Back" BK Billing ........................................69

J.   Clients Voluntarily Chose the Two-Contract Process to *Stop* Their "Sweatbox" 69

L.   Mr. Amerine Performed All of His Pre-Petition Responsibilities and Obligations ........................................74

O.   Respondent Submits Good Cause Does Not Exist for Sanctions or Discipline Because No Errors With the New, Innovative, Process Occurred Because of Malfeasance ........................................81

P.   Personal Statement from Respondent, Jason C. Amerine, Esq. ........................................87

# INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Jason C. Amerine's Declaration Pursuant to 28 U.S.C. § 1746 |
| 2 | Deposition of Jason Amerine (9/5/2019) |
| 3 | Rule 30(b)(6) Deposition of BK Billing through David Stidham (12/13 & 14/2018) |
| 4-A | Accounts Receivable Assignment Agreement between BK Billing, LLC and Castle Law Firm of Kansas City, P.C., dated May 24, 2017 |
| 4-B | Amendment to Accounts Receivable Assignment Agreement between BK Billing, LLC and Castle Law Firm of Kansas City, P.C., dated June 26, 2017 |
| 5 | E-mails between Sherri Wattenbarger and Jason Amerine (June 6, 2017) |
| 6 | Deposition of William Sean Mawhinney (12/14/2018) |
| 7 | Letter dated Nov. 8, 2018 in *In re Ndon*, Del. Bankr. Case No. 18-10333 |
| 8 | Form B2030 (12/15) *"Disclosure of Compensation of Attorney for Debtor(s)"* (blank) |
| 9-A | Doc. 8 in In re Kolle, Case 17-41701 (Form B2030 (12/15) *Disclosure of Compensation of Attorney for Debtor(s)*) |
| 9-B | Doc. 18 in In re Kolle, Case 17-41701 (Form B2030 (12/15) *Disclosure of Compensation of Attorney for Debtor(s)-Amended*) |
| 10-A | Doc. 9 in In re Gould, Case 17-42125 (Form B2030 (12/15) *Disclosure of Compensation of Attorney for Debtor(s)*) |
| 10-B | Doc. 15 in In re Gould, Case 17-42125 (Form B2030 (12/15) *Disclosure of Compensation of Attorney for Debtor(s)-Amended*) |

11        **Doc. 10 in In re Mackey, Case 17-42465 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

12        **Doc. 14 in In re Long, Case 17-43023 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

13        **Doc. 9 in In re Robinson, Case 17-43094 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

14        **Doc. 9 in In re Franklin, Case 17-43313 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

15        **Doc. 10 in In re Harvey, Case 18-40087 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

16        **Doc. 9 in In re Washington, Case 18-40264 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

17        **Doc. 10 in In re Anderson, Case 18-40723 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

18        **Doc. 10 in In re Cook, Case 18-41222 (Form B2030 (12/15)** *Disclosure of Compensation of Attorney for Debtor(s)***)**

19        **Local Rules of Practice, United States Bankruptcy Court, Western District of Missouri (Adopted April 11, 2016) Pgs. 1-16 & 29-32**

20        **Form MOW 2016-1.3 (12/2016),** *"Rights and Responsibilities Agreement Between Chapter 7 Debtors and Their Attorneys"* **(blank)**

21        **Jason Amerine Deposition Exhibit 8,** *Attorney-Client Retainer Agreement* **(from the** *In re Rosa* **bankruptcy (Dated July 6, 2017))**

22        **Jason Amerine Deposition Exhibit 14,** *Contract for Post-Petition Chapter 7 Legal Services* **(from the** *In re Rosa* **bankruptcy (Dated July 17, 2017))**

23        *Remarks of Director Cliff White at the 2019 Annual Conference of the National Association of Bankruptcy Trustees* **(Denver, CO, Aug. 23, 2019)**

I.    **BACKGROUND**

Many debtors have difficulty gaining access to bankruptcy protection due to an

inability to pay attorney fees upfront, before a case is filed.  As a result, debtors are

forced to remain in the "sweatbox."  *See* "Life in the Sweatbox," Pamela Foohey, Robert

M. Lawless, Katherine Porter and Deborah Thorne, 94 Notre Dame L. Rev 219 (2018).

Mr. Amerine has witnessed this situation hundreds of time over the course of the past

19 years of providing bankruptcy legal services, often seeing clients subject to the

"sweatbox" for five or six months.  **Exhibit 1,** *Jason C. Amerine's Declaration Pursuant to*

*28 U.S.C. § 1746*, at ¶ 5.  In fact, the "sweatbox" was a situation for three of four of Mr.

Amerine's clients involved in the recently settled adversary matters.[1]

Alternatively, if a debtor is unable to pay an attorney's fee before a bankruptcy

case is filed, but wants to stop the "sweatbox," then she or he can choose between three

disadvantageous options.  The first option is to file his/her case *pro se*, which can

typically clog-up the bankruptcy court's docket with improper filings and risk

contending with lawyers who represented creditors of the debtor.  *See In re Hazlett*, No.

---

[1] Those adversary matters were (i) *In re James / Casamatta vs. Castle Law Office of Kansas
City, P.C.*, Adv. Case No. 18-4168-CAN, (ii) *In re Babikir / Casamatta vs. Castle Law Office
of Kansas City, P.C.*, Adv. Case No. 18-4172-CAN, (iii) *In re Grant / Casamatta vs. Castle
Law Office of Kansas City, P.C.*, Adv. Case No. 18-4194-CAN, & (iv) *In re Hannah /
Casamatta vs. Castle Law Office of Kansas City, P.C.*, Adv. Case No. 18-4196-CAN
(hereafter, collectively, the "**Adversary Cases**").

16-30360, 2019 WL 1567751, at *5 (Bankr. D. Utah April 10, 2019).  A second option is the

use of non-legal bankruptcy filers, who might provide services that are concerning due

to inadequately looking out for the debtor's interests.  *Id*.  Finally, the last option that

Mr. Amerine has come across, on numerous occasions, is a potential client who had

been advised by another lawyer to file a Chapter 13 case that would only achieve

paying attorney's fees and a small dividend to unsecured creditors.  **Exhibit 1** at ¶ 6.

*See also In re Hazlett*, 2019 WL 1567751, at *6.  The obvious purpose of the other lawyer's

advice was to avoid the established law in the Western District of Missouri that

prohibits attorney's fee-only Chapter 13 plans, which purpose was not necessarily in the

best interest of the potential client.

In Mr. Amerine's opinion, public policy should strongly favor assisting debtors

with access to bankruptcy protection, and not seeking to extensively, and excessively,

sanction a lawyer for trying to think 'outside the box' to find a solution that allows

debtors to avoid suffering one of the three objectionable options to the "sweatbox" just

to seek bankruptcy relief.

The sole purpose of the two-contract system used by Mr. Amerine and his firm

was to provide debtor-clients with another *option* instead of being forced to choose

between one of the three objectionable options or waiting four, five, or six months (and

sometimes even longer) to pay his firm's attorneys' fees for a Chapter 7 case.  In every

situation involving the two-contract option, the client was offered an option to pay his

2

firm's attorneys' fees upfront, and in each and every case the two-contract method was

elected by the client. **Exhibit** 2, *Deposition of Jason Amerine (9/5/19)*, at 76:2-:9.

## II.      EVIDENCE FOR THE AMENDED ORDER TO SHOW CAUSE

### A.      BK Billing's Program for Factoring Law Firm Account

Receivable Debts for Post-Petition Services

The two-contract option was not even a possibility for Mr. Amerine's clients until

2017.  In 2017, Mr. Amerine learned about a revolutionary program that was being

promoted by a high-risk lending entity called BK Billing, which was a business that

provided factor-financing to businesses by purchasing account receivable debts.

**Exhibit 3**, *Rule 30(b)(6) Deposition of BK Billing through David Stidham (12/13 & 14/2018)*,

at 12:13-13:9  BK Billing had already provided factor financing to law firms that

provided legal services for construction law, family law, and impaired driving (i.e.

DWI) cases.  *Id*.

BK Billing's new bankruptcy factoring program would purchase account

receivable debts owed to law firms from Chapter 7 clients for legal services provided to

the client after the Chapter 7 bankruptcy was filed.  **Exhibit 2** at 22:18 – 23:2; & **Exhibit 3**

at 19:7-:24.  Under the program, the attorneys' fees for the lawyer's post-petition legal

services would not be collected prior to filing the bankruptcy case if the lawyer and

client chose to enter into a post-petition legal services agreement for the post-petition

work.  **Exhibit 1** at ¶ 8.  BK Billing would then consider purchasing the account

receivable debt owed to the lawyer for the post-petition services in exchange for a fee

charged to the lawyer.  **Exhibit 2** at 24:13-20, 26:4-:22; & **Exhibit 3** at 19:11-20:20.

Mr. Amerine was interested in the BK Billing two-contract program and

contacted the company to discuss becoming a lawyer-client of BK Billing to access the

program.  **Exhibit 1** at ¶ 7; & **Exhibit 2** at 22:22-23:22.  BK Billing then performed due

diligence on Mr. Amerine and his law firm.  **Exhibit 3** at 14:2-15:2, & 17:2-18:18.  BK

Billing would only work with a lawyer and law firm that was a "good fit" for its

program.  *Id*.  The CEO of BK Billing explained the phrase "good fit" meant:

> "An attorney with experience and a good track record with the Bar,
>
> who is compliant with the bankruptcy code and understands the
>
> bankruptcy code well enough to be compliant with it, and local rules.
>
> So we look for experience that way.  And we are looking for financial
>
> viability when we look at financial records.  We are also looking for
>
> attorneys who have a social impact desire to create more access to
>
> legal services through legal innovation."

**Exhibit 3** at 18:8-:18.

If an interested lawyer met BK Billing's criteria and was approved for the new

bankruptcy factoring program, then BK Billing provided the lawyer with resources that

it had developed through research and analysis.  The resources included having an

attorney analyze the BK Billing-lawyer agreement for compliance with professional ethics rules. **Exhibit 3** at 24:7-:24. The firm also provided training to lawyers several times a year in addition to any specific request from a lawyer-client. **Exhibit 3** at 58:1-:10. And, finally, BK Billing provided its lawyer-client with research that had been compiled about providing legal services to Chapter 7 clients through a two-contract, bifurcated, process. **Exhibit 3** at 124:11-125:17.

Around May 24, 2017, Mr. Amerine's law firm was approved for the new BK Billing bankruptcy factoring program and he signed a factoring agreement. **Exhibit 2** at 24:9-25:2; & **Exhibit 3** at 22:19-23:12. The factoring agreement included numerous provisions to ensure the law firm provided quality legal services to its debtor-clients, such as:

> "... the Firm shall provide all the Services the Firm contracted to provide to the Client within a reasonable period following the effective date of the Contract, and such Services will be provided in accordance with all applicable laws and regulations and generally accepted standards of legal practice and management in the relevant community."

**Exhibit 4-A**, *Accounts at Receivable Assignment Agreement (dated May 24, 2017)*, at 2 (§ 4.1). The purpose for these provisions was to confirm the commitment of the law firm

to provide services to its client even after the account receivable debt was factored with BK Billing.  **Exhibit 3** at 28:12-:17.

Castle Law firm also committed to disclose to its clients the existence of the BK Billing factoring agreement, allow the client to ask questions about the potential sale of the account receivable debt, ask the client to acknowledge that all of his or her questions had been answered, and obtain the client's consent to any future assignment of the account receivable debt and disclosure of information for the assignment transaction. **Exhibit 3** at 29:16-31:21; & **Exhibit 4-A** at 2-3 (§ 4.2).

The BK Billing factoring agreement also set forth the terms that BK Billing would factor the law firm's account receivable debt.  The factoring price was initially seventy percent (70%) of the account receivable debt, **Exhibit 3** at 25:3-:11, & **Exhibit 4-A** at 1 (§ 1), but shortly after signing the factoring agreement it was amended to change the rates **Exhibit 3** at 46:13-48:8; & **Exhibit 4-B**, *Amendment to Accounts at Receivable Assignment Agreement (dated June 26, 2017)*, at 1-2 (§ 2.1).  Under the amendment, BK Billing would purchase the account receivable debt from Mr. Amerine's law firm at seventy-five percent (75%) of the amount of the debt, but the firm would initially only receive sixty percent (60%) of the purchase price.  **Exhibit 3** at 47:24-48:8; & **Exhibit 4-B** at 1-2 (§ 2.1). Another fifteen percent (15%) would be placed in an account, often called the "hold back account," and disbursed only if Mr. Amerine's law firm's clients paid the account receivable debts factored with BK Billing.  **Exhibit 2** at 28:15-:24; & **Exhibit 3** at 47:24-

50:9.  As such, the 15% was held by BK Billing as security against defaults by the law

firm's clients.

The hold back account was described by BK Billing's CEO with the following

hypothetical example involving the factoring of a $1,000 account receivable debt from a

law firm's client.  **Exhibit 3** at 47:24–50:9.  BK Billing would purchase the account

receivable debt of $1,000 for $750 and distribute $600 to the law firm.  *Id*.  Another $150

dollars would be placed in the law firm's hold back account.  If the client defaulted on

the payments of the account receivable debt, then the $150 in the hold back account was

used to off-set any default.  *Id*.  In that situation, the law firm would not receive the $150

and bore that risk with any client default.  *Id*.  If the amount of a client's default was

greater than $150, then BK Billing bore the initial risk for any amount above the $150 in

the hold back account.  *Id*.

The risk of default for a client that owed an account receivable debt that was

created shortly after filing a Chapter 7 bankruptcy was apparent.  To address this risk,

BK Billing's factoring agreement with Mr. Amerine's law firm included several

provisions that protected BK Billing beyond the hold back account terms.  For each

account receivable debt the law firm had factored, BK Billing had the right to collect the

debt from the law firm's client who had defaulted on his/her payments.  **Exhibit 3** at

42:9-:21.  However, BK Billing would provide notice to the law firm before commencing

7

any collection activity. *Id*. The law firm would then be provided ten (10) days to buy-back the factored account receivable debt. *Id*.

Despite a significant number of defaults by debtor-clients of the Castle Law firm, BK Billing never pursued collection activities against any of those people. **Exhibit 3** at 41:4-:11.

In addition the delinquent account buy-back provision, the law firm was contractually required to buy-back a factored account receivable debt if it was determined there was a breach of any of the representations and warranties in the factoring agreement, which representations and warranties generally concerned the obligation of the law firm and lawyers to comply with the disclosure requirements to the law firm's debtor-clients and compliance with ethics rules. **Exhibit 3** at 44:3-:12. BK Billing never required Mr. Amerine's law firm to buy-back an account receivable debt because of a breach of a representation or warranty. *Id*.

### B.    Jason Amerine's Due Diligence

Mr. Amerine performed his own due diligence on BK Billing and its new bankruptcy factoring program. **Exhibit 2** at 22:14-23:2, 34:15-:23, & 48:16-52:16; & **Exhibit 5**, *E-mails between Sherri Wattenbarger and Jason Amerine (June 6, 2017)*, 1-2. The problem of a potential debtor client being unable to afford and obtain legal assistance from a lawyer for a Chapter 7 case was well known to Mr. Amerine. **Exhibit 1** at ¶ 5.

On average each month, about 20% to 30% of potential clients that consult with a lawyer from the Castle Law firm suffer under the affordability problem. *Id*. In Kansas, the problem was resolved when Judge Berger issued a decision in *In re Doucet* that permitted Chapter 13 attorneys' fee-only plans. *See In re Doucet*, No. 15-21531 (Bankr. D. Ks. May 3, 2016). In Missouri, however, pursuing attorneys' fee-only Chapter 13 cases is not an option as it was barred by current case law. *See, e.g.*, *In re Arlen*, 461 B.R. 550, 553-555 (Bankr. W.D. Mo. 2011). For this reason, the affordability problem had no solution in Missouri – other than a client enduring months of financial burdens and harassment from creditors while he or she tried to make all of the payments for the legal fees for a Chapter 7 bankruptcy.

Mr. Amerine's due diligence included reviewing legal research that BK Billing made available to its law firm clients. **Exhibit 1** at ¶ 9. He also had lengthy discussions with BK Billing's principals, including its President, Shawn Mawhinney. **Exhibit 1** at ¶ 10; & **Exhibit 2** at 22:14-23:2. Finally, Mr. Amerine conducted his own, independent, research and analysis on the steps for providing legal services through a two-contract process. **Exhibit 1** at ¶ 11; & **Exhibit 2** at 34:15-:23, & 48:16-52:16.

Mr. Amerine also sent an e-mail message to Assistant U.S. Trustee Sherri Wattenbarger to ask about the office's position on bifurcated legal services in Chapter 7 cases. **Exhibit 2** at 49:3-50:11; & **Exhibit 5** at 1-2. She replied that her office does "not object so long as they are done properly" as Mr. Amerine described in his e-mail.

**Exhibit 2** at 50:12-:24; & **Exhibit 5** at 1.  She emphasized the bifurcated legal services should be in writing and the bifurcation "must be reasonable, meaning [] it must be a realistic apportionment of pre and post-petition services."  *Id*.  This inquiry was made shortly *before* the first two-contract client bankruptcy case was filed.  *Cf.* **Exhibit 5** at 1 (e-mails on June 1, 2017); *with In re Kolle*, No. 17-41701 (filed on June 26, 2017).

Mr. Amerine believed Ms. Wattenbarger's reply e-mail meant that bifurcation was permitted by the local U.S. Trustee office, but that certain procedures had to be followed.  **Exhibit 1** at ¶ 13; & **Exhibit 2** at 51:7-:19.  He understood the attorneys' fees for bifurcated pre-petition services would have to be reasonable, and the fees for bifurcated post-petition services would have to be reasonable in relation to those services.  *Id*.  And, most importantly, the client would be informed about and approve of the process.  *Id*.

Mr. Amerine's due diligence led to an objective to, above all else, take all steps possible to thoroughly inform clients about a two-contract process and factoring of the post-filing account receivable debt.  **Exhibit 2** at 56:2-:22.

After performing his due diligence, Mr. Amerine determined pursuing the BK Billing factoring program was worth the risks of default and possible hostile reactions from the local U.S. Trustee's office.  **Exhibit 1** at ¶ 14.  For this reason, he chose to offer the BK Billing factoring program for his Chapter 7 clients who could not afford to pay all of the attorneys' fees before the time when they wanted their case filed.  *Id*.

10

### C.      Castle Law's Two-Contract Process

The Castle Law firm did not use the BK Billing account receivable factoring

program for every Chapter 7 bankruptcy client.  If a client could afford to pay the

attorneys' fees, then that was the option that was used.  **Exhibit 2** at 57:8-:20.  If the

client struggled to afford the attorneys' fees, then the BK Billing two-contract option

was discussed with the client.  **Exhibit 2** at 57:8-:20, 74:25-75:11, & 76:2-:19.  The two-

contract process was only used if the client was comfortable with, and wanted to use,

the process instead of waiting (possibly for numerous months) to pay the attorneys' fees

in advance.  **Exhibit 2** at 56:2-:16, 57:8-:20, & 77:12-:25.

### 1.      Pre-Petition: The Initial Consultation Meeting

The two-contract process began in a similar way as a typical bankruptcy

representation.  The potential client would meet with Mr. Amerine or another lawyer at

the Castle law firm, called an "initial consultation meeting," to discuss the potential

client's interest in seeking bankruptcy relief.  **Exhibit 2** at 57:8-58:22.  The potential

client would complete a comprehensive intake sheet to provide information about his

or her financial situation, such as ownership of real estate and vehicles, value of

mortgages, income, expenses, and debts.  *Id*.  The lawyer would then discuss the

information the potential client provided and if bankruptcy was an option the person

11

would like to consider.  *Id*.  If bankruptcy relief was an option the potential client

wanted to consider, then the lawyer explained the possible bankruptcy options, such as

Chapter 7 or Chapter 13, and attorneys' fees for the firm's representation of the

potential client.  *Id*.

 If the initial consultation meeting resulted in the client hiring the Castle Law

firm, then the client would sign the pre-petition agreement.  The lawyer would provide

the client with the § 342(b) and § 527(a)(2) disclosure forms required by the Bankruptcy

Code.  **Exhibit 1** at ¶ 15.  Additionally, the client would be provided with a thick

packet to take home to address, which included a 31-page questionnaire to answer and

a list of documents that needed to be collected and provided to the law firm.  **Exhibit 2**

at 58:18-59:4.  And, the client was provided with blank copies of (1) the post-petition

agreement that would be used if the client chose to use Castle Law firm for the post-

petition work, and (2) the "*Rights and Responsibilities Agreement Between Chapter 7 Debtors*

*and Their Attorneys*" ("***RARA***"), and advised to review both of those unsigned

documents.  **Exhibit 1** at ¶ 15.  Finally, a second in-person appointment was scheduled,

called the "shell appointment," for the client to return to the law firm with the

completed questionnaire and collected documents, and to sign his or her bankruptcy

skeletal petition.

### 2.    Pre-Petition: The Shell Appointment Meeting

At the shell appointment, a legal staff employee would meet with the client to scan the documents the client brought to determine if most of the necessary documents were present. **Exhibit 2** at 62:1-63:6.  If most of the documents were present, then the client would next meet with Mr. Amerine or another law firm lawyer to review the information on the Chapter 7 skeletal petition, social security verification page, and creditor matrix.  *Id*.  Mr. Amerine also would discuss the next steps for a Chapter 7 case, including whether the client was interested in hiring the law firm for the post-petition work, the post-petition work that would have to occur, a re-review of the costs for the post-petition legal services, the steps with BK Billing factoring an account receivable debt for post-petition services, and the *RARA*.  **Exhibit 1** at ¶ 16.

When the client was comfortable and ready with proceeding with filing a bankruptcy case, including having all questions answered, then the Chapter 7 petition would be printed and signed by the client and the lawyer. **Exhibit 1** at ¶ 17; & **Exhibit 2** at 63:17-:21.  The *RARA* also was signed by the client and attorney.  **Exhibit 1** at ¶ 17.

The client's Chapter 7 skeletal petition was then filed while the client waited in the Castle Law firm's lobby.  **Exhibit 2** at 191:1-:5.

### 3.    Post-Petition: The First Client Meeting

Mr. Amerine or an associate attorney and the client would again meet after the

Chapter 7 bankruptcy petition was filed. **Exhibit 2** at 190:16-191:5. They would re-

review the client's options for the post-petition work, whether to hire the Castle Law

firm for the work, hire another law firm for the work, or complete the work *pro se*.

**Exhibit 1** at ¶ 19. Mr. Amerine also explained the post-petition work would include

preparation, review and signing of the client's bankruptcy schedules and SOFA, and

that this work would have to be performed within the following fourteen (14) days. *Id*.

If the client had not changed his or her decision about using the Castle Law firm

for the post-petition work, then the post-petition agreement was filled-in with the

Chapter 7 case number and signed by the client and Mr. Amerine or the associate.

**Exhibit 1** at ¶ 20. The client also would be provided with forms related to factoring the

post-petition account receivable debt, including an automatic debit form, to review and

sign, and contact information for BK Billing in the event that the client needed to change

the payment terms. *Id*. Lastly, another appointment would be scheduled for the client

to return to review the completed bankruptcy schedules and statement of financial

affairs ("**SOFA**"), and sign those records. *Id*.

**4.      Post-Petition: Castle Law Firm's Post-Petition Legal**

**Services**

To begin, it is important to emphasize that each client is assigned an attorney and paralegal for his or her file, which helps ensure quality work and timely service.

The post-petition work began with analysis of the client's financial records that were brought to the shell appointment.  **Exhibit 1** at ¶ 21; & **Exhibit 2** at 65:4-:12, 65:21-66:1.  A paralegal would review those records and begin inputting information into the client's schedules and SOFA.  **Exhibit 1** at ¶ 21.

A staff member also prepares and sends a letter to the client to remind him or her about the scheduled Chapter 341 Meeting.  **Exhibit 1** at ¶ 21.

Paralegals also work to answer questions from the attorney about a client's file. **Exhibit 1** at ¶ 22.  The paralegal professional also regularly communicates with the client for questions about his or her financial information, including missing information, and to answer non-legal questions from the client.  *Id.*

The attorney and paralegal will also address any creditors that are discovered to be missing from the client's financial paperwork and credit report, including, when necessary, preparing amended schedules and filing those amended schedules to add creditors to the bankruptcy case at no additional charge to the client.  **Exhibit 1** at ¶ 23.

5. **Post-Petition: Appointment to Review the Client's**

 **Schedules & SOFA**

The client would return to the Castle Law firm office for a third appointment

with the attorney and case administrator/paralegal professional in order to discuss and

review the completed bankruptcy schedules and SOFA. **Exhibit 1** at ¶ 24. If the

schedules and SOFA were accurate, then those documents were signed by the client in

order to be filed. *Id.*


6. **Post-Petition: Chapter 341 Meeting, Amended Filings & Other**

 **Tasks**

Prior to the Chapter 341 Meeting, the attorney will prepare for the Chapter 341

Meeting to ensure familiarity with the file, and review the docket for the Chapter 341

Meeting to verify the correct time is scheduled. **Exhibit 1** at ¶ 25. If someone else from

the Castle Law firm needs to cover for the Chapter 341 Meeting, then the lawyer will

communicate with the client about that situation so he/she is aware and comfortable

with the other lawyer's assistance. *Id.* The lawyer also will answer questions the client

has prior to a court event, such as a Chapter 341 Meeting. *Id.*

When the Chapter 341 Meeting occurs, then the lawyer will review all of the

reaffirmation record(s) and situation(s) with the client, and talk with the client about the

progress of the bankruptcy, and answer any questions after the Meeting.  **Exhibit 1** at ¶ 26.

After the Chapter 341 Meeting, the attorney and paralegal will coordinate work to complete and file reaffirmation agreements, and prepare and sign any amended schedules that are necessary.  **Exhibit 1** at ¶ 27.  A calendar reminder will be made to address the client's tax returns for that year (or the next year).  *Id*.  The lawyer will also review any reaffirmation agreements that are received from a creditor after the Chapter 341 Meeting, and answer questions from the client about such reaffirmation agreements.  *Id*.  Additionally, the lawyer and paralegal will work to obtain and send records to the Chapter 7 trustee that were requested at the Chapter 341 Meeting.  *Id*.

And, when needed, the lawyer will attend with the client any Chapter 341 Meetings that are continued.  **Exhibit 1** at ¶ 28.

Occasionally, the lawyer and paralegal also will prepare and file updates to the bankruptcy case, such as an updated client address.  **Exhibit 1** at ¶ 29.  And, the lawyer will often have calls with the client about the client's future financial decisions and the discharge process.  *Id*.

And, as mentioned above, there are sometimes situations in which creditors must be added to the client's bankruptcy case.  **Exhibit 1** at ¶ 30.  Based on Mr. Amerine's experience, the need to amend a filing, such as adding a creditor to the bankruptcy case, occurs more often when a bankruptcy petition was filed without

17

having the completed schedules and SOFA.  **Exhibit 2** at 71:8-73:1.  Still, any necessary

amended filings are carried out because the Castle Law firm commits, under the post-

petition agreement, to providing the services to facilitate a client receiving a Chapter 7

discharge.  **Exhibit 1** at ¶ 30.

There are numerous other tasks that the Castle Law firm provides post-petition

to aid the client's bankruptcy case and/or likelihood of a discharge, including:

(i)     Staff will perform a search of on-line court records for judgment

        information;

(ii)    Fax secured intention letters to creditors and prepares notations in the file

        about those letters;

(iii)   Fax authorization letters to creditors and prepares notations in the file

        about those letters;

(iv)    Fax notices of various filings to creditors;

(v)     Prepare reaffirmation agreements and discusses those agreements with

        clients;

(vi)    Print, scan, and save reaffirmation agreements in the client's file; and

(vii)   Send the discharge order to creditors.  **Exhibit 1** at ¶ 31.

In addition to the identified services, there are numerous tasks that Castle Law

commits to address, such as answering communications from creditors, responding to

audits from the U.S. Trustee's office, and working to manage paperwork sought by

18

different Chapter 7 trustees.  **Exhibit 1** at ¶ 32.  And, importantly, the client is encouraged to send all creditor calls to the Castle Law firm for the firm to address on behalf of the client.  *Id*.

Finally, the Castle Law firm provides its clients with access to a credit repair program that has a $1,000.00 value if purchased independently, and post-discharge services for addressing errors with a client's creditor report.  **Exhibit 1** at ¶ 33.

### D.    Performance of the Two-Contract Process

The two-contract process achieved the goal of increasing access for legal services for clients who could not afford the advance legal fee payment.  **Exhibit 1** at ¶ 34.  Out of the approximately 109 Chapter 7 bankruptcy cases that used the two-contract process in the Western District of Missouri, only one (1) client did not achieve a discharge of his/her debts.  *Id*. (*See In re Hughes*, No. 17-42191).  And, there were no files that involved any type of delay problems, which Mr. Amerine attributes to the extensive planning and discussions with the client about the two-contract process.  *Id*.

Plus, the goal of decreasing the length of time the client suffered in the "sweatbox" was absolutely achieved.  **Exhibit 1** at ¶ 34.

Financially, the Castle Law firm never received a 15% holdback payment from BK Billing due to the significant amount of defaults by the firm's clients.  **Exhibit 2** at 246:25-247:3.  In other words, the firm only received the initial 60% price that the

19

account receivable debt was factored with BK Billing.  **Exhibit 3** at 47:24-48:5.  For a

$2,000 attorneys' fee, the high default rate meant the Castle Law firm only received

$1,200 from BK Billing from the initial sale of the account receivable debt ($2,000 x .6 =

$1,200).  Thus, the Castle Law firm realized a significantly lower amount of net income

than if a client was forced to suffer the "sweatbox" and pay the typical $1,410.00

attorneys' fees and associated $410 of expenses (or expenses of $455 for a joint filing) in

advance of filing a Chapter 7 bankruptcy case.  **Exhibit 1** at ¶ 35.

In addition, there is a risk BK Billing will attempt in the future to collect the

default amounts from the Castle Law firm because there was a negative balance in the

holdback account due to the high rate of client defaults.  **Exhibit 3** at 154:6-:19.


### E.      Evolution of the Two-Contract Process

#### 1.      The Western District of Missouri U.S. Trustee Office

The local U.S. Trustee office's hostile attitude against debtors' attorneys was

well-known prior to starting the two-contract system.  **Exhibit 1** at ¶ 36.  This was the

reason Mr. Amerine sent an e-mail message to Assistant U.S. Trustee Sherri

Wattenbarger to ask about the office's position on bifurcated legal services in Chapter 7

cases.  *Id.*

Later, in October 2017, another local debtor's attorney, Ms. Rachel Foley,

contacted the U.S. Trustee office to request a meeting between the Acting Trustee,

Daniel Casamatta, and the principals of BK Billing, who were in Kansas City to attend a multi-day bankruptcy conference/seminar. **Exhibit 1** at ¶ 38; & **Exhibit 6**, *Deposition of William Sean Mawhinney (12/14/18)*, at 61:25-62:25. The BK Billing principals wanted to introduce themselves to Mr. Casamatta and informally discuss the company's new, revolutionary, factoring program that would increase access to legal services for debtors who could not afford to pay for the legal services prior to filing a bankruptcy case. **Exhibit 6** at 64:9-65:23. Mr. Casamatta, however, would not meet with BK Billing's principals. **Exhibit 3** at 183:22-:5; & **Exhibit 6** at 61:25-62:25.

Earlier, in August of 2017, an attorney from the local U.S. Trustee office, Mr. Miller, contacted Mr. Amerine to schedule a review of the paper files for some of the first bankruptcy cases that used the new two-contract system. **Exhibit 1** at ¶ 37. Mr. Amerine offered to meet to discuss the new process, the benefits that he hoped could be achieved for the firm's clients, and any revisions the U.S. Trustee office suggests for the process. *Id*. Mr. Miller, though, would not meet to discuss those topics. *Id*.

Later, as the Court is aware, Mr. Miller was the lead attorney in the four Adversary Cases that lasted for more than three years. By the time that Mr. Casamatta agreed to settle his office's claims against Mr. Amerine and his law firm, BK Billing had ceased its bankruptcy factoring program. **Exhibit 2** at 247:9-248:9.

### 2.      Discussions With The Kansas U.S. Trustee Office

The Kansas U.S. Trustee office also investigated the Castle Law firm's two-

contract process.  **Exhibit 1** at ¶ 39.  Part of that investigation involved an Assistant U.S.

Trustee from that office conducting five Rule 2004 examinations of clients that chose to

use the two-contract system for their Kansas bankruptcy case.  *Id.*

Later, around October of 2018, a meeting was held with three members of the

Kansas U.S. Trustee's office, including the Assistant U.S. Trustee who conducted the

2004 examinations, to discuss the two-contract system, and the processes and steps of

the system.  **Exhibit 1** at ¶ 40.  The principals from that office explained concerns they

had about a couple of the parts of the system.  *Id.*  Later, Mr. Amerine offered to make

changes to the system to address the concerns, including providing proposed templates

for a new B2030 disclosure form to file in the bankruptcy cases.  **Exhibit 1** at ¶ 41.  The

purpose of the meeting and subsequent offer was to find a process that the Kansas

office found to be acceptable, but would still allow clients to avoid the "sweatbox"

problem.  *Id.*

Overall, the attitude of the Kansas U.S. Trustee office was drastically different

than the Western District of Missouri office.  The Kansas office clearly was open to

conducting a discussion about the new system to address areas of concern.  The

Western District of Missouri office, on the other hand, seemed to immediately conclude

the new system was based upon devious motives held by Mr. Amerine, and sought to

impose extraordinary penalties for daring to try a new approach to solve clients'

affordability problems.  This distinction in approaches and attitudes by the two offices

is highlighted by the fact that Mr. Miller, of the Western District of Missouri office, was

invited to attend the meeting with the principals of the Kansas office, which invitation

he refused.  **Exhibit 1** at ¶ 42.

### 3.      The Attorney Compensation Disclosure Form

One of the concerns discussed with the Kansas U.S. Trustee office was the

information included on the B2030 disclosure form filed for the two-contract cases.

**Exhibit 1** at ¶ 40.  The Assistant U.S. Trustees explained they would like to receive and

review additional information than just the amounts disclosed on typical, advance

payment, cases.  *Id.*

The typical disclosure had been used for the two-contract system because

comments about the form had not occurred.  **Exhibit 1** at ¶ 47.  The research provided

by BK Billing, as well as the independent research conducted by Mr. Amerine, did not

address the disclosures on the B2030 form.  *Id.*  Instead, the research mostly focused on

whether a two-contract, bifurcated, legal service was allowed under existing

bankruptcy and ethics laws, and whether factoring a post-petition account receivable

debt was allowed under those laws.  *Id.*  The research reflected that courts, such as the

Seventh Circuit Court of Appeals, had signaled bifurcated legal services was lawful.  *Id.*

But, specific details on how to perform the bifurcated services and process were not

addressed in those cases.  And, the BK Billing factoring program was brand new, which

meant there had not been an established precedent for conducting the two-contract

process.  **Exhibit 1** at ¶ 48.

Around the time of the Kansas meeting, Mr. Amerine learned about a

bankruptcy court in Delaware that issued a ruling that mentioned information in the

lawyer's B2030 form, which that court did not criticize.  **Exhibit 1** at ¶ 49.  *See also*

**Exhibit 7**, *Letter dated November 8, 2018 in In re Ndon*, *Del. Bankr. Case No. 18-10333*, at 1-

6.  Mr. Amerine used that ruling to change and improve the information in the

disclosure form filed in the two-contract cases, which updated form was provided to

the Kansas U.S. Trustee office to comment upon.  *Id*.  Mr. Amerine also began to use

that updated format for the two-contract bankruptcy cases filed in the Western District

of Missouri.  *Id*.

As a result of the updated form, Mr. Amerine began to file an initial form that

showed no charges for the limited pre-petition services, and a supplemental form to

show the post-petition attorneys' fees that were charged for post-petition services, as

well as the plan to factor the post-petition account receivable debt.  **Exhibit 1** at ¶ 50.

Another shortfall that was discovered for the disclosure form concerned the

amount of the attorneys' fee that was disclosed in the two-contract cases.  In early cases,

the form disclosed the net amount of money the Castle Law firm anticipated receiving

when the post-petition account receivable debt was factored with BK Billing.  **Exhibit 1**

at ¶ 51; & **Exhibit 2** at 122:1-:21.  By September 2017, a short while after the two-contract

process began, the shortfall was discovered and corrected.  **Exhibit 1** at ¶ 51; & **Exhibit**

**2** at 122:1-:21.  Afterward, the gross amount of the post-petition attorneys' fee was

disclosed even though there was a plan to try and factor the account receivable debt for

a price that was less than the gross amount.  **Exhibit 1** at ¶ 52.

### 4.      The Amount of Attorneys' Fee

Another topic raised by the principals of the Kansas U.S. Trustee office and

discussed at the Kansas meeting was the amount of pre-filing fees charged for the two-

contract system.  Specifically, the principals explained that they did not like having no

fees charged for the limited pre-filing services.  **Exhibit 1** at ¶ 40.  The principals also

expressed a concern that a post-filing fee could be increased to compensate for pre-

filing services.  *Id.*

Mr. Amerine answered the concerns from the principals of the Kansas U.S.

Trustee office by explaining that his firm traditionally, in the past, charged more for a

bankruptcy that involved filing a petition without completed schedules and the SOFA

form due to the increased amount of work that had occurred on those types of files.  *See,*

*e.g.*, **Exhibit 1** at ¶ 43; & **Exhibit 2** at 71:8-73:1.  Mr. Amerine also explained that the firm

realized a lower, net, amount from the post-petition attorneys' fees due to the rate of

defaults by the clients and BK Billing using the 15% hold back amount to off-set the

defaults. **Exhibit 1** at ¶ 43.

Due to the higher default rate and the comments from the meeting with the

Kansas U.S. Trustee office, Mr. Amerine later changed the two-contract system to have

a small fee for pre-petition legal services. **Exhibit 1** at ¶ 44. *See, e.g., In re Brown*, No. 18-

42945 (filed on November 30, 2018).  The goal with the small pre-petition fee was

twofold.  First, the pre-petition attorneys' fee would reduce the overall debt charged for

the Chapter 7 bankruptcy service as he would lower the post-petition fee charged to

clients. **Exhibit 1** at ¶ 45.  He did not want to increase the total amount of attorneys'

fees charged to a client for a Chapter 7 service beyond $2,000 even though he knew the

risk of increased post-petition work continued to exist. *Id*.  Second, the small pre-

petition fee would possibly resolve the concern expressed by the Kansas U.S. Trustee

office that "something" had to be charged for pre-petition services as those services

could not be offered for free. **Exhibit 1** at ¶ 46.  The small pre-petition attorneys' fee

could achieve those goals while still limiting a client's affordability hardship. *Id*.


### 5.    The Bankruptcy Expenses

Another shortfall that Mr. Amerine discovered was the absence of collecting the

pre-petition bankruptcy expenses from the client for the two-contract system. **Exhibit 1**

at ¶ 53.  That issue occurred in some of the early bankruptcy cases and resulted in the

pre-petition bankruptcy expenses mistakenly being included in the post-petition

account receivable debt that was factored with BK Billing. *Id.*

The situation was not discovered before the two-contract process was

implemented because of the focus on explaining the two-contract, bifurcated, process to

the client and striving to make sure the client understood all of the points of that option.

**Exhibit 1** at ¶ 54.

Once the issue was identified, early during the consolidated Adversary Cases,

then the process was changed to ensure the pre-petition bankruptcy expenses were

collected before a Chapter 7 case was filed.  **Exhibit 1** at ¶ 55.


### 6.    The *Rights and Responsibilities Agreement* Form

The final issue that was discovered and addressed involved the *RARA* form

agreement in the Western District of Missouri.

Every bankruptcy case that Mr. Amerine had represented a client had involved

having him and the client signing the form agreement.  **Exhibit 1** at ¶ 56.  The form

addresses the roles for the lawyer and client, and what each person needs to do to fulfill

those roles.  A detriment of the form, though, is the insertion of another's language on

how to explain the roles, which can sometimes create confusion compared to the

ordinary – *and lawful* – explanations that Mr. Amerine provides to clients.

Still, the use of the form had become such a routine that Mr. Amerine did not consider not using the form for the two-contract system because he was not focused on the fact the form was optional. **Exhibit 2** at 97:18-:25. For this reason, he always provided a blank copy of the form to clients at the initial consultation meeting to review before they returned for the shell appointment meeting.

And, importantly, use of the *RARA* form did not stop Mr. Amerine from providing the extensive explanations about the BK Billing factoring program, the two-contract process, the pre-petition services that would be performed for no fee (and later for a small fee), the post-petition services that would be performed for the $2,000 fee (and later a $1,400 fee), the options to not use the Castle Law firm for the post-petition services, and that he would not withdraw as the client's attorney unless advance notice was provided and the bankruptcy court approved that withdrawal. **Exhibit 1** at ¶ 58.

In hindsight, the use of the form created a risk of confusion with the Castle Law firm's client. **Exhibit 2** at 99:22-100:4. Not one time, however, did a client communicate to anyone at the Castle Law firm any level of confusion about the two-contract process, signing the post-petition agreement for post-petition services and post-petition attorneys' fees, or paying the post-petition attorneys' fees through the checking account withdrawals sent to BK Billing. **Exhibit 1** at ¶ 59. In Mr. Amerine's view, the absence of any communication about any confusion is due to the extensive explanations and disclosures that were made to the client. *Id.*

28

III.     **RESPONSE TO THE AMENDED ORDER TO SHOW CAUSE**

A.     **Bankruptcies Were Not Filed as "Emergency" or "Quick**

   **File" Cases**

The Court contends in the *AOSC* that all of the Chapter 7 cases were "filed as a

chapter 7 emergency or 'quick file basis[.]'" *AOSC* at 4.  This contention is incorrect.

The cases that are the subject of the *AOSC* were purposefully planned to use and

follow the two-contract process, which process was a new system for the Castle Law

firm, to solve the affordability problem experienced by a client.  The planning and two-

contract process involved only preparing, pre-petition, the client's skeletal bankruptcy

petition, creditor matrix, social security verification, and the B2030 disclosure form.

There is no legal requirement that an "emergency" must exist to excuse

completing and filing the schedules and SOFA for a Chapter 7 bankruptcy case when

the bankruptcy petition is filed.  *See* Fed. R. Bankr. P. 1007(c).  Instead, a client has

fourteen (14) days to complete and file the schedules and SOFA.  *Id.*

B.     **Compensation Disclosures Showed A Lower Attorney Fee**

The Court contends in the *AOSC* that the B2030 attorney compensation

disclosure form filed in all of the Chapter 7 cases was dated after each case was filed

and reflected "a lower attorney fee than what Amerine and Castle Law actually charged

the debtors[.]"  *AOSC* at 4.

As explained above, in **Section II.E.3**, pages 23-25 *infra*, the disclosure forms filed

in early two-contract cases mistakenly referenced the net amount that was expected

from factoring the post-petition account receivable debt with BK Billing.  That shortfall

was discovered and changed by September 14, 2017, when Mr. Amerine began to use

the gross amount of the post-petition attorneys' fee and not the net factoring amount.

*Cf*. Doc. 9 in *In re Gould*, No. 17-42125, at 1 (filed Aug. 22, 2017 and showing the net

amount after factoring), *with* Doc. 15 in *In re Gould*, No. 17-42125, at 1 (filed Sept. 14,

2020 and reflecting the gross amount), *&* Doc. 10 in *In re Mackey*, No. 17-42465, at 1 (filed

Sept. 22, 2017 and showing the gross amount).


C.      **The Post-Petition Accounts Receivables Were Not Factored**

        **for a 25% Fee**

The Court contends in the *AOSC* that the Castle Law firm factored the post-

petition attorneys' fee account receivable debt to BK Billing for a 25% fee.  *AOSC* at 4.

As explained above, the amended factoring agreement with BK Billing provided

that it would pay the Castle Law firm seventy-five percent (75%) of the value of the

account receivable debt owed by the firm's client.  However, the amended factoring

agreement also provided that only sixty percent (60%) would be initially transferred

shortly after the time when the account receivable debt was factored.  Another fifteen

percent (15%) was placed into a hold back account to provide security to BK Billing for

any defaults on account receivable debts owed by Castle Law firm's clients.

The 15% hold back amount was cross-collateralized, meaning the 15% from the

account receivable debt from client 'A' also served as security for default of the

payment of the account receivable debt from client 'B.'  The cross-collateralization

meant that any default by a Castle Law firm client would harm the firm's ability to

receive the 15% holdback amount.

Over the course of approximately 20 months in which the Castle Law firm

participated in BK Billing's bankruptcy factoring program, until the program could not

be used as a result of the Court's holding in the *In re Hughes* matter (No. 18-42590), the

firm never received a single cent from the hold back account maintained by BK Billing.

Hence, after the defaults were addressed, the Castle Law firm ended up factoring

the post-petition account receivable debt for a disappointing 40% cost.


### D.   The Absence of a Pre-Petition Fee Was Not Part of a

### "Sham"

The Court concluded in the *AOSC* that, due to the fact that the Castle Law firm

did not charge any fees for the limited pre-petition services provided to a client, then

the post-petition attorneys' fee was a "sham" to "allow Amerine and Castle Law to be

paid . . . in apparent violation of the automatic stay and the discharge injunction."
*AOSC* at 4.  This accusation is wrong.

The use of the two-contract process was not accomplished on a hurried basis to address an emergency that did not allow time for planning.  Instead, the process was evaluated by reviewing and analyzing the research provided by BK Billing and conducting independent research, including contacting the local U.S. Trustee office.  The forms provided by BK Billing as guides for the process were also reviewed and edited to meet Mr. Amerine's views on required disclosures.  The review of the process never stopped and resulted in several changes to the forms and structure utilized for the Castle Law firm's the two-contract process.

The advanced planning allowed the pre-petition services to be carefully evaluated and structured to limit the services to only the bare essential to provide the necessary and appropriate advice to the client and complete the bankruptcy skeletal petition.  *See, e.g.*, **Exhibit 2** at 56:6-57:2.  The limited service was offered at no charge because charging a client for pre-petition attorneys' fees defeated the goal of solving the client's affordability problem, which problem had made paying all of the attorneys' fees in advance a hardship.

The Castle Law firm has regularly charged clients a greater amount for attorneys' fees for bankruptcy filings that involved not completing and filing the schedules and SOFA when the petition was filed.  *See, e.g.*, **Exhibit 2** at 71:8-73:1.  A higher amount is

charged because those types of cases typically involve more work by the lawyers and

staff. *Id.*

In these new two-contract cases, the higher post-petition fee was charged due to

the anticipate increased work, similar to the firm's practice prior to BK Billing's new

factoring program, and due to the uncertainty and risks of future hearings and inquiries

by the local U.S. Trustee office.  The settled consolidated Adversary Cases and this

Court's *AOSC* are examples of the possible risks and justification for charging a higher

post-petition fee.


### E.     The Actual Compensation Was Disclosed Prior to the

###         Settlement List

The Court contended in the *AOSC* that "the actual compensation for legal

services Amerine and Castle Law charged the debtors was never disclosed to the Court

until the Court ordered the list be produced as part of its Order approving settlement."

*AOSC* at 4.  This is not true.

To begin, as the Court is aware from reviewing the filings in each case, the

attorney compensation disclosure form used by Mr. Amerine and the Castle Law firm

was form "B2030,"[2] which was form was titled "*Disclosure of Compensation of Attorney for Debtor(s)*."  A blank version of form B2030 is attached as **Exhibit** 8.

Form B2030 sets forth several standardized statements about the disclosure of the identified information.  For example, the standardized statement for information about the amount of compensation is:

> "1.  Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> For legal services, I have agreed to accept . . . . . . . . . . . . . . $ _____
>
> Prior to filing of this statement I have received . . . . . . . . . $ _____
>
> Balance Due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____ "

**Exhibit 8** at 1.

In the second paragraph, form B2030 sought information about the source of past compensation.  Specifically, the form provides:

> "2.  The source of compensation paid to me was:

---

[2]  The form appears to have been created or officially adopted in December of 2015 due to the "(12/15)" next to the form name.

☐ Debtor                    ☐ Other (specify)"

**Exhibit 8** at 1.

The third paragraph required information about the source for any future

compensation, and is/was worded as:

"3.  The source of compensation to be paid to me is:

☐ Debtor                    ☐ Other (specify)"

**Exhibit 8** at 1.

The fourth paragraph sought information about any agreement to share

compensation, and specifically provided:

4.  ☐  I have not agreed to share the above-disclosed compensation with any

other person unless they are members and associates of my law firm.

☐  I have agreed to share the above-disclosed compensation with a [sic]

other person or persons who are not members or associates of my law firm.  A copy of

this agreement, together with a list of the names of the people sharing in the

compensation, is attached."

 **Exhibit 8** at 1.


1.      *In re Kolle***:**

In the *In re Kolle* case, the initial B2030 form, titled "*Disclosure of Compensation of*

*Attorneys for Debtor(s)*," was filed on July 10, 2017 as Document 8.  Exhibit 9-A at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $1,690 for legal services.  Exhibit 9-A at 1.  The disclosure also reported that no compensation was received prior to filing the client's bankruptcy.[3]  *Id*.  For the second paragraph of form B2030, Mr. Amerine also reported that $335.00 of the filing had been paid to the Clerk of the Court.  *Id*.  Mr. Amerine reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who is Ms. Kolle.  *Id*.  Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm.  *Id*.

The disclosure for the "agreed to accept" amount, which is the amount to be received in the future, was the net amount of attorneys' fees for the post-petition agreement after BK Billing agreed to factor Ms. Kolle's account receivable debt.  Mr. Amerine believed the disclosure of the net amount was the information that was required.

As mentioned above, subsequent conversations with BK Billing principals about what they were seeing in other jurisdictions led to the conclusion to file an amended B2030 form to show the gross attorneys' fee amount for the post-petition legal services,

---

[3]  Form B2030 confusingly uses the phrase "[p]rior to filing this statement" when the statute and Bankruptcy Rule require disclosure of compensation paid before the bankruptcy case was filed, not before the B2030 form is filed.

which account receivable debt was factored with BK Billing.  As a result, on August 30, 2017, a supplemental disclosure was filed, titled "Disclosure of Compensation of Attorney for Debtor(s) – Amended," which showed the gross account receivable for attorneys' fees charged to Ms. Kolle for post-petition legal services.  *See* Exhibit 9-B at 1.  The amount of the amount of the attorneys' fee, which was the gross account receivable, was $2,500.00.  *Id*.

Ms. Kolle was charged $2,500 for the post-petition legal services that were provided to her.  **Exhibit 1** at ¶ 61.

Ms. Kolle only paid $200 for her bankruptcy expenses prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 61.  The $200 was applied to her credit counseling course, the costs for a credit report, and part of the filing fee costs.  *Id*.  As such, there was still $200 that was unpaid for the $335 filing fee.  *Id*.

The Castle Law firm paid the full $335.00 filing fee for Ms. Kolle's Chapter 7 bankruptcy.  For this reason, the $200 that Ms. Kolle had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,700.00.  The full account receivable amount, $2,700, was then factored with BK Billing.

Accordingly, Ms. Kolle's account receivable debt factored with BK Billing was *not* the amount of attorneys' fees charged by the Castle Law firm for post-petition legal

services.  The amount of attorneys' fees for post-petition services was $2,500, which was the amount disclosed on the amended B2030 form filed on August 30, 2017.


### 2.      *In re Gould*:

In the *In re Gould* case, the initial B2030 form was filed on August 22, 2017 as Document 9.  **Exhibit 10-A** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $1,425.00 for legal services.  **Exhibit 10-A** at 1.  The disclosure also reported that no compensation was received prior to filing the client's bankruptcy.  *Id.*  For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid to the Clerk of the Court.  *Id.*  He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who is Ms. Gould.  *Id.*  Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm.  *Id.*

Similar to the *In re Kolle* matter (discussed above), the disclosure for the "agreed to accept" amount (the amount to be received in the future) was the net amount of attorneys' fees for the post-petition agreement after BK Billing agreed to factor Ms. Gould's account receivable debt, which is the information Mr. Amerine believed was required for the form.

On September 14, 2017, a supplemental disclosure was filed, which showed the gross account receivable for attorneys' fees charged to Ms. Gould for post-petition legal services.  *See* **Exhibit 10-B** at 1.  The amount of the post-petition attorneys' fee was $2,000.00.  *Id.*

Thus, Ms. Gould was charged $2,000 for the post-petition legal services that were provided to her.  **Exhibit 1** at ¶ 62.

Similar to Ms. Kolle, Ms. Gould only paid $100 for her bankruptcy expenses prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 62.  The $100 was applied to her credit counseling course, the costs for a credit report, and $35 of the court filing fee.  *Id.*  As such, there was still $300 that was unpaid for the $335 filing fee.  *Id.*

The Castle Law firm paid the full $335.00 filing fee for Ms. Gould's Chapter 7 bankruptcy.  For this reason, the $300 that Ms. Gould had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,300.00.  **Exhibit 1** at ¶ 62.  The full account receivable amount, $2,300, was then factored with BK Billing.

Accordingly, Ms. Gould's account receivable debt factored with BK Billing was ***not*** the amount of attorneys' fees charged by the Castle Law firm for post-petition legal services.  The amount of attorneys' fees for post-petition services was $2,000, which was the amount disclosed on the amended B2030 form filed on September 14, 2017.

3.       *In re Mackey*:

In the *In re Mackey* case, the initial B2030 form was filed on September 22, 2017 as Document 10.  **Exhibit 11** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $2,000.00 for legal services.  **Exhibit 11** at 1.  The disclosure also reported that no compensation was received prior to filing the client's bankruptcy.  *Id.*  For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid to the Clerk of the Court.  *Id.*  He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who is Mr. Mackey.  *Id.*  Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm.  *Id.*

Mr. Mackey was charged $2,000 for the post-petition legal services that were provided to him.  **Exhibit 1** at ¶ 63.

Similar to Ms. Kolle and Ms. Gould, Mr. Mackey only paid $100 for his bankruptcy expenses prior to the filing of his Chapter 7 case.  **Exhibit 1** at ¶ 63.  The $100 was applied to his credit counseling course, the costs for a credit report, and $35 of the filing fee.  *Id.*  There was still $300 that was unpaid for the $335 filing fee.  *Id.*

The Castle Law firm paid the full $335.00 filing fee for Mr. Mackey's Chapter 7 bankruptcy.  For this reason, the $300 that Mr. Mackey had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which

40

caused the account receivable to be $2,300.00. **Exhibit 1** at ¶ 63. The full account

receivable amount, $2,300, was then factored with BK Billing.

Thus, Mr. Mackey's account receivable debt factored with BK Billing was **_not_** the

amount of attorneys' fees charged by the Castle Law firm for post-petition legal

services. The amount of attorneys' fees for post-petition services was $2,000, which was

the amount disclosed on the B2030 form that was filed with the Court.

### 4.      *In re Long*:

In the *In re Long* case, the initial B2030 form was filed on November 27, 2017 as

Document 14. **Exhibit 12** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed

to accept" $2,100.00 for legal services. **Exhibit 12** at 1. The disclosure also reported that

no compensation was received prior to filing the client's bankruptcy. *Id.* For the second

paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid

to the Clerk of the Court. *Id.* He reported, for paragraphs 3 and 4 of form B2030, that

the source of the compensation was and would be the "Debtor," who is Ms. Long. *Id.*

Finally, Mr. Amerine disclosed that he had not agreed to share compensation with

anyone outside of the Castle Law firm. *Id.*

Ms. Long was charged $2,100 for the post-petition legal services that were

provided to her. **Exhibit 1** at ¶ 64.

In contrast to some of the previously discussed clients, Ms. Long did not pay any money for her bankruptcy expenses prior to the filing of her Chapter 7 case. **Exhibit 1** at ¶ 64. The Castle Law firm also paid the full $335.00 filing fee for Ms. Long's Chapter 7 bankruptcy. *Id.*

For these reasons, the pre-petition expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,500.00. **Exhibit 1** at ¶ 64. The full account receivable amount, $2,500, was then factored with BK Billing.

As such, Ms. Long's account receivable debt factored with BK Billing was *not* the amount of attorneys' fees charged by the Castle Law firm for post-petition legal services. The amount of attorneys' fees for post-petition services was $2,100, which was the amount disclosed on the B2030 form that was filed with the Court.

### 5. *In re Robinson*:

In the *In re Robinson* case, the initial B2030 form was filed on November 29, 2017 as Document 9. **Exhibit 13** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $2,000.00 for legal services. **Exhibit 13** at 1. The disclosure also reported that no compensation was received prior to filing the client's bankruptcy. *Id.* For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid

to the Clerk of the Court. *Id*. He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who is Ms. Robinson. *Id*. Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm. *Id*.

Ms. Robinson was charged $2,000 for the post-petition legal services that were provided to her. **Exhibit 1** at ¶ 65.

Similar to Ms. Long, Ms. Robinson did not pay any money for her bankruptcy expenses prior to the filing of her Chapter 7 case. **Exhibit 1** at ¶ 65. The Castle Law firm also paid the full $335.00 filing fee for Ms. Robinson's Chapter 7 bankruptcy. *Id*.

Mr. Amerine chose to waive the pre-petition expenses and most of the court filing fee that the firm had paid. For this reason, only $70 from the filing fee was included in the account receivable, which included the $2,000 attorneys' fee for post-petition services. **Exhibit 1** at ¶ 65. The full account receivable amount, $2,070, was then factored with BK Billing.

Hence, Ms. Robinson's account receivable debt factored with BK Billing was *not* the amount of attorneys' fees charged by the Castle Law firm for post-petition legal services. The amount of attorneys' fees for post-petition services was $2,000, which was the amount disclosed on the B2030 form that was filed with the Court.

6.  *In re Franklin*:

In the *In re Franklin* case, the initial B2030 form was filed on December 22, 2017 as

Document 9.  **Exhibit 14** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed

to accept" $2,000.00 for legal services.  **Exhibit 14** at 1.  The disclosure also reported that

no compensation was received prior to filing the client's bankruptcy.  *Id*.  For the second

paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid

to the Clerk of the Court.  *Id*.  He reported, for paragraphs 3 and 4 of form B2030, that

the source of the compensation was and would be the "Debtor," who was Mr. Franklin.

*Id*.  Finally, Mr. Amerine disclosed that he had not agreed to share compensation with

anyone outside of the Castle Law firm.  *Id*.

Mr. Franklin was charged $2,000 for the post-petition legal services that were

provided to him.  **Exhibit 1** at ¶ 66.

Similar to Ms. Long, Mr. Franklin did not pay any money for his bankruptcy

expenses prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 66.  The Castle Law

firm also paid the full $335.00 filing fee for Mr. Franklin's Chapter 7 bankruptcy.  *Id*.

For these reasons, the pre-petition expenses and the court filing fee were

included in the account receivable debt for post-petition legal services, which caused

the account receivable to be $2,400.00.  **Exhibit 1** at ¶ 66.  The full account receivable

amount, $2,400, was then factored with BK Billing.

44

Accordingly, Mr. Franklin's account receivable debt factored with BK Billing was _not_ the amount of attorneys' fees charged by the Castle Law firm for post-petition legal services.  The amount of attorneys' fees for post-petition services was $2,000, which was the amount disclosed on the B2030 form that was filed with the Court.


      **7.**     ***In re Harvey*:**

In the *In re Harvey* case, the initial B2030 form was filed on January 25, 2018 as Document 10.  **Exhibit 15** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $2,000.00 for legal services.  **Exhibit 15** at 1.  The disclosure also reported that no compensation was received prior to filing the client's bankruptcy.  *Id.*  For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid to the Clerk of the Court.  *Id*.  He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who was Ms. Harvey.  *Id*.  Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm.  *Id*.

Ms. Harvey was charged $2,000 for the post-petition legal services that were provided to her.  **Exhibit 1** at ¶ 67.

Similar to Ms. Long and Mr. Franklin, Ms. Harvey did not pay any money for her bankruptcy expenses prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 67.  The

Castle Law firm also paid the full $335.00 filing fee for Ms. Harvey's Chapter 7 bankruptcy. *Id.*

For these reasons, the pre-petition expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00. **Exhibit 1** at ¶ 67. The full account receivable amount, $2,400, was then factored with BK Billing.

Accordingly, Ms. Harvey's account receivable debt factored with BK Billing was <u>not</u> the amount of attorneys' fees charged by the Castle Law firm for post-petition legal services. The amount of attorneys' fees for post-petition services was $2,000, which was the amount disclosed on the B2030 form that was filed with the Court.

8.      *In re Washington***:**

In the *In re Washington* case, the initial B2030 form was filed on February 13, 2018 as Document 9. **Exhibit 16** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $2,000.00 for legal services. **Exhibit 16** at 1. The disclosure also reported that no compensation was received prior to filing the client's bankruptcy. *Id.* For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid to the Clerk of the Court. *Id.* He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who was Ms.

Washington.  *Id.*  Finally, Mr. Amerine disclosed that he had not agreed to share

compensation with anyone outside of the Castle Law firm.  *Id*.

Ms. Washington was charged $2,000 for the post-petition legal services that were

provided to her.  **Exhibit 1** at ¶ 68.

Similar to Ms. Long, Ms. Washington did not pay any money for her bankruptcy

expenses prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 68.  The Castle Law

firm also paid the full $335.00 filing fee for Ms. Washington's Chapter 7 bankruptcy.  *Id*.

For these reasons, the pre-petition expenses and the court filing fee were

included in the account receivable debt for post-petition legal services, which caused

the account receivable to be $2,400.00.  **Exhibit 1** at ¶ 68.  The full account receivable

amount, $2,400, was then factored with BK Billing.

Accordingly, Ms. Washington's account receivable debt factored with BK Billing

was *not* the amount of attorneys' fees charged by the Castle Law firm for post-petition

legal services.  The amount of attorneys' fees for post-petition services was $2,000,

which was the amount disclosed on the B2030 form that was filed with the Court.


9.      *In re Anderson*:

In the *In re Anderson* case, the initial B2030 form was filed on April 2, 2018 as

Document 10.  **Exhibit 17** at 1.


47

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed to accept" $2,000.00 for legal services. **Exhibit 17** at 1. The disclosure also reported that no compensation was received prior to filing the client's bankruptcy. *Id.* For the second paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid to the Clerk of the Court. *Id.* He reported, for paragraphs 3 and 4 of form B2030, that the source of the compensation was and would be the "Debtor," who was Ms. Anderson. *Id.* Finally, Mr. Amerine disclosed that he had not agreed to share compensation with anyone outside of the Castle Law firm. *Id.*

Ms. Anderson was charged $2,000 for the post-petition legal services that were provided to her. **Exhibit 1** at ¶ 69.

Similar to Ms. Long, Ms. Anderson did not pay any money for her bankruptcy expenses prior to the filing of her Chapter 7 case. **Exhibit 1** at ¶ 69. The Castle Law firm also paid the full $335.00 filing fee for Ms. Anderson's Chapter 7 bankruptcy. *Id.*

For these reasons, the pre-petition expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00. **Exhibit 1** at ¶ 69. The full account receivable amount, $2,400, was then factored with BK Billing.

Thus, Ms. Anderson's account receivable debt factored with BK Billing was *not* the amount of attorneys' fees charged by the Castle Law firm for post-petition legal

services.  The amount of attorneys' fees for post-petition services was $2,000, which was

the amount disclosed on the B2030 form that was filed with the Court.


      **10.**    *In re Cook*:

In the *In re Cook* case, the initial B2030 form was filed on May 16, 2018 as

Document 10.  **Exhibit 18** at 1.

For the first paragraph, the filing disclosed that Mr. Amerine's law firm "agreed

to accept" $2,007.00 for legal services.  **Exhibit 18** at 1.  The disclosure also reported that

no compensation was received prior to filing the client's bankruptcy.  *Id.*  For the second

paragraph of form B2030, Mr. Amerine reported that $335.00 of the filing had been paid

to the Clerk of the Court.  *Id.*  He reported, for paragraphs 3 and 4 of form B2030, that

the source of the compensation was and would be the "Debtor," who was Mr. Cook.  *Id.*

Finally, Mr. Amerine disclosed that he had not agreed to share compensation with

anyone outside of the Castle Law firm.  *Id.*

Mr. Cook was charged $2,007 for the post-petition legal services that were

provided to him.  **Exhibit 1** at ¶ 70.

Mr. Cook paid $335 toward his pre-petition bankruptcy expenses and filing fee

prior to the filing of her Chapter 7 case.  **Exhibit 1** at ¶ 70.  The Castle Law firm also

paid the full $335.00 filing fee for Mr. Franklin's Chapter 7 bankruptcy.  *Id.*  For this

reason, the $63 that Mr. Cook had not paid for the expenses was included in the account

receivable debt for post-petition legal services, which caused the account receivable to

be $2,070.00.  The full account receivable amount, $2,070, was then factored with BK

Billing.

Accordingly, Mr. Cook's account receivable debt factored with BK Billing was

_not_ the amount of attorneys' fees charged by the Castle Law firm for post-petition legal

services.  The amount of attorneys' fees for post-petition services was $2,007, which was

the amount disclosed on the B2030 form that was filed with the Court.


### F.      The Source of the Attorneys' Fees Was Not BK-Billing

The Court opined in the _AOSC_ that "clearly it was BK-Billing's [sic] advance to

Amerine and Castle Law that was the source of the [attorneys'] fees." _AOSC_ at 5.  This

statement is factually and legally incorrect.

There is no _evidence_ of an "advance" from BK Billing to Mr. Amerine or his firm

_before_ a client hired the law firm for its pre-petition or post-petition bankruptcy services.

Likewise, there is no _evidence_ of an "advance" of attorneys' fees from BK Billing to Mr.

Amerine or the Castle Law firm _prior_ to the point in time when a client and Mr.

Amerine signed the post-petition representation agreement.  There is no _evidence_ before

the Court that BK Billing promised to "advance" future attorneys' fees to the Castle

Law firm's client if the client would agree to hire the firm for his/her future bankruptcy.

In each and every situation, the Castle Law firm and its client signed a post-petition representation agreement that included a promise by the client to pay a flat attorneys' fee for the post-petition services the firm would provide to the client. The promise to pay the flat attorneys' fee for the post-petition legal services is called an "account receivable" debt. Thus, the Castle Law firm agreed to provide post-petition legal services to the client in exchange for the _client's_ written promise to pay the account receivable debt.

In each and every situation, the _evidence_ proves Castle Law firm submitted the post-petition representation agreement to BK Billing, _after it was executed,_ to determine if BK Billing would agree to factor the account receivable debt. The _evidence_ also shows that BK Billing would evaluate each and every request to make a decision on whether to factor the account receivable debt. If BK Billing agreed to factor the account receivable debt, then it would initially pay the Castle Law firm 60% of the value of the account receivable debt. The _evidence_ before the Court indicates this submittal, evaluation and payment process could take several days to complete. **Exhibit 1** at ¶ 63; & **Exhibit 3** at 25:8-26:3.

The post-petition legal services were not contingent upon BK Billing agreeing to factor the client's account receivable debt. If BK Billing had declined an account receivable factoring request, then the Castle Law firm would have still been contractually obligated to provide the post-petition legal services to its client in

51

exchange for the promise to pay the account receivable debt. *See* **Exhibit 3** at 28:12-:17.

But, the law firm would have had to collect the debt from its client.

And, most importantly, the law firm's post-petition legal services were not

contingent upon the client paying BK Billing the entire amount of the account receivable

debt prior to the time when the services would be provided.  If a Castle Law firm client

failed to pay the account receivable debt factored with BK Billing, then that

development would indirectly increase the factoring rate for the account receivable debt

from a gross rate of 75%, which included the 15% placed into the holdback account, to

60%.   As mentioned, the number of defaults by clients caused the Castle Law firm to

*never receive one cent* of the 15% that was held in the holdback account.

Aside from contradicting the evidence, the Court's conclusion that BK Billing

was the "source" of the legal fees is an incorrect legal conclusion based on court

decisions that have addressed the topic of the legal property right(s) in a law firm's

account receivable debt.  As far back as 1984, a Texas Court of Appeals was called upon

to determine the property rights in a lawyer's account receivable. *See Hennigan v.

Hennigan*, 666 S.W.2d 322 (Tx. Ct. of App. 1984).  The lawyer contested that a receiver

appointed by a trial court could obtain legal rights to account receivable debts owed to

him. *Id*. at 323-325.  The *Hennigan* court turned to the Texas version of the Uniform

Commercial Code ("U.C.C."), § 9.106 to address the legal question. *Id*. at 325

(discussing Tex. Bus. & Com. Code Ann. § 9.106).  It noted an "account" was defined in

the U.C.C. as "*any right to payment* for goods sold or leased *or for services rendered* which is no evidenced by an instrument or chattel paper, *whether or not it has been earned by performance . . . .*" *Id*. (*emphasis* in original).  The court then concluded that the account receivable debt, for earned and future attorneys' fees, was a property right that could be assigned.  *Id*.  Therefore, under the Texas U.C.C. the account receivable was "subject to action by a Receiver" under the law.  *Id*.

The question of whether the assignment of a law firm's account receivable was addressed, again, in 2013 by a Texas appellate court.  *See Counsel Fin. Svcs., LLC v. Leibowitz*, No. 13-12-00103-CV, 2013 WL 3895331 (Tx. Ct. App. July 25, 2013).  In that case, the law firm argued the assignment of its account receivable debt was against public policy because it amounted to impermissible fee sharing.  Relying, in part, on the *Hennigan* decision, the *Counsel* appellate court rejected that fee-sharing argument.  *Id*. 2013 WL 6895331, at *8 ("However, Texas case law allows an attorney to assign accounts receivable, consisting of current or future, earned or unearned, attorney fees as property securing a transaction").  And, using a prior disciplinary ruling, the court further explained:

> "[C]ommon use and understanding of 'sharing fees' does not include the type of permissible behavior [appellant] complains may be confused with proscribed behavior.  Our national economy comprises a multitudinous system of payments from one party to

> another, who in turn settle debts with third parties, who continue the
> stream of payments ad infinitum.  One does not ordinarily consider
> paying a pre-existing debt with sums earned by fees generated from
> rendering services as sharing those fees.  A wage earner does not
> 'share' his salary with a landlord by virtue of paying rent, nor do the
> State of Texas . . . 'share' tax revenue with their employees.
> According to a common use and understanding of the phrase 'share
> legal fees,' a lawyer does not 'share legal fees' by paying a salary to
> his employees or by using money generated by legal fees to pay the
> lawyer's debts to employees or others."

*Id.* (quoting *State Bar of Tx. v. Tinning*, 875 S.W.2d 403, 410 (Tx. Ct. App. 1994).  For those

reasons, the security agreement for the lawyer's account receivable was not an

impermissible "fee sharing" agreement.  *Id.  See also Santander Bank, N.A. v. Durham

Commercial Capital Corp.*, Civil Action No. 14-13133-FDS, 2016 WL 199408, at * (D. Mass.

Jan. 15, 2016) (agreeing with the holding in *Counsel Fin. Svcs.* to conclude that a

factoring agreement was not unenforceable and, under the Massachusetts U.C.C.,

"allows a firm access to capital and reduces the firm's working capital necessary to its

operations[]").

    If the assignment of a law firm's account receivable is allowed because the

account receivable is a property right that can be used as security for a debt, and if use

of an account receivable to pay a debt is not an impermissible "fee sharing" transaction,

then there is no basis for a legal conclusion that the sale of an account receivable is the

payment of a legal fee by the purchaser.  Otherwise, the assignment of the account

receivable and use of the account receivable to pay a debt would be potentially

problematic as a third party's payment of a legal fee.


### G.    The Text of Local Rule 2016-1 and the *Rights and Responsibilities*

### *Agreement* Did Not Prohibit Use of Two Agreements

The Court then held "[b]ifurcating the fee into pre- and postpetition amounts

means that counsel has effectively 'unbundled' his services, which violates the Rights

and Responsibilities Agreement and violates the Local Rule, unless court approval was

sought. . . ."  *AOSC* at 5.  This conclusion is respectfully contested


### 1.    The Text of Local Rule 2016-1

At the time when each of the representation agreements were signed, the Local

Rule 2016-1 provided:

> **"Rule 2016-1. Compensation For Services Rendered and Reimbursement of Expenses**
>
> **A. Prepetition Retainers and Other Payments.**  11 USC §§ 329 and 330 and Fed. R. Bankr. P. 2016 and 2017 require or authorize the court to review and approve the compensation and expenses of attorneys in bankruptcy proceedings. Therefore, certain disclosures and

applications are required. Pursuant to § 329 and Fed. R. Bankr. P. 2016(b), the attorney for the debtor shall file with the petition a disclosure of the amount and source of all retainers received by the attorney. The disclosure shall be served on the United States Trustee and any case trustee. Unless excused pursuant to the provisions of subpart D of this Rule, all professionals shall: (1) deposit all retainers (with the exception of earned on receipt retainers), whether received from the debtor or any other source, in the attorney's trust account pending an order of the court; and (2) with respect to all retainers and other payments made or fees sought, file an application seeking approval of such retainers, payments, and fees pursuant to § 330 and Fed. R. Bankr. P. 2016(a) (in the case of Chapter 11, 12, and 13 proceedings), or file an application to facilitate the court's review of the reasonableness of such retainers, payments, and fees pursuant to § 329 and Fed. R. Bankr. P. 2017 (in the case of Chapter 7 proceedings).   Until the case is closed by final decree, debtor's attorney is under a duty to disclose all subsequent payments by filing a supplemental statement as required by Fed. R. Bankr. P. 2016(b).

*          *          *

**D. When Application Unnecessary.** If debtor's attorney's total fee in a below median family income case is $3,000 or less, or if the total fee in an above median family income case is $3,500 or less, and if the attorney and the debtor(s) have signed the applicable Rights and Responsibilities Agreement **(See Local Forms MOW 2016-1.3 or 2016-1.4)**, the disclosure of fees in initial filings is sufficient and it is unnecessary to file an application under subpart C of this rule."

*See* **Exhibit 19**, Local Rule 2016-1 at 17-18 (emphasis in original).

Hence, Local Rule 2016-1.A. set forth several requirements.  First, Mr. Amerine was mandated, "shall," disclose the "amount and source of all retainers received by the attorney" through a filing "with the petition."  Second, unless "excused" by subpart "D" of Local Rule 2016-1, Mr. Amerine was required to deposit all retainers into a trust

56

account, unless the retainer was an "earned on receipt retainer," until there was an order from the bankruptcy court, and file an application for "all retainers and other payments" to "facilitate the court's review of the reasonableness of such retainers, payments, and fees" pursuant to 11 U.S.C. § 329 and Fed. Bankr. R. 2017.  Finally, Mr. Amerine was required to disclose all "subsequent payments" by filing a supplemental statement "as required by Fed. R. Bankr. P. 2016(b)."

There is no mention in Local Rule 2016-1.A. about the topic of bifurcating, dividing, the bankruptcy legal services into pre-petition and post-petition representation agreements.

As for subpart "D.," if the attorneys' fee was below $3,000 for a below median family income case ($3,500 for an above median family income case), and if the lawyer and the client signed the *RARA*, then the "disclosure of fees in initial filings is sufficient and it is unnecessary to file an application under subpart C of this rule."  The latter part of subpart "D." appears to be nonsensical – as subpart "C." of Local Rule 2016-1 merely addressed *additional* service obligations for an application that concerned attorneys' fees that exceeded $1,000.  Instead, it is more logical, and reasonable, to construe subpart "D." to waive the application requirement set forth in subpart "A." if the *RARA* was used and signed.  At least – over the past two decades that has been the common interpretation and practice with the bankruptcy courts in this district.

Similar to subpart "A.," subpart "D." of Local Rule 2016-1 does not mention the topic of bifurcating bankruptcy legal services into pre-petition and post-petition agreements.

### 2.     The Terms Within the *Rights and Responsibilities*

*Agreement*

Mr. Amerine and his client signed a *RARA* in each of the bankruptcy cases.  For this reason, an examination of the terms in the *RARA* is warranted.

It is possible there is confusion about the *RARA* topic because of inaccurate factual allegations and unsupported claims made by the local U.S. Trustee office in the Adversary Cases against Mr. Amerine and his law firm.  However, there is no evidence before the Court that each *RARA* that was signed was not followed.  None.

Consider that the *RARA* "Section I" requires the client to meet with his or her attorney and timely provide the attorney with a range of documents.  *See* **Exhibit 20**, *Rights and Responsibilities Agreement Between Chapter 7 Debtors and Their Attorneys (Form MOW 2016-1.3 (12/2016)*, at 1-2.  There is no *evidence* that those responsibilities were not carried out in each of the cases before the Court.

The *RARA* also seeks assurance from the client that he or she will perform specific tasks after the bankruptcy case is filed by his/her lawyer.  **Exhibit 20** at 2-3.  Those tasks also were performed by the clients in their bankruptcy cases.

58

In "Section III" of the *RARA*, the lawyer agrees to perform several identified tasks. **Exhibit 20** at 3-4.  The lawyer commits to meeting with the client to review his or her financial situation, counsel the client about the bankruptcy options and procedures, review completed petitions, schedules, statements and any amendments with the client, explain the attorneys' fees "that are being charged in the case, how and when those attorney's fees are determined and paid, and whether additional fees will be charged for representation in adversary proceedings that might be filed in the case, or in the event the case is converted to another Chapter."  *Id*.  The evidence before the Court, explained herein, shows that all of these tasks were completed.

In "Section IV" of the *RARA*, other services are identified that the lawyer agrees to provide, which includes: (i) providing advice about attending the 341(a) meeting of creditors, **Exhibit 20** at 4; (ii) providing information about the 341(a) meeting of creditors, *id*.; (iii) advise if any pleading is filed to seek relief against the debtor, *id*.; (iv) prepare and file any necessary amended documents, *id*. at 5; (v) and monitor information in the case for accuracy and completeness *id*.  Once again, the evidence set forth herein proves all of the actions identified in "Section IV" of the *RARA* were performed, if needed.

### 3.      Incorrect Assumptions About Deadlines Referenced

### Within the *Rights and Responsibilities Agreement*

Still, the U.S. Trustee office made various contentions in its Adversary Cases

against Mr. Amerine and the Castle Law firm about the *RARAs* that were signed, such

as signing the *RARA* was inconsistent with the pre-petition agreement entered between

the Castle Law firm and its client.  Those accusations were likely due to incorrect

assumptions about the Local Rule, the *RARA*, and the use of the two-contract process.

The incorrect assumption might have concluded a two-contract process cannot

be used under Local Rule 2016-1.  But, as explained above, there is no prohibition in the

Local Rule against use of two contracts for the legal services to be provided to the client.

In fact, the topic of bifurcation, or two contracts, cannot be found within Local Rule

2016-1.

The wrong conclusion also might have been caused by the title of Section III in

the *RARA*, which provides:

> "BEFORE THE CASE IS FILED, YOUR ATTORNEY AGREES TO
>
> PROVIDE ALL SERVICES NECESSARY FOR REPRESENTATION,
>
> INCLUDING BUT NOT LIMITED TO:"

**Exhibit 20** at 3.  This title might have caused an incorrect legal conclusion that Mr.

Amerine and his law firm had to provide *all* of the tasks/services identified in Section III

of the *RARA before* the client's bankruptcy case was filed, including reviewing with the client "the completed petition, statements, schedules, and all amendments[.]"

Under the two-contract process utilized by Mr. Amerine and the Castle Law firm, the legal services to evaluate, prepare and review the completed schedules and statements with the client occurred after the bankruptcy case was filed.

However, as a matter of law, the Section III title cannot require a lawyer to complete the client's schedules and statements, and review those documents with the client, before the bankruptcy case is filed if such a requirement is contrary to the federal bankruptcy laws and rules. "As a general rule of law, any local rule of bankruptcy procedure that conflicts with a federal rule of bankruptcy procedure is invalid and of no effect." *In re McGowan*, 226 B.R. 13, 19 (8th BAP 1998) (Koger, CJ). "A local rule 'may only be upheld if (a) it is consistent with the Bankruptcy Code in that it does not 'abridge, enlarge, or modify any substantive right,' as required by 28 U.S.C. § 2075 and (b) it is 'a matter of procedure not inconsistent with the Bankruptcy Rules as required by Bankruptcy Rule 9029." *Id.*

Of importance for the arguments against Mr. Amerine, and the *AOSC* and the Court's conclusions therein, there is no provision in the Bankruptcy Code or the Bankruptcy Rules that requires completion of the client's bankruptcy schedules and statement(s) *before* the petition is filed to start the bankruptcy. Consider:

(a) Rule 1002 simply requires the petition be filed with the clerk to start a case.  Fed. R. Bankr. P. 1002;

(b) Rule 1005 mandates inclusion of specific information in the caption of the petition.  Fed. Bankr. P. 1005;

(c) Rule 1007(a) requires the debtor's petition be accompanied by a list of the debtor's creditors.  Fed. Bankr. P. 1007(a); and

(d) Rule 1007(b) addresses the schedules and statement of financial affairs. Fed. Bankr. P. 1007(b).  But, notably, subpart (b) does *not* provide a deadline for completing and filing those documents.  Instead, the deadline for completing and filing the schedules and statement(s) required by subpart (b) is set forth in subpart (c).  *Id*.; and

(e) As the Court knows, Rule 1007(c) provides *two* *alternate* deadlines to complete the schedules and statements, which deadlines are (1) when the petition is filed *or* (2) within 14 days of filing the petition.  Fed. Bankr. P. 1007(c).

In the bankruptcy cases identified in the *AOSC*, there was compliance with Fed. R. Bankr. P. 1002 because a client's petition was filed with the clerk.  All of the cases included the information required by Rule 1005.  And, a review of all of the bankruptcy cases proves the creditor lists were filed at the time when each petition was filed. Lastly, Mr. Amerine and his firm complied with Fed. R. Bankr. P. 1007(c) because all of

his client's completed schedules and statements were filed within 14 days of when the

petitions were filed.

Thus, the confusion caused by the prior *RARA* allegations against Mr. Amerine

probably stem from either an incorrect understanding of the terms in Local Rule 2016-1

and the *RARA*, or an incorrect legal conclusion that the Local Rule and *RARA* could

change the alternate deadlines in Fed. R. Bankr. P. 1007(c) to eliminate one of the

options, which was a deadline that occurred 14 days after the filing of the petition.  But,

the elimination of the second option is not lawful.  *In re McGowan*, 226 B.R. at 19.


### 4.    Incorrect Assumptions About Payment Terms Within the

### *Rights and Responsibilities Agreement*

The prior attacks against Mr. Amerine also might have been due to wrong

assumptions about the charges to a client under the *RARA*.  As already explained, the

Castle Law firm only charged the clients in the bankruptcy cases (identified herein) for

the services provided under the post-petition agreement.  There were no charges for the

limited pre-petition services until the end of the use of the system when a small pre-

petition attorneys' fee was charged and collected (pre-petition).

The *RARA* addressed the topic of attorneys' fees in "Section V."  **Exhibit 20** at 6.

Specifically, the *RARA* set forth:

## "V. ALLOWANCE AND PAYMENT OF ATTORNEYS' FEES

You and your attorney agree that the fee for all legal services to be provided in the bankruptcy case will be $_____. You agree to pay this fee. This fee does/does not (circle the appropriate verb) include representation in adversary proceedings and does/does not include representation if the case is converted to another Chapter. (If neither is designated, representation is included).

If you dispute the legal services provided or the fees charged by your attorney, you may file an objection with the Court. Should your attorney's continued representation create a hardship, such attorney may seek a court order allowing him or her to withdraw from the case. Under Local Rule 2091-1, such attorney will not be allowed to withdraw until another attorney enters the case, unless good cause is shown for the withdrawal.

<u>Client's Signature</u>. By signing this agreement, you certify that you have read the agreement and understand and agree to carry out the terms of the agreement to the best of your ability, and that you have received a signed copy of the agreement.

<u>Attorney's Signature</u>. By signing this agreement, your attorney certifies that, before the case was filed, he or she personally met with you and counseled and explained to you all matters as required by this agreement."

*Id*. (<u>emphasis</u> in original).

As shown by a review of the terms in the first paragraph in Section V, the client and attorney are agreeing the "fees" for "all legal services to be provided . . . will be" an amount to be filled-in on the *RARA*. **Exhibit 20** at 6. The phrases "to be provided" and "will be" are future tense, meaning actions that will occur in the future. Thus, the fee is for future legal services that will be provided to the client, and not for any past legal services.

There is no prohibition in the first paragraph of Section V about providing the legal services through two separate agreements.  In fact, the topic of separate agreements is not mentioned in the first paragraph.

For the second paragraph of Section V, the client is advised that he or she can file an objection with the bankruptcy court if a dispute arises about the legal services that were provided or the "fees charged."  **Exhibit 20** at 6.  The paragraph also explains that the lawyer can "seek a court order allowing him or her to withdraw from the [bankruptcy] case" if the "continued representation create[s] a hardship[.]"  *Id*.  It is further explained that the lawyer may not be allowed to withdraw, under Local Rule 2091-1, "until another lawyer enters the case, unless good cause is shown for the withdrawal."  *Id*.

Similar to the evaluation for the first paragraph, Section V's second paragraph does not bar providing legal services through two separate agreements.  In fact, the two-contract topic is not found within the paragraph.

In this matter, Mr. Amerine and the Castle Law firm used similar forms for the pre-petition and post-petition representation agreements, which agreements complied with the provisions in Section V.  The pre-petition agreement, for example, provided:

> "After the bankruptcy case is filed, I understand that I will be presented with a second retainer agreement to pay Castle Law Office

$\_\_\_\_ the [sic] attorney's fees, plus any necessary post-petition costs

to represent my interests. . . ."

**Exhibit 21**, *Attorney-Client Retainer Agreement*, at 1.   The pre-petition agreement further

explained:

"I understand that once my bankruptcy is filed, I will not be legally

obligated to pay and [sic] fees to Castle Law Office.  If any fees are

owed to Castle Law Office and not paid as of the filing of the

bankruptcy case, they will be discharged in the bankruptcy and may

not be collected by Castle Law Office or its assignees.  After my

bankruptcy is filed, I may sign a second retainer agreement

promising to pay fees for the remainder of my representation in

consideration of services to be performed by Castle Law Office after

the filing of my bankruptcy.  I understand that I will be under no

obligation to do so and can refuse to sign such an agreement.

However, Castle Law Office reserves the right to seek to withdraw

from my representation in the event that I do not sign a second

retainer."

*Id*.

A comparison of Section V in the *RARA* and the above-provisions from the pre-

petition agreement reflects the terms in both documents are similar, not contradictory.

66

The *RARA* addressed fees for future legal services as shown by the phrases "to be

provided" and "will be[.]"  Likewise, the pre-petition agreement addressed fees for

future work – "in consideration of services to be performed[.]"  The *RARA* also

explained that the lawyer might seek to withdraw if "continued representation" created

a hardship.  And, the pre-petition agreement also addressed the withdrawal topic by

noting that Mr. Amerine and the Castle Law firm reserved the right to seek a

withdrawal in the event the client decided to not sign the post-petition agreement.

The only distinction between the *RARA* and the pre-petition agreement was the

inclusion in the *RARA* that Local Rule 2091-1 did not allow the attorney to withdraw

unless another lawyer entered the case to represent the client, or unless good cause was

shown for the withdrawal.  There was no chicanery with the absence of the comment in

the pre-petition agreement because the *RARA* was provided to the client at the initial

consultation meeting to review, which was well before the time when the post-petition

agreement was signed (after the bankruptcy filing), so the client was aware of Local

Rule 2091-1 and the explanation (in the *RARA*) about the rule.

And, as the Court is aware, there were no situations in which Mr. Amerine and

his firm sought to withdraw because a client did not want to proceed with the second,

post-petition, representation agreement.  Arguably such a situation did not occur

because of the repetitive, and thorough, explanations that were provided to the client

about the two-contract process and how the process could help the client with his/her

"sweatbox" situation.

### H. Information in the Clients' Schedules Reflected Very Little Disposable Income

The Court observed that "very little disposable income" was shown in the filed

Schedule I and Schedule J documents for each respective client. *AOSC* at 6. This

statement is correct.

*Schedule I* requires a debtor to provide an "estimate" on his or her monthly

income. Similarly, *Schedule J* seeks an "[e]stimate" for various expenses.

It is quite possible a client's estimates for monthly income and expenses turns out

to be precisely the amount of the future monthly income and expenses. It also is

possible the estimates turn out to be too low or too high. The client has to be trusted to

understand her or his on-going financial situation and prioritize payment of expenses.

For example, incurring expenses for recreation, such as attending a theme park or a

movie, might have to be avoided during a month if mandatory expenses, such as rent,

have not been paid.

## I.        The Clients Did Not Pay "Back" BK Billing

The Court also stated Mr. Amerine's clients had to "pay back the factor, BK

Billing." *AOSC* at 6.

As mentioned before, there was no debt owed to the Castle Law firm for

attorneys' fees until *after* the bankruptcy case was filed, *after* the post-petition agreement

was signed, and *after* the services were provided.  The firm's clients had promised to

pay their respective account receivable debts, but they had not promised to "pay back"

any amount of money to a third party – such as BK Billing.

## J.        Clients Voluntarily Chose the Two-Contract Process to *Stop* Their
##          "Sweatbox"

Next, the Court questioned why it was in each client's "best interests" to file the

bankruptcy case without completed schedules and statements.  *AOSC* at 6.

Of course, the division of legal services into pre-petition and post-petition

services was necessary to help the client stop the "sweatbox," yet allow the law firm to

earn income to pay wages to employees and other expenses.

If Mr. Amerine and the lawyers at the Castle Law firm had performed *more* or

*most* of the legal services before the bankruptcy case was filed, such as evaluating the

client's financial records and reviewing the completed schedules and statements, then

the client would have been charged for such work.  But, in every single case before the

69

Court the client could not afford to pay the attorneys' fees for such services.  That is the

reason the "sweatbox" would continue for the client while she or he tried to save

money, sometimes over periods of five or six months, to pay those pre-petition

attorneys' fees.

If the Castle Law firm provided legal services to complete the schedules and

statements, but did _not_ receive payment for the services from the client, then the client's

debt for the completed services would have been subject to discharge upon the filing of

the bankruptcy petition.  In that situation, the firm would have not earned an income to

pay its employees and office expenses.

And, if the majority of the legal services were performed under the pre-petition

agreement, and only limited post-petition services remained, such as counseling and

attendance for the Chapter 341 Meeting, then it would not have been possible or

reasonable to charge the client $2,000 for the post-petition services.  A smaller fee, such

as $400, would have had to have been charged, which amount would not be sufficient

to meet wages and other office expenses.

The solution to these conditions was use of the two-contract process to have

services that could be performed, lawfully, after the petition was filed, to be performed

(future tense) post-petition.  The work was not haphazardly planned to achieve this

objective.  Rather, the process to complete the work in specific stages was carefully

planned and carried out.  In fact, Mr. Amerine even sent a message to an Assistant U.S.

Trustee to inquire on the office's position on the bifurcation topic.  The result of the

planning of the two-contract process, and performance of the steps, allowed the client to

stop the "sweatbox" and also allowed the law firm to earn a reasonable income.

The client was always provided with the pre-filing, pay-in-full, option, which

option expressly set forth that the attorneys' fee was smaller than the two-contract

process.  The clients in the pending cases chose to use the two-contract process, after

being advised of the option, because they did not want to delay filing bankruptcy and

obtaining relief from their creditors.

### K.    A Twenty-Five Percent Factor Fee Appeared Reasonable
###    And, in Hindsight, Was Not Achieved

The Court also wondered why a "25% factoring fee was reasonable."  *AOSC* at 6.

To begin, it cannot be emphasized enough that neither the clients, Mr. Amerine,

nor the Castle Law firm established BK Billing's factoring fee for the purchase of the law

firm's account receivable debts.  BK Billing set that fee, which was most likely based on

its experience in the factoring industry.

It also is significant that the twenty-five percent (25%) factoring fee proved, over

the course of about eighteen (18) months, that it was not a sustainable rate for BK

Billing.

In _all_ of the Chapter 7 cases that are the subject of the *AOSC*, Mr. Amerine's law firm never received from BK Billing the fifteen percent (15%) holdback amount from the factoring of the accounts receivables.  Why did BK Billing not pay to the Castle Law firm any of the holdback amounts?  Because the rate of default for the law firm's clients was too great.

When BK Billing stopped factoring the account receivable debts from the law firm's bankruptcy clients the total amount for all of the accounts receivable debts was $244,265.00.  **Exhibit 1** at ¶ 72.  As part of the factoring transaction, BK Billing paid the Castle Law firm $146,559.00, which was 60% of the total amount for the accounts receivable debts ($244,265 x .6 = $146,559).  *Id*.  In order for BK Billing to receive its 25% factoring fee it needed to collect at least $61,066.25 ($244,265 x .25 = $61,066.25) plus the $146,559 paid to the Castle Law firm, or a total of $207,625.25 ($61,066.25 + $146,559 = $207,625,25).

However, BK Billing ended up only collecting $194,829.69 from the clients who were responsible for the account receivable debts, which meant it did not realize a 25% factoring fee.  **Exhibit 1** at ¶ 72.  If the 25% factoring fee is used and the initial 60% payment is made to the law firm, then BK Billing _lost_ $12,795.56 ($194,829.69 - $61,066.25 - $146,559 =  -$12,795.56).  The factor fee BK Billing realized after the defaults was only 20%, which is computed as:

Target factoring fee of 25% on $244,265 total A/R debts:          $61,066.25

Less loss on collected A/R debts after initial 60% purchase:   <u>-$12,795.56</u>

Sub-total:                                                                            $48,270.69

Rate of return on $244,265 total A/R debts:                        19.8%

Thus, overall, a 25% factoring fee was not achieved by BK Billing.

To return to the Court's question about the reasonableness of BK Billing trying to receive a 25% factoring fee, the performance of the account receivable debts showed that the risk of default was high.  That risk was known to BK Billing considering all of the account receivable debtors had filed for bankruptcy relief prior to agreeing to pay their respective account receivable debts.  Despite knowing the risk BK Billing decided to factor the Castle Law firm's account receivable debts for a factoring fee of 25%.

And, Mr. Amerine is not aware of factoring rates charged by any other finance businesses for account receivable debts owed by a law firm's clients who had filed for bankruptcy relief.  **Exhibit 1** at ¶ 73.

For these reasons, the factoring fee of 25% seems to have been reasonable because of the high default risk for the clients that owed the account receivable debts, the poor performance for the repayment of those debts, which poor performance prevented BK Billing from receiving its 25% factoring fee, and because there is no evidence of factoring rates charged by other finance businesses that indicate the rate charged by BK Billing was too high or too low.

73

**L.** **Mr. Amerine Performed All of His Pre-Petition**

**Responsibilities and Obligations**

The *AOSC* next includes an assumption that charging no money for pre-petition

services "is fundamentally inconsistent with" obligations under 11 U.S.C. § 707(b) to

perform "a reasonable legal and factual investigation." *AOSC* at 6. Unfortunately,

there is no explanation for the basis for this assumption.

Factual investigations to support the filing of a bankruptcy are often not very

complicated. Typically, a debtor will contact the Caste Law firm to ask about services

and options to file a bankruptcy case. Often the factual reason a debtor will make that

contact is due to an inability to pay off his or her (or their) debts.

In every bankruptcy case identified in the *AOSC,* the pre-petition contract scope

of work involved an analysis of information provided by the client, both written and

oral, for the purpose of evaluating whether a Chapter 7 case was an appropriate

strategy under the law and each client's financial situation. Mr. Amerine has been

practicing bankruptcy law for almost two decades. After a review of the

comprehensive intake sheet completed by the client and law firm staff, it was readily

apparent as to what Chapter the client would need to file if he or she wanted to proceed

to seek bankruptcy relief. This process rarely took very much time given Mr. Amerine's

experience and the information that had been collected.

74

Any attorneys' fee that could have been allocated to the pre-petition evaluation and counseling of the client was waived.  Charging a pre-petition fee for the initial financial information evaluation and client counseling would defeat the goal of alleviating the client's affordability problem.

More importantly, the absence of a fee does not *evidence* that any necessary evaluation and counseling work was not performed.  In fact, none of the bankruptcy cases identified in the *AOSC* involved any type of error that was caused by the pre-petition evaluation of the client's financial information.

### M.     The Rights and Responsibilities Agreement Does Not Prohibit The Use of Two Contracts

The Court also concluded in the *AOSC* that "requiring the debtor to enter into a postpetition fee agreement under threat of their attorney withdrawing from representation if the client fails to do so violates the express terms of the Rights and Responsibilities Agreements, which require the attorney to provide certain pre- and post-petition services for one, 'no-look' fee, absent Court approval."  *AOSC* at 7.

After the client decided which direction to proceed, such as pursue a Chapter 7 bankruptcy case or pursue other options, then the client was advised of the process for a Chapter 7 bankruptcy case, including the attorneys' fees charged by Castle Law firm for representing the client.  If the client could afford to pay the attorneys' fees before a

75

Chapter 7 case was filed, then that option was encouraged.  If the client could not pay

the attorneys' fees, then the client was counseled on options of waiting to file the

bankruptcy case while the attorneys' fees are paid to the firm, or entering into two

contracts to permit the post-petition fees to be charged after the bankruptcy case was

filed.

At no point did a client ever feel like he or she would be abandoned in the

unlikely event the second, post-petition, contract was not signed.  **Exhibit 1** at ¶ 60.

Both contracts were reviewed before the pre-petition agreement was even signed.  Mr.

Amerine is confident that each client entered into both agreements with informed

consent and a complete understanding of the two-contract process.  *Id*.  In fact, there

were no clients who expressed or exhibited surprise when the post-petition agreement

was presented after the bankruptcy was filed.  **Exhibit 1** at ¶ 59.

The *RARA* was not drafted by Mr. Amerine or anyone at the Castle Law firm.  It

was drafted by the Court.  The *RARA* was used and signed because it was thought to be

a mandatory requirement that had to be used under the Court's local rules for Chapter

7 cases.  That conclusion is now believed to be incorrect.  Instead, the *RARA* was an

option, and not mandatory.

In hindsight, use of the *RARA* could have caused a risk of an unintended

ambiguity between the pre-petition contract and post-petition contract and the scopes

of work set forth and addressed by each of those two contracts.  The scopes of work

performed by Castle Law and the cooperation of the client with the scopes of work are

facts that help resolve any possible ambiguity to show what Castle Law and the client

intended with the different scopes of work under each of the two contracts that were

signed by the client.


N.     **There Was No Effort, Whether 'Great Lengths' or**

      **Otherwise, to Conceal Information**

The Court next assumed in the *AOSC* that "great lengths" were undertaken "to

conceal the nature of [the] fee agreements from the Court[.]"  *AOSC* at 7.  The Court

based this assumption on the following:

i.   The bankruptcy cases were filed as "quick files," meaning without completed

    schedules and statement(s), *id*.;

j.   The supposed inability of the debtors to afford "the 25% financing premium"

    based on "their budgets," *id*.;

k.   The failure to "disclose the true amount of the fees their clients were paying

    and to seek approval of the fee arrangement under the local rules," *id*.

The Court's assumption is incorrect.

As explained in great detail herein, **Section III.G.3.** at pages 60-63 *infra*, the

Federal Bankruptcy Rules allow the debtors schedules and statement(s) to be completed

by two – alternate – deadlines.  One of those deadlines is fourteen (14) days after the

bankruptcy petition is filed.  Fed. R. Bankr. P. 1007(c).  There is no law within the

Bankruptcy Code, nor any other rule within the Federal Rules of Bankruptcy Procedure,

that bars, prohibits, or eliminates the 14-day post-petition deadline.  Most importantly,

there is no special requirement, such as an "emergency," to use the 14-day post-petition

deadline.  For this reason, the Court's focus on the so-called "quick file[]" basis of the

bankruptcy cases seems misplaced.

Also explained and discussed herein, **Section III.H**. at page 68 *infra*, is the fact a

client's financial information on *Schedule I* and *Schedule J* involve estimates, which the

respective forms specifically allow.  A budget that is tight, meaning very little excess

(discretionary) income after expenses, is not surprising based upon Mr. Amerine's two

decades of experience.  **Exhibit 1** at ¶ 74.  The reason most of his bankruptcy clients

need to pursue bankruptcy relief is because of a tight budget.  *Id*.

A budget with little excess income after expenses does not mean the client could

not afford the post-petition account receivable monthly payments.  **Exhibit 1** at ¶ 74.

As mentioned before, one of the Castle Law firm's services to bankruptcy clients is

access to a credit repair program, which program provides information and

recommendations that can help a client improve his or her management of monthly

expenses.  In addition, as the Court is aware, a client is required by law to take a post-

petition debtor education course, which course also provides a client with information

and suggestions to improve his or her management of finances.

Most importantly, the Castle Law firms clients identified in the *AOSC* voluntarily

chose the two-contract process because they could not afford to pay – *in full* - the

Chapter 7 legal services before the time when they wanted their respective cases filed.

It is not clear from the Court's observations what supports an apparent belief a client

could afford to pay *all* of the attorneys' fees and costs before filing a Chapter 7

bankruptcy case if there is a supposition the client could not afford to pay the post-

petition account receivable debt over nine or twelve months.

It also is unclear how the client's post-petition estimated budget has any

relationship to an assumption that a "great length" was undertaken to conceal the

amount of the client's attorneys' fees or the two fee agreements.  Mr. Amerine submits

there is no relationship because there were no "great lengths" undertaken to conceal

any information or process.

As for the allegation that Mr. Amerine and the Castle Law firm failed to disclose

"the true amount of the fees their clients were paying," that accusation is simply

incorrect.

The B2030 form filed by Mr. Amerine and the Castle Law firm followed a format

that had been used thousands of times over the prior decade.  There were no known

court decisions that reflected different or additional information for a two-contract

process that involved factoring the post-petition account receivable debt.  Later, after a

Delaware bankruptcy court issued a detailed order that included comments about

79

information in a B2030 form for a two-contract-factoring case, which the court did not

criticize, then Mr. Amerine used the information mentioned in that court decision to

improve the format and information in the B2030 forms that were filed for his clients'

two-contract cases.

It is worth noting that the Delaware decision was not published.  Arguably, if

Mr. Amerine wanted to go to "great lengths" to conceal information about the two-

contract process, then he would not voluntarily use a format mentioned by a Delaware

court in an unpublished decision.

Also, the Court's conclusion might be caused by not considering that all

expenses (i.e filing fee, both required classes, and a full credit report) were part of the

client's total bankruptcy cost, but are not included in Form B2030 as expenses are not

considered "compensation."  *See* Fed. R. Bankr. P. 2016(a) (separating the terminology-

phrase "necessary expenses" from the terminology-phrase "interim or final

compensation for services").  Several of the cases identified in the *AOSC* involved the

Castle Law firm paying for part or all of the client's bankruptcy filing fee, which is a

bankruptcy expense.  With the client's knowledge and consent, any amount of the

bankruptcy filing fee that was paid by the law firm was included in the post-petition

account receivable debt owed to the firm and, later, factored with BK Billing.

In addition, as outlined in **Section III.E.** at pages 33-50 *infra*, in each of the cases listed in the *AOSC* the amended or initial B2030 form set forth the gross attorneys' fee charged to the Castle Law firm client.

O.      **Respondent Submits Good Cause Does Not Exist for**

       **Sanctions or Discipline Because No Errors With the New,**

       **Innovative, Process Occurred Because of Malfeasance**

The Court mentioned at several places within the *AOSC* about the necessity to file a motion to approve the fee arrangement between the clients, on the one hand, and Mr. Amerine and the Castle Law firm, on the other hand.  The absence of such a motion was simply a misunderstanding in that Mr. Amerine mistakenly believed if the post-petition attorneys' fee was below the no-look threshold in Local Rule 2016-1, then a fee application was unnecessary.  The two-contract process had never been used by Mr. Amerine or, to his knowledge, any lawyer in the Western District of Missouri or the District of Kansas.  And, there were no known court decisions from other courts across the country that had reviewed the two-contract process and factoring of the account receivable debt.  Even this Court previously acknowledged that legal issues and topics related to the two-contract system were cases of "first impression" in this jurisdiction. *See* Doc. 17 in *In re James / Casamatta v. Castle Law Office of Kansas City, P.C., Adv. Case*

No. 18-4168-CAN, *Report and Recommendation to the District Court on Defendants' Motion to Withdraw the Reference*, at 3 n. 4 (Bankr. W.D. Mo. Nov. 28, 2018).

As mentioned earlier, filing a bankruptcy case without completed schedules or statement(s) does not require an exigent circumstance under the controlling law.   The decision to use that process was *always* made after, and based upon, an *extensive* consultation with the client.   And, the two-contract process and completion of the schedules and statement(s) after the bankruptcy case was filed certainly never diminished the amount of work and, in fact, added an in-person meeting with the client to meet all legal obligations.

Given that an attorney fee was believed reasonable in the Western District of Missouri if it was at or below $3,000 when a *RARA* was used, Mr. Amerine believed an attorneys' fee of approximately $2,000 for all of the law firm's post-petition work was reasonable.   That belief seems to have been supported by a recent ruling from Judge Fenimore, in which he held a rate of $250 per hour was reasonable and it is common for there to be at least eight (8) hours of post-petition work depending on the cooperation from the debtor and what is required from the Chapter 7 trustee.   *See* Doc 148 in *In re Carpenter*, No. 17-50483, *Hearing Held & Order Denying in Part* (Bankr. W.D. Mo. Jan. 15, 2019).

It is concerning that various issues and topics involved in the identified bankruptcy cases appear to have been pre-judged, such as accusations that Mr. Amerine

used "great lengths" to conceal information.  The evidence does not support such a

conclusion and/or judgment.  Before the two-contract process was used on the first case,

Mr. Amerine sent an e-mail to an Assistant U.S. Trustee to ask about her office's view(s)

on the topic of bifurcation of legal services.  When the two-contract process began, as far

as Mr. Amerine is aware, there were no laws or rules prohibiting a lawyer from

factoring or selling a post-petition account receivable account to a third party.

On two separate occasions subsequent e-mails were sent to representatives of the

local U.S. Trustee office to request a meeting to discuss options or possible

modifications to the two-contract process.  **Exhibit 1** at ¶ 42.  Another e-mail was sent to

a representative of the local U.S. Trustee office with information about (approximately)

20 files, which message also outlined the two-contract system and the factoring of the

post-petition account receivable debt to BK Billing.  *Id*.  Given that the local U.S. Trustee

office was not interested in conducting any discussions about the two-contract process,

the system was modified by Mr. Amerine based on information he learned from other

districts, such as the Delaware decision and an informal discussion with representatives

of the Kansas U.S. Trustee office.

It was always the goal to carry-out the two-contract system correctly.  If the new

system could be used, then it would be a tremendous benefit to clients who could not

afford to pay all of the bankruptcy costs, both attorneys' fees and expenses, prior to

filing a Chapter 7 case.  And, it is presumed other lawyers who represent debtors might

83

try to use the system, which would further benefit the general (broad) class of Chapter 7 debtors.

Mr. Amerine admits unintentional mistakes were made without a proven roadmap on how to perform each necessary step in the two-contract process and factoring of the post-petition account receivable debt, and apologizes to the Court for those errors.

As is evidenced by the last handful of cases that used the two-contract system and were before this Court, *see, e.g.*, *In re Hughes*, No. 18-42590, there were changes with the process to improve the overall system.  The B2030 fee disclosure forms included more details (based upon the decision from the Delaware bankruptcy court), more than one B2030 fee disclosure form was filed, the client's anticipated post-petition payments were included in the estimated monthly expenses in *Schedule J*, and a fee application was filed in each case.

Furthermore, Mr. Amerine submits it is not reasonable to conclude he was trying to use "great lengths" to conceal the details with two-contract system considering that dozens of (additional) cases that used the two-contract model were filed *after* the local U.S. Trustee filed its four Adversary Cases against him.  If there was a goal of concealing the process, then it is not logical to continue filing the two-contract cases.

There simply is no evidence that a flaw with the process was not an honest mistake and, instead, was purposeful.  Mr. Amerine and his firm have a stellar record of

84

consistently providing quality and affordable bankruptcy services to clients for 20 years.

Moreover, there was absolutely no financial incentive for Mr. Amerine to make any mistake in the two-contract process.  As explained before, **Section II.D.** at pages 19-20 *infra*, the Castle Law firm received less money than if Mr. Amerine had not taken a risk with the two-contract model and, instead, forced clients and/or potential clients to continue to suffer in their respective "sweatbox[es]."  Mr. Amerine also was aware of the local U.S. Trustee's office's hostility toward lawyers within the debtors' bar and the risk that his firm would have to defend against accusations from that office.  Those concerns were proven correct as Mr. Amerine and the Castle Law firm incurred thousands of dollars in costs to defend against the overly aggressive (and unsupported) claims from the local U.S. Trustee office, and thousands of dollars to settle[4] those excessive claims.

Now, the two-contract process and factoring of the account receivable debt has been thoroughly evaluated, without bias, in the 2019 court decision *In re Hazlett*.  In fact, the Director of the U.S. Trustee Program, Mr. Clifford White, commended the attendees at the 2019 Annual Conference for the National Association of Bankruptcy Trustees to

---

[4]  The settlement included agreements from the local U.S. Trustee and Mr. Amerine that the fact a settlement was reached was not an admission of liability.  The settlement is considered reasonable after the Court appeared to give little to no weight to the *In re Hazlett* decision, which was the most thorough, and reasoned, court decision to address the two-contract system and factoring of the post-petition account receivable debt.

review the *In re Hazlett* opinion due to Bankruptcy Judge Anderson's analysis and

reasoning about the new two-contract process.[5]  *See* **Exhibit 23**, *Remarks of Director Cliff*

*White at the 2019 Annual Conference of the National Association of Bankruptcy Trustees*

*(Denver, CO, Aug. 23, 2019)*, at 5.

Finally, the Court has asked for reasons why there should not be further

disgorgement from Mr. Amerine and the Castle Law firm after, and even though, it was

the Court that ordered Mr. Amerine and the local U.S. Trustee to mediate their disputes

in the Adversary Cases and such mediation occurred and resulted in a settlement.  Of

all the two-contract cases, only one client did not receive a Chapter 7 discharge.  Each

client of the law firm and Mr. Amerine received suburb representation and – most

importantly - would have struggled to escape their respective "sweatbox" if the two-

contract system had not been an option and used.

Unfortunately, Mr. Amerine was unable to implement a perfect system that

could be used to give clients better access to relief provided from a Chapter 7

bankruptcy case.  Even though his office did not receive a financial windfall and, in fact,

incurred tens of thousands of dollars in losses, he does not regret trying the new system

---

[5]  It is necessary to note that Director White incorrectly concluded in his remarks that
the B2030 form used in *In re Hazlett* included disclosures that Bankruptcy Judge
Anderson believed were necessary.  In fact, Judge Anderson noted the B2030 form did
not disclose the BK Billing factoring arrangement, but he did not sanction the lawyer,
likely, because there were "no reported decisions regarding the use of BK Billing by a
debtor's counsel" when the bankruptcy case was filed in November 2016.  *See In re
Hazlett*, 2019 WL 1567751, at *11.

that would benefit his clients and the general debtors' bar.  Instead, his only regret is

not waiting for the potential legal and procedural issues to be addressed by courts in

other jurisdictions – waiting for a decision like *In re Hazlett* and Director White's

comments.

Now, Mr. Amerine and his firm have discontinued use of the two-contract

system.  BK Billing no longer offers factoring for post-petition account receivable debts.

And, the BK Billing files showed the sizeable risks with Castle Law firm clients

defaulting with payment of those account receivable debts.  More importantly, the risks

of hostile and aggressive claims due to the two-contract system have not diminished,

which seems to have been reflected by the local U.S. Trustee's office settlement

demands and the issuance of the so-called *In re Hughes Order*, both of which occurred

after the *In re Hazlett* decision and Director White's post *In re Hazlett* comments.


**P.      Personal Statement from Respondent, Jason C. Amerine, Esq.**

I, first and foremost, would like to apologize to the Court for taking up your

valuable time to address the concerns raised by the court related to my firm's two-

contract system of handling Ch 7's.  My office - under my supervision - has filed

thousands of bankruptcies over the last two decades and has always strived to provide

quality client service and, above else, file true and accurate pleadings.  I take great pride

in being an honest father, husband, and lawyer.  I have never once thought about trying

to "slip one by."  I would not tarnish my reputation that I have worked hard to earn,

which reputation - I believe - was acknowledged when Judge Venters appointed me to

sit on the *Bankruptcy Ad Hoc Rules Committee*.  I have disengaged from more suspicious

cases than some lawyers will see in a lifetime.  I have previously sacrificed thousands of

dollars to properly advise my clients not to file bankruptcy despite them wanting

to.  Having said that, I will admit the two contract process did not start off without

some hiccups.

I first learned of BK Billing in the spring of 2017 from another consumer firm out

of state over social media.  The firm and its clients were enjoying success with the

process and had approval from the firms' local UST offices and judges.  The primary

purpose of incorporating this novel method into my practice was to give debtors better

access to bankruptcy relief.

After practicing bankruptcy for over 20 years I became frustrated with the

number of debtors that were unable to get proper access to Ch 7 due to the cost.  Even

worse, I was meeting with a growing number of debtors that were being improperly

advised by other debtor's counsel to file bogus Ch 13s simply to pay fees and a small

unsecured dividend to comply with the WDMO's prohibition of attorney fee only CH

13s.  When I learned of the two contract process, I saw a great way to assist debtors that

had very little options, and to, of course, generate at least some sort of revenue on cases

that would otherwise not be filed.

I fully vetted this process by reviewing case law not only in the 8th Circuit but in outlying circuits.  I found numerous locations where the process had been accepted by the courts, including Maryland, Delaware, Arizona, and Utah to name a few.  The 10th Circuit generated an ethics opinion accepting the practice.  And in 2019, the two-contract process received further endorsement in the *In re Hazlett* decision.  In fact, the Director of the UST Program, Mr. Clifford White, commended the opinion to the attention of the National Association of Bankruptcy Trustees.  I didn't have much of a roadmap to follow in the WDMO, other than what firms out of state had successfully tried.  I even went as far as sending an email to the local UST office prior to this process to obtain the office's position on the bifurcation topic.  I truly wanted to get this right.

When I was told the local UST had no prohibition against bifurcated cases so long as the workload was reasonable allocated I began the two contract process in the summer of 2017.  As mentioned above, I quickly learned some mistakes had been made.  For example, I erroneously was disclosing the net amount of compensation the firm was to receive after the receivable was sold to BK Billing.   I quickly made amendments to those cases and, going forward, the gross amount of the compensation minus expenses was properly disclosed.  Another tweak to the system I had overlooked was to disclose the post-petition payment to BK Billing in Schedule J.  Again, this was something that hadn't even occurred to me.  I made those changes immediately after discussions with other lawyers over particular concerns other UST offices had

89

expressed.  The process was constantly improved as information was received from other districts.

Despite the KS UST meeting with my office to discuss the two contract procedure, I tried to arrange a meeting with Mr. Miller's office to figure out how to make this process work effectively in the WDMO, but we were denied such a meeting.  The local UST's office at some point made a request to inspect several files, which I gladly opened my files up to Mr. Miller.  Subsequently, another request was made to inspect approximately 25 additional files, which was promptly complied with as well.  Despite the UST investigation and subsequent adversary filing, at no point did I think I was violating any rules given what was transpiring nationwide and given there was little to no precedent on this exact issue in our circuit.

This process was constantly modified to address any concerns that was presented by other UST's.  Towards the end of the two-contract process, my office was filing two separate 2030 disclosures with the Court, the expenses and a small attorney fee was collected pre-petition, the post-petition payment was disclosed in Schedule J, and the 2030's had much more robust language in them.  As mentioned earlier, I truly tried to get this right and it was a work in progress the entire way.  I will admit unintentional mistakes were made along the way, which I have agreed to pay a great amount for my errors.

As far as the clients and the process….my firm spent a great amount of time advising the debtors of their various options.   The attorney would almost always recommend the pay up front option over the two-contract process.  Although revenue was not my primary motivation, many of the two-contract filings resulted in defaults and the firm received a lesser fee, which was a risk I fully accepted.  Most debtors that chose the two-contract process did so either due to pending lawsuits/garnishment or simply wanting to get the case filed expeditiously without coming up with the fees to remove themselves from the "sweatbox."  Every one of these clients expressed gratitude to have such an option and, in fact, many have left positive on-line reviews, including Ms. Rosa James.

After the consultation, in addition to the normal "homework" packet each debtor was sent home with their signed pre-petition contract, an unsigned copy of the post-petition contract, and an unsigned Right and Responsibilities agreement.  Usually, at least a week or two would go by before the debtor would return to my office to complete the "skeletal" filing.  Every debtor knew when they returned they would be receiving a bankruptcy case number and given options on how to proceed.  Not one debtor was surprised or expected any other conclusion for their decision.

The US Trustee's office proudly boasts its program mission is:

"The mission of the United States Trustee Program is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders – debtors,

creditors, and the public." Unfortunately, I feel by not allowing the two contract system to proceed under some capacity, the benefit of the bankruptcy system for some debtors and the public has failed.

My office did not receive a financial windfall in this process, and, in fact, took less fees on all of these filings. I don't regret trying something new that would benefit the public; however, I am sorry that I didn't wait longer for the potential issues to get ironed out. I apologize for the mistakes along the way, but I can truly tell the Court it was without intent. I respect the bankruptcy judges and the law too much to deliberately deceive or misrepresent my practice methods. I appreciate your time and I hope you find my words sincere and credible.

Very truly yours,

/s/*Jason C. Amerine*

Jason C. Amerine, Esq.

**Dated November 12, 2020.**

Respectfully submitted,

BROWN & JAMES, P.C.

By:   /s/ Matthew G. Koehler
Matthew G. Koehler,        #48760
800 Market Street, Suite 1100
St. Louis, Missouri 63101-2501
Phone: (314) 421-3400
Fax:  (314) 421-3128
mkoehler@bjpc.com

*Attorneys for Respondent Jason C.
Amerine of Castle Law Office of Kansas
City, P.C.*

## CERTIFICATE OF SERVICE

A copy of the foregoing document was electronically filed with the United States

Bankruptcy Court, Western District of Missouri, through the Court's electronic filing

system and electronically served on all counsel of record, on this **12th day of November,**

**2020**.

/s/ Matthew G. Koehler
_____

*Attorneys for Respondent Jason C. Amerine
of Castle Law Office of Kansas City, P.C.*

93