**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| IN RE:<br><br>Amanda June Kolle,<br><br>Debtor. | ) ) ) ) ) ) ) ) | Case No. 17-41701-CAN |
| IN RE:<br><br>DeAnn Michelle Gould,<br><br>Debtor. | ) ) ) ) ) ) ) ) | Case No. 17-42125-DRD |
| IN RE:<br><br>Justin Mantez Mackey,<br><br>Debtor. | ) ) ) ) ) ) ) ) | Case No. 17-42465-BTF |
| IN RE:<br><br>Melissa Maxine Long,<br><br>Debtor. | ) ) ) ) ) ) ) ) | Case No. 17-43023-BTF |
| IN RE:<br><br>Lateisha Jenee Robinson,<br><br>Debtor. | ) ) ) ) ) ) ) ) | Case No. 17-43094-CAN |

**EXHIBIT 1**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| Ernestine Richetta Franklin, | ) | Case No. 17-43313-BTF |
| Debtor. | ) | |
| IN RE: | ) | |
| Leona Tenelle Harvey, | ) | Case No. 18-40087-CAN |
| Debor. | ) | |
| IN RE: | ) | |
| Nechol Mutesa Washington, | ) | Case No. 18-40264-CAN |
| Debtor. | ) | |
| IN RE: | ) | |
| Angel Marie Demeturis Anderson, | ) | Case No. 18-40723-DRD |
| Debtor. | ) | |
| IN RE: | ) | |
| Kenneth Darwin Cook, | ) | Case No. 18-41222-DRD |
| Debtor. | ) | |

**JASON C. AMERINE'S**
**DECLARATION PURSUANT TO 28 U.S.C. § 1746**

I, Jason C. Amerine, Esq., state the following:

1. I am over the age of eighteen, of sound mind, capable of making this declaration, and personally acquainted with the facts stated in this declaration.

2

2. I am an attorney who is licensed to practice law in Missouri, Kansas, the U.S. District Court - Western District of Missouri, and the U.S. District Court – Kansas. I have never been disciplined in any jurisdiction in which I am licensed to practice.

3. I also am the owner of Castle Law Office of Kansas City, P.C.

4. I have practiced bankruptcy law, representing consumer debtors, since 2001.

5. Over the course of my career, I have witnessed hundreds of clients and potential clients who suffered a so-called "sweatbox" due to harassment and pressure from creditors, but who could not afford to pay for the attorneys' fees to pursue a Chapter 7 bankruptcy case. On average each month, this situation is seen about 20% to 30% of the time, and sometimes even more. I have had clients who struggled to pay all of the attorneys' fees and expenses for their Chapter 7 case, which struggles have lasted sometimes for five or six months, and sometimes even longer.

6. On numerous occasions I have met with a potential client who had been advised by another lawyer to file a Chapter 13 case that paid a small amount of money to creditors, which advice was clearly meant to benefit the lawyer recovering his or her attorneys' fee through the Chapter 13 plan payments.

7. I learned about a new bankruptcy factoring program offered by a business called BK Billing, and so contacted the company to learn about the program.

8. Under the BK Billing bifurcated, two-contract, program, attorneys' fees for post-petition legal services would not be collected prior to the bankruptcy filing as long as the client and lawyer decided to enter into a post-petition representation agreement for those post-petition services.

9. I reviewed research about bifurcation of Chapter 7 legal services, factoring of attorneys' fees, and ethical evaluations of those processes, which research had been compiled by BK Billing.

10. I also spoke at length with one of BK Billing's principals, an attorney named Shawn Mawhinney.

11. I also conducted my own research on the bifurcation and factoring topics.

12. My own research included, but was not limited to, sending an e-mail to Assistant U.S. Trustee Sherri Wattenbarger to inquire about her office's view on bifurcation of Chapter 7 legal services.

13. From Ms. Wattenbarger's reply, I understood the attorneys' fees for bifurcated pre-petition services would have to be reasonable, and the fees for bifurcated post-petition services would have to be reasonable in relation to those services. And, the client would need to be informed about, and approve of, the process.

14. I decided using the BK Billing factoring program was worth the risks of default and possible hostile reactions from the local U.S. Trustee's office. Therefore, I decided to offer the BK Billing factoring program for my Chapter 7 clients who could not afford to pay all of the attorneys' fees before the point of the time when they wanted to have their case filed.

15. For the two-contract system, if a client decided to hire my firm at the initial consultation meeting, then the lawyer meeting with the client, whether me or one of the firm's other lawyers, would provide the client with the § 342(b) and § 527(a)(2) disclosure forms required by the Bankruptcy Code, a blank copy of the post-petition representation agreement to take home and review, a blank copy of the *Rights and Responsibilities Agreement* to take home

4

and review, a 31-page questionnaire to complete, and a list of documents to collect and bring to the next in-person meeting.

16. In addition to the initial consultation, at the next meeting I would again discuss the next steps for a Chapter 7 case, including whether the client was interested in hiring the law firm for the post-petition work, the post-petition work that would have to occur, a re-review of the costs for the post-petition legal services, the steps with BK Billing factoring an account receivable debt for post-petition services, and the *Rights and Responsibilities Agreement*.

17. When the client was comfortable and ready with proceeding with filing a bankruptcy case, including having all questions answered, then the Chapter 7 skeletal petition would be printed and signed by the client and the lawyer. The *Rights and Responsibilities Agreement* also was signed by the client and attorney. And, finally, I reviewed and signed the B2030 attorney compensation disclosure form.

18. The client would wait in the lobby while his or her bankruptcy case was filed.

19. After the bankruptcy case was filed, then I would meet with the client to review, again, the client's options for the post-petition work, whether to hire the Castle Law firm for the work, hire another law firm for the work, or complete the work *pro se*. I also explained that the work to complete and file the schedules and statements had to be done within fourteen days.

20. If the client had not changed her or his mind about using my law firm for the post-petition work, then the post-petition agreement was filled-in with the Chapter 7 case number and signed. I also would provide the client with the forms related to factoring the post-petition account receivable debt, including an automatic debit form, so the client could review and sign those forms. We also would schedule another appointment for the client to return to review the completed bankruptcy schedules and statements, and sign those records.

5

21.     The post-petition work began with analysis of the client's financial documents that she or he had brought to the shell appointment. A paralegal would review those records and begin inputting the information into the client's schedules and statements. A staff member also would prepare and send a letter to the client to remind him or her about the scheduled Chapter 341 Meeting.

22.     Post-petition work also included paralegals answering questions from the attorney about a client's file. The paralegal professional also typically communicates with the client for questions about his or her financial information, including missing information, and to answer non-legal questions from the client.

23.     Post-petition work also will include involve the attorney and paralegal addressing any creditors that are discovered to be missing from the client's financial paperwork and credit report, including, when necessary, preparing amended schedules and filing those amended schedules to add creditors to the bankruptcy case.

24.     The client would then return to our law office for a third appointment to discuss and review the completed bankruptcy schedules and statements. If the schedules and statements were accurate, then those documents were signed by the client in order to be filed.

25.     Prior to the 341 Meeting, the attorney will prepare for the 341 Meeting to ensure familiarity with the file and review the docket for the 341 Meeting to verify the correct time is scheduled. If another lawyer at the Castle law firm needs to cover for the 341 Meeting, then the attorney will communicate with the client about that situation so he/she is aware and comfortable with the other lawyer's assistance. The lawyer also will answer questions the client has prior to a court event, such as a 341 Meeting.

26. When the 341 Meeting occurs, then the lawyer will review all of the reaffirmation record(s) and situation(s) with the client, and talk with the client about the progress of the bankruptcy, and answer any questions after the Meeting.

27. After the 341 Meeting, the attorney and paralegal will coordinate work to complete and file reaffirmation agreements, and prepare and sign any amended schedules that are necessary. A calendar reminder will be made to address the client's tax returns for that year (or the next year). The lawyer will also review any reaffirmation agreements that are received from a creditor after the 341 Meeting, and answer questions from the client about such reaffirmation agreements. Additionally, the lawyer and paralegal will work to obtain and send records to the 7 trustee that were requested at the 341 Meeting.

28. And, when needed, the lawyer will attend with the client any 341 Meetings that are continued.

29. Sometimes the lawyer and paralegal also will prepare and file updates to the bankruptcy case, such as an updated client address. And, the lawyer will often take calls with the client about the client's future financial decisions and the discharge process.

30. And, there are sometimes situations in which creditors must be added to the client's bankruptcy case. Based on my experience, the need to amend a filing, such as adding a creditor, often occurs when a bankruptcy petition was filed without having the completed schedules and SOFA. But, any necessary amended filings are carried out because the firm committed, under the post-petition agreement, to provide the services to help a client receive a Chapter 7 discharge.

31. Other post-petition services that our firm provide to aid the client's bankruptcy case include: (a) having staff perform a search of on-line court records for judgment information,

7

(b) fax secured intention letters to creditors and prepares notations in the file about those letters, (c) fax authorization letters to creditors and prepares notations in the file about those letters, (d) fax notices of various filings to creditors, (e) prepare reaffirmation agreements and discusses those agreements with clients, (f) print, scan, and save reaffirmation agreements in the client's file; and (g) send the discharge order to creditors.

32. My law firm, in addition to the services listed above, also commits to addressing various tasks, such as answering communications from creditors, responding to audits from the U.S. Trustee's office, and working to manage paperwork sought by different Chapter 7 trustees. And, we encourage the client to send all creditor calls to us to handle on behalf of the client.

33. My law firm also provides clients with access to a credit repair program that has a $1,000.00 value if purchased independently, and post-discharge services for addressing errors with a client's creditor report.

34. In my opinion, the two-contract system achieved the goal of increasing access for legal services for my firm's clients who could not afford the advance legal fee payment. Of approximately 109 Chapter 7 bankruptcy cases, only one client did not achieve a discharge of his/her debts, which was the *In re Hughes*, No. 17-42191, case. And, there were no files that involved any type of delay problems, which I think was due to the extensive planning and discussions with the client about the two-contract system and factoring process. And, the goal of decreasing the time one of my clients suffered in the "sweatbox" was absolutely definitely accomplished.

35. My law firm did not receive a financial windfall from the two-contract system and BK Billing factoring program. Overall, the firm only received the initial 60% price for a factored account receivable debt. This meant, for a $2,000 attorneys' fee case, the firm only

8

received $1,200 from factoring the account receivable debt with BK Billing, which included expenses. My firm would have earned a higher fee and a lot more money if I had decided to have clients continue to suffer in their "sweatboxes" and pay the typical pre-filing $1,410.00 attorneys' fees and associated $410 of expenses for a Chapter 7 case.

36. I knew about the U.S. Trustee office's hostility towards debtors' attorneys before beginning the two-contract system. That was the reason I sent an e-mail message to Assistant U.S. Trustee Sherri Wattenbarger to ask about the office's position on bifurcated legal services in Chapter 7 cases.

37. In August of 2017, an attorney from the local U.S. Trustee office, Mr. Adam Miller, contacted me to schedule a review of the paper files for some of the first bankruptcy cases that used the two-contract system. I offered to meet with him to discuss the new process, why it would benefit clients, and if there were any suggestions the U.S. Trustee office had for adjusting the process. Mr. Miller, though, would not meet with me to discuss those topics.

38. I am aware that later, in October of 2017, another attorney, Rachel Foley, tried to plan a meeting between the Acting U.S. Trustee and principals of BK Billing to discuss the company's new bankruptcy bifurcation and factoring program when the BK Billing principals were going to be in Kansas City for a bankruptcy seminar.

39. Similar to the local U.S. Trustee investigation, the Kansas U.S. Trustee office also investigated my firm's two-contract system. An Assistant U.S. Trustee from that office conducted five Rule 2004 examinations of clients that chose to use the two-contract system for their Kansas bankruptcy case.

40. About a month later, around October of 2018, I met with three members of the Kansas U.S. Trustee's office, including the Assistant U.S. Trustee who took the 2004

9

examinations of my clients, to discuss the two-contract system and how we carried out the system. The representatives from that office were concerned about a couple of points, including having more information on the B2030 compensation disclosure form and the absence of any fee for the limited pre-petition services.

41. Later, I sent a written offer to make changes to the two-contract system to address those concerns, including providing proposed templates for a new B2030 disclosure form to file in the cases. The reason I wanted to meet with those representatives and make an offer to change the system was due to a motivation of finding a process that the Kansas office found to be acceptable, but which would still allow my clients to avoid the "sweatbox" problem.

42. My lawyer had extended an offer to Mr. Miller to attend the meeting with the Kansas U.S. Trustee office representatives, but he refused that invitation. Additionally, three separate e-mails were sent to request a meeting with the local U.S. Trustee office to discuss the two-contract process, but the representatives from that office would not meet with me.

43. When I met with the representative from the Kansas U.S. Trustee office, I explained that I have traditionally charged more for a bankruptcy case that involved filing a petition without completed schedules and the statement forms due to the increased amount of work that often occurs on those types of files. I also emphasized that the firm realized a lower, net, amount from factoring the post-petition account receivable debt due to the rate of defaults by the clients and BK Billing using the 15% hold back amount to off-set those defaults.

44. Due to the higher default rate and the comments from the meeting with the Kansas U.S. Trustee office, I decided to change the two-contract system to have a small fee for pre-petition legal services.

45. I had two goals with using a small pre-petition fee. First, I wanted to reduce the client's post-petition debt for the Chapter 7 bankruptcy service because I decided to also lower the post-petition fees. I did not want to increase the total amount of attorneys' fees charged to a client for a Chapter 7 service beyond $2,000 even though the material risk of increased post-petition work remained.

46. My second goal was to resolve the concern expressed by the Kansas U.S. Trustee office that "something" had to be charged for pre-petition services as those services could not be offered for free. The small pre-petition attorneys' fee could achieve those goals while still limiting a client's affordability hardship.

47. For the attorney compensation disclosure form, I used the same format for the disclosure we have typically used for traditional Chapter 7 cases because comments about how to change the form had not occurred. The research provided by BK Billing and my research did not reflect any suggested changes to the information on the B2030 disclosure form. BK Billing's research, in particular, mostly focused on whether a two-contract, bifurcated, legal service was allowed under existing bankruptcy and ethics laws, and whether factoring a post-petition account receivable debt was allowed under those laws. The research showed that courts in different jurisdictions had signaled that bifurcated legal services was lawful. But, specific details on how to perform the bifurcated services and process were not addressed in those cases.

48. Of course, the BK Billing factoring program was brand new, which meant there had not been an established precedent for how to conduct the two-contract process.

49. But, around the time of the Kansas meeting, I learned about a bankruptcy court in Delaware that issued a ruling that mentioned information in the lawyer's B2030 disclosure form, which that court did not criticize. I then used that ruling to change and improve the information

11

in the disclosure forms I filed in my firm's two-contract cases. I also provided that updated form to the Kansas U.S. Trustee office to comment upon. I later began to use that updated format for the two-contract bankruptcy cases filed in the Western District of Missouri.

50. As a result of the updated form, I started to file an initial form that showed no charges for the limited pre-petition services, and a supplemental form to show the post-petition attorneys' fees that were charged for post-petition services, as well as the plan to factor the post-petition account receivable debt.

51. Another mistake that I discovered for the disclosure form concerned the amount of the attorneys' fee that was disclosed in the two-contract cases. In early cases, the form that I reviewed and signed disclosed the net amount of money that our law firm anticipated receiving if BK Billing accepted the post-petition account receivable debt for factoring. By September 2017, which was only a short time after we started using the two-contract process, the mistake was discovered through a discussion with principals from BK Billing.

52. I then changed the information disclosed on the B2030 disclosure form to show the gross post-petition attorneys' fee charged to the client, and not the possible net amount that would be received if BK Billing agreed to factor the account receivable debt.

53. Another mistake that I discovered was the absence of collecting the pre-petition bankruptcy expenses from the client for the two-contract system. That situation occurred in some of the early bankruptcy cases and resulted in the pre-petition bankruptcy expenses mistakenly being included in the post-petition account receivable debt that was factored with BK Billing.

54. The situation was not discovered before the two-contract process was implemented because of the focus on explaining the two-contract, bifurcated, process to the client and striving to make sure the client understood all of the points of that option.

55. When I realized the mistake early during the four adversary cases, then the process was updated and changed to ensure the pre-petition bankruptcy expenses were collected before a Chapter 7 case was filed.

56. A final issue that was discovered and addressed for the two-contract system involved the *Rights and Responsibilities Agreement* form in the Western District of Missouri. To my knowledge, practically every bankruptcy case that I had represented a client had involved me and the client signing the form agreement.

57. In hindsight, the use of the *Rights and Responsibilities Agreement* form could have created an unintended ambiguity with the terms and language in the pre-petition retainer agreement and post-petition retainer agreement.

58. Even though we used the *Rights and Responsibilities Agreement*, I never stopped providing the thorough explanations about the BK Billing factoring program, the two-contract process, the pre-petition services that would be performed for no fee (and later for a small fee), the post-petition services that would be performed for the $2,000 fee (and later a $1,400 fee), the options to not use the Castle Law firm for the post-petition services, and that I would not withdraw as the client's attorney unless advance notice was provided and the bankruptcy court approved that withdrawal.

59. At no time, though, did a client communicate to anyone at my law firm about any confusion about the two-contract process, signing the post-petition agreement for post-petition services and post-petition attorneys' fees, or paying the post-petition attorneys' fees through the

checking account withdrawals sent to BK Billing. I believe the absence of any confusion is due to the extensive explanations and disclosures that we strived to make to the client.

60.     And, at no time do I believe that a client felt pressured to sign the post-petition agreement, or felt like he or she would be abandoned. I believe all of the clients fully understood the process and the transactions before they agreed to those.

61.     For Amanda Kolle's bankruptcy, Ms. Kolle was only charged $2,500 for the post-petition legal services that were provided to her. She paid $200 for her bankruptcy expenses prior to the filing of her Chapter 7 case. The $200 was applied to her credit counseling course, the costs for a credit report, and part of the filing fee costs. Therefore, there was still $200 that was unpaid for the $335 filing fee. My law firm paid the full $335.00 filing fee for Ms. Kolle's Chapter 7 bankruptcy. For that reason, the $200 that Ms. Kolle had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,700.00.

62.     For DeAnn Gould's bankruptcy, Ms. Gould was charged $2,000 for the post-petition legal services that were provided to her. Ms. Gould only paid $100 for her bankruptcy expenses prior to the filing of her Chapter 7 case. The $100 was applied to her credit counseling course, the costs for a credit report, and $35 of the court filing fee. As such, there was still $300 that was unpaid for the $335 court filing fee. My firm paid the full $335.00 filing fee for Ms. Gould's Chapter 7 bankruptcy. The $300 that Ms. Gould had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,300.00.

63.     For the Justin Mackey bankruptcy, Mr. Mackey was charged $2,000 for the post-petition legal services that were provided to him. Mr. Mackey only paid $100 for his bankruptcy

14

expenses prior to the filing of his Chapter 7 case. The $100 was applied to his credit counseling course, the costs for a credit report, and $35 of the filing fee. There was still $300 that was unpaid for the $335 filing fee. Our law firm paid the full $335.00 filing fee for Mr. Mackey's Chapter 7 bankruptcy. For that reason, the $300 that Mr. Mackey had not paid for the filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,300.00.

64. For the Melissa Long bankruptcy, Ms. Long was charged $2,100 for the post-petition legal services that were provided to her. Ms. Long did not pay for any of her bankruptcy expenses prior to the filing of her Chapter 7 case. Also, our law firm paid the full $335.00 filing fee for Ms. Long's Chapter 7 bankruptcy. The $400 that Ms. Long had not paid for her expenses and the filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,500.00.

65. For the Lateisha Robinson bankruptcy, Ms. Robinson was charged $2,000 for the post-petition legal services that were provided to her. Ms. Robinson did not pay for any of her bankruptcy expenses prior to the filing of her Chapter 7 case. Also, our law firm paid the full $335.00 filing fee for Ms. Robinson's Chapter 7 bankruptcy. But, I decided to waive most of her expenses and court filing fee, and only charged her $70 for the court filing fee. For that reason, the $70 that Ms. Robinson had not paid for the court filing fee was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,070.00.

66. For the Ernestine Franklin bankruptcy, Mr. Franklin was charged $2,000 for the post-petition legal services that were provided to him. Mr. Franklin did not pay any of his bankruptcy expenses prior to the filing of his Chapter 7 case. And, our law firm paid the full

15

$335.00 filing fee for Mr. Franklin's Chapter 7 bankruptcy. The $400 that Mr. Franklin had not paid for his bankruptcy expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00.

67. For the Leona Harvey bankruptcy, Ms. Harvey was charged $2,000 for the post-petition legal services that were provided to her. Ms. Harvey did not pay any of her bankruptcy expenses prior to the filing of her Chapter 7 case. My law firm paid the full $335.00 filing fee for Ms. Harvey's Chapter 7 bankruptcy. For that reason, the $400 that Ms. Harvey had not paid for her bankruptcy expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00.

68. For the Nechol Washington bankruptcy, Ms. Washington was charged $2,000 for the post-petition legal services that were provided to her. Ms. Washington did not pay any of her bankruptcy expenses prior to the filing of her Chapter 7 case. Also, our law firm paid the full $335.00 filing fee for Ms. Washington's Chapter 7 bankruptcy. The $400 that Ms. Washington had not paid for her bankruptcy expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00.

69. For the Angel Anderson bankruptcy, Ms. Anderson was charged $2,000 for the post-petition legal services that were provided to her. Ms. Anderson did not pay any of her bankruptcy expenses prior to the filing of her Chapter 7 case. And, the Castle Law firm paid the full $335.00 filing fee for Ms. Anderson's Chapter 7 bankruptcy. The $400 that Ms. Anderson had not paid for her bankruptcy expenses and the court filing fee were included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,400.00.

70. For the Kenneth Cook bankruptcy, Mr. Cook was charged $2,007 for the post-petition legal services that were provided to him. Mr. Cook paid $335 toward his bankruptcy expenses and the court filing fee prior to the filing of his Chapter 7 case. The Castle Law firm paid the full $335.00 filing fee for Mr. Cook's Chapter 7 bankruptcy. For this reason, the $63 that Mr. Cook had not paid for expenses was included in the account receivable debt for post-petition legal services, which caused the account receivable to be $2,070.00.

71. I did not know whether BK Billing would factor a post-petition account receivable debt before it was submitted. BK Billing had its own evaluation on whether it would accept a debt for factoring. And, the process to review the account receivable debt could take several days.

72. Overall, my law firm factored with BK Billing account receivable debts that totaled $244,265. BK Billing paid my law firm $146,559 as the initial factoring payment. Of the $244,265 total, I am aware that BK Billing only collected $194,829.69.

73. I am not aware of other rates charged by factoring businesses for factoring account receivable debts owed by bankruptcy clients for post-petition legal services.

74. I have reviewed the Court's concerns that some of the client's post-petition estimated budgets in their schedules were tight because there was not very much excess income after estimated expenses. That situation is not surprising. Most clients need to pursue bankruptcy relief because they have a problem with their monthly budget. But, a tight budget on estimated income and expenses does not mean that a client could not afford the post-petition payments for the account receivable debt.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 12th, 2020, in Kansas City [ city ], Missouri [ state ], United States of America.

_Jason Amerine_
Jason C. Amerine

18