Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 1 of 74
**JASON AMERINE  9/5/2019**

Page 1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE WESTERN DISTRICT OF MISSOURI
 2                     WESTERN DIVISION

 3    In re:

 4    ROSA NICHOLE RENEE JAMES,      Case No. 17-41965-BTF7

 5                 Debtor.
      _____
 6
      DANIEL J. CASAMATTA,
 7    ACTING UNITED STATES TRUSTEE,

 8                 Plaintiff,

 9    vs.                        Adv. Case No. 18-4168-CAN

10    CASTLE LAW OFFICE OF
      KANSAS CITY, P.C.,
11
                   Defendant,
12
      and
13
      JASON C. AMERINE,
14
                   Defendant.
15

16         DEPOSITION OF JASON AMERINE, a Witness,

17    taken on behalf of the Plaintiff, pursuant to

18    Notice, on September 5, 2019, at the Law Offices of

19    Brown & James, PC, Suite 2100, 2345 Grand Boulevard,

20    Kansas City, Missouri 64108, before

21

22                 CHERIE L. HOUSE

23

24    Registered Professional Reporter, Certified Court

25    Reporter of the States of Kansas and Missouri.
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 2 of 74
**JASON AMERINE  9/5/2019**

**Page 2**

```
 1                    APPEARANCES

 2   For the Plaintiff:

 3        Mr. Adam E. Miller
          Office of the United States Trustee
 4        Charles Evans Whittaker Courthouse
          400 East Ninth Street, Room 3440
 5        Kansas City, Missouri 64106
          (816) 512-1940
 6        adam.e.miller@usdoj.gov

 7
     For the Defendants:
 8
          Mr. Matthew Koehler
 9        BROWN & JAMES, PC
          800 Market Street, Suite 1100
10        St. Louis, Missouri 63101
          (314) 242-5267
11        mkoehler@bjpc.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 3 of 74
**JASON AMERINE  9/5/2019**

**Page 3**

```
 1                    TABLE OF CONTENTS

 2                                              Page

 3

 4    Stipulation                                12

 5    JASON AMERINE

 6        Examination by Mr. Miller              12

 7    Certificate of Reporter                   288

 8    Errata Sheet                              290

 9    Signature of Witness                      291

10

11                     EXHIBITS

12    No.  Description                          Page

13     1   BK Billing - Accounts Receivable      24

14         Assignment Agreement - 5/24/17

15         Bates BKB 3 through 9 (8 pages)

16     2   BK Billing - Amendment to Accounts    35

17         Receivable Assignment Agreement -

18         Bates BKB 1 and 2 (2 pages)

19     3   BK Billing Holdback Reconciliation -  38

20         Bates CLOKC 3206 through 3208

21         (3 pages)

22     4   E-mails Between Wattenbarger and      49

23         Amerine - Bates Castle UST 161 and 162

24         (2 pages)

25     5   Best Case Bankruptcy Case Notes for   66
```

Case 17-41701-can7    Doc 40-2    Filed 11/12/20    Entered 11/12/20 17:55:16    Desc
Exhibit 2 (Deposition of J Amerine)    Page 4 of 74
**JASON AMERINE  9/5/2019**

**Page 4**

```
 1              Rosa James (1 page)

 2      6       Attorney-Client Retainer Agreement           81

 3              Between Castle Law and Rosa James -

 4              Bates CLOKC 313 (1 page)

 5      7       Castle Law Statement CLOKC 315               85

 6              (1 page)

 7      8       Attorney-Client Retainer Agreement           88

 8              Between Castle Law and Rosa James -

 9              Bates CLOKS 309 and 310 (2 pages)

10      9       Rights and Responsibilities Agreement        98

11              Between Chapter 7 Debtors and Their

12              Attorneys - Bates BKB 378 through 381

13              (4 pages)

14     10       Recurring Payment Authorization and          111

15              Consent Form - Bates CLOKC 314

16              (1 page)

17     11       BK Billing Payment Receipt for Rosa          114

18              James - Bates BKB 51 and 2 (2 pages)

19     12       Declaration Re:  Electronic Filing for       117

20              Rosa Nichole Renee James -

21              Bates BKB 382 (1 page)

22     13       Disclosure of Compensation of Attorney       120

23              for Debtors for Rosa Nichole Renee

24              James - Bates CLOKC 323 (1 page)

25     14       Contract for Postpetition Chapter 7          132
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 5 of 74
**JASON AMERINE  9/5/2019**

**Page 5**

```
 1           Legal Services for Rosa James - Bates

 2           CLOKC 311 and 312 (2 pages)

 3      15   Invoice Details - Bates BKB 64              139

 4           (1 page)

 5      16   Disclosure of Compensation of Attorney      144

 6           for Debtors - Amended for Rose Nichole

 7           Renee James - Bates BKB 383 (1 page)

 8      17   Official Form 107 - Statement of            154

 9           Financial Affairs for Individuals

10           Filing for Bankruptcy for Rosa Nichole

11           Renee James - Bates BKB 330 through

12           336 (7 pages)

13      18   Official Form 106J for Rosa Nichole         157

14           Renee James (2 pages)

15      19   Verification by Debtors for Rosa            158

16           Nichole Renee James (1 page)

17      20   Official Form 106J for                      160

18           Rosa Nichole Renee James -

19           Amended (2 pages)

20      21   Best Case Bankruptcy Case Notes for         162

21           Jeffrey Hannah - Bates CLOKC 836

22           (1 page)

23      22   Attorney-Client Retainer Agreement for      169

24           Jeffrey Hannah - Bates UST 37 and 38

25           (2 pages)
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 6 of 74
JASON AMERINE  9/5/2019

Page 6

|    |    |    |    |
|----|----|----|----|
| 1  | 23 | Rights and Responsibilities Agreement | 171 |
| 2  |    | Between Chapter 7 Debtors and Their |    |
| 3  |    | Attorneys for Jeffrey Hannah - |    |
| 4  |    | Bates CLOKC 924 through 927 (4 pages) |    |
| 5  | 24 | Signature Page of Mr. Amerine - | 172 |
| 6  |    | Bates CLOKC 883 (1 page) |    |
| 7  | 25 | Declaration Re:  Electronic Filing for | 177 |
| 8  |    | Jeffrey Scott Hannah - Bates CLOKC 928 |    |
| 9  |    | (1 page) |    |
| 10 | 26 | Disclosure of Compensation of Attorney | 180 |
| 11 |    | for Debtors for Jeffrey Scott Hannah - |    |
| 12 |    | Bates CLOKC 884 (1 page) |    |
| 13 | 27 | Disclosure of Compensation of Attorney | 181 |
| 14 |    | for Debtors - Amended for Jeffrey |    |
| 15 |    | Scott Hannah - Bates CLOKC 839 |    |
| 16 |    | (1 page) |    |
| 17 | 28 | Contract for Postpetition Chapter 7 | 184 |
| 18 |    | Legal Services for Jeffrey Hannah - |    |
| 19 |    | Bates CLOKC 834 and 835 (2 pages) |    |
| 20 | 29 | Recurring Payment Authorization and | 189 |
| 21 |    | Consent Form for Jeff Hannah - |    |
| 22 |    | Bates CLOKC 833 (1 page) |    |
| 23 | 30 | BK Billing Payment Receipt for Jeffrey | 191 |
| 24 |    | Hannah - Bates BKB 14 (1 page) |    |
| 25 | 31 | Invoice Details - BKB 25 (1 page) | 192 |

**JASON AMERINE  9/5/2019**

**Page 7**

```
 1    32   Official Form 106Dec - Declaration        194
 2          About an Individual Debtor's Schedules
 3          for Jeffrey Scott Hannah -
 4          Bates CLOKC 911 - (1 page)
 5    33   Official Form 106J - Schedule J for        195
 6          Jeffrey Scott Hannah - Bates CLOKC 909
 7          and 910 (2 pages)
 8    34   Verification by Debtors for Jeffrey        196
 9          Scott Hannah - Bates CLOKC 847
10          (1 page)
11    35   Best Case Bankruptcy Case Notes for        200
12          Antoinette Grant - Bates CLOKC 1291
13          (1 page)
14    36   Attorney-Client Retainer Agreement for     203
15          Antoinette Grant - Bates CLOKC 1289
16          (1 page)
17    37   Castle Law Statement for Antoinette        207
18          Grant - Bates 1287 (1 page)
19    38   Attorney-Client Retainer Agreement for     208
20          Antoinette Grant (2 pages)
21    39   Recurring Payment Authorization and        210
22          Consent Form for Antoinette Grant
23          (1 page)
24    40   Signature Page of Mr. Amerine -            212
25          Bates CLOKC 1343 (1 page)
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 8 of 74
**JASON AMERINE  9/5/2019**

**Page 8**

| 1 | 41 | Disclosure of Compensation of Attorney | 215 |
| 2 | | for Debtors for Antoinette Michelle | |
| 3 | | Grant - Bates CLOKC 1344 (1 page) | |
| 4 | 42 | Contract for Postpetition Chapter 7 | 218 |
| 5 | | Legal Services for Antoinette Grant | |
| 6 | | (1 page) | |
| 7 | 43 | BK Billing Payment Receipt for | 220 |
| 8 | | Antoinette Grant - Bates BKB 26 and 27 | |
| 9 | | (2 pages) | |
| 10 | 44 | Invoice Details - Bates BKB 38 | 221 |
| 11 | | (1 page) | |
| 12 | 45 | Disclosure of Compensation of Attorney | 222 |
| 13 | | for Debtors - Amended (1 page) | |
| 14 | 46 | Official Form 107 - Statement of | 224 |
| 15 | | Financial Affairs for Individuals | |
| 16 | | Filing for Bankruptcy for Antoinette | |
| 17 | | Michelle Grant - Bates CLOKC 1378 | |
| 18 | | through 1383 (6 pages) | |
| 19 | 47 | Official Form 106J - Schedule J for | 226 |
| 20 | | Antoinette Michelle Grant - | |
| 21 | | Bates CLOKC 1375 and 1376 (2 pages) | |
| 22 | 48 | Verification by Debtors for Antoinette | 227 |
| 23 | | Michelle Grant - Bates CLOKC 1254 | |
| 24 | | (1 page) | |
| 25 | 49 | Best Case Bankruptcy Case Notes for | 228 |

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 9 of 74
JASON AMERINE  9/5/2019

Page 9

```
 1              Huzaifah Babiker - Bates CLOKC 1331
 2              (1 page)
 3     50       Attorney-Client Retainer Agreement for      230
 4              Huzaifah Babiker - Bates CLOKC 1886
 5              and 1887 (2 pages)
 6     51       Castle Law Office Statement for              233
 7              Huzaifah Babiker - Bates CLOKC 1830
 8              (1 page)
 9     52       Attorney-Client Retainer Agreement for      233
10              Huzaifah Babiker - Bates CLOKC 1888
11              and 1889 (2 pages)
12     53       Rights and Responsibilities Agreement       235
13              Between Chapter 7 Debtors and Their
14              Attorneys for Huzaifah Tarik Babiker -
15              Bates CLOKC 1821 through 1824
16              (4 pages)
17     54       Declaration Re:  Electronic Filing for      236
18              Huzaifah Tarik Babiker - Bates CLOKC
19              1771 (1 page)
20     55       Disclosure of Compensation of Attorney      237
21              for Debtors for Huzaifah Tarik
22              Babiker - Bates 1779 (1 page)
23     56       Contract for Postpetition Chapter 7         241
24              Legal Services for Huzaifah Babiker -
25              Bates CLOKC 1890 and 1891 (2 pages)
```

**JASON AMERINE  9/5/2019**

```
 1    57    Recurring Payment Authorization and      243
 2          Consent Form for Huzaifah Babiker -
 3          Bates CLOKC 1892 (1 page)
 4    58    BK Billing Payment Receipt for           244
 5          Huzaifah Babiker - Bates BKB 39
 6          (1 page)
 7    59    Invoice Details for Huzaifah Babiker -   245
 8          Bates BKB 50 (1 page)
 9    60    Official Form 106J - Schedule J for      248
10          Huzaifah Tarik Babiker -
11          Bates CLOKC 1802 and 1803 (2 pages)
12    61    Official Form 107 - Statement of         251
13          Financial Affairs for Individuals
14          Filing for Bankruptcy for Huzaifah
15          Tarik Babiker - Bates CLOKC 1805
16          through 1810 (6 pages)
17    62    Verification by Debtors for Huzaifah     252
18          Tarik Babiker - Bates CLOKC 1893
19          (1 page)
20    63    Disclosure of Compensation of Attorney   253
21          for Debtors - Amended -
22          Bates CLOKC 1825 (1 page)
23    64    E-mails - Bates CLOKC 266 and 267        255
24          (2 pages)
25    65    E-mails - Bates CLOKC 237 (1 page)       261
```

Case 17-41701-can7    Doc 40-2    Filed 11/12/20    Entered 11/12/20 17:55:16    Desc
Exhibit 2 (Deposition of J Amerine)    Page 11 of 74
JASON AMERINE  9/5/2019

Page 11

```
 1    66   E-mails - Bates CLOKC 177 and 178         264

 2         (1 page)

 3    67   E-mails - Bates CLOKC 145 (1 page)        267

 4    68   E-mails - Bates CLOKC 140 (1 page)        268

 5    69   E-mails - Bates CLOKC 110 (1 page)        271

 6    70   E-mails - Bates CLOKC 91 (1 page)         273

 7    71   Disclosure of Compensation of Attorney    274

 8         for Debtors for Brian Nelson Laverne

 9         Wilson - Bates Castle UST 1658

10         (1 page)

11    72   Bankruptcy Petition for Chad Michael       278

12         Gibson and Leslee Belle Gibson

13         (5 pages)

14    73   Disclosure of Compensation of Attorney    279

15         Debtors for Chad Michael Gibson and

16         Leslee Belle Gibson (1 page)

17    74   Disclosure of Compensation of Attorney    281

18         Debtors for Mimi Genee Laws (1 page)

19

20    Reporter's Notes:  The exhibits were returned to

21    plaintiff's counsel.

22

23

24

25
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 12 of 74
**JASON AMERINE  9/5/2019**

**Page 12**

1                        STIPULATION

2            IT IS STIPULATED AND AGREED by and between

3    the respective parties hereto that said deposition

4    shall be signed by the witness before the time of

5    trial of this case.

6                    P R O C E E D I N G S

7            (The deposition commenced at 9:20 a.m.)

8                    JASON AMERINE,

9    a witness, being first duly sworn, testified under

10   oath as follows:

11                      EXAMINATION

12   BY MR. MILLER:

13       Q.   Mr. Amerine, you and I know each other

14   so -- this is the deposition of Mr. Amerine, the

15   defendant, in the adversary case -- or actually four

16   adversary cases which have been consolidated for

17   pretrial proceedings under the caption Casamatta

18   v. Castle Law Office of Kansas City and Jason

19   Amerine, adversary; Case No. 18-4168.

20            Let me give you some general instructions.

21   I think you've heard them.  You've been present for

22   all of the depositions, but I just want to make sure

23   we are all clear on the record.  I don't want you to

24   speculate to anything.  If you don't know the answer

25   to my question, tell me you don't know.  It's okay

**JASON AMERINE  9/5/2019**

**Page 22**

 1      Q.    And how -- when did you first become

 2  familiar with BK Billing?

 3      A.    Sometime in 2017.

 4      Q.    Okay.  How did you become familiar with

 5  them?

 6      A.    Through other debtors law firms throughout

 7  the country.

 8      Q.    Anyone in the Kansas City area that you

 9  talked to about BK Billing at that time?

10      A.    No.

11      Q.    Did you at some point make a decision to

12  start utilizing BK Billing services?

13      A.    Yes.

14      Q.    Did you have any conversations with

15  BK Billing before you signed up or signed any

16  paperwork with BK Billing?

17      A.    I'm sure I did.

18      Q.    Do you know who you would have talked to

19  at BK Billing?

20      A.    It would have been John Magueny (phonetic)

21  or David Stidham.

22      Q.    Do you recall any of those conversations

23  before you signed up with BK Billing?

24      A.    It would have just been the general

25  procedures on how to handle those types of cases and

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 14 of 74
JASON AMERINE  9/5/2019

Page 23

 1   what kind of feedback they were receiving at other

 2   venues.

 3         Q.    Approximately, how many bankruptcy cases

 4   have you filed as an attorney?

 5         A.    I have no idea.

 6         Q.    I assume that number would be in the

 7   thousands?

 8         A.    Probably.

 9         Q.    Prior to signing up with BK Billing, had

10   you offered or utilized a zero-down Chapter 7

11   bankruptcy filing method?

12         A.    I mean there's pro bono cases that I do

13   frequently, but not just like these, no.

14         Q.    Had you heard the term bifurcation prior

15   to filing with BK Billing?

16         A.    Yes.

17         Q.    What was your experience or knowledge with

18   bifurcation prior to BK Billing?

19         A.    Can you ask the question again?

20         Q.    Sure.  Did you have any experience in

21   bifurcating fees prior to working with BK Billing?

22         A.    I don't recall.

23         Q.    Do you recall if you've ever bifurcated a

24   case prior to BK Billing?

25         A.    I don't remember.

**JASON AMERINE  9/5/2019**

**Page 24**

1      Q.    Is it possible that you had bifurcated a
2  case?

3      A.    Sure.

4      Q.    Do you recall drafting any fee agreements
5  that provided for the bifurcation of cases?

6      A.    No.

7           (J. Amerine Exhibit No. 1 was marked for
8  identification.)

9      Q.    (By Mr. Miller)  I'll hand you a document
10  I've marked as Exhibit 1.  Have you seen this
11  document before?

12      A.    Yes.

13      Q.    And for the record, I'll note that this is
14  a document entitled "BK Billing Accounts Receivable
15  Assignment Agreement."  It's Bates stamped as a
16  production for BK Billing page numbers 3 through 9.
17  Could you tell me what your understanding of this
18  document is?

19      A.    This was an agreement for Castle Law to
20  sell accounts receivable to BK Billing.

21      Q.    Turning to the last page of this form, it
22  looks like this form was electronically submitted.
23  Do you see that?

24      A.    It looks like it.

25      Q.    Did you personally submit this paperwork

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 16 of 74
JASON AMERINE  9/5/2019

Page 25

```
 1   to BK Billing?

 2        A.   Yes.

 3        Q.   Did you read this document before you

 4   submitted it to BK Billing?

 5        A.   Yes.

 6        Q.   Prior to entering into this agreement with

 7   BK Billing, have you ever factored fees with any

 8   other entity?

 9        A.   No.

10        Q.   To the best of your knowledge, did Castle

11   Law ever factor fees prior to entering into this

12   agreement?

13             MR. KOEHLER:  Objection, form, assumes

14   facts not in evidence.

15             Go ahead and answer.

16        A.   Not that I'm aware of.

17        Q.   (By Mr. Miller)  What was your

18   understanding of the purpose of this agreement?

19        A.   I think I answered that.  Rephrase.

20        Q.   Well, I asked you if you have seen this

21   document and what you understood this document to

22   be.  What was your understanding of what the purpose

23   of this document is?

24             MR. KOEHLER:  I'll object to the extent

25   that it calls for a legal conclusion.  The document
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 17 of 74
JASON AMERINE  9/5/2019

Page 26

1    speaks for itself.

2              Go ahead and answer.

3        A.    You'll have to ask me one more time.

4        Q.    (By Mr. Miller)  What were you trying to

5    accomplish by entering into this document?

6              MR. KOEHLER:  Same objections.

7              Go ahead.

8        A.    To sell accounts receivable to a third

9    party.

10       Q.    (By Mr. Miller)  That third party being

11   BK Billing?

12       A.    Correct.

13       Q.    Let's look at some of the provisions of

14   this.  If you turn to page -- the very first page of

15   this document, which is page 3 at the bottom,

16   there's a purchase price.  Do you see that?

17       A.    Yes.

18       Q.    There's a clause.  What was your

19   understanding of how BK Billing was going to

20   purchase your accounts?

21       A.    They would purchase the receivables at a

22   discounted rate.

23       Q.    What was the discounted rate that they

24   would purchase receivables under this agreement?

25       A.    Well, I think it depended on the success

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 18 of 74
JASON AMERINE  9/5/2019

Page 27

1  of the contract that was being sold.

2      Q.    Well, were you -- maybe we need to take a

3  step back from this.  What was your understanding of

4  the process of how it would work to factor your

5  accounts with BK Billing?

6      A.    We would get a percentage of the contract

7  initially, and based on the performance of the

8  contract, there would be an additional amount.

9      Q.    So at the time that you transferred the

10  account to BK Billing, Castle Law would receive an

11  advance; is that correct?

12      A.    Correct.

13      Q.    Okay.  And then depending on whether or

14  not the client paid BK Billing, there would be

15  additional amounts transferred to Castle Law; is

16  that correct?

17      A.    Correct.

18      Q.    Would there ever be a time, based on your

19  understanding of this agreement, when BK Billing

20  would have to return any of the monies to you --

21  or -- I'm sorry -- Castle Law would have to return

22  any monies to BK Billing that had been advanced?

23      A.    I don't recall that happening.

24      Q.    Well, I think we're mixing time periods.

25  At the time that you entered into this agreement,

**JASON AMERINE  9/5/2019**

**Page 28**

1   was it your understanding that there would ever be a

2   time when Castle Law might have to either repurchase

3   or have to give back part of the advance to

4   BK Billing?

5      A.   No.

6      Q.   What was the percentage of the fee that

7   would be advanced to BK Billing -- or from

8   BK Billing to Castle Law at the time that the

9   agreement of contract was factored?

10     A.   I believe it was 60 percent.

11     Q.   And then I've deposed BK Billing, and they

12  referred something called a holdback.  Are you

13  familiar with that?

14     A.   Yes.

15     Q.   What was your understanding of what the

16  holdback is at BK Billing?

17     A.   The holdback was to protect BK Billing due

18  to nonperformance, not underperforming contracts.

19     Q.   So if a client didn't pay BK Billing, then

20  those -- the amount of the holdback would be

21  credited to BK Billing; is that correct?

22     A.   Well, I wouldn't get the remaining portion

23  of the contract; so that was the -- the consequence

24  was on me for the contract not performing.

25     Q.   Was it your understanding if clients

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 20 of 74
JASON AMERINE  9/5/2019

Page 31

1    authorization, and I think proof of the case number.

2        Q.    Would you ever send the clients' financial

3    information to BK Billing?

4        A.    I think -- yeah, we would send pay stubs.

5        Q.    Did you tell the clients that you were

6    sending their pay stubs to BK Billing?

7        A.    Yes.

8        Q.    Would you ever send any of their bank

9    records to BK Billing?

10        A.    That may have happened if they didn't have

11    a job.

12        Q.    Okay.  Did you receive any written

13    authorization from a client to send their bank

14    statements to BK Billing?

15        A.    Yes.

16        Q.    And would you keep that written

17    authorization in your file?

18        A.    Yes.

19        Q.    Was that on the same form or separate form

20    from the authorization to collect the payments?

21        A.    I believe it was the same form.

22        Q.    Did you understand whether or not -- let

23    me strike that.

24            Did you have any understanding if

25    BK Billing performed any type of underwriting of the

Case 17-41701-can7  Doc 40-2  Filed 11/12/20  Entered 11/12/20 17:55:16  Desc
Exhibit 2 (Deposition of J Amerine)  Page 21 of 74
JASON AMERINE  9/5/2019

Page 32

1    individual clients to determine if they were

2    creditworthy?

3         A.   Yes.

4         Q.   What was your understanding of the

5    underwriting process of BK Billing?

6         A.   I don't recall what the exact threshold

7    was at the time, but there was a minimum amount that

8    had to be -- there's a minimum salary to qualify at

9    that time.

10        Q.   Okay.  When you say "at that time," we're

11   talking about when you first entered into this

12   agreement in 2017?

13        A.   There was always an underwriting

14   threshold, but it changed over time; so I don't know

15   what it was at this time.

16        Q.   Okay.  But it was your understanding

17   that -- and I think you've answered, yes, that --

18   that there was some degree of qualification going on

19   at BK Billing; is that correct?

20        A.   Yes.

21        Q.   Do you have any recollection if any of

22   your clients were rejected by BK Billing?

23        A.   I believe we had a couple that were

24   initially rejected.  We had to provide additional

25   documents, and then it was approved.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 22 of 74
JASON AMERINE  9/5/2019

Page 34

1        Q.   There's a second paragraph -- or a second
2   sentence there.  It says "Provided, however,
3   BK Billing shall notify the firm prior to making any
4   such negative report, and the firm shall have the
5   right to buy back the same at the buyback purchase
6   price within 10 days thereafter."  Do you see that?
7        A.   Yes.
8        Q.   Did you ever receive any notifications
9   from BK Billing that they were intending to
10  negatively report your clients?
11       A.   No.
12       Q.   Did you ever buy back any accounts from
13  BK Billing?
14       A.   No.
15       Q.   Prior to entering into this agreement, did
16  you do any due diligence to determine whether or not
17  entering into this agreement was ethically
18  permissible?
19       A.   I looked to see what was going on in other
20  jurisdictions.  I mean there was nothing on point in
21  Missouri or Kansas as to whether or not this was
22  ethical or unethical, and all I could do was look to
23  see what was going on other places and --
24       Q.   Did you retain counsel to review this
25  agreement?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 23 of 74
JASON AMERINE  9/5/2019

Page 36

 1    like it was electronically submitted to BK Billing;

 2    is that correct?

 3         A.   It appears to be.

 4         Q.   Do you recall if you personally filled

 5    this information out?

 6         A.   I would have been the one that did this,

 7    yes.

 8         Q.   Okay.  Do you have any reason to doubt

 9    that you submitted this to BK Billing on or about

10    June 26 of 2017?

11         A.   No.

12         Q.   Do you have any reason to doubt that this

13    is an authenticated copy of the amendment to the

14    accounts receivable assignment agreement?

15         A.   No.

16         Q.   What do you believe is the purpose of this

17    particular amendment?

18         A.   I believe this changed the percentage that

19    was advanced and the holdback terms.

20         Q.   And what is your understanding of the

21    changes to the hold -- to the percentage payment?

22         A.   I believe the percentage increased from

23    what the previous was, but the holdback was a little

24    more stringent on the debtor's attorney.  I'm not

25    100 percent certain.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 24 of 74
JASON AMERINE  9/5/2019

Page 37

1      Q.   Did you have any discussions with

2   BK Billing that you recall prior to authenticating

3   this amendment?

4      A.   No.

5      Q.   Would you have received some sort of

6   memorandum or other document from BK Billing

7   explaining these changes?

8      A.   There may have been an e-mail stating they

9   were changing the percentages, but I don't recall.

10      Q.   But under this agreement, as I understand

11   it, 60 percent of the total value of the agreement

12   would be disbursed to you at the time that you

13   submitted the documents to BK Billing and they were

14   approved; is that correct?

15      A.   Correct.

16      Q.   And then 15 percent of the total amount or

17   value of the contract would then be held back; is

18   that correct?

19      A.   Correct.

20      Q.   Did you ever receive any payments from the

21   holdback to you?

22      A.   No.

23      Q.   So you've never received any of the

24   15 percent of the escrowed amounts paid to Castle

25   Law?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 25 of 74
**JASON AMERINE  9/5/2019**

**Page 38**

```
 1        A.    No.

 2        Q.    Is that because the holdback was always a

 3   negative balance?

 4        A.    Correct.

 5              (J. Amerine Exhibit No. 3 was marked for

 6   identification.)

 7        Q.    (By Mr. Miller)  I'm handing you a

 8   document that I just marked as Exhibit 3 for your

 9   deposition.  It's Bates stamped Castle Law

10   Production 3206 through 3208.  It's entitled

11   "BK Billing Holdback Reconciliation."  Do you see

12   that?

13        A.    Yes.

14        Q.    Are you familiar with this document?

15        A.    Yes.

16        Q.    Did you provide this document to

17   Mr. Koehler?

18        A.    Yes.

19        Q.    Could you explain to me generally what

20   this document is intended to represent?

21        A.    It represents the payments on each

22   account, and I believe the defaults per each

23   account.  And I'm not exactly sure what else is on

24   here, but that's the gist of it is what's been paid

25   and what's been defaulted.
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 26 of 74
JASON AMERINE  9/5/2019

Page 40

1       A.    Yes.

2       Q.    To the best of your knowledge, does this

3   document have clients from both the Western District

4   of Missouri and the District of Kansas on it?

5       A.    Yes.

6       Q.    You don't have a separate list at all

7   maintained by Castle Law, just the cases that were

8   filed in the Western District of Missouri?

9       A.    Not that I'm aware of.

10      Q.    Okay.  Let's look at some things on this

11  document, please.  At the very top of the document

12  it says "Law Firm:  Castle Law of Kansas City"; is

13  that correct?

14      A.    Yes.

15      Q.    And then it says this document is "As of

16  March 31 of 2019"; is that correct?

17      A.    Yes.

18      Q.    Then it says "Previous holdback balance."

19  Do you see that?

20      A.    Yes.

21      Q.    And it seems to indicate a negative

22  $22,750.14; is that correct?

23      A.    Yes.

24      Q.    What is your understanding of what that

25  number represents?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 27 of 74
JASON AMERINE  9/5/2019

Page 41

1        A.    That there's been $22,750.14 of missed

2    payments.

3        Q.    If you go to the "Current Missed

4    Payments" -- do you see that?

5        A.    Yes.

6        Q.    -- it says there's $1,114.33; is that

7    correct?

8        A.    Yes.

9        Q.    Is it your understanding that that's the

10   number -- total number of missed payments that were

11   due during the month of March of 2019 that were not

12   paid by your client to BK Billing?

13       A.    I don't know what that number means.

14       Q.    Okay.  Do you see current month

15   chargebacks?

16       A.    Yes.

17       Q.    It says it's a negative $1,511.67?

18       A.    Yes.

19       Q.    What is your understanding of what that

20   number is, if you have one?

21       A.    It looks like those were the current month

22   missed payments, but I'm not sure.

23       Q.    It says "New holdback balance."  And it's

24   a negative $23,147.48.  Do you see that?

25       A.    Correct.

**JASON AMERINE  9/5/2019**

**Page 48**

```
 1        Q.    And advanced was $1,631.25?

 2        A.    Yes.

 3        Q.    The total amount of payments by Ms. James

 4   was expected to be $2,175?

 5        A.    Yes.

 6        Q.    And Ms. James appears to have made all of

 7   those payments; is that correct?

 8        A.    Yes.

 9        Q.    So of the three of the four clients we are

10   here on today, only Mr. Babiker did not make all of

11   his payments?

12        A.    It appears that way.

13        Q.    Do you have any other evidence that you're

14   aware of to the contrary?

15        A.    No.

16        Q.    Prior to entering into a relationship or

17   about the time you entered into a relationship with

18   BK Billing, did you engage in the United States

19   Trustee's office in some conversations about whether

20   or not bifurcation would be acceptable to our

21   office?

22        A.    Yes.

23        Q.    Who do you recall speaking with at the

24   United States --

25        A.    Ms. Wattenbarger.
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 29 of 74
JASON AMERINE  9/5/2019

Page 49

```
 1                 (J. Amerine Exhibit No. 4 was marked for

 2      identification.)

 3           Q.    (By Mr. Miller)  I've marked as Exhibit 4

 4      an e-mail.

 5                 MR. MILLER:  For the record, what I've

 6      labeled as Exhibit 4 is an e-mail that we produced

 7      in discovery.  It's marked Castle UST 0161 through

 8      0162.

 9           Q.    (By Mr. Miller)  Putting aside the fact

10      that this has some headers on it where

11      Ms. Wattenbarger forwarded it to me to produce to

12      your attorney, have you seen this document before?

13           A.    Yes.

14           Q.    And does this appear to be an accurate

15      reflection of your communications with

16      Ms. Wattenbarger?

17           A.    Yes.

18           Q.    It seems to indicate that on June 6 of

19      2017 you e-mailed Ms. Wattenbarger around 9:30 a.m.;

20      is that correct?

21           A.    Yes.

22           Q.    And you say:

23                 "Good morning, Sherri.  Does your office

24      have any opinion one way or another on bifurcated

25      retainers for Chapter 7, assuming they are done
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 30 of 74
JASON AMERINE  9/5/2019

Page 50

1   properly, i.e., full disclosure to debtor,

2   reasonableness at work, pre v post, et cetera."

3         And then you said:

4         "I see no case law in the circuit other

5   than In re Perez out of Nebraska that deals with a

6   reaffirmation of attorney fees.  Thank you."

7         Do you see that?

8   A.   Yes.

9   Q.   And you authored that e-mail to

10  Ms. Wattenbarger?

11  A.   Yes.

12  Q.   And Ms. Wattenbarger replied the same day

13  it would appear?

14  A.   Yes.

15  Q.   And it says:

16        "Jason," comma, "Yes, we do not object so

17  long as they are done properly as you've described.

18  They should be in writing in the retainer agreement

19  and the bifurcation must be reasonable, meaning that

20  it must be a realistic apportionment of pre- and

21  postpetition services.

22        "Thank you, Sherri."

23        Do you see that?

24  A.   Yes.

25  Q.   Did you have an understanding of what

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 31 of 74
**JASON AMERINE  9/5/2019**

**Page 51**

1    Ms. Wattenbarger was communicating to you on June 6?

2              MR. KOEHLER:  Objection, calls for

3    speculation.

4              Go ahead and answer to the extent you

5    know.

6         A.   Yes.

7         Q.   (By Mr. Miller)  What was your

8    understanding of what Mr. Wattenbarger communicated

9    to you?

10        A.   That bifurcation was permitted by your

11   office, and there were certain procedures that had

12   to be complied with to make it, I guess, acceptable.

13        Q.   And what was your understanding of what

14   those procedures needed to be?

15        A.   That the fees that were charged for the

16   work done prefiling must be reasonable and that the

17   fees charged for the work done postpetition was to

18   be reasonable to those services.  Debtor must be

19   informed as to what was going on.

20        Q.   So you had an understanding that the

21   bifurcation itself must be allocated to the

22   prepetition and postpetition services being

23   rendered?

24             MR. KOEHLER:  Objection, form and calls

25   for speculation.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 32 of 74
JASON AMERINE  9/5/2019

Page 52

```
 1              Go ahead and answer.
 2       Q.    (By Mr. Miller)  It seems to me that
 3  you're confused by the question; so I'll try to
 4  rephrase it for you.
 5       A.    Okay.
 6       Q.    So did you have an understanding that the
 7  U.S. Trustee believed, based on Mrs. Wattenbarger's
 8  e-mail, that the fee that was charged in a
 9  bifurcation would be separately allocated to the
10  prepetition amounts and postpetition amounts?
11              MR. KOEHLER:  Objection, form, foundation,
12  calls for speculation.
13              Go ahead and answer.
14       A.    I knew that the work allocated prepetition
15  must be reasonable to the fee charged and vice-versa
16  with the post.
17       Q.    (By Mr. Miller)  Okay.  Was this the
18  extent of your communications with the United States
19  Trustee's office of the Western District of Missouri
20  prior to completing any work on any bifurcated
21  BK Billing cases?
22       A.    It seems like I would have replied to
23  this, but if you don't have anything, if we didn't
24  produce anything, then I guess so.
25       Q.    Do you have any independent recollection
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 33 of 74
JASON AMERINE  9/5/2019

Page 54

 1        Q.    Did you review that agreement before it
 2   was implemented at Castle Law?
 3        A.    Yes.
 4        Q.    Talking about the postpetition agreement
 5   now, would the same be true, was that drafted by
 6   somebody outside of Castle Law?
 7        A.    Yes.
 8        Q.    And did you review that document before it
 9   was used at Castle Law?
10        A.    Yes.
11        Q.    Do you recall if you made any changes to
12   either the pre- or postpetition agreement before it
13   was implemented?
14        A.    I believe we changed some of the blanks
15   for numbers.
16        Q.    Did you talk to your nonattorney staff
17   about implementing BK Billing before you took on
18   your first BK Billing client?
19        A.    Yes.
20        Q.    And do you recall what information you
21   provided to your nonattorney staff?
22        A.    Written or oral?
23        Q.    Let's start with oral.
24        A.    Okay.  I told everyone on the
25   BK Billing -- or -- I'm sorry -- the bankruptcy

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 34 of 74
**JASON AMERINE  9/5/2019**

**Page 55**

1   staff how this had to be done to make it work for
2   the debtors, and that was based off of my
3   discussions with people outside of our district
4   because I knew it was being approved by the
5   U.S. Trustee and those places.  So I took what
6   information was given to me and implemented it here.
7   We didn't have a road map here to follow; so I used
8   what was outside being approved.
9        **Q.   Let's break that down just a little bit.**
10  **You mentioned that you believe that it was being**
11  **approved by other United States Trustees, and it was**
12  **being done in a certain manner; is that correct?**
13       A.   It was being approved.
14       **Q.   What jurisdictions do you believe that**
15  **bifurcation with BK Billing was being approved in?**
16       A.   There's several.  I mean the most recent
17  one is Utah.  I mean that's the 10th Circuit; so
18  it's right next door.
19       **Q.   Do you believe those bifurcations were**
20  **approved by the court or a United States Trustee or**
21  **some combination thereof?**
22       A.   Combination.
23       **Q.   At the time you implemented BK Billing,**
24  **what jurisdictions did you believe that it was**
25  **approved in?**

**JASON AMERINE  9/5/2019**

**Page 56**

1        A.    I don't remember all of them.

2        Q.    Okay.  Now, you said specifically that

3    there had -- that there was a way that it had to be

4    done to make it acceptable to you; is that correct?

5        A.    Correct.

6        Q.    Could you explain to me what that

7    particular manner or way of proceeding was?

8        A.    Well, obviously the debtor had to be

9    informed of what we were doing.  The work performed

10    had to be evenly distributed between what we were

11    charging prefiling versus what we were filing

12    postfiling; so in other words, if we were doing the

13    work prepetition, then we can't charge a lower

14    amount for postpetition because the work has already

15    been done; so we knew we had to do the bulk of the

16    work postpetition to make this work for the debtor.

17        Q.    So in these cases the decision to do the

18    work postpetition was done based on the need to be

19    able to bifurcate the fee and the work in the

20    postpetition amounts?

21        A.    The decision was made to make sure we

22    could help the debtors with this process.

23        Q.    Did you implement specific procedures as

24    to exactly what work should be done prepetition and

25    postpetition in BK Billing cases?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 36 of 74
JASON AMERINE  9/5/2019

Page 57

1      A.   The only work that was done prepetition
2    was the consultation and the shell.

3      Q.   **Okay.  What documents did you instruct**
4    **your staff to collect or -- before the shell was**
5    **completed and filed?**

6      A.   As many of the documents that were on the
7    checklist.

8      Q.   **Okay.  Let's go back for a minute.  Let's**
9    **discuss an initial consultation.  What was your**
10    **understanding or expectation for an initial**
11    **consultation at Castle Law?**

12      A.   So the attorney would meet with the
13    prospect at the consultation, decide if bankruptcy
14    was an option for the debtor.  If it was, then we
15    would go into what options they had:  Chapter 7,
16    Chapter 13.  Once Chapter 7 was determined as the
17    best option, we would talk about fees, and if the
18    upfront fee option wasn't feasible for that
19    particular client, then at that time BK Billing was
20    presented as an alternate option.

21      Q.   **Was it your expectation as to -- that an**
22    **attorney would do the initial consultation?**

23      A.   Yes.

24      Q.   **Were those typically done in person or by**
25    **telephone or some combination thereof?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 37 of 74
JASON AMERINE  9/5/2019

Page 58

1        A.    90 percent of them were done in person.

2        Q.    And in an initial consultation in person,

3   would there be an expectation that the client would

4   complete some information for Castle Law?

5        A.    There's an intake sheet.

6        Q.    What -- to the best of your recollection,

7   what was that intake sheet trying to capture?

8        A.    Whether they should even be in our office

9   or not.

10       Q.    Well, I'm talking specifically.  I

11  understand generally why you would use an intake

12  sheet.  What information specifically were you

13  capturing on the intake sheet?

14       A.    Me personally, I can use the intake sheet

15  to determine everything that needs to happen with

16  the client.  It has real estate, vehicle, values,

17  mortgage, income, expenses, debt.

18       Q.    I understand from deposing your employees

19  that there was a more detailed packet or client

20  questionnaire that was then given to the client; is

21  that correct?

22       A.    Yes.

23       Q.    Would that be given at the initial

24  consultation to the client?

25       A.    It would be given to them after they

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 38 of 74
**JASON AMERINE  9/5/2019**

**Page 59**

1    decided to retain us.

2        Q.    **What was your expectation about when that**

3    **document would be completed by the client?**

4        A.    When they returned.

5        Q.    **Would you file a BK Billing case without**

6    **that client questionnaire being completed by the**

7    **client?**

8        A.    I don't know.

9        Q.    **Was it your expectation that it would be**

10   **completed by the client before the shell was filed?**

11       A.    My expectation was that all of the work

12   was to be done postpetition; so if it wasn't filled

13   out, then it was going to be filled out after the

14   shell.

15       Q.    **Well, would you not have needed the**

16   **information to decide if the debtor qualified for a**

17   **Chapter 7?**

18       A.    Not necessarily.

19       Q.    **Would you have an expectation that your**

20   **attorneys would review pay statements prior to**

21   **filing the BK Billing shell?**

22       A.    Not necessarily.

23       Q.    **Wouldn't they need to determine what the**

24   **debtor's CMI would be to determine if they qualified**

25   **for a Chapter 7?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 39 of 74
JASON AMERINE  9/5/2019

Page 62

1            What would be -- in a BK Billing case,

2    after the initial consultation, what would be the

3    next step by Castle Law?

4        A.   The next step would be they would come in

5    for the shell.

6        Q.   Okay.

7        A.   Sarah would make sure we have whatever

8    documents they brought in, may or may not have all

9    of them.  If the bulk of them were there, then they

10   meet with the attorney.  They file the shell, the

11   shell petition.  The case is filed, and then they

12   would go back at some and meet with Sarah either

13   that day or a different day.  I don't always know

14   what day she met with them.  It was never before the

15   shell, I know that, but I don't know if it was the

16   same day.

17       Q.   Okay.  How would it be determined what

18   attorney would meet with them at the shell?

19       A.   It was just whoever was available.

20       Q.   What does a shell mean to you?  What does

21   the term shell mean to you as we're using it here

22   today?

23       A.   It's just the bare bones petition.  No

24   schedules.

25       Q.   So we're talking about the petition, the

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 40 of 74
**JASON AMERINE  9/5/2019**

**Page 63**

1  matrix.  What other documents would you include in a

2  shell filing?

3       A.   I believe the social security verification

4  page, and with the BK Billing we're -- at some

5  point -- I don't know if we did in these cases -- we

6  were filing a disclosure of compensation.

7       Q.   So the client would come in.  Who would

8  prepare that shell for the client's review?

9       A.   When they came in when?  For the actual

10 shell?

11      Q.   So there would be a shell appointment,

12 correct?

13      A.   Yes.

14      Q.   What was the purpose of the shell

15 appointment?

16      A.   To sign the petition.

17      Q.   Who would have prepared the petition that

18 they would be signing?

19      A.   It would have been prepared at the

20 consultation; so it would have been printed for

21 signature at the shell signing.

22      Q.   Okay.  So the attorney who did the initial

23 consultation would prepare the petition?

24      A.   Correct.

25      Q.   And that would typically be done while the

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 41 of 74
JASON AMERINE  9/5/2019

Page 64

1    client was in the office at the initial

2    consultation?

3        A.    Yes.

4        Q.    And that was based on the information that

5    was provided to you, the attorney, during the

6    initial consultation?

7        A.    Correct.

8        Q.    And then it would just be printed at

9    the -- for the signing?

10       A.    The shell signing.

11       Q.    Why would there need to be a delay, then?

12   If the petition was prepared at the initial

13   consultation, why wouldn't you just have the client

14   sign it and file it right then?

15       A.    Because we need documents.

16       Q.    Maybe I'm just a little confused.  You

17   testified earlier that you thought you could get all

18   of the information from the initial consultation

19   sheet in most of your cases; is that correct?

20       A.    That's to determine whether or not they

21   need our services or not.

22       Q.    Okay.

23       A.    Yeah.

24       Q.    Okay.  But not necessarily whether or not

25   they qualify for it or shouldn't be filing a

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 42 of 74
**JASON AMERINE  9/5/2019**

**Page 65**

1   **particular chapter of bankruptcy?**

2        A.   I can generally determine if they qualify

3   based on the intake sheet.

4        **Q.   Okay.**

5        A.   I mean the purpose of the second

6   appointment was to get the packet, the thicker

7   packet filled out -- tax returns, bank statements,

8   the pay stubs -- but the actual going through all of

9   that was not done until after the shell.  It was

10  gathered up, but whether or not we were missing a

11  pay stub or bank statement was not done until after

12  the shell.

13       **Q.   Okay.  I understand that.  Would the**

14  **attorney who was present at the signing of the**

15  **shell, would they review those documents with the**

16  **client prior to signing the petition?**

17       A.   No.

18       **Q.   So all you were trying to do was to verify**

19  **the client had the documents with them?**

20       A.   Yes.

21       **Q.   Why would you need to know if the client**

22  **had the documents with them before you actually**

23  **filed the case if you weren't reviewing the**

24  **documents?**

25       A.   So we could get it processed after the

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 43 of 74
**JASON AMERINE  9/5/2019**

**Page 66**

1    shell was filed.

2        Q.    Let's look at some specific case examples

3    of these specific four cases.

4            (J. Amerine Exhibit No. 5 was marked for

5    identification.)

6        Q.    (By Mr. Miller)  I think you testified a

7    few moments ago you don't recall ever meeting with

8    Ms. James; is that correct?

9        A.    I don't recall meeting with any of these

10   people.

11       Q.    Okay.  I'm handing you what has been

12   marked as Exhibit 5.

13           MR. MILLER:  And I'll represent for the

14   record that this is a document titled "Best Case

15   Bankruptcy Case Notes" for Rosa James.

16       Q.    (By Mr. Miller)  Do you see that?

17       A.    Yes.

18       Q.    Are you familiar with Best Case?

19       A.    Yes.

20       Q.    What is Best Case used for at your firm?

21       A.    It's for the bankruptcy management.

22       Q.    So would it be software that is basically

23   for case management?

24       A.    Correct.

25       Q.    And there is a place in Best Case to keep

**JASON AMERINE  9/5/2019**

**Page 70**

1        A.    The pre-  and postclasses, and the

2    credit -- I'm sorry -- the credit report.

3        **Q.    So Castle Law would advance the costs of**

4    **the pre- and postpetition credit counseling?**

5        A.    I don't know if we advanced the cost, but

6    it was included in the cost.

7        **Q.    Let me phrase it differently.  Maybe**

8    **"advance" was an inartful term.  Counsel would pay**

9    **those expenses and then would seek reimbursement**

10    **from the client?**

11        A.    The debtor would pay us, and then we would

12    pay.

13        **Q.    So you would pay -- Castle Law would pay**

14    **those expenses directly, not the debtor?**

15        A.    Yes.

16        MR. KOEHLER:  Make sure when he's done

17    take a breath, then answer.

18        THE WITNESS:  Okay.

19        **Q.    (By Mr. Miller)  And then there would be a**

20    **credit report fee, correct?**

21        A.    Yes.

22        **Q.    Did that -- what we've been calling it --**

23    **and maybe this term is inartful too -- standard fee**

24    **or general fee that Castle Law charged, did that**

25    **change in July of 2017?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 45 of 74
**JASON AMERINE  9/5/2019**

Page 71

1          A.    The fee changed in '17.  I don't recall

2    exactly when.  It was sometime in the spring.

3          Q.    **Okay.  And what did the fee change to?**

4          A.    I believe it was 1,810.

5          Q.    **Okay.  Did you charge a different amount**

6    **for BK Billing clients?**

7          A.    Yes.

8          Q.    **And what was the rationale for charging a**

9    **different amount for the BK Billing clients?**

10         A.    We always charge more for shells whether

11   they're Chapter 13s or Chapter 7s.  And so it's more

12   work, and I knew BK Billing cases were going to be

13   the same amount of work as a normal shell; so I

14   charged about the same amount more for those than I

15   did for 13s.

16         Q.    **Okay.  Why would it be more work to do a**

17   **shell?**

18         A.    Because usually there's an extra

19   appointment.  There's usually a scrambling of

20   dropping everything we're doing to clear calendars

21   for deadlines that we typically don't have on a

22   regular Chapter 7 or Chapter 13.  We almost always

23   have to add creditors postpetition.  They're just

24   more work.

25         Q.    **Would you file Chapter 7 shells outside of**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 46 of 74
**JASON AMERINE  9/5/2019**

**Page 72**

1    BK Billing?

2         A.    Yes.

3         Q.    **How many of those would you typically file**

4    **in a year?**

5         A.    Several.  I don't know.  It's not as

6    common as a Chapter 13.

7         Q.    **And would you charge more for those**

8    **Chapter 7 shells?**

9         A.    Yes.

10        Q.    **Would you charge the same amount as you**

11   **were charging your BK Billing clients for a**

12   **Chapter 7 shell that didn't involve BK Billing?**

13        A.    Possibly.

14        Q.    **When you say "possibly," you just don't**

15   **know, or do you think that's what you would normally**

16   **do?**

17        A.    I would charge about the same as a

18   BK Billing for a non-BK Billing shell.  It's based

19   off of my experience doing extra work, and it's

20   usually two to three hours' more work, if not more,

21   than that, and the debtors are typically a lot more

22   complicated to deal with.

23        Q.    **When you say they are "more complicated to**

24   **deal with," what do you mean by that?**

25        A.    There's a lot more chasing down of papers

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 47 of 74
JASON AMERINE  9/5/2019

Page 73

1   and missed 341 meetings and --

2       Q.   When you did a BK Billing case, it was

3   your -- you knew up front that you were not going to

4   get the full amount of the fee, correct?

5            MR. KOEHLER:  Objection, form and calls

6   for speculation.

7            Go ahead and answer it.

8            MR. MILLER:  I'll rephrase it.  I can ask

9   that question better than I did.

10      Q.   (By Mr. Miller)  When you filed a

11  BK Billing case, you understood that the full amount

12  of the fee that the client was signing up for would

13  not all be paid to Castle Law, BK Billing would

14  retain some of that when it was filed, correct?

15           MR. KOEHLER:  Objection, form, assumes

16  facts not in evidence.

17           Go ahead and answer.

18      A.   I knew we were selling the receivable at a

19  discount.

20      Q.   (By Mr. Miller)  So you knew the amount

21  that Castle Law would retain of the total amount of

22  the contract would be less than its face value?

23           MR. KOEHLER:  Yeah, go ahead and answer.

24      A.   Yes, yes.

25      Q.   (By Mr. Miller)  Did you factor in how

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 48 of 74
JASON AMERINE  9/5/2019

Page 74

 1    much BK Billing would retain into setting your

 2    prices in BK Billing cases?

 3         A.    No.

 4         Q.    Let's continue with the James case notes.

 5    So on February 14 of 2017 there's a note.  Do you

 6    see that?  It says "Client called and paid $50."

 7         A.    Yes.

 8         Q.    And then if you go down on 5/2 of 2017

 9    there's a second note.  It says "DM.  CL paid CC

10    payment of $50."  Do you see that?

11         A.    Yes.

12         Q.    So the debtor paid another $50 on May 2;

13    is that correct?

14         A.    Yes.

15         Q.    Okay.  And then on 5/25, it says "KEA.

16    Client called in a payment of $25"; is that correct?

17         A.    Yes.

18         Q.    Then there's a note on 6/26 of 2017.  It

19    says "SC.  Called client to follow up on payment and

20    discuss BK Billing."  Do you see that?

21         A.    Yes.

22         Q.    "BK Billing call set for June 28, 2017

23    with PRP."  Do you see that?

24         A.    Yes.

25         Q.    What was your understanding of the

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 49 of 74
**JASON AMERINE  9/5/2019**

**Page 75**

1    **June 26, 2017, note?**

2         A.   When we first started doing BK Billing, a

3    lot of the cases, specifically like three of the

4    four that you chose to pursue, were under a pay

5    upfront retainer; and these particular debtors could

6    not pay the fees either at all or in a timely

7    manner; so we were presenting another option for

8    them to get the relief they wanted.  So this was a

9    phone call that was going to be set up between the

10   debtor and an attorney to discuss the two-contract

11   option.

12        **Q.   Okay.  And it looks like that that phone**

13   **call did not -- or that phone conversation never**

14   **happened, but that Ms. Putnam e-mailed the client**

15   **with BK Billing info.  Do you see that on 6/28?**

16        A.   Yes.

17        **Q.   Okay.  And this note specifically refers**

18   **to financing.  Do you see that?**

19        A.   Yes.

20        **Q.   Did you ever personally discuss with**

21   **clients the BK Billing option?  I'm assuming that**

22   **answer to that question is yes?**

23        A.   Yes.

24        **Q.   Did you personally have discussions with**

25   **clients about using BK Billing services?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 50 of 74
JASON AMERINE  9/5/2019

Page 76

1       A.   Yes.

2       **Q.   What would you typically communicate to**

3  **them about BK Billing services?**

4       A.   So I always pushed the option of pay up

5  front.  That was always Plan A.  When that option

6  was not available, then I would discuss BK Billing

7  as -- or the two-contract system as an option.  And

8  I explained to them you know -- I don't know how

9  much detail you want here.

10      **Q.   Well, keep going.  You're still answering**

11 **my question, so --**

12      A.   I just told them what the process was to

13 do it under the two-contract system.

14      **Q.   When you explained how the payments would**

15 **be made postpetition, how would you explain how that**

16 **payment system would work to them?**

17      A.   I would just tell them that they have a

18 choice as to how to pay it, when to pay it, and it

19 would be debited off their card.

20      **Q.   Did any of those clients, to the best of**

21 **your recollection, question whether or not this was**

22 **a loan?**

23      A.   No.

24      **Q.   Did you view this as a loan?**

25      A.   No.

**JASON AMERINE  9/5/2019**

1      Q.   Well, somebody was extending credit to

2   these clients with an expectation of payment; is

3   that correct?

4          MR. KOEHLER:  Objection, foundation, form,

5   assumes facts not in evidence, calls for a legal

6   conclusion.

7          Go ahead and answer.

8      A.   The agreement was the debtor would make a

9   payment to a certain dollar amount, and then whether

10  or not they paid me or if I sold the account

11  receivable was irrelevant to the debtor.

12     Q.   (By Mr. Miller)  I understand that.  I

13  don't disagree with that.  But if you were -- you

14  were rendering services with the expectation that

15  you were going to get paid; is that correct?

16     A.   I do that every day.

17     Q.   I understand that.  But the expectation

18  was that the client was going to repay these

19  amounts; is that correct?  Or pay these amounts to

20  you; is that correct?

21     A.   It was hopeful.  What you don't understand

22  is the debtors appreciated this more than anything

23  else that could ever be offered to them; so there

24  was no chance they looked at it as a loan.  They

25  were so happy they could get relief.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 52 of 74
JASON AMERINE  9/5/2019

Page 95

1    filed by Castle Law later, and then did not retain

2    Castle Law to complete the schedules?

3         A.    No.

4         Q.    Are you aware of any clients of Castle Law

5    who signed an attorney-client retainer agreement in

6    a BK Billing case with Castle Law and then hired

7    another law firm to file its case?

8         A.    No.

9         Q.    Is it true that you would have a

10   discussion with the clients about what work needed

11   to be done postpetition in their case before the

12   case was filed?

13        A.    Yes.

14        Q.    Is it true that you would have discussed

15   with them what the fee postpetition would be?

16        A.    Yes.

17        Q.    Would you have told them what their

18   payments under the BK Billing arrangement would be

19   postpetition before the case was filed?

20        A.    Yes.

21        Q.    The next sentence in the agreement says

22   "However, Castle Law reserves the right to seek to

23   withdraw from my representation in the event I do

24   not sign a second retainer." Do you see that?

25        A.    Yes.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 53 of 74
**JASON AMERINE  9/5/2019**

**Page 97**

 1   **responsibilities agreement with respect to**

 2   **Ms. James?**

 3        MR. KOEHLER:  Objection, form, calls for

 4   conclusion.

 5        Go ahead and answer.

 6        MR. MILLER:  I asked him if he entered

 7   into an agreement with.

 8        MR. KOEHLER:  It's the difference between

 9   signing a document and entering into an agreement.

10   Same objection.

11        Go ahead and answer.

12     A.   I don't know.

13     Q.   **(By Mr. Miller)  Was it Castle Law's**

14   **practice in July of 2017 to enter into the rights**

15   **and responsibilities agreement in every Chapter 7**

16   **case filed in the Western District of Missouri?**

17     A.   Ask it again, please.

18     Q.   **Was it Castle Law's policy to enter into**

19   **the rights and responsibilities agreement for every**

20   **Chapter 7 case filed in the Western District of**

21   **Missouri in July of 2017?**

22        MR. KOEHLER:  Objection, vague as to what

23   "policy" means.

24        Go ahead and answer.

25     A.   Yes.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 54 of 74
**JASON AMERINE  9/5/2019**

**Page 99**

 1    responsibilities agreement that was filed in the

 2    Rosa Nichole Renee James bankruptcy case?

 3         A.   It looks like it.

 4         Q.   Do you see on page 3 of that document a

 5    title heading that's Roman numeral IV?

 6         A.   Yes.

 7         Q.   And it's titled "After the case is filed,

 8    your attorney agrees to provide all services

 9    necessary for representation, including, but not

10    limited to," 19 different requirements?

11              MR. KOEHLER:  Objection, form, legal

12    conclusion.

13              Go ahead and answer.

14         A.   Yes.

15         Q.   (By Mr. Miller)  And after signing this

16    agreement, this agreement would have obligated your

17    firm to attend Ms. James' 341 meetings, correct?

18              MR. KOEHLER:  Objection, form, calls for a

19    legal conclusion.

20              Go ahead and answer.

21         A.   Not necessarily.

22         Q.   (By Mr. Miller)  Under what conditions,

23    based on your understanding of this agreement, would

24    you not be required to attend Ms. James' 341?

25              MR. KOEHLER:  Objection, form, calls for

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 55 of 74
**JASON AMERINE  9/5/2019**

**Page 100**

 1    legal conclusions.

 2              Go ahead and answer.

 3         A.    I believe this document creates an

 4    ambiguity between my agreement with my client.

 5         **Q.    (By Mr. Miller)  Would you look at**

 6    **paragraph 3 of Part 4 of this agreement?  Do you see**

 7    **that?**

 8         A.    Yes.

 9         **Q.    Could you read that?**

10         A.    "Attend the 341 meetings and any court

11    hearings either personally or through another

12    attorney from his or her firm or through an

13    appearance attorney who has been adequately briefed

14    on this case."

15         **Q.    Would you turn to the last page of this**

16    **agreement?  This document was signed on July 25 of**

17    **2017; is that correct?**

18         A.    Yes.

19         **Q.    And it was signed by Ms. James; is that**

20    **correct?**

21         A.    Yes.

22         **Q.    And then your name appears on this**

23    **document; is that correct?**

24         A.    Yes.

25         **Q.    Did you personally sign this document?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 56 of 74
**JASON AMERINE  9/5/2019**

**Page 109**

```
 1              MR. KOEHLER:  Objection, form, legal
 2   conclusion.
 3              Go ahead and answer.
 4        A.   No.
 5        Q.   (By Mr. Miller)  Why do you think that's
 6   not -- why would you not agree that that's
 7   inconsistent?
 8        A.   Because I don't.
 9        Q.   Do you have a basis for believing that --
10        A.   I think there's a discrepancy between the
11   language in the rights and responsibilities and the
12   contract that I enter in with my client.
13        Q.   Which one of those do you think would
14   control your relationship with Ms. James on July 25
15   of 2017?
16              MR. KOEHLER:  Objection, form, legal
17   conclusion.
18              Go ahead and answer.
19        A.   I don't know.
20        Q.   (By Mr. Miller)  Just sitting here -- I
21   just want to make sure I understand this.  Sitting
22   here today as Ms. James' lawyer, you don't know
23   whether the agreement you signed on July 6 of 2017
24   or the rights and responsibilities agreement on
25   July 25 of 2017 would have controlled your
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 57 of 74
JASON AMERINE  9/5/2019

Page 110

 1   **attorney-client relationship with Ms. James?**

 2          MR. KOEHLER:  Same objection.

 3          Go ahead and answer.

 4      A.   My agreement was with my client, and that

 5   was the agreement that we understood.

 6      **Q.   (By Mr. Miller)  Did you have any**

 7   **procedures or policies in place with your attorneys**

 8   **at Castle Law to explain the rights and**

 9   **responsibilities agreement to clients of Castle Law?**

10      A.   My understanding is that they are given a

11   copy of the rights and responsibilities, and they

12   went home with it, and brought it back.  I don't

13   know what the other attorneys said to them.

14      **Q.   When you met with clients, would you**

15   **explain the rights and responsibilities agreement to**

16   **them?**

17      A.   Yes.

18      **Q.   Would you generally provide them advice as**

19   **to whether or not this agreement -- when I say "this**

20   **agreement" -- let's strike that.**

21          **Would you generally provide advice to your**

22   **clients about whether the rights and**

23   **responsibilities agreement was consistent with your**

24   **own fee agreement with your clients?**

25          MR. KOEHLER:  Objection, form, calls for

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 58 of 74
JASON AMERINE  9/5/2019

Page 120

1    would be accurate.

2            (J. Amerine Exhibit No. 13 was marked for

3    identification.)

4        Q.   (By Mr. Miller)  I'm handing you a

5    document that's been marked 13 in the 323 in the

6    defendants' production.  Have you seen this document

7    before?

8        A.   Yes.

9        Q.   What is your understanding of this

10   document?

11       A.   It's a disclosure of compensation.

12       Q.   What is your understanding of what the

13   purpose of disclosure of compensation is?

14           MR. KOEHLER:  Objection, form, legal

15   conclusion.

16           Go ahead and answer.

17       A.   To notify the court as to what fees have

18   been agreed to and what has been paid.

19       Q.   (By Mr. Miller)  Does this appear to be

20   the disclosure of compensation for the Rosa Nichole

21   Renee James case?

22       A.   It's a disclosure of compensation.

23       Q.   Well, does this appear to be the initial

24   disclosure of compensation?

25       A.   I believe so.  I'm not sure.

**JASON AMERINE  9/5/2019**

1      Q.    It's dated July 25 of 2017; is that
2  correct?
3      A.    Yes.
4      Q.    That's the same date that appears on the
5  declaration of your electronic filing; is that
6  correct?
7      A.    Yes.
8      Q.    Do you have any reason to believe that
9  this document was filed with the court on a date
10  other than July 25 of 2017?
11      A.    I don't know.  There were a couple of
12  amended ones that were filed; so I mean if it was
13  dated the 25th, I presume it was filed the same day
14  as the shell.
15      Q.    This document contains a representation of
16  your signature; is that correct?
17      A.    Yes.
18      Q.    It doesn't contain your actual signature,
19  does it?
20      A.    No.
21      Q.    Do you have any recollection of reviewing
22  this document before it was filed with the court?
23      A.    I reviewed these documents before they
24  were filed.  My recollection for -- as to that
25  specific date, I don't know, but I reviewed this.

**JASON AMERINE  9/5/2019**

1     Q.    Would you have reviewed the disclosure of

2  compensation filed in all bankruptcy cases before

3  they were filed?

4     A.    On BK Billings I would.

5     Q.    Who would have completed the disclosure of

6  compensation form?

7     A.    Me.

8     Q.    So you drafted this disclosure of

9  compensation?

10    A.    Yes.

11    Q.    Do you believe as we sit here today, do

12 you believe this disclosure of compensation form was

13 accurate?

14    A.    No.

15    Q.    To the best of your knowledge, why was it

16 inaccurate?

17    A.    I mistakenly put the fees that I thought

18 we were getting as the firm, not the total amount

19 that we had agreed to with the debtor; and once I

20 learned that that was probably best practice, I went

21 back and amended it.

22    Q.    Let's look at this particular disclosure.

23 There's a line 1.  Do you see that?

24    A.    Yes.

25    Q.    It has some language, and it says "For

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 61 of 74
**JASON AMERINE  9/5/2019**

**Page 127**

1    goes towards services.

2        Q.    Okay.  Let's look at line 2 of this

3    disclosure of compensation.

4        A.    Okay.

5        Q.    You said $335 of the filing fee has been

6    paid.  Do you see that?

7        A.    Yes.

8        Q.    Was that true at the time this statement

9    had been filed?

10       A.    Yes.

11       Q.    Why do you believe that statement is true?

12       A.    Because the filing fee had been paid.

13       Q.    Has been paid to the court or to you?

14       A.    It doesn't distinguish.

15       Q.    What's your understanding of what that

16   disclosure is seeking you to disclose?

17             MR. KOEHLER:  Objection, form, calls for

18   legal conclusion.

19             Go ahead and answer.

20       A.    That the filing fee has been paid.

21       Q.    (By Mr. Miller)  To whom?

22             MR. KOEHLER:  Objection, form, calls for

23   legal conclusion, and the document speaks for

24   itself.

25             Go ahead and answer.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 62 of 74
JASON AMERINE  9/5/2019

Page 128

1          A.    To the court.

2          Q.    (By Mr. Miller)  Ms. James had not at the

3     time that this document was filed paid the full

4     filing fee to your office; is that correct?

5          A.    Correct.

6          Q.    Line 3, you said, "The source of the

7     compensation paid to me was the debtor"; is that

8     correct?

9          A.    Yes.

10         Q.    The debtor had not -- it's your

11     contention, as I understand, the debtor had not paid

12     you any compensation as of July 25 of 2017; is that

13     correct?

14              MR. KOEHLER:  Objection, form, assumes

15     facts not in evidence.

16              Go ahead and answer.

17         A.    Correct.

18         Q.    (By Mr. Miller)  On line 4 you said, "The

19     source of the compensation to be paid to me is" --

20     and you selected "debtor"; is that correct?

21         A.    Yes.

22         Q.    Do you have an understanding of whether

23     that was correct at the time you made that

24     statement?

25         A.    Yes, it was correct.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 63 of 74
**JASON AMERINE  9/5/2019**

**Page 130**

 1    established that's a payment authorization Ms. James

 2    signed; is that correct?

 3         A.   Yes.

 4         Q.   And it's dated July 6; is that correct?

 5         A.   Yes.

 6         Q.   And that would be before July 25, correct?

 7         A.   Yes.

 8         Q.   Okay.  And that authorized BK Billing to

 9    withdraw a sum of money from her account in

10    consideration of paying her legal fees in this case;

11    is that correct?

12              MR. KOEHLER:  Objection, form, calls for a

13    legal conclusion, assumes facts not in evidence.

14              Go ahead and answer.

15         A.   Not necessarily.

16         Q.   (By Mr. Miller)  Isn't it true on July 25

17    of 2017, that you and Ms. James had already agreed

18    that you were going to factor her account with

19    BK Billing?

20              MR. KOEHLER:  By which date?

21              MR. MILLER:  July 25 of 2017.  I'll re-ask

22    it so you can object if you want.

23         Q.   (By Mr. Miller)  Isn't it true that by

24    July 25 of 2017, Castle Law and Ms. James had an

25    understanding that her fees would be factored

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 64 of 74
**JASON AMERINE  9/5/2019**

Page 131

1    through BK Billing?

2          MR. KOEHLER:  Objection, form, calls for a

3    legal conclusion, assumes facts not in evidence --

4    fees being owed.

5          Go ahead and answer.

6          A.   No.  Fees are not factored to BK Billing.

7    My accounts receivable is factored to BK Billing.

8          Q.   (By Mr. Miller)  Isn't it true that by

9    July 25 of 2017, Castle Law and Ms. James had an

10   understanding that she would be paying any fees that

11   she would owe to your law firm to BK Billing?

12         MR. KOEHLER:  Objection, form, calls for

13   legal conclusion, assumes facts not in evidence.

14         A.   No.

15         Q.   (By Mr. Miller)  When you filed the

16   statement on July 25 of 2017, did Castle Law have an

17   expectation of how it was going to be paid for its

18   services in this case?

19         A.   I just need to clarify the file date is

20   the 25th of July?

21         Q.   I'm sorry if I misspoke.

22         MR. KOEHLER:  I think the case was filed

23   on July 25, 2017, yes.

24         A.   Okay.  Can you ask the question again,

25   please?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 65 of 74
JASON AMERINE  9/5/2019

Page 132

1       Q.    (By Mr. Miller)  I said when the case was

2    filed on July 25 of 2017, when this disclosure of

3    foundation was filed, did Castle Law have an

4    expectation of how its fees were going to be paid?

5            MR. KOEHLER:  Objection, asked and

6    answered.  Go ahead and explain again.

7       A.    I'm not sure.

8       Q.    (By Mr. Miller)  You're the person who

9    completed this disclosure; is that correct?

10      A.    Yes.

11      Q.    But it's your testimony you are not sure

12   how the firm was going to be paid for this case on

13   July 25 of 2017?

14           MR. KOEHLER:  Objection, asked and

15   answered.

16           Answer again.

17      A.    We didn't know if it was going to be paid

18   through her payments to be BK Billing or paid by

19   her, by the debtor.

20           (J. Amerine Exhibit No. 14 was marked for

21   identification.)

22      Q.    (By Mr. Miller)  I have one more question.

23   Turn back to Exhibit 10.  Your firm would have given

24   this document to Ms. James; is that correct?

25      A.    Yes.

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 66 of 74
**JASON AMERINE  9/5/2019**

**Page 135**

1    says "I agree to pay and Castle Law Office agrees to

2    accept $2,400" was preprinted but was crossed out,

3    and $2,175 was written in in attorney fees.  Do you

4    see that?

5        A.   Yes.

6        Q.   **What is your understanding of the purpose**

7    **of that agreement?**

8             MR. KOEHLER:  Objection, form, calls for

9    legal conclusion.

10            Go ahead and answer.

11            And the document speaks for itself.

12       A.   We would provide postpetition legal

13   services for 2,175.

14       Q.   **(By Mr. Miller)  Okay.  Was it your**

15   **understanding as to -- let me strike that.**

16            **Did you have an understanding as to the**

17   **amount of fees that Castle Law would receive for the**

18   **prepetition work done in this case?**

19       A.   I'm not sure.

20       Q.   **Well, isn't it true that the 2,175 amount**

21   **when added to what Ms. James paid on the invoice**

22   **equals the $2,400?**

23       A.   Yes.

24       Q.   **Okay.  Did Castle Law charge Ms. James for**

25   **its prepetition services on this case?**

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 67 of 74
**JASON AMERINE  9/5/2019**

Page 136

1        A.    No.

2        Q.    And why did Castle Law not charge

3   Ms. James for its prepetition services in this case?

4        A.    That was our agreement.

5        Q.    So the total fees that Castle Law was

6   expecting to receive under this agreement was

7   $2,175?

8        A.    No.

9        Q.    Okay.  Can you explain why that's not

10   true?

11        A.    Because the 2,175 had some expense in it.

12        Q.    But the document itself says it was for

13   attorney fees; is that correct?

14        A.    Yes.

15        Q.    So it's your testimony that that was not

16   your understanding of what the $2,175 was for?

17        A.    It was not my understanding?

18        Q.    Well, let me re-ask it.  The document says

19   that $2,175 was for attorney fees; is that correct?

20        A.    Correct.

21        Q.    But it's your testimony the $2,175

22   included expenses?

23        A.    Correct.

24        Q.    Did you have that discussion or anyone at

25   Castle Law have that discussion with Ms. James?

**JASON AMERINE  9/5/2019**

1    fee between Castle Law and the debtor.

2        Q.    (By Mr. Miller)  Okay.  At the time that

3    this agreement was entered into on July 27 of 2017,

4    did Castle Law have any expectation that this

5    agreement would be factored with BK Billing?

6        A.    The 27th probably, yes.

7        Q.    When was the decision made to factor this

8    with BK Billing?

9        A.    I don't know.

10       Q.    Did you have any clients that you used

11   these -- this particular form of agreement with

12   whose case was not factored with BK Billing and

13   Castle Law collected the payments?

14       A.    I don't recall.

15       Q.    Had Castle Law already begun to render

16   postpetition services to Ms. James before the entry

17   of this agreement?

18       A.    No.

19       Q.    So no work was done postpetition on

20   Ms. James' file before this agreement was executed?

21       A.    Not that I'm aware of.

22       Q.    Do you have any idea when Ms. James'

23   schedules were prepared?

24       A.    Do not.

25            MR. KOEHLER:  Are you going to another

**JASON AMERINE  9/5/2019**

1    before or after?

2        A.    No.

3        Q.    Let's review this document for a minute.

4    This document shows that -- well, let me step back

5    for a second.  Did you sign this document?

6        A.    Yes.  Well, I signed it with my stamp.

7        Q.    Okay.  Do you have a recollection of

8    personally reviewing this document before it was

9    filed with the court?

10       A.    Yes.

11       Q.    Did you complete this document personally?

12       A.    I don't understand the question.

13       Q.    Were you the person who filled out this

14   document?

15       A.    Yes.

16       Q.    Okay.  It shows on line 1 "For legal

17   services, I have agreed to accept $2,000"; is that

18   correct?

19       A.    Yes.

20       Q.    And that is a change from the initial

21   disclosure; is that correct?

22       A.    Yes.

23       Q.    And why was that change made to the best

24   of your knowledge?

25       A.    At the time I believe the initial

Case 17-41701-can7    Doc 40-2    Filed 11/12/20    Entered 11/12/20 17:55:16    Desc
Exhibit 2 (Deposition of J Amerine)    Page 70 of 74
JASON AMERINE  9/5/2019

Page 146

1   disclosure didn't include the entire contract

2   amount.  It just had what, I believed, was going to

3   Castle Law, and I subsequently amended it to add in

4   the entire amount.

5        Q.    Okay.  Let's go back to that initial

6   disclosure, which is -- I didn't write the exhibit

7   number on it.  What is it?

8        A.    13.

9        Q.    Exhibit 13.  You testified, I think, just

10  before we took our break, that there was no

11  agreement at this point to factor the accounts with

12  BK Billing; is that correct?

13       A.    I believe I said I didn't know.

14       Q.    Well, you testified you completed this

15  disclosure that's Exhibit 13; is that correct?

16       A.    Yes.

17       Q.    And you testified you were at $1,455

18  because that was the amount that Castle Law was

19  expected to receive; is that correct?

20       A.    I believe so.

21       Q.    Was somebody else expected to receive some

22  funds from Ms. James at that time?

23       A.    No.

24       Q.    Then why would you not have put the entire

25  amount of the contract on that fee, on that line?

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 71 of 74
**JASON AMERINE  9/5/2019**

Page 147

```
1          A.   This --

2               MR. KOEHLER:  Objection, form,

3     argumentative.

4               Go ahead, answer.

5          A.   This was new; so I did my best, and if

6     there was a mistake, it was inadvertent.  And I went

7     to try to fix it as quickly as I realized it was a

8     mistake.  I don't know what to tell you.

9          Q.   (By Mr. Miller)  On line 5 of Exhibit 13,

10    you put "I have not agreed to share the

11    above-disclosed compensation with any other person

12    unless they are members or associates in my law

13    firm"; is that correct?

14         A.   Yes.

15         Q.   Was that a true statement on July 25 of

16    2017?

17         A.   Yes.

18         Q.   Well, again, you listed only part of the

19    fee to be paid by Ms. James; is that correct?

20         A.   I don't remember what I did there.  I just

21    know it was an error.

22         Q.   Okay.  If you turn to what I've just

23    marked now as the amended compensation form, which

24    is Exhibit 16.  This document was dated August 28 of

25    2017; is that correct?
```

**JASON AMERINE  9/5/2019**

```
 1        A.    Yes.

 2        Q.    And it shows that an invoice was submitted

 3   to BK Billing on or about July 27 of 2017?

 4        A.    Yes.

 5        Q.    And that amount invoiced was $2,200; is

 6   that correct?

 7        A.    Yes.

 8        Q.    And it's the same amount of Mr. Babiker's

 9   postpetition contract; is that correct?

10        A.    Yes.

11        Q.    And that the total amount that could

12   possibly be advanced to Castle Law was $1,650; is

13   that correct?

14        A.    Yes.

15        Q.    And on July 30 of 2017 an advance was made

16   to your firm by BK Billing of $1,320; is that

17   correct?

18        A.    I believe it was July 31.

19        Q.    I'm sorry.  On July 31 of 2017 there was

20   an advance of $1,320; is that correct?

21        A.    Yes.

22        Q.    And $330 was placed in the holdback or

23   escrow account?

24        A.    Yes.

25        Q.    By the way, have you ever received any of
```

Case 17-41701-can7   Doc 40-2   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 2 (Deposition of J Amerine)   Page 73 of 74
JASON AMERINE  9/5/2019

Page 247

1    the monies in any of these cases that was placed in

2    the holdback or escrow accounts?

3        A.   No.

4        Q.   Is that because other clients are

5    delinquent and you accept payment in an amount that

6    exceeds the holdback or escrow account that your

7    firm has on file with BK Billing?

8        A.   Yes.

9        Q.   I understand that BK Billing is ceasing

10   operations with you.  Are you aware of that?

11       A.   We got an e-mail from a third party saying

12   something about it, but I have not received any

13   direct communication.

14       Q.   Have you had any discussions with

15   BK Billing about how the cases that are currently

16   being factored with BK Billing will be handled going

17   forward?

18       A.   No.

19       Q.   Have you stopped factoring cases with

20   BK Billing?

21       A.   Yes.

22       Q.   When did that occur?

23       A.   When we had our hearing and I couldn't get

24   paid.

25       Q.   And that's the hearing in the four cases

**JASON AMERINE  9/5/2019**

1   that we've objected that aren't the four cases that

2   we're here on today?

3        A.   Correct.

4        Q.   So since the time that Judge Norton

5   entered the -- I'll call it a "stay order" for lack

6   of a better word -- you have not factored any

7   additional accounts in the Western District of

8   Missouri with BK Billing?

9        A.   Correct.

10        Q.   I'll hand you a document I'll mark as

11   Exhibit 60.

12             (J. Amerine Exhibit No. 60 was marked for

13   identification.)

14        Q.   (By Mr. Miller)  Have you seen this

15   document before?

16        A.   I've seen a document like that.

17        Q.   For the record I didn't identify it.  It's

18   Bates-stamped 1802 through 1803; is that correct?

19        A.   Yes.

20        Q.   Does this appear to be the Schedule J for

21   Mr. Babiker's case?

22        A.   Yes.

23        Q.   If you turn to page 2 of this document, is

24   there any disclosure of any payments to be made to

25   your firm or to BK Billing on this document?