Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 1 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1   53                UNITED STATES BANKRUPTCY COURT

 2                FOR THE WESTERN DISTRICT OF MISSOURI

 3                          WESTERN DIVISION

 4
          in re:                    )
 5                                  )
          ROSA NICHOLE RENEE        )   Case No. 17-41965-BTF7
 6        JAMES,                    )
                                    )
 7            Debtor.               )
                                    )
 8        DANIEL J. CASAMATTA,      )   30(b)(6) Deposition of
          ACTING UNITED STATES      )   BK Billing through:
 9        TRUSTEE,                  )
                                    )   David Stidham
10            Plaintiff,            )
                                    )
11        vs.                       )
                                    )
12        CASTLE LAW OFFICE OF      )
          KANSAS CITY, PC, a        )
13        Missouri Professional     )   Adv. Case No. 18-4168-CAN
          Corporation,             )
14            Defendant.            )
                                    )
15                                  )
          and                       )
16                                  )
          JASON C. AMERINE,         )
17                                  )
              Defendant.            )
18

19
                        December 13 and 14, 2018
20

21                    Location:  Christensen & Jensen
                      257 East 200 South, Suite 1100
22                     Salt Lake City, Utah 84101

23
                      Reporter:  Diana Kent, RPR, CRR and
24                            Dawn Perry, CSR
              Notary Public in and for the State of Utah
25
```

**EXHIBIT 3**

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 2 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1                A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3            Adam E. Miller
              OFFICE OF THE UNITED STATES TRUSTEE
 4            Attorney at Law
              Charles Evans Whittaker Courthouse
 5            400 East 9th Street, Room 3440
              Kansas City, Missouri  64106
 6            Tel: (816) 512-1940
              Fax: (816) 512-1967
 7            adam.e.miller@usdoj.gov

 8            Laurie A. Cayton
              UNITED STATES DEPARTMENT OF JUSTICE
 9            Attorney at Law
              405 South Main Street, Suite 300
10            Salt Lake City, Utah  84111
              Tel: (801) 524-3031
11            Fax: (801) 524-5628
              laurie.cayton@usdoj.gov

12

13    FOR THE DEFENDANT:

14            Matthew Koehler
              BROWN & JAMES
15            Attorney at Law
              800 Market Street, Suite 1100
16            St. Louis, MO 63101
              Tel: (314) 242-5267
17            Fax: (314) 242-5467
              mkoehler@bjpc.com

18

19    FOR THE DEPONENT:

20            Aaron B. Millar
              MILLAR WALKER
21            Attorney at Law
              5200 South Highland Drive, #300
22            Holladay, Utah  84117
              Tel: (801) 424-5280
23            Fax: (801) 424-5281
              aaron@millarwalker.com

24

25    (Continued on following page)
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 3 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

```
 1                  A P P E A R A N C E S

 2    ALSO PRESENT:

 3              Robert B. Cummings
              THE SALT LAKE LAWYERS
 4              Attorney at Law
              10 Exchange Place, #622
 5              Salt Lake City, Utah  84111
              Tel: (801) 590-7555
 6              Fax: (801) 590-7519
              robert@thesaltlakelawyers.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 4 of 65

**30(b)(6)**

**David Stidham * December 13, 2018**

```
 1                    I N D E X

 2   DAVID STIDHAM                              PAGE

 3   Examination By Mr. Miller                     5

 4   Examination By Mr. Koehler                  160

 5   Further Examination By Mr. Miller           186

 6

 7

 8                   E X H I B I T S

 9   NUMBER               DESCRIPTION           PAGE

10   A      Invoice and Account Information on   160
            Huzaifah Babikir
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 5 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1                    P R O C E E D I N G S

 2

 3                      David M. Stidham,

 4           called as a witness, being first duly sworn,

 5              was examined and testified as follows:

 6

 7                       EXAMINATION

 8    BY MR. MILLER:

 9        Q.    This is a Rule 30(b)(6) deposition of BK

10    Billing, LLC which is a Utah entity in connection with

11    four related adversary proceedings in the United States

12    Bankruptcy Court for the Western District of Missouri

13    which have been, for pretrial purposes, consolidated in

14    regards to the case of In Re Rosa Nichole Renee James.

15    And the adversary style is Daniel Casamatta versus

16    Castle Law Office of Kansas City, PC and Jason C.

17    Amerine under case number 18-4168.

18              Would you state your name, sir.

19        A.    Yes.  David Michael Stidham.

20        Q.    And you have been designated by BK Billing

21    as the witness to appear here today; is that correct?

22        A.    Yes.

23        Q.    And I know that you have been previously

24    examined in a deposition before by Ms. Cayton but I'm

25    going to go over some rules just so we are all clear.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 6 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1   Everything that we are going to say today is going to
 2   be recorded by the court reporter, so I need you to
 3   answer my questions verbally.  Okay?
 4        A.    Okay.
 5        Q.    I will try and wait for you to finish your
 6   answer before I ask the next question, and if you'll
 7   wait until I finish my question, that way she can make
 8   a clear record.
 9        A.    Okay.
10        Q.    I notice you are nodding your head and
11   verbally answering my question, so that's good.
12   Sometimes witnesses just nod their head and she can't
13   take that down.
14             I don't want you to speculate with regards
15   to any of my questions.  If you don't know the answer,
16   I'd like you to tell me that you don't know the answer.
17   I may ask you a follow-up question which is, "Does
18   anyone in BK Billing know the answer," because this is
19   technically a deposition of the corporate entity.  So
20   we might try and work with your counsel to figure out
21   if there's another way to get the information.  Okay?
22        A.    Okay.
23        Q.    Why don't you go ahead and state what your
24   role with BK Billing is.
25        A.    I'm the CEO of BK Billing.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 7 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          Q.    And how long have you been the CEO?

 2          A.    I have been the CEO of BK Billing since

 3     its founding.

 4          Q.    And when was that?

 5          A.    February of 2016.

 6          Q.    Okay.  And don't be offended by my next

 7     questions but I ask them to every witness.  Have you

 8     taken any drugs or alcohol in the last 24 hours that

 9     would affect your ability to testify today?

10          A.    No.

11          Q.    Do you have any condition, mental or

12     otherwise, that would affect your ability to recall

13     events?

14          A.    No.

15          Q.    There's a binder of exhibits in front of

16     you and I'd like you to turn to the very first exhibit.

17     And I'll represent to you that this is a Notice of

18     Deposition, together with a subpoena issued in this

19     case.  Have you seen this document before?

20          A.    Yes.

21          Q.    Okay.  And would you agree that this is

22     the notice and subpoena under which you are appearing

23     here today?

24          A.    Yes.

25          Q.    Okay.  If you'd turn to the sixth page of
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 8 of 65

30(b)(6)

David Stidham * December 13, 2018

```
 1          A.     Yes.

 2          Q.     And who were those conversations with?

 3          A.     Tyler Olson, Sean Mawhinney, and a few

 4   other employees that probably were present at various

 5   conversations.

 6          Q.     How many employees does BK Billing have?

 7          A.     We have approximately twelve or thirteen.

 8          Q.     You mentioned somebody by the name of

 9   Tyler Olson.  What is his role at BK Billing?

10          A.     He is the COO of BK Billing.

11          Q.     What are his responsibilities?

12          A.     Operations.

13          Q.     When you say "operations," could you be a

14   little more specific?

15          A.     Yes.  General management of the company.

16          Q.     Okay.  And you mentioned Mr. Mawhinney; is

17   that correct?

18          A.     Yes.

19          Q.     And what is Mr. Mawhinney's role in BK

20   Billing?

21          A.     Predominantly customer service.

22          Q.     Does he have a title within BK Billing?

23          A.     Yes.

24          Q.     What is that title?

25          A.     President.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 9 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1          Q.     And how long has he been the president of

 2     BK Billing?

 3          A.     Since about its -- since about February of

 4     2016, I would say.

 5          Q.     Did you have any discussions with Jason

 6     Amerine or anyone at Castle Law Firm about this

 7     deposition?

 8          A.     Yes.

 9          Q.     What discussions did you have?

10                 Well, let me ask you this question:  Who

11     did you discuss this deposition with?

12          A.     Jason Amerine.

13          Q.     What discussions did you have with

14     Mr. Amerine?

15          A.     That we would do the deposition and then

16     we would discuss where to go from there.

17          Q.     Did you discuss with Mr. Amerine what

18     questions might be asked and how to answer them?

19          A.     No.  Not necessarily.

20          Q.     How many times did you speak with

21     Mr. Amerine about this deposition?

22          A.     Once by phone.

23          Q.     Do you recall when that occurred?

24          A.     Saturday morning.

25          Q.     This past Saturday?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 10 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1    Corporation?

2         A.    I believe 2013 to present.

3         Q.    So that corporation still exists?

4         A.    Yes.

5         Q.    And you are still employed by that

6    corporation, as well?

7         A.    No, I would not say employed.  It's an

8    entity that I own.

9         Q.    Does that entity have active clients?

10        A.    Yes.

11        Q.    Are any of them clients of BK Billing?

12        A.    No.

13        Q.    What would you say BK Billing's primary

14   business is?

15        A.    Factoring.

16        Q.    Factoring of attorneys' fees?

17        A.    Of -- factoring of any accounts receivable.

18        Q.    Does BK Billing factor any accounts

19   receivable currently that are not attorneys' fees?

20        A.    Yes.

21        Q.    What other types of accounts does BK

22   Billing currently factor?

23        A.    Construction.

24        Q.    Does BK Billing factor attorneys' fees

25   other than bankruptcies?

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 11 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

```
 1        A.    Yes.

 2        Q.    What other types of law does BK Billing

 3   factor fees from?

 4        A.    Relevance?

 5              MR. MILLAR:  It's my job to assert the

 6   objection.

 7              THE WITNESS:  I'm just being curious.

 8              MR. MILLAR:  Just answer the question.

 9        A.    Family, DUI, that's what I would say.

10        Q.    (By Mr. Miller)  Okay.  What percentage of

11   BK Billing's clients would be bankruptcy attorneys of

12   its overall client base?

13        A.    A significant percentage.

14        Q.    More than 50?

15        A.    Yes.

16        Q.    More than 75?

17        A.    No.  Perhaps.  I don't know right off the

18   top of my head, but perhaps.  You're getting pretty

19   close.

20        Q.    With respect to factoring bankruptcy fees,

21   would it be a fair statement that BK Billing believes

22   that the attorneys are the clients of BK Billing?

23        A.    Yes.

24        Q.    Do you have any direct contractual

25   relationship with the bankruptcy debtors?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 12 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1        A.    No.
 2        Q.    Generally speaking, how would an attorney
 3   who wanted to do -- let me restate this.  How would a
 4   bankruptcy attorney wanting to do business with BK
 5   Billing sign up with you?
 6        A.    Website.
 7        Q.    What information, generally, would they
 8   provide you?
 9        A.    Would the attorney provide us?
10        Q.    Yes.
11        A.    Their Bar number, the EIN of their law
12   firm or entity that they have, their address, personal
13   contact information, and goals.
14        Q.    When you say "goals," you mean the goals
15   for the law firm?
16        A.    Yes.
17        Q.    Is Castle Law Firm a client of BK Billing?
18        A.    Yes.
19        Q.    Okay.  What information did Castle Law
20   Firm provide to BK Billing when it became a client?
21        A.    That information.
22        Q.    Okay.  Is there a written document that
23   that was provided?
24        A.    Yes.
25        Q.    You would then enter into a contractual
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 13 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1   relationship with the client attorney; is that correct?
 2        A.   Yes.
 3        Q.   Generally speaking, does BK Billing have
 4   any role in setting the fees that the lawyer clients
 5   charge?
 6        A.   No.
 7        Q.   Is there ever a case where BK Billing, or
 8   I should say is there ever a bankruptcy case in which
 9   BK Billing assisted a lawyer in setting fees?
10        A.   No.
11        Q.   If an attorney has a case that they want
12   to factor with BK Billing, how would they provide that
13   information to you?
14        A.   Upload information into our software.
15        Q.   What information would they upload?
16        A.   They would generally attach a copy of the
17   contract between themselves and their client.  They
18   would upload a copy of the payment authorization which
19   would have their fee schedule.  They would -- that's
20   about it.
21        Q.   Are you familiar with the term
22   "bifurcation"?
23        A.   Yes.
24        Q.   What is BK Billing's understanding of the
25   term "bifurcation of fees"?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 14 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

1          A.     Splitting into two parts.

2          **Q.     A part that is pre-petition and a part**

3    **that's post-petition?**

4          A.     Are you speaking about for bankruptcy

5    specifically?

6          **Q.     Let's assume, unless I say otherwise, I'm**

7    **talking about bankruptcy specifically.  So with regard**

8    **to bankruptcy cases, when you are talking about**

9    **splitting fees into two parts you are talking about a**

10   **pre-petition and a post-petition part, right?**

11         A.     Yes.

12         **Q.     You said that the attorney would attach a**

13   **contract.  Would he, in a bankruptcy context, would he**

14   **attach both contracts or only one?**

15         A.     Both the pre-petition and post-petition

16   contracts?

17         **Q.     Yes.  Would they attach both a**

18   **pre-petition and post-petition contract, or just one**

19   **contract?**

20         A.     I believe all that is required is the

21   post-petition contract.  But out of habit, some

22   attorneys have uploaded both contracts.

23         **Q.     Does BK Billing have any underwriting**

24   **standards with respect to its client attorneys in**

25   **determining who it will do business with?**

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 15 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          A.    What do you mean specifically?

 2          Q.    Well, does BK Billing do any investigation

 3     into client attorneys who want to do business with BK

 4     Billing?

 5          A.    What do you mean by "investigation"?

 6          Q.    Do you review any records with respect to

 7     the attorney before you accept them as a client?

 8          A.    What kind of records specifically are you

 9     talking about?

10          Q.    Any records.

11          A.    Yes, there are times when we review

12     records to determine who we will work with at BK

13     Billing.

14          Q.    And what records would you typically

15     review?

16          A.    Their standing with the Bar, Pacer filing

17     data, and bank information.

18          Q.    With respect to Pacer filing data, what

19     are you specifically looking for?

20          A.    Volume of cases.

21          Q.    So would it be a fair statement that BK

22     Billing is looking to do business with attorneys who

23     have a certain volume of filing?

24          A.    Not necessarily.

25          Q.    Has BK Billing ever rejected an attorney
```

Case 17-41701-can7    Doc 40-3    Filed 11/12/20    Entered 11/12/20 17:55:16    Desc
Exhibit 3 (Deposition of D Stidham)    Page 16 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1   who wanted to do business with them?

 2        A.    Yes.

 3        Q.    How often would you say that occurs?

 4        A.    Quite often.

 5        Q.    What are the typical reasons for rejecting

 6   an attorney who wants to do business with BK Billing?

 7        A.    Fit.  We just don't feel it's a good fit.

 8        Q.    When you say "fit," what is BK Billing

 9   looking for in terms of a fit?

10        A.    An attorney with experience and a good

11   track record with the Bar, who is compliant with the

12   bankruptcy code and understands the bankruptcy code

13   well enough to be compliant with it, and local rules.

14   So we look for experience that way.  And we are looking

15   for financial viability when we look at financial

16   records.  We are also looking for attorneys who have a

17   social impact desire to create more access to legal

18   services through legal innovation.

19        Q.    Do you know if any type of records were

20   reviewed with respect to Castle Law and Mr. Amerine?

21        A.    Yes.

22        Q.    What records were reviewed by BK Billing

23   before he entered into an agreement with the company?

24        A.    I believe bank records and Pacer data, and

25   I cannot recall specifically but I would imagine we
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 17 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1    would have checked the Bar, as well, in Missouri.

 2         Q.    Who typically would conduct that review

 3    within BK Billing?

 4         A.    Now we have two or three people that would

 5    perform that review.  In the case of Amerine and Castle

 6    Law, I'm not sure who performed that.

 7         Q.    Okay.  And in July of 2017, did BK Billing

 8    have underwriting guidelines with respect to factoring

 9    particular bankruptcy cases?

10         A.    Could you define "particular"?

11         Q.    Well, in June or July of 2017, did you

12    review each bankruptcy case that an attorney proposed

13    to factor with you to determine if it met any sort of

14    internal guidelines?

15         A.    Yes.

16         Q.    What were those guidelines?

17         A.    First, it needed to be a post-petition

18    contract, so we verified that a case had been filed in

19    Pacer; we verified, via Pacer, that a case had been

20    filed.  And then the second step would be to verify the

21    amount of the contract, that a contract was signed and

22    executed properly, that there was an attaining payment

23    schedule with the client, between the attorney and the

24    client.  And that would be about it, I would imagine.

25         Q.    Okay.  In July of 2017, did BK Billing
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 18 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1    review each agreement to determine if a debtor could

 2    afford to make the payments that were proposed?

 3         A.    What do you mean by "afford"?

 4         Q.    Let me ask it this way:  Did BK Billing

 5    have any guidelines for accepting factoring with regard

 6    to the amount of money a debtor made?

 7         A.    Yes.

 8         Q.    Okay.  What were those guidelines in July

 9    of 2017?

10         A.    Those guidelines have changed as

11    information has come in.  In July of 2017, I would

12    imagine it would be a percentage -- that the payment to

13    the attorney could not exceed a certain percentage of

14    the gross total income of the client.  So we would

15    verify client gross income, and then there was a

16    calculation that said that a certain percentage of the

17    gross client income could go to an attorney monthly

18    payment, and that if the payment schedule fit within

19    that parameter we would agree to accept it for

20    factoring.

21         Q.    Do you know what that percentage was?

22         A.    No.

23         Q.    Does BK Billing have records that would

24    indicate what that percentage was in July of 2017?

25         A.    Yes.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 19 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1    that were issued in the four bankruptcy cases?

 2         A.    I believe so, yes.

 3         Q.    And did BK Billing comply with the

 4    subpoena?

 5         A.    To my knowledge, yes.

 6         Q.    Okay.  It's true that BK Billing produced

 7    records to our office responsive to the subpoena; is

 8    that correct?

 9         A.    Yes.

10         Q.    Do you know who conducted the search for

11    those records?

12         A.    Yes.

13         Q.    Who did that?

14         A.    Tyler Olson.

15         Q.    To the best of BK's knowledge, the

16    documents produced are all the documents in its

17    possession responsive to these subpoenas?

18         A.    Yes.

19         Q.    Let's turn back to Exhibit 2.  For the

20    record, this has a Bates stamp on it that is labeled

21    BKB, the underlying case number in one of the

22    bankruptcy cases, and then 03 through 09.  Do you see

23    that at the bottom?

24         A.    Yes.

25         Q.    Is this one of the documents that was
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 20 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

1    produced in response to the subpoena that is Exhibit

2    19?

3         A.    Yes.

4         Q.    Have you seen this document before?

5         A.    Yes.

6         Q.    And is this a copy of the initial contract

7    between BK Billing and Castle Law Office?

8         A.    Yes.

9         Q.    And was the purpose of this agreement to

10   govern the factoring of fees between Castle Law and BK

11   Billing?

12        A.    Yes.

13        Q.    Do you know who drafted this agreement?

14        A.    Yes.

15        Q.    Who?

16        A.    Dave Evans.

17        Q.    Who is Mr. Evans?

18        A.    He is our primary counsel at Kirton

19   McConkie.

20        Q.    So he is outside counsel that BK Billing

21   retained for the purpose of doing this work?

22        A.    Yes.

23              Can I clarify something?

24        Q.    Sure.

25        A.    Dave is our representative at Kirton

Case 17-41701-can7    Doc 40-3    Filed 11/12/20    Entered 11/12/20 17:55:16    Desc
Exhibit 3 (Deposition of D Stidham)    Page 21 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1    McConkie.  I'm not sure who he engaged in his firm to

2    actually write or produce those contracts.

3        Q.    Okay.  But it's a fair statement that

4    these were drafted by outside counsel retained by BK

5    Billing?

6        A.    Yes.

7        Q.    Do you know if any ethics lawyer ever

8    reviewed this agreement?

9        A.    Yes.

10        Q.    Who?

11        A.    Adelaide Maudsley.

12              Wait a minute.  We are talking about this

13    accounts receivable assignment agreement.

14        Q.    Yes.

15        A.    In regards to bankruptcy ethics

16    specifically, Adelaide Maudsley at Kirton McConkie.  We

17    also had other counsel that reviewed it.

18        Q.    And who is the other counsel that reviewed

19    this agreement?

20        A.    We have an attorney that we use for

21    factoring who, frankly, we view as a proprietary

22    connection for our business that we are not wanting to

23    disclose.  But yes, we have had other attorneys review

24    this document.

25        Q.    Let's talk about some specifics in the

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 22 of 65

30(b)(6)

David Stidham * December 13, 2018

Page 25

 1    agreement for a minute.

 2         A.    Okay.

 3         Q.    At the very bottom, paragraph 1 of the --

 4    numeral paragraph 1 of the agreement governs the

 5    purchase price for the purchase of the agreement, or

 6    the contract; is that correct?

 7         A.    Yes.

 8         Q.    And it indicates that Castle Law would

 9    sell accounts to BK Billing in exchange for 70 percent

10    of the face value of that agreement; is that correct?

11         A.    Yes.

12         Q.    It also says that Castle Law would be paid

13    within two to three days after providing BK Billing

14    with all the documents regarding an individual account;

15    is that correct?

16         A.    Yes.

17               Well, hold on.  I said yes too soon.

18         Q.    Okay.

19         A.    It says, "BK Billing will pay the Purchase

20    Price to the Firm within two to three business days

21    after BK Billing's approval of the Firm's Transferred

22    Accounts uploaded to the BK Billing online portal."  So

23    documents could be uploaded into the portal, but unless

24    they got through underwriting there would not be a

25    transfer of funds until that occurred.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 23 of 65

30(b)(6)
**David Stidham * December 13, 2018**

1      Q.    So BK Billing does do underwriting with
2  respect to every contract?
3      A.    Yes.
4      Q.    Okay.  And that was the criteria that we
5  were talking about earlier; is that correct?
6      A.    Yes.
7      Q.    Who does the actual underwriting review at
8  BK Billing?
9      A.    For each individual contract?
10      Q.    Yes.  Do you have staff that do that?
11      A.    Yes.
12      Q.    Are those lawyers?
13      A.    No.
14      Q.    Okay.  Do you reject contracts routinely?
15      A.    No.  Not routinely, no.
16      Q.    Okay.  Does BK Billing ever reject any
17  contracts that are submitted for factoring?
18      A.    Yes.
19      Q.    Has BK Billing rejected any contract
20  submitted by Castle Law Office?
21      A.    I'm not sure.  I would imagine the answer
22  is yes.
23      Q.    Does BK Billing keep any records with
24  respect to contracts that's rejected for factoring?
25      A.    Yes.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 24 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1   proceed with a processing fee, which is in the
 2   contract, but rarely is executed.
 3        Q.    Let's turn to paragraph 4.1.  Do you see
 4   that?
 5        A.    Yes.
 6        Q.    The firm is obligated - and when I say
 7   "the firm" I'm talking about Castle Law firm in this
 8   case - to finish the representation of all debtor
 9   clients on which it's factored fees with you; is that
10   correct?
11        A.    I don't totally understand the question.
12        Q.    Let me ask it a different way.  The
13   contract requires that Castle Law continue to provide
14   services to the debtor, even after it's factored fees
15   with your firm?
16        A.    Yes.  The attorney is bound to their
17   contractual obligations to their client, yes.
18        Q.    Paragraph 4.2 talks about the engagement
19   agreement; do you see that?
20        A.    Yes.
21        Q.    And is that the engagement agreement
22   between Castle Law and Castle Law's clients?
23        A.    Let me review it so I can answer that
24   appropriately.
25        Q.    Sure.  Take your time.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 25 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          A.    Yes.

 2          Q.    So these are certain standards under which

 3    Castle Law is contracting to BK Billing that it will --

 4    let me rephrase that.

 5              Paragraph 4.2 is concerned with the

 6    disclosures that will be made to the client of the law

 7    firm in engagement agreements between the law firm and

 8    its clients.

 9          A.    Yes.

10              MR. KOEHLER:  Objection to the extent it

11    calls for a legal conclusion.

12              Go ahead.

13          A.    Sorry.  I'm not trying to be difficult,

14    but would you repeat that so I can answer it

15    accurately?

16          Q.    Sure.  To the best of BK Billing's

17    understanding, the purpose of Section 4.2 is to impose

18    certain standards in the agreement between the law

19    firm, in this case Castle Law, and Castle Law's

20    clients.

21              MR. KOEHLER:  Same objection.

22              Go ahead.  Thank you.

23          A.    Yes.

24          Q.    So, for example, the very first sentence

25    says, "The Firm does hereby affirm, represent, and
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 26 of 65

30(b)(6)
**David Stidham * December 13, 2018**

```
 1    warrant that the Transferred Accounts discloses the

 2    existence or potential existence of this Agreement."

 3    Is that correct?

 4         A.    Yes.

 5         Q.    So it is BK Billing's -- well, let me

 6    strike that.

 7              The contract work requires that Castle Law

 8    would need to disclose the existence of this agreement

 9    and any agreement with its clients it was proposing to

10    factor?

11         A.    That is what the contract states, yes.

12         Q.    Okay.  And then 4.2(b) says that they will

13    disclose -- I'm sorry.  4.2 says that the client of the

14    law firm has been provided an opportunity to ask the

15    law firm questions regarding the sale or potential sale

16    of the account.  Do you see that?

17         A.    Yes.

18         Q.    So you're requesting that Castle Law

19    represent that they have done that in each one of their

20    cases?

21         A.    Yes.

22         Q.    Okay.  And (c) says, "Client has

23    acknowledged that the Firm has answered all such

24    questions to the Client's satisfaction."  Is that

25    correct?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 27 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          A.    Yes.

 2          Q.    So it's BK Billing's understanding that

 3   with respect to each factored account, Castle Law is

 4   representing it has done that in each case?

 5          A.    Yes.

 6          Q.    Okay.  4.2(d) says, "Client has explicitly

 7   consented in writing to the Firm's assignment of the

 8   accounts receivable associated with the Transferred

 9   Account."  Do you see that?

10          A.    Yes.

11          Q.    So Castle Law is warranting to BK Billing

12   that the debtor has expressly, in writing, consented to

13   the transfer of the account?

14          A.    Yes.

15          Q.    And then (e) says, "Client has explicitly

16   consented in writing to the Firm's disclosure of

17   certain Client information necessary to the collection

18   of the accounts receivable, such as the Client's name,

19   address, and phone number, together with a copy of the

20   Transferred Account."  Do you see that?

21          A.    Yes.

22          Q.    So Castle Law is warranting to BK Billing

23   that it has obtained the consent of Castle's clients to

24   make certain disclosures to BK Billing; is that

25   correct?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 28 of 65

30(b)(6)
**David Stidham * December 13, 2018**

```
 1          A.    Yes.

 2          Q.    Does anybody at BK Billing monitor the

 3   agreements that are provided to BK Billing to ensure

 4   that they are in conformance with paragraph 4.2 of the

 5   contract with Castle?

 6          A.    Yes.

 7          Q.    Who does that?

 8          A.    Our underwriting staff.

 9          Q.    Are they instructed to do that with

10   respect to every case?

11          A.    Yes.

12          Q.    Do you know of any cases that BK Billing

13   has accepted for factoring from Castle Law that did not

14   need the warranties in Section 4.2 of this agreement?

15          A.    Not specifically, no.

16          Q.    Okay.  Let's talk about paragraph 4.3 on

17   the next page.  Do you see that paragraph?

18          A.    Yes.

19          Q.    This first sentence of 4.3 requires Castle

20   Law to obtain a mutually agreeable payment

21   authorization from its clients; is that correct?

22          A.    Yes.

23          Q.    Is that typically referred to as the ACH

24   agreement?

25          A.    No.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 29 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

1      Q.    Okay.  Is there a particular term of art

2   that BK Billing uses for that authorization?

3      A.    I believe we call it a payment

4   authorization form.

5      Q.    Well, we can discuss that later, because

6   I'll ask you some specific questions about the ones in

7   this case.  But there is a requirement that Castle Law

8   provide you with a signed payment authorization form?

9      A.    Yes.

10      Q.    Does anyone at BK Billing monitor

11   compliance with this provision with respect to Castle

12   Law?

13      A.    Yes.

14      Q.    And would that be the underwriting staff?

15      A.    Yes.

16      Q.    Is there any requirement about when the

17   payment authorization needs to be executed in regards

18   to the filing of this case?

19      A.    Yes.

20      Q.    And what is that?

21      A.    To be specific, we are discussing a

22   bankruptcy case, correct?

23      Q.    Correct.  With respect to all of these.

24   This contract with -- let me ask you this question:

25   Has Castle Law firm factored any cases with BK Billing

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 30 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1    that are not bankruptcy related?

 2         A.    Not to my knowledge.

 3         Q.    Okay.  So the purpose of this agreement

 4    that we are talking about, which is Exhibit 2, was to

 5    factor bankruptcy cases?  Or factor fees in bankruptcy

 6    cases?

 7         A.    The specific reason for this contract is

 8    to factor attorney fees with Castle Law.  Castle Law

 9    predominantly practices in bankruptcy, and so the

10    majority of the factoring opportunities that we have

11    had with Castle Law have been bankruptcy.  However,

12    this agreement could just as easily transfer to other

13    areas of law if Castle Law chose to engage in those

14    areas of law.

15         Q.    To the best of BK Billing's knowledge, has

16    there been any discussion between BK Billing and Castle

17    Law about factoring fees in cases other than

18    bankruptcy?

19         A.    Yes.

20         Q.    And what area of law was that in regards

21    to?

22         A.    Family, DUI, immigration.

23         Q.    And when did those conversations occur?

24         A.    May or June of 20-- well, I'm not sure.

25    Let me take a pause so I can answer that appropriately.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 31 of 65

30(b)(6)
**David Stidham * December 13, 2018**

```
 1   I believe there are e-mails that discuss when we
 2   visited Kansas City.  I remember having a conversation
 3   with Jason Amerine about those other possibilities when
 4   we visited Kansas City, whenever that was.  I'm not
 5   sure exactly when that was.
 6       Q.    Let me ask you this question, and maybe
 7   this will help you.  When you say visiting Kansas City,
 8   you were attending an American Bankruptcy conference in
 9   Kansas City; is that correct?
10       A.    Yes.
11       Q.    And I believe that conference was the
12   Midwestern Bankruptcy Institute; is that correct?
13       A.    I believe so, yes.
14       Q.    And that would have been the 2017
15   conference?
16       A.    Yeah.  I think that was right.
17       Q.    Okay.  If I represented to you that that
18   conference occurred in early October of 2017, would
19   that refresh your recollection?
20       A.    I'd take your word for it, yeah.
21       Q.    So you met with Mr. Amerine while you were
22   in Kansas City?
23       A.    Yes.
24       Q.    Did you discuss the factoring of
25   bankruptcy fees during that?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 32 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          A.    Yes.

 2          Q.    And what generally do you recall

 3   discussing?

 4          A.    Stay compliant with the bankruptcy code

 5   and the local rules and enjoy the fruits of offering

 6   zero down bankruptcy to your clients who need access to

 7   their services right now.  And it is your right, under

 8   the bankruptcy code, to execute post-petition contracts

 9   for post-petition services.

10          Q.    What is BK Billing's understanding of the

11   term "zero down bankruptcy"?

12          A.    Our understanding of the term zero down

13   bankruptcy at BK Billing is when a client, or potential

14   client, of an attorney would approach the attorney

15   needing a Chapter 7 bankruptcy to be filed for them and

16   would then seek some means to pay the attorney for

17   those legal services.

18                It is our understanding of the bankruptcy

19   code that the automatic stay is a pretty powerful

20   dividing line, and that anything that happens

21   pre-petition is therefore subject to the automatic stay

22   and is a pre-petition service or contract; and that

23   anything that happens post-petition would not be

24   subject to the automatic stay and is therefore a

25   post-petition contract for post-petition services which
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 33 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

Page 37

```
 1   are legally within the right of the attorney to offer
 2   to his clients, and the clients to pay the attorney for
 3   those services.  That is the official position of BK
 4   Billing.
 5             A zero down bankruptcy specifically would
 6   address a client who came to an attorney for
 7   pre-petition services, and the attorney would disclose
 8   to that client that, "I will represent you for
 9   pre-petition services, and then once I file your case,
10   you have a few options:  You may choose again for me to
11   represent you in the providing of post-petition
12   services; you may choose to represent yourself and
13   continue in post-petition representation; or you may
14   choose to hire another attorney to provide
15   post-petition services for you."
16             "If you do a pre-petition agreement, I
17   might not necessarily charge you any money at all to do
18   your pre-petition services, which, once I file your
19   petition, invokes the automatic stay and draws a pretty
20   powerful line in the sand.  And then once that case is
21   filed and you have some options as far as what is
22   needed to continue your bankruptcy case, I may be in a
23   position to help you perform or to help you provide
24   those post-petition services for a contracted amount or
25   fee, which would then be post-petition payments, or an
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 34 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

1   up-front fee if you have it."  Most debtors in that

2   situation do not, after having filed a bankruptcy, and

3   so they will construct some sort of payment arrangement

4   with the attorney for the post-petition services that

5   they desire to hire and will have the attorney perform

6   post-petition.  That is BK Billing's official opinion

7   on what a zero down bankruptcy is.

8        Q.   Okay.  So I want to ask you some questions

9   about what you just said.

10       A.   Sure.

11       Q.   So it is BK Billing's belief that the fee

12   that is charged in the post-petition contract cannot be

13   for services that were rendered pre-petition.

14       A.   Yes.

15       Q.   Are you aware of any client -- let me

16   rephrase this.  Through your discussions with

17   Mr. Amerine and Castle Law, are you aware of any

18   clients who have used the zero down model who have not

19   retained Castle for the post-petition agreement?

20       A.   Not offhand, no.

21       Q.   Okay.  Through your discussions with all

22   of your client attorneys, are you aware of cases in

23   which debtors who have retained them for the

24   pre-petition services have not retained them for

25   post-petition services?

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 35 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

```
 1        A.    Not specifically, no.
 2        Q.    Okay.  I want to turn back to this
 3   agreement for a second.  I want to look at paragraph
 4   4.4 of this agreement, which deals with collections.
 5   Would you agree with that?
 6        A.    Yes.
 7        Q.    And paragraph 4.4 appears to require the
 8   law firm to cooperate with BK Billing in collecting
 9   delinquent accounts; is that correct?
10        A.    I believe so, yes.
11        Q.    There is, it appears, a buy-back provision
12   in that; is that correct?
13        A.    Yes.
14        Q.    Is BK Billing aware of any Castle Law firm
15   accounts that have become delinquent?
16        A.    Yes.
17        Q.    Okay.  Have there been collection actions
18   taken against any Castle Law clients related to the
19   delinquency?
20        A.    Could you define "collection actions"?
21        Q.    Any activity -- well, let me ask it this
22   way:  What kind of collection activities would BK
23   Billing usually take with respect to delinquent
24   accounts?
25        A.    Generally speaking -- what would you
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 36 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1   define as a delinquent account?

2        Q.    So a delinquent account would be a debtor

3   who hasn't paid on time, who is obligated to make

4   payments to BK Billing as a result of the transfer of

5   the agreement.  Does BK Billing have collection methods

6   it would use to attempt to collect the payments that

7   were due under the account?

8        A.    Yes.  Generally we work directly with the

9   client of the attorney, the client that we know and

10   collect payments from, through communicating with them

11   through various communication methods, phone numbers,

12   e-mails, text messages, and then come to some agreement

13   to rectify the delinquency and continue on some form of

14   payment plan.

15        Q.    Okay.  Let's hypothetically say that

16   doesn't work.  Is there a next step that BK Billing

17   would take if the debtor either doesn't reach an

18   agreement with BK Billing or then defaults on that

19   agreement?

20        A.    There are a few options, yes.

21        Q.    What steps would BK Billing take?

22        A.    I think I can answer that question by

23   saying this:  BK Billing has not sought legal

24   collection actions against any of its delinquent

25   accounts that I am aware of.  However, since this is a

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 37 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1   public document, I would also say that BK Billing

 2   reserves the right to engage in legal collection

 3   activities should it feel it were necessary to do so.

 4        Q.    Okay.  So as I understand your statement,

 5   as we sit here today, to the best of your knowledge BK

 6   Billing has never sued any of the clients involved in a

 7   bankruptcy case that it has factored fees for?

 8        A.    That is right, yes.

 9        Q.    Has it ever hired a collection agency to

10   attempt to collect debts related to a bankruptcy

11   contract?

12        A.    Can we define something?

13        Q.    Okay.

14        A.    BK Billing is a d/b/a and is now the

15   official name of the entity that we are discussing.

16   The entity itself predates the launch of BK Billing in

17   February of 2016.  So in the business practices of BK

18   Billing specifically, have there been any lawsuits, or

19   hired any collection agencies?

20        Q.    Well, let me ask you this question, with

21   that understanding or that explanation, thank you.  So

22   this contract is between -- Exhibit 2 is between Castle

23   Law Firm and BK Billing, LLC; is that correct?

24        A.    Yes.

25        Q.    So has BK Billing, LLC ever retained a
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 38 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1    collection agency to attempt to recover fees due on a

 2    bankruptcy contract?

 3         A.    Prior to 2016, yes.

 4         Q.    Okay.  Since 2016?

 5         A.    No.

 6         Q.    Is there a certain point at which BK

 7    Billing will just write off delinquent debt?

 8         A.    Yes.

 9         Q.    Paragraph 4.4 of this agreement does

10    indicate that if BK Billing were to take any legal

11    action, they would need to notify the lawyer

12    beforehand; is that correct?

13         A.    Yes.

14         Q.    And then the lawyer would have ten days

15    with which to buy back the account; is that correct?

16         A.    Yes.

17         Q.    And I assume by "buy back the account,"

18    it's BK Billing's understanding that that would mean

19    pay back to BK Billing any amounts that were advanced

20    as payment for that account?

21         A.    Yes.

22         Q.    Okay.  Do you know if Castle Law firm has

23    ever bought back any accounts that have been factored

24    with BK Billing?

25         A.    No.  Not to my knowledge.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 39 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

```
 1              May I clarify something?

 2         Q.    Sure.

 3         A.    In this case, the idea of buy-back is

 4    very, very specific to the entirety of the contract.

 5    We do have a working -- we sometimes call it escrow,

 6    although that's not exactly the most accurate term,

 7    where we had a percentage of the purchase price that is

 8    held back from the total contract value against the

 9    risk of future default.  That is quite active.  That

10    percentage point is quite active.

11              What I understand this provision to mean

12    as buy-back is writing off the entire account in one

13    shot, which does rarely happen.  So when we say

14    buy-back as it pertains to this provision, I am unaware

15    of Castle Law having bought back the entirety of the

16    AR.  I am aware, however, as is the norm of all of our

17    clients, to have significant action in the holdback

18    account.

19         Q.    Okay.  Let me ask you this question, and

20    we will get this in a minute:  This document was

21    amended, right?  There was an amended contract?

22         A.    I believe so.

23         Q.    And we will get to that in a second.  So

24    what I'm asking you about is the original agreement.  I

25    have some questions about the holdback, which we will
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 40 of 65

30(b)(6)

David Stidham * December 13, 2018

```
 1    get to when we talk about the amended agreement, okay?
 2         A.    Okay.
 3         Q.    So 4.6 says, with that understanding and
 4    explanation of what you just told me, that if the law
 5    firm, in this case Castle Law, breached any of the
 6    representations or warranties, it would be obligated to
 7    purchase back the account from BK Billing; is that
 8    correct?
 9         A.    Yes.
10         Q.    Do you know if that's ever happened with
11    respect to Castle Law?
12         A.    No.
13         Q.    Let's turn to paragraph 5.2 at the very
14    bottom of that page.  "Use of Client Information and
15    Sale of Account Receivables."  Is that correct?
16         A.    Yes.
17         Q.    And this provision permits BK Billing,
18    with prior notice, to further sell any factored
19    accounts; is that correct?
20              Actually, let me restate that, because I
21    used some words in there that probably aren't going to
22    read right in the transcript.
23              Is it your understanding that there are
24    provisions in paragraph 5.2 of this agreement that
25    would permit BK Billing to further sell accounts that
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 41 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

1    Castle Law's clients under certain circumstances; is

2    that correct?

3         A.    Yes.

4         Q.    To the best of your knowledge, has BK

5    Billing ever done that with respect to a Castle Law

6    client?

7         A.    No.

8         Q.    Does BK Billing do that as part of its

9    regular practice?

10         A.    Report negatively?

11         Q.    Yes.

12         A.    No.

13         Q.    Okay.  Let's move to Exhibit 3.  Done with

14    this one.  As we mentioned before, you talked about

15    escrowing, and have you seen this document before?

16         A.    Yes.

17         Q.    And would it be fair to say that is an

18    amendment to Exhibit 2?

19         A.    Yes.

20         Q.    And that amendment is dated June 26, 2017;

21    is that correct?

22         A.    I'm looking for the date.  Yes.

23         Q.    Okay.  And for the record, this was

24    labeled as BK Billing 1 through 2.  Was this a document

25    that was produced to our office as a result of the

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 42 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1    October 2017 subpoena?

 2         A.    Yes.

 3         Q.    Okay.  To the best of your knowledge this

 4    is an accurate copy of the amendment?

 5         A.    Yes.

 6         Q.    And what was the purpose of this

 7    amendment, to the best of BK Billing's knowledge?

 8         A.    I believe to adjust the overall purchase

 9    price and then the escrowed amount of the accounts

10    receivable assignment agreement.

11         Q.    Okay.  So as I understand it, this

12    increased the purchase price to 75 percent of the face

13    value of the transferred account.

14         A.    Yes.

15         Q.    And we didn't discuss this, but

16    "transferred account" in this agreement meant the

17    receivable that was sold to BK Billing; is that

18    correct?

19         A.    Yes.

20         Q.    Okay.  And then it changed how that

21    percentage was disbursed to Castle Law firm; is that

22    correct?

23         A.    Yes.

24         Q.    And so would it be a fair statement that

25    under the revised agreement, Castle Law would receive
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 43 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1   60 percent of the face value of the contract initially?

 2        A.    Yes.

 3        Q.    Assuming that it met underwriting

 4   standards of course.  Correct?

 5        A.    Yes.

 6        Q.    And then the remaining 15 percent would be

 7   placed into some sort of holdback or escrow?

 8        A.    Yes.

 9        Q.    Could you just generally explain to me how

10   the escrow works from BK Billing's perspective?

11        A.    Yes.  So we place -- we advance 60 percent

12   of the purchase price as opposed to -- well, let me

13   restate that.  We advance 60 percent -- this is

14   actually worded incorrectly.

15             We advance 60 percent of the overall

16   contract amount that is disbursed by BK Billing to the

17   law firm.  We then take 15 percent of the overall

18   contract amount and essentially hold it back off of the

19   advance or purchase amount that we give so that we have

20   some space on the total contract value to make

21   adjustments for delinquent accounts.

22             If the account is over the 15 percent

23   holdback amount for delinquency, then that affects BK

24   Billing.  If it is under 15 percent of the delinquency

25   holdback amount, then the delinquency amount is taken
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 44 of 65

30(b)(6)
**David Stidham * December 13, 2018**

1    out of the holdback amount and any remaining funds are

2    then disbursed to the attorney.

3         Q.    Okay.  Let's use a hypothetical example

4    and we are going to use really simple numbers because

5    my math skills are really weak.  Let's say the contract

6    amount was a thousand dollars.  So understand that

7    agreement, under that hypothetical agreement, BK

8    Billing would, assuming it got all the payments, pay

9    $750 to Castle Law Firm.

10        A.    Yes.

11        Q.    So it would initially pay, of that $1000,

12   $600 to Castle Law Firm initially.

13        A.    Yes.

14        Q.    And then it would hold $150 in that escrow?

15        A.    Yes.

16        Q.    Okay.  So if the debtor defaulted and

17   didn't make payments, Castle Law would be on the hook

18   for the first $150 in that example?

19        A.    Yes.

20        Q.    Okay.  So BK Billing wouldn't have a

21   default risk unless the default was more than $150.

22        A.    Yes.

23        Q.    And then BK Billing would bear the default

24   risk of that over the $150, or that 15 percent.

25        A.    Yes.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 45 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1        Q.    So it's a fair statement that Castle Law

2   bears some risk if there is a default of the factoring

3   by its client?

4        A.    It's dependent upon how you define "risk."

5        Q.    Well, I'm defining risk as the possibility

6   that it would not get paid the full 75 percent.

7        A.    Of the purchase amount.

8        Q.    Correct.

9        A.    Yes.

10       Q.    Let's turn to Exhibit 4 and this is Bates

11   stamped 1935 to through 1936 of our production to the

12   defendants in this case.  Have you ever seen this

13   document before?

14       A.    Yes.  No.  This document, no.  This

15   information looks familiar to me.

16       Q.    Okay.  So why don't I represent that this

17   was a printout of a screenshot of a presentation to be

18   made at the National Association of Consumer Bankruptcy

19   Attorneys, NACBA, from 2017.  Is it your understanding

20   that there was a presentation made at NACBA's

21   conference about zero down bankruptcies?

22       A.    Yes.

23       Q.    And people from BK Billing participated in

24   that presentation?

25       A.    Yes.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 46 of 65

30(b)(6)
**David Stidham  *  December 13, 2018**

```
 1          Q.    Does BK Billing ever provide any training
 2    for its client attorneys on how the factoring of fees
 3    works with BK Billing?
 4          A.    On how factoring fees for attorney's
 5    clients works specifically?
 6          Q.    Yes.
 7          A.    Yes.
 8          Q.    How often do you provide that training?
 9          A.    Generally a few times a year.
10    Individually, upon the needs of the client.
11          Q.    Okay.  Do you know if you have ever
12    provided any training to Mr. Amerine with respect to
13    how BK Billing factors fees?
14          A.    Yes.
15          Q.    Do you know when he attended trainings
16    provided by BK Billing?
17          A.    No.
18          Q.    Would BK Billing have records of who
19    attended each one of its trainings?
20          A.    It may have records regarding its
21    conference calls, yes.
22          Q.    Okay.  We will make a request to see if
23    you have such records.
24                Do you know if BK Billing, as part of
25    those trainings, ever provided advice or a discussion
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 47 of 65

30(b)(6)
**David Stidham * December 13, 2018**

```
1    share insight, information and opinions with

2    BK Billing clients, yes.

3         Q.    Okay.  Let's turn to Exhibit 26.  And, for

4    the record, this is page 128 in the defendants'

5    discovery.

6              In the middle of that page, do you see an

7    e-mail dated December 15th of 2017 from Mr. Amerine

8    that says, "Sean:  Can you give us the password to your

9    research library on your website?"

10        A.    Yes.

11        Q.    Are you -- does BK Billing have a research

12   library that is accessible to its client attorneys?

13             MR. KOEHLER:  I'm going to object just to

14   the extent that this is a fraction of an e-mail

15   document.  To the extent that you are going to ask the

16   witness questions about the e-mail, I believe he's

17   entitled to know the entire context of the e-mail

18   string.

19             With that said, you can go ahead and

20   answer, sir.

21             THE WITNESS:  I would not necessarily term

22   it a research library, but we do have much information

23   that we can provide to our attorneys' clients upon

24   their request.

25        Q.    (By Mr. Miller) Well, let me ask you this
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 48 of 65

30(b)(6)

David Stidham  *  December 13, 2018

1    question:  Does BK Billing have a section on its

2    website with opinions or other documents that client

3    attorneys can access with a password?

4         A.    BK Billing has a section on its website

5    where attorneys can access case law and cases that are

6    pertinent to bifurcation and factoring, yes.

7         Q.    Okay.  Do you know what information is

8    stored on that website?

9         A.    Yes.

10        Q.    Okay.  It's just case law regarding the

11   various topics you discussed?

12        A.    Yes.  BK Billing has spent many dollars

13   and resources in accumulating that information, and

14   that is one of the value adds that we provide to our

15   attorneys, is the fact that we have done that work and

16   we make information easily and readily available to our

17   clients, yes.

18        Q.    Who gathered the documents that appear on

19   that website?

20        A.    It's collaboration.

21        Q.    Would it only be people at BK Billing?

22        A.    And attorneys that BK Billing hired for

23   that purpose, yes.

24        Q.    Do you know if that research library was

25   actually accessed by somebody at Castle Law Firm?

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 49 of 65

30(b)(6)

**David Stidham * December 13, 2018**

Page 154

```
 1          A.    Yes.

 2          Q.    Okay.  So the underwriters, when reviewing

 3     a contract to accept it for factoring, would apply

 4     these guidelines?

 5          A.    Yes.

 6          Q.    Let's talk about the re -- the provision

 7     that says Recourse.

 8                Do you see that?

 9          A.    Yes.

10          Q.    What's your understanding of what the word

11     "recourse" means in this document?

12          A.    My understanding of what the word

13     "recourse" means is the ability to be held legally

14     responsible for the performance of a contract or

15     financial note.

16          Q.    So it's BK Billing's belief that only

17     attorneys that have a negative holdback balance will be

18     responsible for payment of any delinquent amounts?

19          A.    Yes.

20          Q.    But it is a true statement that with

21     respect to attorneys that have a positive holdback

22     balance, delinquent amounts may be deducted from their

23     holdback?

24          A.    Yes.  This would apply lightly, because,

25     as you've seen from our contracts, we don't have
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 50 of 65

30(b)(6)

**David Stidham * December 13, 2018**

Page 155

1   personal guarantees or things like that.

2           The way that we use that term is -- in the

3   event that an attorney were to be grossly over their

4   delinquency rate within their holdback amount, we would

5   not advance the full amount of the future contracts to

6   the attorney without that delinquency being remedied

7   from those advances.

8           So in the event an attorney was a thousand

9   dollars over their holdback or whatever, and the

10  advance was 1,200, we would advance 200 and retain the

11  thousand, because the attorney's account was negative.

12       Q.    Okay.  Do you see the next provision that

13  says No Interest?

14       A.    Yes.

15       Q.    And this provision is bolded; is that

16  correct?

17       A.    Yes.

18       Q.    And it says, "It is essential for the

19  client to understand that their post-petition payments

20  cost them zero percent interest.  This is a

21  post-petition factoring agreement between the attorney

22  and BK Billing.  There is no financing cost to the

23  debtor."

24           Do you see that?

25       A.    Yes.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 51 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

Page 162

```
 1        A.    This is a printout of invoice details for

 2   a Castle Law client, Huzaifah Babikir.

 3        Q.    All right.  And, generally, can you

 4   provide a summary of what this Exhibit A is telling you

 5   about the Castle Law client Babikir and payments

 6   that --

 7        A.    Yes.  This shows the advances that were

 8   paid, according to this particular contract or invoice,

 9   and then the payment receipts that have been received

10   in accordance with that contract.

11        Q.    Okay.  And how many payments were

12   received, according to that contract?

13        A.    It appears to be six.

14        Q.    And was that all of the payments that were

15   expected for that contract?

16        A.    No.

17        Q.    Would you agree with me that if we

18   calculated up the missed payments, that the amount

19   would be about $1,100?

20        A.    Yes.

21        Q.    Okay.  And based upon your testimony

22   yesterday, would it be fair for me to assume that BK

23   Billing has not taken any type of collection actions

24   against this Babikir, formal type of lawsuits,

25   small-claims court, anything like that?
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 52 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1        A.   Yes.
 2        Q.   All right.  You would also agree that
 3   Castle Law, to the extent that you are aware of, has
 4   not also filed any type of small-claims actions or
 5   anything against client Babikir, correct?
 6        A.   To my knowledge, that is my understanding.
 7        Q.   All right.  I'm going to jump around a
 8   little bit, because I'm trying to cover some questions
 9   that I have based upon your answers to Mr. Miller's
10   questions over the last day.
11             The first thing I want to ask is,
12   sometimes his questions have talked about factoring
13   fees, and I understand from your testimony -- would it
14   be fair that BK Billing's position is they are
15   factoring contracts that a law firm has with the law
16   firm's client?  Would that be correct?
17        A.   Yes.
18        Q.   To the extent that the contract is for
19   attorneys' fees, it is what it is.  True?
20        A.   Yes.
21        Q.   Okay.  But, specifically, BK Billing is
22   not factoring attorneys' fees, per se?  In other words,
23   they are not hiring -- a client -- let me strike that.
24             A consumer is not hiring BK Billing and
25   agreeing to pay BK Billing fees and they are factoring
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 53 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

Page 164

1    with that some type of arrangement with the law firm.

2    True?

3         A.    That would be correct, yes.

4         Q.    All right.  So to the extent that you've

5    been answering any questions in which the phrase

6    "factoring fees" -- would it be fair that what you are

7    actually -- your company is actually factoring, to my

8    understanding, is contracts?

9         A.    Yes.  We are factoring the accounts

10   receivable of a service provider -- in this case,

11   attorneys -- who verify that accounts receivable in the

12   form of service contracts.

13        Q.    Okay.  Mr. Miller -- let me -- again, I'm

14   jumping around.

15             You were asked some questions, and I think

16   even today touched upon what's called the company's

17   underwriting policies or procedures.  In 2017 -- in

18   July, for example, of 2017, I think you were shown some

19   documents involving Castle Law.  Did BK Billing work to

20   ensure that there were proper disclosures to consumer

21   clients of Castle Law Firm during their underwriting

22   analysis?

23             MR. MILLER:  Objection to form.  I'm not

24   sure I understand your question, but if he does, he can

25   answer it.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 54 of 65

30(b)(6)

**David Stidham * December 13, 2018**

```
 1          Q.    Makes sense.

 2                And just for clarity, when you use the

 3    word "shrinkage," you're talking about, like in a

 4    retail context, shoplifting --

 5          A.    Yes.

 6          Q.    -- or damaged product.  It hurts your

 7    bottom line --

 8          A.    Yes.

 9          Q.    -- correct?

10          A.    Yes.

11          Q.    Okay.  In the context of factoring of

12    bankruptcy accounts receivables, then, would you agree

13    that part of this fit that you are talking about is

14    that you want to have clients -- your law firm clients

15    who you perceive to be ethical?  Would that be fair?

16          A.    Yes.

17          Q.    You also want to have law firm clients

18    that you feel make an effort to meet the requirements

19    of the bankruptcy law.  Would that be fair?

20          A.    Yes.

21          Q.    And if you did not have a bankruptcy law

22    firm client that was meeting those, would it be fair

23    for me to assume that you would end the relationship

24    with that client?

25          A.    Absolutely.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 55 of 65

30(b)(6)
**David Stidham * December 13, 2018**

1          Q.     Because it's not in your best interests

2     and your business interests, as far as you are a

3     witness and a CEO of BK Billing, to have that

4     relationship.

5               Would you agree with that?

6     A.     Yes.

7          Q.     You also talked -- I think there was some

8     testimony yesterday -- and I'm not -- a touchy subject,

9     because I'm not trying to hold you to it.  I realize

10    that this could be a transcript that could be open to

11    the public.  But I think that there was some testimony

12    that there was a certain type of fee that the contract

13    allows BK Billing to possibly charge a law firm client,

14    but you indicated might not be charged in every

15    situation.

16              Do you remember that testimony?

17    A.     Yes.

18         Q.     Okay.  If your -- would it be correct for

19    me to assume that if you charged the fee that the

20    agreement allows you to charge each time, that would

21    help your firm cover costs, lights, electricity,

22    employee salary, whatever it is, rent?  It helps your

23    company's overhead.

24              Would that be a fair statement?

25    A.     Yes.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 56 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1   speculation, but he can answer.

2          THE WITNESS:  No, it would not surprise me

3   if an attorney engaged in a similar type of strategy

4   for that.

5          Q.    (By Mr. Koehler) Okay.  Mr. Miller was

6   asking you questions about the information, I think the

7   way you described it, research and cases from across

8   the nation that you willingly provide to your clients

9   as a service to those.  Some of those questions I think

10  were a little bit yesterday, you've also asked about

11  those this morning.

12          Do you recall that?

13  A.    Yes.

14          Q.    Would you agree with me that if a law

15  firm -- and I'll give you an example -- like my client,

16  Castle Law, had to do all of the research on its own,

17  that that would cause it, potentially, to have to

18  charge its clients more money in order to carry out

19  that research?

20          Would that make sense?

21  A.    Yes, that would make sense.

22          Q.    So by Castle Law using the research -- the

23  information, as you correctly described it, that your

24  company has accumulated, that, arguably, is a benefit

25  that Castle Law is helping pass along to its clients by

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 57 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

Page 174

 1    not having to charge them more money to do that

 2    research on its own.  Fair?

 3                 MR. MILLER:  Objection.  Calls for

 4    speculation.

 5                 You can answer.

 6                 THE WITNESS:  Yes, that is fair.

 7                 MR. KOEHLER:  Okay.

 8        Q.    (By Mr. Koehler)  Mr. Miller was also

 9    asking you questions about the information that you

10    share with your clients about different actions that

11    have been brought by U.S. Trustee's offices across the

12    country.

13                 Do you remember those questions?

14        A.    Yes.

15        Q.    And you've shared information with your

16    clients, including Castle Law, about some of those

17    lawsuits, is my understanding.  True?

18        A.    Yes.

19        Q.    Would you expect that the U.S.

20    Trustee's -- the different regional offices also would

21    share information about these actions that they've

22    taken that relate to your company, amongst themselves?

23                 MR. MILLER:  Objection.  Calls for

24    speculation.

25                 You can answer.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 58 of 65

30(b)(6)
**David Stidham * December 13, 2018**

```
 1   way we know how to get a post-petition bankruptcy
 2   receivable is through the process of bifurcation.
 3        Q.    (By Mr. Koehler) And it's not by
 4   accident -- oops, I forgot to do half my services
 5   before the bankruptcy is filed; I guess I'll go ahead
 6   and bifurcate this agreement -- it's a planned process.
 7   Would that be a fair statement?
 8        A.    Yes.
 9        Q.    All right.  You've answered questions over
10   the last several hours between yesterday and today
11   about the underwriting process and evaluating, for
12   example, some information with regards to the law
13   firm's client.  So there might be bank statements or
14   paycheck records or something like that.
15             Do you recall those questions and your
16   answers about those documents?
17        A.    Yes.
18        Q.    All right.  On the topic of the law firm's
19   clients and, for example, the sophistication of a
20   client, would you expect that a client that is needing
21   bankruptcy services -- potential bankruptcy services,
22   and knowing enough to search out a law firm, has at
23   least some level of sophistication to be able to make
24   these types of decisions about their personal finances?
25        A.    Yes.
```

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 59 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1      Q.    All right.  If you were wanting to try to

2  get a viewpoint, an opinion, if you will, because --

3  strike that.  Let me back up.

4           Would it be fair for me to say that in

5  your business model BK Billing does not, for example,

6  call up a law firm's client and have a ten-minute

7  interview where they are asking questions and having

8  the client answer questions as far as trying to gauge

9  that client's specific sophistication?  Would that be

10  fair?

11      A.    Yeah, that does not happen.

12      Q.    Would you -- as the CEO of BK Billing,

13  would you want to obtain the viewpoint or opinion about

14  sophistication of a client from a law firm that

15  regularly deals with consumers, or would you want to

16  try to get or rely upon the opinion, for example, of a

17  government lawyer who has been a 30-year bureaucrat?  I

18  mean, whose opinion would you trust more?

19      A.    We, as a rule, default to the service

20  provider and the service provider's opinion.

21      Q.    Do you value that they have daily

22  interaction with these types of consumer clients versus

23  a government lawyer?

24      A.    We would expect it.

25      Q.    Would you also expect that -- based upon

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 60 of 65

30(b)(6)

**David Stidham * December 13, 2018**

1    my prior questions a few minutes ago of wanting to deal

2    with ethical lawyers, that you would be wanting to have

3    relationships with lawyers and law firms that are

4    interested in looking after the best interests of their

5    clients?

6         A.    That is one of the key criteria.

7         Q.    And that would include topics such as

8    conflicts of interest or anything.  Would that be fair?

9         A.    Yes.

10        Q.    All right.  And based upon your

11   experience, would you trust the clients that you are

12   working with to be able to provide that type of

13   analysis, or would you expect that a government lawyer,

14   who has been with the government for 30 years, for

15   example, would be in the best position to make that

16   analysis?

17             MR. MILLER:  Objection.  Calls for

18   speculation.

19             You can answer.

20             THE WITNESS:  It is my experience that

21   there are varying degrees of sophistication amongst

22   service providers that we deal with or that we work

23   with.

24             However, generally speaking, the consumer

25   attorneys that we work with have their boots on the

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 61 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

Page 182

1   ground, so to speak, and understand the actual needs of

2   the people that are coming to them for service, and

3   their viewpoint as to how to best meet their clients'

4   needs and their consumers' needs would hold weight, in

5   my mind, as opposed to a bureaucratic opinion, yes.

6        Q.   **(By Mr. Koehler) Okay.  I asked you,**

7   **before you came in here today, to read -- there is a**

8   **plaque in the lobby of this U.S. Trustee's office.  Did**

9   **you read that?**

10       A.   Yes.

11       Q.   **And would you agree with me that it**

12   **generally said that the U.S. Trustee's office -- that**

13   **their goals are to preserve the integrity and**

14   **efficiency of the bankruptcy process, the bankruptcy**

15   **system?**

16            MR. MILLER:  Objection.  It exceeds the

17   scope of my direct examination of the debtor, and it's

18   irrelevant, but he can answer.

19            THE WITNESS:  Yes.

20       Q.   **(By Mr. Koehler) Okay.  And would you**

21   **agree with me that if you were trying to achieve**

22   **efficiency, that it would be more efficient to have a**

23   **conversation with someone than to file, in your words,**

24   **a spurious lawsuit?**

25            MR. MILLER:  Objection.  Same objection I

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 62 of 65

30(b)(6)

David Stidham  *  December 13, 2018

Page 183

1    raised before.

2              You can answer.

3              THE WITNESS:  In my opinion, yes, I would

4    think a congenial conversation would be more efficient

5    than an adversarial process, yes.

6         Q.    (By Mr. Koehler) And you're an experienced

7    businessman; my expectation is that you've had such

8    conversations in the past -- and I'm guessing -- but

9    they always don't work themselves out, and they could

10   lead to a lawsuit.

11             Would that be a fair statement?

12        A.    Yes.

13        Q.    But you would agree that if you wanted to

14   be efficient, then it would be better to try to have

15   the conversation first rather than file the lawsuit

16   first.

17             Would that be a true statement?

18             MR. MILLER:  Objection.  It calls for

19   speculation and exceeds the direct examination.

20             You can answer.

21             THE WITNESS:  Yes.

22        Q.    (By Mr. Koehler) All right.  In -- my

23   understanding is your firm actually tried to have such

24   a conversation with the plaintiff in this lawsuit,

25   Mr. Casamatta, like 18 months ago or so.

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 63 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

1              Would that be fair?

2        A.    Yes, I believe that's right.

3        Q.    All right.  Were you able to have that

4    meeting?

5        A.    I do not believe so, no.

6        Q.    Have you -- talking about the Department

7    of Justice system as a whole, and the lawsuits that

8    have been filed in various jurisdictions against your

9    clients, has anyone from the Department of Justice ever

10   reached out to you, before filing the lawsuit, to have

11   a conversation to learn about the business model, maybe

12   talk about if there's ways to tweak it?

13             I don't mean to imply that the model is

14   wrong, but sometimes you can always improve upon

15   something.

16             Has anyone in the Department of Justice,

17   as a whole, ever reached out to your company to have

18   such a conversation?

19             MR. MILLER:  Objection.  Exceeds the scope

20   of direct examination.

21             You can answer.

22             MR. KOEHLER:  You can have a continuing

23   objection, Adam.

24             MR. MILLER:  Okay.  That's fine.

25             THE WITNESS:  Not -- not to my knowledge,

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 64 of 65

30(b)(6)

**David Stidham  *  December 13, 2018**

1    no.

2         Q.    (By Mr. Koehler) If such a conversation

3    was occurring, I would assume, because you are the CEO

4    of the company, that you would know of it.   True?

5         A.    Yes.

6         Q.    Okay.  Would you welcome such a

7    conversation?

8         A.    Absolutely.

9         Q.    Does your company have anything to hide

10   with regard to this business model?

11        A.    No.  I believe our marketing efforts have

12   proven that.

13        Q.    And let me clarify.  I understand you have

14   proprietary information that you don't want to share,

15   but you're not opposed to having a conversation about

16   the model, in general, with anyone from the Department

17   of Justice, whether it's in the Western District of

18   Missouri or Maine or Hawaii or anywhere else.

19              Would that be a fair statement?

20        A.    Yes, we would welcome that conversation.

21              MR. KOEHLER:  All right.  No further

22   questions.  Thank you.

23              MR. MILLER:  I have some brief redirect.

24              THE WITNESS:  Okay.

25

Case 17-41701-can7   Doc 40-3   Filed 11/12/20   Entered 11/12/20 17:55:16   Desc
Exhibit 3 (Deposition of D Stidham)   Page 65 of 65

30(b)(6)

David Stidham  *  December 13, 2018

194

1          REPORTER'S CERTIFICATE

2

STATE OF UTAH          )
3                              )  ss.
COUNTY OF SALT LAKE    )

4

5          I, Dawn Perry, Certified Shorthand
Reporter and Notary Public in and for the State of
6 Utah, do hereby certify:

7          That prior to being examined, the witness,
David Stidham, was by me duly sworn to tell the truth,
8 the whole truth, and nothing but the truth;

9          That pages 116 through 192 of said
deposition were taken down by me in stenotype on
10 December 14, 2018, at the place therein named, and was
thereafter transcribed and that a true and correct
11 transcription of said testimony is set forth in the
preceding pages;

12

          I further certify that, in accordance with
13 Rule 30(e), a request having been made to review the
transcript, a reading copy was sent to Attorney Aaron
14 Millar for the witness to read and sign, and the
original transcript will be delivered to Attorney Adam
15 Miller for safekeeping.

16          I further certify that I am not kin or
otherwise associated with any of the parties to said
17 cause of action and that I am not interested in the
outcome thereof.

18

          WITNESS MY HAND AND OFFICIAL SEAL this
19 28th day of December, 2018.

20

21

22          Dawn M. Perry, CSR

23

24

25



CITICOURT
THE REPORTING GROUP