# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **AMANDA JUNE KOLLE,** | ) **Case No. 17-41701-CAN** |
| | ) |
| Debtor. | ) |
| _____ | ) |
| IN RE: | ) |
| | ) |
| **DeANN MICHELLE GOULD,** | ) **Case No. 17-42125-DRD** |
| | ) |
| Debtor. | ) |
| _____ | ) |
| IN RE: | ) |
| | ) |
| **JUSTIN MANTEZ MACKEY,** | ) **Case No. 17-42465-BTF** |
| | ) |
| Debtor. | ) |
| _____ | ) |
| IN RE: | ) |
| | ) |
| **MELISSA MAXINE LONG,** | ) **Case No. 17-43023-BTF** |
| | ) |
| Debtor. | ) |
| _____ | ) |
| IN RE: | ) |
| | ) |
| **ERNESTINE RICHETTA FRANKLIN,** | ) **Case No. 17-43313-BTF** |
| | ) |
| Debtor. | ) |
| _____ | ) |
| IN RE: | ) |
| | ) |
| **LEONA TENELLE HARVEY,** | ) **Case No. 18-40087-CAN** |
| | ) |
| Debtor. | ) |
| _____ | ) |

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **ANGEL MARIE DEMETURIS ANDERSON,** | ) **Case No. 18-40723-DRD** |
| | ) |
| Debtor. | ) |
| | ) |
| IN RE: | ) |
| | ) |
| **KENNETH DARWIN COOK,** | ) **Case No. 18-41222-DRD** |
| | ) |
| Debtor. | ) |
| | ) |
| IN RE: | ) |
| | ) |
| **LATEISHA JENEE ROBINSON,** | ) **Case No. 17-43094-CAN** |
| | ) |
| Debtor. | ) |
| | ) |
| IN RE: | ) |
| | ) |
| **NECHOL MUTESA WASHINGTON,** | ) **Case No. 18-40264-CAN** |
| | ) |
| Debtor. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER FINDING CAUSE TO REFER ATTORNEY FOR PROFESSIONAL DISCIPLINE

Almost four years ago, the United States Trustee ("UST") filed four adversary complaints against attorney Jason Amerine and his law firm, Castle Law Office of Kansas City, P.C. The UST sought sanctions, disgorgement, and discipline, arising out of Mr. Amerine's and his law firm's practice of failing to disclose they had "factored" fees owed to them by some of their chapter 7 debtor clients.[1] After a court-ordered mediation, the parties reached a settlement requiring Castle

---

[1] The four adversaries, all captioned *Casamatta v. Castle Law Office of Kansas City, P.C., et al*, are: (1) Adv. No. 18-4168 in *In re Rosa James* (Case No. 17-41965-BTF); (2) Adv. No. 18-4172, in *In re Huzaifah Babikir* (Case No. 17-41960-DRD); (3) Adv. No. 18-4194 in *In re Antoinette Grant* (Case No. 17-41914-CAN); and (4) Adv. No. 18-4196

2

Law to disgorge fees and to pay a civil penalty.[2] Once the motion seeking the court's approval for the settlement was filed, however, it came to light that the factoring and nondisclosure had occurred – not just in the four cases – but in an additional 100 cases or more.[3]

The court approved the settlement but issued an order to Mr. Amerine to show cause why additional sanctions should not be imposed in connection with the additional cases.[4] After nearly a thousand pages of briefs and exhibits filed and numerous hearings held over the course of almost a year, new and previously undisclosed facts about the extent of the nondisclosures are still coming to light. Because, the court believes, it should not take almost four years and hundreds of pages for a debtor's attorney to completely and accurately disclose how much he charged and was paid for filing chapter 7 bankruptcy cases, the court is compelled to impose additional sanctions in the form of a disciplinary referral.

**Part I: Background**

*Introduction*

Mr. Amerine is a consumer bankruptcy attorney representing debtors in chapter 7 and 13 bankruptcy cases in the Western District of Missouri and the adjacent District of Kansas since 2001.[5] He was the managing attorney at Castle Law from 2002 to 2014, when he became the sole

---

in *In re Jeffrey Hannah* (Case No. 17-41912-BTF). The four adversaries were consolidated for hearing before this judge.

[2] Conducted by the Hon. Dale L. Somers, U.S. Chief Bankruptcy Judge for the District of Kansas.

[3] *Kolle*, Case No. 17-41701, ECF No. 35-1 *SEALED\**. The court notes that it *sua sponte* sealed the document showing the names, case numbers, accounts receivable factored and payments made by the debtors in the 100+ cases to protect the interests of those debtors whose cases were not randomly selected for review but will refer to information in the sealed document as necessary and appropriate during this opinion.

[4] The court selected these ten cases at random and issued a joint OSC, as will be discussed below. *See, e.g.*, ECF No. 35 in Case No. 17-41701 (*In re Kolle*). The court notes that all the orders, responses and exhibits relevant to this matter were filed jointly in all ten cases. Therefore, for ease of reference, the court will use the ECF docket numbers in the *Kolle* case when referring to orders, responses and exhibits filed in these ten cases, unless otherwise specified. When referring to deposition testimony, because there are two deposition transcripts for each witness, the first an excerpted version and the second a complete version, the court will refer to the complete version by referring first to the ECF number and then to the page of the transcript.

[5] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 4, transcript pp. 14-15.

owner.[6] By his own calculation, he has filed thousands of cases for consumer debtors over the course of his legal career.[7] Although other attorneys work at Castle Law,[8] every bankruptcy case Castle Law files is filed under Mr. Amerine's name.[9]

### The UST's Filing of the Four Adversary Complaints Against Mr. Amerine & Castle Law

The issues in this case were first brought to the court's attention when, on March 12, 2018, the UST filed the first of four adversary complaints against Mr. Amerine and Castle Law in *In re James*.[10] The initial complaint, as well as the three that followed, alleged what on their face were disturbing facts: that the four debtors had retained Mr. Amerine and his law firm to file chapter 7 bankruptcy cases for flat fees; that, after the debtors each paid some funds, Mr. Amerine and his law firm pressured the debtors to accept a new fee contract, under which $0 would be allocated to the prepetition services; and that, after filing for bankruptcy, the debtors were then presented with a second fee contract for a higher amount than the originally quoted flat fee and told that if they did not accept it, Mr. Amerine would withdraw.

The complaints further alleged that after filing the cases, Castle Law sold or "factored" the second fee contracts at a discount to a third-party funder, known as BK Billing, who then collected the fees directly from the debtors in apparent violation of the automatic stay and the discharge injunction. The UST alleged that the debtors, whose payments included in the price of their fees a 25% factoring fee, were charged an unreasonable fee and that none of these details, including the amounts Castle Law had been paid by BK Billing, had been disclosed to the court.

---

[6] *Kolle*, 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 4, transcript p. 14.
[7] *Kolle*, 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 6, transcript p. 23.
[8] *Kolle*, 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 5, transcript p. 19.
[9] The court takes judicial notice of its own records. F.R.E 201.
[10] Adv. No. 18-4168 (Case No. 17-41965). Since subsequent motions and orders were filed jointly in all four adversaries, which the court also consolidated for pretrial proceedings, the court for ease of reference will use the ECF docket numbers in the *James* adversary when referring to joint motions and orders filed in all four adversaries, unless otherwise specified. Page references will be to the ECF page number.

The UST alleged that "bifurcating" the fees in this manner into pre- and postpetition amounts was not only unreasonable and unethical, but in direct violation of this court's local rule, L.R. 2016-1.D.[11] This rule excuses debtors' attorneys from filing motions to approve their fees if two conditions are met: (1) the attorneys certify they have executed the court's Rights and Responsibilities Agreement ("RRA") for one flat fee for pre- and postpetition legal services; and (2) that fee does not exceed the "no look" amount of (then) $3,000.[12] In the event attorneys elect not to execute the RRA, the fees exceed the no look, or the fee agreement terms are otherwise nonstandard, the local rule requires attorneys to hold the fees in trust pending the prompt filing of a motion and court approval.

By failing to seek court approval under L.R. 2016-1.D and by failing to disclose the bifurcation and factoring of his fees, Mr. Amerine had, according to the UST, actively attempted to conceal the details of his fee arrangements from the UST and the court, particularly because Mr. Amerine had certified he had executed the RRA in all four cases.

The UST's five-count complaints alleged violations of 11 U.S.C. §§ 526–528, the so-called "debt relief agency" provisions of the Bankruptcy Code; of 11 U.S.C. § 329, Fed. R. Bankr. Proc. 2016(b) and L.R. 2016-1.D regarding the failure to disclose and the reasonableness of the fees; as well as violations of various rules of the Missouri Rules of Professional Conduct ("MRPC").[13] Specifically, the UST alleged that Mr. Amerine's fees were subject to the requirements of reasonableness and disclosure as set out in § 329 and Rule 2016(b), and that Mr. Amerine had

---

[11] Now L.R. 2016-1, effective December 1, 2019.

[12] Courts have recognized that, given the number of routine, no asset consumer cases, it is not an abuse of discretion for the court to set a presumptively reasonable fee and then to require documentation to substantiate a fee in excess of that amount in chapter 7 cases. *Matter of Geraci*, 138 F.3d 314, 321 (7th Cir. 1998). *See also In re Williams*, 357 B.R. 434, n.3 (B.A.P. 6th Cir. 2007) (same).

[13] The specific MRPC the UST alleged that Mr. Amerine and Castle Law had violated were Rule 4-3.3 (Candor Toward the Tribunal), Rule 4-1.7 (Conflict of Interest); Rule 4-1.8 (Prohibited Transactions) and Rule 4-8.4 (Misconduct).

made materially false and misleading statements in his Rule 2016(b) disclosures and that the fees were unreasonable.[14] The UST sought imposition of civil penalties, disgorgement, injunctive relief, sanctions, and a disciplinary referral.

Mr. Amerine and Castle Law, through experienced insurance defense counsel,[15] vigorously defended, not only denying most of the allegations, but contesting the bankruptcy court's jurisdiction and authority to hear and determine the complaints by filing a motion in each adversary to withdraw the reference.[16] Mr. Amerine and Castle Law did not object to this court's lengthy report, which methodically laid out why the bankruptcy court did, indeed, have both jurisdiction and authority to hear and determine whether Mr. Amerine and Castle Law should be sanctioned, or to the recommendation that the motions to withdraw reference be denied.[17]

The U.S. District Court[18] adopted this court's report and recommendation in each case the day after the deadline to object expired and denied the motions to withdraw reference.[19] The District Court stated: "This Court, having reviewed the motion to withdraw reference and the report and recommendation, and given the lack of objection by Defendants, is convinced that the recommendation of the [then] Chief Bankruptcy Judge is correct and should be adopted."[20] In the meantime, however, resolution of the four adversary complaints was delayed for several months while the parties briefed the motions and the court heard oral arguments and drafted its report and recommendation.

---

[14] *James*, Adv. No. 18-4168, ECF No. 1, pp. 32-33.
[15] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 5-6, transcript pp. 20-21.
[16] *James*, Adv. No. 18-4168, ECF Nos. 7 (Motion to Withdraw Reference), 20 (Suggestions in Support of Reply to the UST), 28 (Suggestions in Support of Sur-reply).
[17] *James*, Adv. No. 18-4168, ECF No. 43.
[18] The Hon. Stephen R. Bough, U.S. District Court Judge for the Western District of Missouri.
[19] Case Nos. 4:18-mc-09026-SRB, 4:18-mc-09027-SRB; 4:18-mc-0928-SRB; and 4:18-mc-0929-SRB.
[20] *E.g.*, Case No. 4:18-mc-09026-SRB, ECF No. 4.

### *Mr. Amerine Files the Hughes Case*

While the motions to withdraw reference in the four adversaries were pending, Mr. Amerine filed another chapter 7 case, *In re Arlando & Angela Hughes.*[21] Mr. Amerine filed the Hugheses' bankruptcy case as an incomplete – otherwise known as a "skeletal" filing – with just the petition, creditor matrix, and Rule 2016(b) Disclosure of Compensation of Attorney For Debtor(s). The court would come to learn that Mr. Amerine refers to this type of skeletal filing as a "shell." The Rule 2016(b) Disclosure (Form B2030) in *Hughes* certified that Mr. Amerine had agreed to accept $0 for his legal services; had received no money prior to the filing of the statement; and that no balance was due.

In Part 4 of the Disclosure, regarding the source of the compensation "to be paid to me," Mr. Amerine certified: "At the time of this filing there is no agreement to be paid future compensation. Debtor's [sic] counsel did receive the cost for the filing fee, credit reports, and required classes totaling $445."[22] Part 6.b of the Disclosure, stating what legal services Mr. Amerine had agreed to render, stated: "Post-filing debtor [sic] and Castle Law intend to discuss alternate options to address further work that needs to be performed including hiring other counsel, continuing pro se, or continuing further engagement with Castle Law under a new contract all subject to local rules and the rights and responsibilities agreement."[23] Notwithstanding the statement that any new fee agreement would be subject to the RRA, Mr. Amerine also certified with the filing of the petition that he had not executed the RRA and had declined the no look fee in L.R. 2016-1.D, and would be submitting "motions for compensation based on time records."[24]

---

[21] *Hughes*, Case No. 18-42590, filed October 1, 2018.
[22] *Hughes*, Case No. 18-42590, ECF No. 1, p. 8.
[23] *Id.*
[24] *Hughes*, Case No. 18-42590, ECF No. 2. Note that Mr. Amerine later testified that he does not keep time records but looks at phone logs and calendars to determine how much fees he had earned. *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 21, 52, transcript pp. 84, 206.

The court issued its standard order to show cause ("OSC") why the *Hughes* case should not be dismissed for the failure to file all required schedules, statements, and related documents within 14 days.[25] Ten days later, in connection with filing all the rest of the required documents, Mr. Amerine filed an amended Rule 2016(b) Disclosure.[26] The Amended Disclosure in *Hughes* certified that Mr. Amerine had agreed to accept $2,000 for his legal services; had received no payments "prior to the filing of this statement"; that $2,000 was the balance due; and debtors were the source of the compensation to be paid.[27] The Disclosure included an "other provision" that Castle Law had entered into a new contract with the debtors after the filing for $2,000, and had sold the receivable to BK Billing "in return for a payment of $1550 based on completion of the contract," and that Castle Law "acknowledges receipt of that payment post-petition." The statement said that the Hugheses had agreed to pay BK Billing $230 per month for nine months.

The Hugheses' accompanying Schedule J reflected a monthly expense of $230 for "postpetition legal payment," leaving them with $6.74 per month left over in their budget.[28] The disclosure of the postpetition payment was appropriate because the Schedule J requires debtors to disclose under penalty of perjury whether they expect an increase or decrease in their expenses within the year after filing. The Schedule J gives this example: "For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage." If the "yes box" is checked, the form requires the debtor to "explain here."

SOFA Question No. 16 asks: "Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about

---

[25] *Hughes*, Case No. 18-42590, ECF No. 7.
[26] *Hughes*, Case No. 18-42590, ECF No. 12.
[27] *Hughes*, Case No. 18-42590, ECF No. 12.
[28] *Hughes*, Case No. 18-42590, ECF No. 10, p. 33.

seeking bankruptcy or preparing a bankruptcy petition? Include any attorneys, bankruptcy petition preparers, or credit services required in your bankruptcy." The Hugheses' SOFA did not show any payments for any expenses related to the bankruptcy in response to Question No. 16, notwithstanding that, according to Mr. Amerine's first Disclosure, the Hugheses had paid Castle Law prepetition $445 for their bankruptcy expenses and the Hughes' Certificate of Credit Counseling was dated several months before the bankruptcy filing.[29]

### Mr. Amerine and Castle Law File a Motion to Approve Factored Fees in the Hughes Case

Shortly after the Hugheses' chapter 7 trustee filed a report of no distribution, and while the motions to withdraw reference in the adversaries were under advisement, Mr. Amerine and Castle Law collectively filed a "*Motion to Approve Fee Agreement, Or In The Alternative, Stay Ruling Pending Conclusion of Adversary 18-04168.*"[30] In addition to the details in the Amended Disclosure, the Motion alleged that the Hugheses had retained Castle Law "after a thorough consultation" for the limited purpose of performing a pre-bankruptcy analysis and preparing and filing a chapter 7 petition, for which the firm had charged nothing.

The Motion stated that "shortly" after the bankruptcy filing, the Hugheses retained Castle Law under a second, limited scope agreement for providing postpetition services for a flat fee of $2,000. The Motion alleged that the second agreement for postpetition services had been sold to BK Billing, and that Castle Law had received $1,200 on account of the sale. The Motion did not address the discrepancies between the first two disclosures and the Motion: why the first Rule 2016(b) Disclosure stated that the agreed fee was $0 and the Motion and the Amended Disclosure

---

[29] *Hughes*, Case No. 18-42590, ECF No. 10, p. 40; ECF No. 3. Unless excused or extended for exigent circumstances, individual debtors are not eligible to file bankruptcy unless they have taken an approved credit counseling within the 180 days before filing bankruptcy. 11 U.S.C. § 109(h)(1).
[30] *Hughes*, Case No. 18-42590, ECF No. 26.

said $2,000, and why the first Disclosure stated $0 had been received, the Amended Disclosure said $1,550, and the Motion said $1,200.[31]

The Motion described this as a "two-contract" process that was reasonable based on the Hugheses' financial situation, although no details of the Hugheses situation were disclosed. No part of the Motion addressed why $2,000 was a reasonable fee for the Hugheses to pay for legal services for a simple, no asset chapter 7 bankruptcy. Rather, the Motion alleged that the total fee was reasonable because the fee was less than the court's "no look" fee, making the fee "presumptively reasonable." The Motion alleged that Mr. Amerine had not executed the RRA because "it causes an ambiguity to occur with the two fee agreement contracts signed by the Debtors and Castle Law."[32]

### *Legal Authority Cited by Mr. Amerine and Castle Law in Support of the Factored Fees*

The Motion in *Hughes* also attempted to muster legal authority in support of Castle Law's use of the "two-contract" process. The Motion quoted from an eloquent passage by Bankruptcy Judge Phillip Shefferly from the Eastern District of Michigan in *In re Gourlay*,[33] in which Judge Shefferly bemoaned the difficulties of clients who are unable to afford the fees for filing bankruptcy. The Motion did not disclose, however, that the lawyer in *Gourlay* had not used a two-contract process; instead, where the lawyer had one prepetition agreement for a $900 fee and the debtor had only paid $100 of the fee before the filing, Judge Shefferly agreed with the UST in that

---

[31] As will be discussed below, many of the disclosures signed by Mr. Amerine had similar discrepancies. The exhibit submitted as part of the settlement with the UST (*Kolle*, 17-41701, ECF No. 35-1 *SEALED*) appears to show that Castle Law sold a $2,000 accounts receivable to BK Billing and that BK Billing charged a $500 (or 25% factoring fee) so the court might presume that on Oct. 8, 2018 when BK Billing charged the $500, the $1500 net would have been advanced to Castle Law; however, the chart also reflects a holdback of $476.67. So, it is not clear to the court how much Castle Law received as an advance from BK Billing in the *Hughes* case on October 8, only that it is clear Castle Law had received some amount of payment from BK Billing before the Amended Disclosure was filed two days later, on October 10, 2018.

[32] *Hughes*, Case No. 18-42590, ECF No. 26, p. 3.

[33] 483 B.R. 496, 501-02 (Bankr. E.D. Mich. 2012).

case that the lawyer was barred by the automatic stay[34] from collecting the fees from the debtor and that the unpaid balance was discharged upon entry of the discharge order.[35]

Another Michigan case, *In re Michel*,[36] also cited in the *Hughes* Motion, likewise involved a lawyer's postpetition attempt to collect fees arising from a single prepetition fee agreement, with the same result. The court in *Michel* rejected the lawyer's argument that the Code and Rules provide inadequate guidance on how an attorney may be paid, noting that the attorney should have known based on ample case authority "that there was at least a serious question about the legality of his fee arrangement with the Debtors in this case."[37]

The only Eighth Circuit case Castle Law cited in the Motion, *In re Kula*,[38] involved whether fees of a professional employed by the estate in a chapter 11 case were reasonable under § 330 and the so-called "lodestar standard." The Motion cited *Kula* for the unremarkable proposition that the lodestar standard – the method of determining reasonableness by multiplying a reasonable number of hours by a reasonable hourly rate – is not required in all cases, quoting *Kula's* comment "that some cases, particularly Chapter 13 cases, are not prone to a lodestar calculation."[39]

*Kula* held that § 330 applied to applications for fees in chapter 7 cases. But, to the extent *Kula* intended to suggest that § 330 standards should apply to the reasonableness of debtors' attorneys' fees under § 329, that *dicta* was of course later repudiated by the Supreme Court in

---

[34] 11 U.S.C. § 362(a). Unless otherwise indicated, all statutory references will be to title 11 of the United States Code and all references to rules shall be to the Federal Rules of Bankruptcy Procedure.
[35] 11 U.S.C. §§ 524, 727(a); *In re Gourlay*, 483 B.R. 496, 501-02 (Bankr. E.D. Mich. 2012).
[36] 509 B.R. 99 (Bankr. E.D. Mich. 2014).
[37] 509 B.R. at 108.
[38] 213 B.R. 729 (B.A.P. 8th Cir. 1997).
[39] 213 B.R. at 737. The Motion's reliance on *Kula* is puzzling. *Kula* notes that some courts have local rules excusing lawyers from itemizing fees, pointing to this court's "no look" local rule as an example. *Kula* therefore suggests that lawyers should pay attention to their own court's local rules governing fees.

*Lamie v. U.S. Trustee.*[40] In any event, there was nothing in the *Kula* case that remotely bore on

whether the court should approve the Motion under § 329 and this court's local rules other than to

reiterate that attorneys should indeed comply with local rules regarding their fees.[41]

The final case Castle Law cited in the Motion was likewise unavailing. The Motion cited

the Seventh Circuit in *Bethea v. Robert J. Adams & Associates*[42] for the proposition that the two-

contract process is an option. *Bethea* did not involve a factored fee agreement. But *Bethea* had

observed that, "[t]hose who cannot prepay in full can tender a smaller retainer for prepetition work

and later hire and pay counsel once the proceeding begins," observing that the legal fees incurred

after filing receive administrative priority.[43]

The problem with relying on *Bethea* was several-fold, however. First, *Bethea*'s holding

reaffirmed that unpaid attorney fees agreed to prepetition are discharged in chapter 7. Second, the

*dicta* the Motion quoted was actually a rejection of the debtor lawyer's policy argument that

enforcing the discharge injunction would preclude debtors from finding lawyers (a policy

argument, you will discover below, that Mr. Amerine made later in this case). And, most

importantly, the *Bethea dicta* was overruled by the Supreme Court the very next year in the *Lamie*

case.

---

[40] 124 S.Ct. 1023 (2004) (holding that § 330(a)(1), as amended in 1994, does not authorize debtors' attorneys to be paid from the bankruptcy estate unless employed by the chapter 7 trustee pursuant to § 327). The court does not believe *Kula* intended to so indicate but, rather, that *Kula* was referring to applications of professionals retained in chapter 7, not chapter 7 debtor's attorney's applications to prove fees, such as the Motion in *Hughes*.

[41] *Kula's* comment was recently cited with approval in *In re Allen*, 626 B.R. 641, 641 (B.A.P. 8th Cir. 2021). The court notes that *Allen* involved a similar two-contract agreement factored with a different entity. The B.A.P. held that the bankruptcy court did not abuse its discretion by reducing the fees by the amount charged in the second contract. The bankruptcy court had found that the attorney provided the same services he would have provided regardless of whether his were paid under the prepetition or postpetition payment option. The B.A.P. rejected the attorney's argument that the bankruptcy court erred in not analyzing the fees under the lodestar standard, noting that the burden to prove reasonableness was on the attorney, and that the attorney had presented no evidence that would enable to court to conduct a lodestar analysis. *Id.*

[42] 352 F.3d 1125 (7th Cir. 2003).

[43] 352 F.3d at 1128.

***The Two Hughes Fee Agreements***

The other problem with Mr. Amerine's reliance on these case authorities became immediately apparent when the court examined the two *Hughes* fee agreements, attached as exhibits to the Motion.[44]

The so-called "prepetition" agreement, titled "Attorney-Client Retainer Agreement," bearing an execution date of seven months before the Hugheses' bankruptcy filing on October 1, 2018, did not actually state that the Hugheses were paying $0 for the "limited" prepetition services, otherwise described as "the shell." Instead, with respect to prepetition fees, the agreement only addressed prepetition expenses:

> I understand that to file my Chapter 7 I will pay Castle Law Office the court filing fee of $335, the credit counseling, the financial management, [sic] credit report cost of $110. I understand that Castle Law Office's representation of me pursuant to this contract shall immediately end upon the filing of a petition and related schedules on my behalf for Chapter 7 relief. I understand that pursuant to the terms of this agreement, Castle Law Office shall have no obligation to provide any additional legal services after my Chapter 7 is filed.

With respect to postpetition fees, however, the prepetition agreement expressly established the amount of the postpetition fee:

> After the bankruptcy case is filed, I understand that I will be presented with a second retainer agreement to pay Castle Law Office <u>$2,000</u> the attorney's fees [sic], plus any necessary post-petition costs to represent my interests, including: preparation and amendment, if necessary, of schedules; preparation and attendance of the Section 341 Meeting of Creditors; review and attendance, if necessary, [sic] motions for stay relief; review of any redemption agreements; review of any reaffirmation agreements and case administration.

The prepetition agreement provided that the clients understood "that the fee of <u>$2000</u> to be paid pursuant to the terms of this Contract is a flat fee and that this fee shall immediately become

---

[44] *Hughes*, Case No. 18-42590, ECF No. 26-1.

the property of Castle Law Office in exchange for a commitment by Castle Law Office to provide the legal services described above."

The prepetition agreement provided that once the case was filed, the Hugheses were not "legally obligated to pay and [sic] fees to Castle Law Office" and that if any fees were owed and not paid as of the filing of the case, they would "be discharged in the bankruptcy and may not be collected by Castle Law Office or its assignees." With respect to the second retainer agreement to be presented, the prepetition agreement stated:

> After my bankruptcy is filed, I may sign a second retainer agreement promising to pay fees for the remainder of my representation in consideration of services to be performed by Castle Law Office after the filing of my bankruptcy. I understand that I will be under no obligation to do so and can refuse to sign such an agreement. However, Castle Law Office reserves the right to seek to withdraw from my representation in the event that I do not sign a second retainer.[45]

The second, allegedly postpetition agreement was titled "Contract for Post-Petition Chapter 7 Legal Services." The Motion represented that Castle Law had presented this second agreement, dated the same day as the bankruptcy filing, to the Hugheses "shortly" after the bankruptcy filing. This second agreement stated that, although the Hugheses' prepetition agreement was now unenforceable, and the Hugheses were free to choose another attorney, they had agreed to pay Castle Law $2,000 for representing them in the bankruptcy case.[46] The second agreement provided that all fees had to be paid before the services to be provided were completed, specifying the same services the prepetition agreement had specified (i.e., preparation and amendment of schedules, attendance at the § 341 meeting, etc.). The second agreement said that the debtors "acknowledged" and "agreed" that "these additional fees constitute post-petition services, and they are not dischargeable in my Chapter 7 case."

---

[45] *Hughes*, Case No. 18-42590, ECF No. 26-1.
[46] *Hughes*, Case No. 18-42590, ECF No. 26-1.

The second agreement also contained several puzzling contradictions and ambiguities. The second agreement stated that the clients understood that the fee of $2,000 "to be paid pursuant to this Contract" is a flat fee, but nowhere else in the agreement did it state how the $2,000 was to be paid. Nor did the second agreement state that the Hugheses would be paying a third party, not Castle Law.

The second agreement stated that the fees would be deposited into the firm's operating account and would be nonrefundable, because Castle Law "will begin to work on my file immediately after entering into this contract," notwithstanding that the second agreement also stated, as noted above, all fees had to be paid before the services to be provided were completed. And, although the scope of postpetition work included representation in connection with motions for relief from stay, another provision of the second agreement excluded motions for relief, providing: "I further understand that this retainer does not include attorney representation in any court action filed in conjunction with Client's Dischargeabilty Complaints and Motions such as Avoidance of Lien, Relief from Stay, Modification or Dismissal."[47] As for what was meant by "retainer," the second agreement was unclear, since in no other place in the agreement was the word "retainer" used.

The fact that the prepetition agreement established an amount for the postpetition services suggested to the court that, like the fee agreements in *Gourlay*, *Michel* and *Bethea*, the Hugheses had, in reality, agreed to pay Castle Law $2,000 before they filed bankruptcy. Therefore, any part of the $2,000 remaining unpaid was dischargeable. In addition, nothing in either the first or second fee agreements reflected that Castle Law intended to sell the Hugheses' account receivable to another entity or that Castle Law's proceeds from the factoring would be reduced by a 25%

---

[47] Note that if Mr. Amerine and the Hugheses had executed the RRA, the exclusion of representation in connection with motions for relief, dismissals, and lien avoidance would have violated the express terms of the RRA.

factoring fee and a further holdback (the holdback provisions will be discussed below). Finally, nowhere in the *Hughes* Motion did Mr. Amerine or Castle Law explain why, if the Hugheses truly made the decision to enter a postpetition agreement after they filed bankruptcy, the Hugheses had agreed seven months previously to pay $2,000 for a fee agreement to be sold to BK Billing.

### The UST's Objection to the Hughes Motion to Approve Fees

No party objected to the *Hughes* Motion but the court on its own motion set the matter for hearing.[48] The UST, who had not been served with the Motion and whose office was closed during the (then) government shutdown, later filed a comprehensive objection.[49]

The UST contended that the two-contract model was a "fiction," where, as in the Hugheses' case, the clients and the lawyer had already discussed and agreed to the postpetition amount when they executed the prepetition contract seven months earlier. The UST pointed out that charging $0 for prepetition work was inconsistent with an attorney's duty of investigation before filing a bankruptcy case under § 707(b)(4). Mr. Amerine's contention that the debtors were knowingly choosing to enter into the second agreement was illusory, the UST argued, particularly where the second agreement was signed the same day as the case was filed. The UST observed that the *dicta* in *Bethea,* seemingly approving of a two-contract model, had been effectively overruled by *Lamie.* But, the UST argued, even assuming that a two-contract fee model was still permissible, "[it] is doubtful that it is permissible to bifurcate a flat fee on these facts, where counsel is clearly attempting through mere nomenclature to transform a dischargeable pre-petition agreement for a $2,000 flat fee into a non-dischargeable post-petition agreement."[50]

---

[48] The court originally inadvertently granted the Motion in part, then vacated the order.
[49] *Hughes*, Case No. 18-42590, ECF No. 37.
[50] *Hughes*, Case No. 18-42590, ECF No. 37, p. 6.

Finally, the UST attached a chart to his Objection showing that Castle Law clients who had agreed to the two-contract arrangement were effectively charged a much higher fee than Castle Law normally charged for similar chapter 7 cases. The UST argued that, based on other Castle Law filings, the firm typically charged $1,245 to $1,420 for legal fees for filing chapter 7 cases, whereas it charged $1,765 to $2,000 in factored cases, such as the Hugheses' case. "This evidence suggests," the UST argued, "that the higher fee is not related to the complexity of the case, the amount of work to be performed by Castle Law or any other legitimate factor this Court would consider in a Section 329(b) analysis … Rather, this fee is solely an undisclosed or 'hidden' financing fee, which is added to Castle Law's fee to compensate BK Billing for financing the transaction."[51]

### Castle Law's Reply to the UST's Objection

Castle Law filed a 32-page Reply including exhibits to the UST's objection, arguing that all the UST's arguments were meritless.[52] In the Reply – filled with underlined and bolded language for emphasis – the firm accused the UST of failing to cite cases contrary to what the firm described as *Bethea's* holding that bifurcated fee agreements were permissible in bankruptcy. Castle Law also accused the UST of opposing "free" services being provided to debtors:

> The objection that no amount was charged for the pre-petition services is confusing as it indicates the [UST] is against the concept of providing a free service or good as part of a business model. Does the [UST] bar personnel in his office from staying at hotels that offer guests a *free* continental breakfast or wi-fi? Why should a consumer not be offered a free service if he or she is in financial trouble and needs to consider bankruptcy help?

(emphasis in original).[53]

---

[51] *Hughes*, Case No. 18-42590, ECF No. 37, p. 7.
[52] *Hughes*, Case No. 18-42590, ECF No. 40.
[53] *Hughes*, Case No. 18-42590, ECF No. 40, p. 4.

The Reply argued that there was no evidence the contracts were signed other than on the days they were dated (one prepetition and one postpetition) and suggested the UST needed to review a Virginia case in which the court observed that "trustees should discharge their duties discreetly, courteously, and professionally, without embarrassment of the attorney."[54] The Reply alleged that the UST had failed to cite any relevant authority. "This objection and smear against Mr. Amerine should be ignored by the Court," the Reply exhorted.[55]

Finally, the Reply was supported by Mr. Amerine's Affidavit, in which he stated that the Hugheses had signed the first fee agreement prepetition and the second one after the case was filed. He said that the UST had deposed his clients, the Hugheses, even though the UST had never examined any of his clients before and that the UST had now asked to examine at least 20 of his clients' files, which the UST's office had "*hardly ever*" done before (emphasis in original).[56] He concluded the affidavit by stating the UST's claims against him and his firm had cost the firm tens of thousands of dollars in legal fees for defense.

### The Court's First Hearing and Order to Show Cause in the Hughes Case

At the first status hearing on the Motion, the court learned that Castle Law had filed motions to approve fees in four other cases and was possibly intending to file more.[57] The court, Mr. Amerine's counsel, and the UST all agreed that the motions should thus be stayed pending resolution of the adversary proceedings to preserve the status quo and not moot the adversary complaints. The court directed counsel for the UST, Mr. Amerine and Castle Law to collaborate

---

[54] *Hughes*, Case No. 18-42590, ECF No. 40, p. 5, citing *In re McLean*, 6 B.R. 327, 328 (Bankr. E.D. Va. 1980) (holding that if a chapter 7 trustee believed a debtor's attorney fee was unreasonable, the trustee should file a motion to have the court examine the fee, not determine himself whether the fee was reasonable). *McLean* clearly doesn't apply here.

[55] *Id.*

[56] *Hughes*, Case No. 18-42590, ECF No. 40, Exhibit C, Amerine Affidavit.

[57] *In re Boston*, Case No. 18-43172; *In re Brown*, 18-42945; *In re Ellis*, Case No. 18-43125 and *In re Juarez* 18-42866.

on an order requiring Castle Law to hold any payments from BK Billing in trust and to stay the
debtors' obligation to make payments to BK Billing pending a final order.[58]

At the next status conference however, the parties reported they were unable to agree on
the form of an order. Castle Law's position was that it was a "drastic remedy" to require the firm
to hold any funds from factoring its clients' account receivables in its trust account. Because the
parties could not agree, the court stated it would issue its own order.[59]

The court issued its OSC a few days later. The court ordered Mr. Amerine and Castle Law
to show cause why the court should not enter an interim order that (1) authorized the firm to
consider as earned all pre- and postpetition attorney fees and expenses the debtors had paid directly
to Castle Law; (2) required the firm to hold all fees and expenses obtained by factoring in trust;
(3) stayed the debtors' obligation to pay BK Billing; and (4) directed Castle Law to serve a copy
of the order on BK Billing, pending a final ruling in the adversaries.[60]

### Mr. Amerine and Castle Law's Response to the Court's OSC

Mr. Amerine and Castle Law filed a 79-page response including exhibits to the court's
three-page OSC.[61] The firm argued that the court's proposed order would effectively prevent it
from factoring, because the firm was not set up to accept monthly payments and BK Billing would
be unlikely to buy any of the firm's accounts receivables if the payments were stayed, citing a risk
of default. In fact, the firm alleged, of the accounts receivable Castle Law had already factored, a
high number of clients had not paid BK Billing. The firm argued that the court's proposed order
would harm debtors, since debtors would be left with only three choices: to (1) file for bankruptcy
*pro se* or with a bankruptcy petition preparer; (2) delay filing until they accumulated the fees; or

---

[58] *Hughes*, Case No. 18-42590, ECF No. 43.
[59] *Hughes*, Case No. 18-42590, ECF No. 44.
[60] *Hughes*, Case No. 18-42590, ECF No. 46.
[61] *Hughes,* Case No. 18-42590, ECF No. 48.

(3) file an unnecessary chapter 13. The firm also decried what it described as the UST's "aggressive hostility" to a bifurcated fee model and argued that § 329 was "not intended to be used to sanction law firms or protect the bankruptcy system . . ." but rather was aimed solely at preventing overreaching by debtors' attorneys.

The court's proposed order, Castle Law argued, would also impact the firm, which needed the funds to pay its operating expenses. Finally, the firm "strongly urge[d]" the court to review a recent opinion from the District of Utah, *In re Hazlett*,[62] and to consider adopting a local rule similar to the Southern District of Alabama,[63] both of which districts the firm described as having the most "reasoned" approach to the issue of bifurcated fees.

The Response was also supported by another sworn affidavit of Mr. Amerine. This affidavit, captioned a declaration, attested to Castle Law's financial difficulties as laid out in the Response. The declaration included the name and a quote of another client. This client, according to Mr. Amerine, had expressed "anger and frustration" at not being able to use what Mr. Amerine now described as the "bifurcated model" of paying attorney's fees, due to the UST's "opposition toward the model, and me and my law firm."[64] The client referenced, however, had decided to file a chapter 13 case for reasons unrelated to any difficulty of paying attorney fees.[65]

---

[62] 2019 WL 1567751, Case No. 16-30360 (Bankr. D. Utah Apr. 10, 2019). The *Hazlett* decision was issued six days before Mr. Amerine filed his response. The court will discuss the significance of *Hazlett* below.
[63] The Southern District of Alabama, by Local General Order No. 19, effective April 1, 2018, authorized chapter 7 debtors' counsel and debtors to agree to separate prepetition and postpetition contracts for legal services, provided the contracts complied with Alabama Rules of Professional Conduct, the debt relief agency provisions of the Bankruptcy Code, and other applicable standards, and also required that all compensation paid or agreed to be paid must be disclosed pursuant to § 329 and Rule 2016(b). *Hughes*, Case No. 18-42590, ECF No. 48-7.
[64] *Hughes*, Case No. 18-42590, ECF No. 48-1, p. 5.
[65] *Hughes*, Case No. 18-42590, ECF No. 48-1, p. 5.

***The UST's Reply to Mr. Amerine's and Castle Law's Response***

The UST filed a reply to Mr. Amerine's and Castle Law's Response in support of the court's proposed order.[66] The UST pointed out that nothing in the proposed order prevented the firm from either bifurcating or factoring fees and that the proposed order was consistent with this court's longstanding local rule that unearned fees be held in trust pending court approval. The UST noted that nothing in the Response addressed the UST's core allegations: that debtors unreasonably paid more under a factored fee arrangement and that the firm had consistently failed to address why the 25% factoring fee was reasonable. The UST also argued that the *Hazlett* case was readily distinguishable. Yes, the UST argued, *Hazlett* had approved factoring, but only under limited circumstances and with complete and accurate disclosure, something that Castle Law still had not done.

***The Court Issues the "Hughes" Order***

At the next status hearing, the court heard arguments but ruled it would issue its order, later to become known as "The *Hughes* Order" in the five cases in which Castle Law had filed motions to approve factored fees.[67] The court rejected Mr. Amerine's argument that preserving the status quo would harm the debtors or Castle Law; rather, the court noted, Castle Law was the party that had originally requested a stay when it filed its first motion for approval of fees in the *Hughes* case. Castle Law, the court noted, had already filed 150 consumer bankruptcy cases as of that date in the year, a third of which were chapter 7 cases and, of those, only five appeared to involve factored fees. The court thus concluded that requiring Castle Law to hold the factored fees in trust in only five cases would not unreasonably prejudice the firm.

---

[66] *Hughes*, Case No. 18-42590, ECF No. 50.
[67] *Hughes*, Case No. 18-42590, ECF No. 54.

By contrast, the court reasoned, it had no jurisdiction over BK Billing, and if the court later determined in the adversary proceedings that the fee agreements were void, unenforceable, or unreasonable, it was not clear how the debtors could be made whole. Thus, the court concluded, the order the court had proposed balanced the equities and was within the court's jurisdiction and authority to enter. Neither Mr. Amerine nor Castle Law appealed the order in any of the five cases in which it was entered.

### *Litigation Continues in the Adversaries Until a Settlement is Reached*

In the meantime, discovery continued in the four adversary proceedings, with disputes and motions to compel and countermotions continuing apace. At one of the numerous status conferences held in these cases in November 2019 (recall: the first adversary was filed in March 2018), the court ordered the parties to mediate in the adversaries and the five related cases.[68] It is an understatement to say that neither party was pleased with the court's order. The court's reasoning in compelling mediation, however, was that Mr. Amerine represented to the court that his firm was no longer factoring fees, leading the court to believe that the issues were limited to just nine cases (the four adversaries and the five cases in which motions to approve factored fees had been filed).

Nonetheless, after many months, the UST, Mr. Amerine and Castle Law reported they had reached a settlement. After many more months, a joint motion to approve the settlement was filed.[69] As noted above, the court in reviewing the settlement learned that the factoring had occurred in dozens of more cases and hence the court issued the OSC in these above-captioned ten randomly selected cases on September 28, 2020, resulting in the nearly 1,000 pages of responses and exhibits and thereafter this opinion.

---

[68] *James,* Adv. No. 18-4168, ECF No. 83; *Hughes*, Case No. 18-42590, ECF No. 55.
[69] *James,* Adv. No. 18-4168, ECF No. 95; *Hughes*, Case No. 18-42590, ECF No. 56.

### *The Court's OSC in These Ten Cases*

A brief discussion of the court's OSC at issue here: the court recited in its OSC that, after many months of litigation, the court had compelled the parties to mediate and was later informed the parties had reached a settlement. The settlement required Castle Law to disgorge certain amounts of factored fees to a number of clients, and required the payment of a $3,000 civil penalty, which Castle Law promptly paid. In the process of approving the settlement, the court learned that Mr. Amerine and Castle Law had failed to disclose factored fees in more than 100 other cases. The court approved the settlement, conditioned on Mr. Amerine and Castle Law providing a list of those cases. Given the volume of the cases, and with the approval of her judicial colleagues, the court selected ten to randomly review.

In the court's OSC in these ten cases, the court stated:

Review of the ten randomly selected cases reflects a disturbing pattern:

- Each case was filed as a chapter 7 emergency or on a "quick file" basis;

- In each case, the Disclosure of Compensation signed by Mr. Amerine under penalty of perjury was filed after the court issued its OSC for the failure to file complete schedules and statements with the emergency filing;

- Each Disclosure of Compensation was dated after the filing of the case and reflects a lower attorney fee than what Mr. Amerine and Castle Law actually charged the debtors, based on the court's comparison of the list to the Disclosures of Compensation filed with the court;

- In each case Mr. Amerine and Castle Law bifurcated the fee agreement into a pre- and postpetition component, and "factored" the postpetition component to a third party factor called BK Billing for a 25% fee;

- None of the fees agreed to be paid by the debtors were allocated to any prepetition services; hence, the entire fee in every case was "allocated" only to postpetition work. Since Mr. Amerine and Castle Law had to have done some prepetition work to prepare the petition, mailing matrix and verification filed with the court, the allocation of $0 to work done prepetition appeared to be a sham, to allow Mr. Amerine and Castle Law to be paid postpetition in apparent violation of the automatic stay and the discharge injunction;

- The actual amount of compensation for legal services Mr. Amerine and Castle Law charged the debtors was never disclosed to the court until the court ordered the list be produced as part of its order approving the settlement;

- The Disclosures of Compensation filed in each case state that the debtors were the source of the payment of the fees when clearly it was BK Billing's advances to Mr. Amerine and Castle Law that constituted the source of the fees;

- That Mr. Amerine and Castle Law did not comply with the local rule requiring counsel to file a motion to approve the nonstandard fee agreement;

- Specifically, L.R. 2016-1.A provided, in accordance with 11 U.S.C. §§ 329 and 330 and Rule 2016 and 2017, *unless excused pursuant to subpart D of the Rule*, debtors' attorneys "shall: (1) deposit all retainers (with the exception of earned on receipt retainers), whether received from the debtor or any other source, in the attorney's trust account pending an order of the court; and (2) with respect to all retainers and other payments made or fees sought, . . . file an application to facilitate the court's review of the reasonableness of such retainers, payments, and fees pursuant to § 329 and Fed. R. Bankr. P. 2017 (in the case of Chapter 7 proceedings)." Subpart D excused this requirement if the fee requested was $3,000 or less in a below-median case or $3,500 or less in an above-median case and if the attorney and the debtor(s) had signed the applicable RRA;

- The fees in each of these cases were below the no look amounts, and counsel in each case certified that the RRA had been executed with the various clients. However, the RRA requires counsel to provide certain pre- and postpetition services to the debtors as part of the no look fee. Bifurcating the fee into pre- and postpetition amounts meant that Mr. Amerine had effectively "unbundled" his services, which violated the RRA and violated the Local Rule, unless court approval was sought, which it was not in any of these cases;

- That the Schedules I and J reflected in most instances very little monthly disposable income and thus an inability of the debtors to pay the factor, BK Billing; and

- That the Statement of Financial Affairs likewise reflected no payments of attorney fees or filing fees to Mr. Amerine or Castle Law, even though Mr. Amerine and Castle Law paid the filing fees when the cases were filed and the Disclosures of Compensation stated that the filing fees were paid. The court therefore believed it unlikely there were no prepetition fees or expenses paid in any of these cases.[70]

---

[70] *Kolle*, Case No. 17-41701, ECF No. 35.

The court also noted that although some of the debtors had been sued before they filed bankruptcy, there was nothing in the schedules or SOFAs to explain why it was in the debtors' best interests to file their cases as "quick files" or why a 25% factoring fee was reasonable. The court observed that a bankruptcy case may be commenced as a skeletal filing but that attorneys must certify in a consumer case that they had performed a reasonable legal and factual investigation in accordance with § 707(b)(4)(D) before the case was filed. Allocating "$0" to the prepetition work necessary to file the case appeared fundamentally inconsistent with that obligation.

Most importantly, the court said, that "requiring the debtor to enter into a postpetition fee agreement under threat of their attorney withdrawing from representation if the client fails to do so violates the express terms of the RRA, which requires the attorney to provide certain pre- and post-petition services for one, 'no-look' fee, absent Court approval." With one exception, the court noted, "the cases the Court reviewed appear to be simple, no-asset chapter 7 cases, for which fees of $2,000 or more[71] would be unreasonable compared to what other similarly situated debtors would pay a lawyer to file a bankruptcy case in the Western District of Missouri."[72]

The court concluded that Mr. Amerine had concealed his factored fees and thereby had violated the Code, Rules and ethics rules:

> Taken as a whole – the nature of the filings as "quick files"; the inability of the debtors based on their budgets to afford the 25% financing premium;[73] and the

---

[71] The factored fees charged by Mr. Amerine in the random sample range from $2,070 with a $517.50 factoring fee to $2,700 with a $675 factoring fee. *Kolle*, Case No. 17-41701, ECF No. 35-1 *SEALED*.

[72] The *Gould* case, Case No. 17-42125, was an asset case. The debtor had transferred property valued at $50,000 for $1,300 to third parties and the chapter 7 trustee settled with the alleged third party fraudulent transferees. It is unknown whether, if debtor's case had not been filed as a "shell" that the transfer would have been discovered before filing.

[73] The court notes that in the *Anderson* case and the *Cook* case, both filed in 2018 after the factoring had been going on for some time, the Schedule Js did include a "post petition legal payment" of $200 while the earlier cases had not included any expense for the postpetition legal fees in the budget. In both *Anderson* and *Cook*, however, the debtors had very tight budgets and with the inclusion of this payment, the debtors had less than $3.00 left over per month. The list also shows that these debtors have not been able to make all the postpetition payments to BK Billing. Finally, the

failures of Amerine and Castle Law to disclose the true amount of the fees their clients were paying and to seek approval of the fee arrangement under the local rules – indicates to this Court that Amerine and Castle Law went to great lengths to conceal the nature of their fee agreements from the Court, in violation of their disclosure obligations under the Bankruptcy Code and Rules and their ethical obligations of candor to the Court.

Pursuant to the court's statutory and inherent authority to regulate fees and the conduct of attorneys who appear before it, and pursuant to 11 U.S.C. §§ 105, 329, 707(b), Rule 2016 and L.R. 2016-1, the court ordered Mr. Amerine to show cause why the court should not disgorge his fees, sanction him, or impose other relief such as a disciplinary referral for these failures in these ten captioned cases as well as the other cases on the list, which list the court sealed. The court also ordered that Mr. Amerine's response should address the ten cases in particular and add any other information related to the other cases on the list as he believed appropriate. The court reserved the right to issue further orders to show cause specifically related to the other cases if necessary.

### Mr. Amerine's First Response to the OSC

Mr. Amerine filed a 335-page response including exhibits to the court's 18-page OSC.[74] This Response, for the first time, argued that "[m]any debtors have difficulty gaining access to bankruptcy protection due to an inability to pay attorney fees upfront, before a case is filed [and as] a result, debtors are forced to remain in the 'sweatbox.'"[75] Mr. Amerine alleged that three of the four debtors in the adversaries had been in "the sweatbox," although he did not allege any of the randomly selected ten in the OSC had been.[76] He argued that "public policy" should strongly favor assisting debtors with access to bankruptcy protection and that the "sole purpose" of the

---

court also notes that by the time *Anderson* and *Cook* were filed, the UST had already begun its investigation and filed its first adversary complaint against Mr. Amerine and his firm.
[74] *Kolle*, Case No. 17-41701, ECF No. 40.
[75] *Kolle*, Case No. 17-41701, ECF No. 40, p. 7.
[76] *Kolle*, Case No. 17-41701, ECF No. 40, p. 7.

"two-contract system" was to provide debtors with another option. Mr. Amerine also insisted that

it was the debtors who had, in every case, elected the "two-contract method."[77]

The Response went on to say that Mr. Amerine and his firm had been approved for the

"revolutionary program" with BK Billing on May 24, 2017.[78] BK Billing only worked with law

firms if they were a good fit, meaning, among other considerations, that the attorney was

experienced, and not only understood but was compliant with the Bankruptcy Code and local

rules.[79] The Response alleged that Mr. Amerine had performed "due diligence" before signing up

with BK Billing.[80] An example of the "due diligence" Mr. Amerine cited was his email to Sherri

Wattenbarger, one of the UST's attorneys in this district, on June 6, 2017, two weeks after signing

the agreement with BK Billing:

> Good morning Sherri: does your office have an opinion one way or another on
> bifurcated retainers for Ch 7 assuming they are done properly (i.e full disclosure to
> debtor, reasonableness of work pre v post etc) I see no case law in this circuit other
> than In re Perez out of Nebraska that deals with a reaffirmation of attorney fees.
> Thank you

> Ms. Wattenbarger promptly responded:

> Yes, we do not object so long as they are done properly as you described. They
> should be in writing in the retainer agreement and the bifurcation must be
> reasonable, meaning that it must be a realistic apportionment of pre and post-
> petition services. Thank you, Sherri.[81]

The Response described the process of offering the "two-contract" option to clients as

follows: that Castle Law charged typical chapter 7 clients who paid upfront $1,410 for attorney

fees plus $410 of expenses and that only if clients were struggling to pay the fees upfront did the

---

[77] *Kolle*, Case No. 17-41701, ECF No. 40, pp. 8–9.
[78] *Kolle*, Case No. 17-41701, ECF No. 40, pp. 9, 11. Recall that the first motion to approve fees was not filed in the *Hughes* case until November 14, 2018, after the UST had filed the first adversary proceeding in March 2018.
[79] *Kolle*, Case No. 17-41701, ECF No. 40, p. 10.
[80] *Kolle*, Case No. 17-41701, ECF No. 40, pp. 14-16.
[81] *Kolle*, Case No. 17-41701, ECF No. 40-6, Exhibit 5.

firm offer the factoring program.[82] According to the Response, the potential clients met with Mr. Amerine or another attorney for a meeting called the "initial consultation meeting" to discuss filing bankruptcy.[83] The clients completed a "comprehensive intake sheet" about their financial situation, including their assets and debts.[84] The lawyer then discussed the information the clients provided and if bankruptcy was an option, discussed chapter 7 or 13 and the attorney's fees and costs. If the clients decided to retain Castle Law, they signed the prepetition fee agreement and were given a "thick" packet to take home, which included a 31-page questionnaire, a list of documents required, the debt relief agency disclosures,[85] and blank copies of the RRA and the postpetition fee agreement, with the instruction they should read those documents.[86]

The firm then scheduled a second, in-person appointment, called "the shell appointment."[87] During the shell appointment, a staff employee reviewed the documents the clients had brought in and if "most" were present, the clients met with Mr. Amerine or another attorney to review the petition, matrix and "social security verification page."[88] It was at this time that Mr. Amerine then discussed "whether the client was interested in hiring the law firm for the post-petition work," including what work needed to be performed, the costs under the postpetition fee agreement, and the factoring with BK Billing.[89] Assuming the client was ready to proceed, the client and attorney then signed the petition, other skeletal documents, and the RRA. "The client's Chapter 7 skeletal petition was then filed *while the client waited in the Castle Law Firm's lobby.*"[90] (emphasis added).

---

[82] *Kolle*, Case No. 17-41701, ECF No. 40, p. 17.

[83] *Kolle*, Case No. 17-41701, ECF No. 40, p. 17.

[84] *Kolle*, Case No. 17-41701, ECF No. 40, p. 17.

[85] As required by §§ 342(b) and 527(a)(2).

[86] *Kolle*, Case No. 17-41701, ECF No. 40, p. 18.

[87] *Kolle*, Case No. 17-41701, ECF No. 40, p. 19.

[88] The court is unaware based on its experience of any document required for filing bankruptcy called a "social security verification page" but assumes the Response is referring to the Declaration of Electronic Filing since that document includes verification of a debtor's social security number.

[89] *Kolle*, Case No. 17-41701, ECF No. 40, p. 19.

[90] *Kolle*, Case No. 17-41701, ECF No. 40, p. 19; ECF 40-1 (Exhibit 1, Amerine Declaration, at ¶ 18).

Finally, according to the Response, the clients signed the postpetition fee agreement and the automatic debit form BK Billing used to debit payments from the clients' account. The source of this description was another Mr. Amerine affidavit, attached as one of the exhibits to the response.[91] Thereafter, Castle Law proceeded with the postpetition work, which began with a paralegal's analysis of the client's financial records and drafting of the schedules and statements for postpetition filing.[92] The firm then scheduled another appointment for the client to review and sign the schedules and statements.[93] The firm also prepared for and attended the § 341 meeting of creditors, prepared amended schedules and statements as necessary, and reviewed reaffirmation agreements and otherwise stated that it did what was necessary to assist the client in completing the case.

### How the Factoring Process Worked

The Response stated that Mr. Amerine on behalf of Castle Law had executed an agreement with BK Billing titled "Accounts Receivable Assignment Agreement" (the "AR Agreement") and attached a copy of the agreement.[94] The original AR Agreement provided that the "factoring price" was 70% of the firm's account receivable debt.[95] The AR Agreement also provided that Castle Law would pay BK Billing an "onboarding fee" of $199 to be paid out of the firm's first funding from BK Billing in addition to a $25 processing fee for each contract.[96] The original AR Agreement was shortly thereafter amended to provide that BK Billing would purchase Castle Law's accounts receivable for 75%, but that the firm would receive only 60% of the purchase price immediately and the remaining 15% would be placed in an account called the "holdback

---

[91] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration).
[92] *Kolle*, Case No. 17-41701, ECF No. 40, p. 21.
[93] *Kolle*, Case No. 17-41701, ECF No. 40, p. 22.
[94] *Kolle*, Case No. 17-41701, ECF No. 40-4, Exhibit 4-A.
[95] *Kolle*, Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, p. 1.
[96] *Kolle*, Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, p. 2.

account."[97] The amounts in the holdback account would only be disbursed to Castle Law if all

other clients whose accounts receivable were factored paid all amounts due BK Billing. "As such,

the 15% was held by BK Billing as security against defaults by the law firm's clients."[98]

According to the Response, BK Billing's CEO, David Stidham, had described the holdback

working hypothetically as follows in the event of a factored $1,000 account receivable:

> BK Billing would purchase the account receivable debt of $1,000 for $750 and
> distribute $600 to the law firm. Another $150 dollars would be placed in the law
> firm's hold back account. If the client defaulted on the payments of the account
> receivable debt, then the $150 in the hold back account was used to off-set any
> default. In that situation, the law firm would not receive the $150 and bore that risk
> with any client defaults. If the amount of the client's default was greater than $150,
> then BK Billing bore the initial risk for any amount above the $150 in the hold back
> account.[99]

Because of the "apparent" risk of default, according to Castle Law, the AR Agreement

included "several provisions that protected BK Billing beyond the holdback account terms."[100]

Those included that BK Billing had the right to collect from any of the firm's clients who had

defaulted, after notice and giving Castle Law the right to buy back the accounts receivable. In

addition, Castle Law was required to buy back delinquent accounts in the event the firm breached

any of its representations and warranties under the AR Agreement, "which generally concerned

the obligations of the law firm and lawyers to comply with the disclosure requirements to the law

firm's debtor-clients and compliance with ethics rules."[101] Nonetheless, according to the

Response, BK Billing had not required the firm to buy back any of its accounts receivable and had

---

[97] *Kolle,* Case No. 17-41701, ECF No. 40-5, Exhibit 4-B.
[98] *Kolle,* Case No. 17-41701, ECF No. 40, pp. 13, 37.
[99] *Kolle,* Case No. 17-41701, ECF No. 40, p. 13 (cites to Exhibit 3 omitted).
[100] *Kolle*, Case No. 17-41701, ECF No. 40, p. 13.
[101] *Kolle*, Case No. 17-41701, ECF No. 40, p. 14.

"never" pursued collection activities "against any of those people," despite a significant number

of defaults.[102]

***Legal Argument in Support of Mr. Amerine's and Castle Law's Response to the Court's OSC***

The Response raised a host of arguments in support of Mr. Amerine's "two-contract"

process and why he should not be further sanctioned. Greatly summarized, Mr. Amerine argued:

- that the "two-contract" process achieved the goal of increasing access for legal services

- that it decreased the time the client suffered in the "sweatbox"

- that the firm actually lost money on the process because of the high default rate

- that the UST in the Western District of Missouri had been hostile and refused to meet with BK Billing's principals, so the firm had had no guidance with the "new" process

- that the firm's initial research had not included how to complete the Rule 2016(b) disclosure when factoring and instead had focused on whether the two-contract process and factoring were authorized and ethical

- that as the firm learned more, it updated its processes and learned to file a second disclosure of the gross amount of the fee being charged and factored

- that because the process resulted in more work for the firm, that justified the higher fee charged, typically $2,000 or more plus expenses as compared to $1,410

- that "another shortfall" was that the firm didn't collect expenses with the two-contract process, resulting in the "prepetition bankruptcy expenses mistakenly being included in the postpetition account receivable debt that was factored" and

- that, in hindsight, use of the RRA form "created a risk of confusion" for the clients.

Mr. Amerine denied that he had filed the cases as what the court in its OSC described as

"quick files" because the firm "purposefully planned" the skeletal filings to take advantage of the

two-contract process.[103] In a personal declaration attached as an exhibit, Mr. Amerine also rejected

the court's characterization in the OSC that the postpetition receivables were factored for a 25%

---

[102] *Kolle*, Case No. 17-41701, ECF No. 40, p. 14.
[103] *Kolle,* Case No. 17-41701, ECF No. 40, p. 35.

fee; Castle Law only received 60% of the gross account receivable, Mr. Amerine declared.[104] BK Billing placed 15% in a holdback account as security and cross-collateralization for defaults, "meaning the 15% from the account receivable from client 'A' also served as security for default of the payment of the account receivable debt from client 'B.'"[105] Castle Law, the Response alleged, "never received a single cent from the hold back account," and therefore Castle Law "ended up factoring the post-petition account receivable debt for a disappointing 40% cost."[106]

Mr. Amerine also vehemently denied that the fee arrangement had been a sham, as the court described it in the OSC. The higher fees charged for the process were on account of "increased work" and "due to the uncertainty and risks of future hearing and inquiries by the local U.S. Trustee office."[107]

Mr. Amerine also denied the allegation that his fees and payments had never been accurately disclosed. The Rule 2016(b) Disclosure was confusing, he alleged; he thought that the Official Form B2030 only required disclosure of the net amount of the fee he was factoring, although he had changed the disclosures in later cases.[108] The Official Form B2030 was also confusing because it requested a disclosure of payments made "prior to the filing of the statement," whereas, Mr. Amerine contended, § 329 and Rule 2016 only require disclosure of fees paid before the petition is filed.[109]

Mr. Amerine also rejected the court's characterization of BK Billing as the source of the fee because it was the client who promised to pay the fees. Citing nonapplicable Texas cases, he argued that attorney accounts receivables from clients are a property right that may be assigned.

---

[104] *Kolle,* Case No. 17-41701, ECF No 40-1, Exhibit 1, p. 8.
[105] *Kolle,* Case No. 17-41701, ECF No. 40, pp. 36-37.
[106] *Kolle,* Case No. 17-41701, ECF No. 40, p. 37.
[107] *Kolle,* Case No. 17-41701, ECF No. 40, p. 39.
[108] *Kolle,* Case No. 17-41701, ECF No. 40, p. 42.
[109] *Kolle,* Case No. 17-41701, ECF No. 40, p. 42, n.3. As the court will discuss, this argument is specious, as a plain reading of § 329 and Rule 2016 reveals.

Finally, Mr. Amerine contested the court's allegation that use of two contracts was contrary to L.R. 2016-1 and the RRA. He reiterated that that he was not required to file a motion to approve his fees because his fees were under the no look amount and were thus presumptively reasonable. He argued that for two decades "that has been the common interpretation and practice with the bankruptcy courts in this district" and that the court's interpretation of the local rule was "nonsensical."[110] Nothing in the local rules or RRA prohibited his use of two fee contracts, he argued.

The Response ended with a personal statement from Mr. Amerine, who apologized to the court but also defended his actions, contending that he had "fully vetted" the two-contract process and had found numerous courts, such as Maryland, Delaware, Arizona and Utah, "to name a few," that approved his process.[111] He contended when he discovered errors, he had "quickly made amendments."[112] He said the revenue was not his primary motivation and, pointing to the UST's mission statement, stated that he believed the system has failed some debtors by not allowing the two-contract process for fees.[113] He requested that the court not impose any sanction.

### The Status Hearings on the OSC

At the first status hearing to determine whether Mr. Amerine wanted to present evidence, Mr. Amerine's lawyer questioned why the court needed evidence, implying that the court should vacate the OSC on its face.[114] The court responded that it had many questions. For example, why, if the UST refused to give guidance to Mr. Amerine, did Mr. Amerine not file a motion for clarification with the court? Mr. Amerine's counsel did not have an answer.

---

[110] *Kolle,* Case No. 17-41701, ECF No. 40, p. 63.
[111] *Kolle,* Case No. 17-41701, ECF No. 40, p. 95.
[112] *Kolle,* Case No. 17-41701, ECF No. 40, p. 95.
[113] *Kolle,* Case No. 17-41701, ECF No. 40, pp. 98-99.
[114] *Kolle,* Case No. 17-41701, ECF No. 44, held Feb. 9, 2021.

The court pointed out another reason for not simply vacating the OSC. The Response had disclosed that the first randomly selected debtor, Ms. Kolle, had paid Castle Law $200 prepetition; Castle Law had charged her $2,500 postpetition; Castle Law created a $2,700 accounts receivable that was sold to BK Billing; and Ms. Kolle had paid BK Billing $2,700. Mr. Amerine's first Rule 2016(b) Disclosure in the *Kolle* case, however, certified that he had agreed to charge Ms. Kolle $1,690 for legal services and disclosed no payments and the second disclosure certified Mr. Amerine had charged Ms. Kolle $2,500 with no payments. Nor were any payments disclosed in Ms. Kolle's SOFA. So why had Ms. Kolle paid $2,700 to BK Billing and another $200 to Castle Law, for a total of $2,900? How much had Ms. Kolle actually been charged for legal services and how much did she actually pay for what, on its face, was a simple no asset chapter 7 case? There were similar discrepancies with all the other debtors, the court noted. Mr. Amerine's lawyer asked for a continuance to talk to his client.

At this point, the UST's counsel, who had entered an appearance but said he intended just to observe, interjected: Mr. Amerine's Response to the OSC had contained only select excerpts from three of the depositions taken in the adversaries. The UST's counsel advised the court that the omitted portions of the deposition transcripts contradicted some of the representations in the Response and in Mr. Amerine's sworn declaration. Mr. Amerine's counsel then requested a continuance, which the court granted.

At the next status conference, Mr. Amerine's lawyer requested the ability to supplement the Response to address the court's questions. He agreed to submit the complete deposition transcripts.

*Mr. Amerine's Supplemental Response*

Mr. Amerine filed a 659-page Supplemental Response, including a 37-page brief and exhibits.[115] The Supplemental Response argued that, with Ms. Kolle for example, Mr. Amerine had mistakenly believed the Rule 2016(b) Disclosure only required he disclose the net amount Castle Law was receiving from the sale of its accounts receivable, or the 60% figure. He represented that, of the $200 Ms. Kolle paid Castle Law before filing, $30 had been applied to her credit counseling courses, $35 for the cost of the credit report, and the balance of $135 to the court's filing fee.

Mr. Amerine stated that Castle Law had paid the $200 balance of the filing fee to the court. He explained that Castle Law therefore created an accounts receivable from Ms. Kolle of $2,700 ($2,500 for the attorney fee, and $200 for the filing fee), which was sold to BK Billing for 75% of the face value of the receivable. Mr. Amerine contended that he did not have to disclose the $200 Ms. Kolle had paid because the official form did not require disclosure of expenses. He also argued that, although he had received an advance from BK Billing before he filed the Rule 2016(b) Disclosure in the *Kolle* case, he listed $0 received because he understood the form to only require disclosure of payments received before the bankruptcy case was filed.

As for not filing a motion to approve the factored fees earlier, the subject had not "arisen" because Mr. Amerine had wanted to have an informal discussion with the UST, which the UST refused him.

*The Final Hearing on the OSC*

Since Mr. Amerine had earlier waived the right to put on live witness testimony, the court scheduled a final hearing for oral arguments. In preparation for the hearing, the court re-read the

---

[115] *Kolle,* Case No. 17-41701, ECF No. 47.

entire record and read for the first time the three complete deposition transcripts from the adversary proceedings, including Mr. Amerine's deposition transcript. The oral argument largely followed what had been argued in the Response and Supplemental Response, including the argument that Mr. Amerine had initially misunderstood what amounts the Rule 2016(b) Disclosure (Official Form B2030) required him to disclose so that he had only disclosed his fees net of the factoring fee and holdback. The court responded that, in the *Kolle* case, the court had been unable to determine how the $1,690 disclosed as the fees agreed to be charged could be the net of either $2,500 or $2,700, whether at a 60% or 75% holdback. Mr. Amerine, who was also present at the hearing, personally intervened and volunteered that the $1,690 was not the net and that he was also unable to figure out where he came up with that number. The court thereafter took the matter under advisement.

### Part II: What a Review of the Record Reveals

It was not until the court read the complete deposition transcripts and exhibits and examined each of the randomly selected ten cases that the scale of the nondisclosures and noncompliant practices became evident. The court is frankly stunned with what it discovered. The court will address Mr. Amerine's arguments in defense of his actions, which boil down to three main themes: (1) he did adequate due diligence; (2) the UST refused to provide guidance and there was none in the Eighth Circuit; and (3) that although he made mistakes, he complied with the Bankruptcy Code, Rules, and Local Rules. In sum, these arguments all point to a single plea: that any mistakes he made were inadvertent and well-intentioned, such that he should not be sanctioned.

1.  *Mr. Amerine's defense that he "thoroughly vetted" the BK Billing Program before factoring fees*

The court finds wholly disingenuous Mr. Amerine's defense that he "thoroughly vetted" the BK Billing program before agreeing to it, for several reasons.

Mr. Amerine, on behalf of Castle Law, signed the AR Agreement with BK Billing on May 24, 2017.[116] The Agreement was amended on June 26, 2017[117] and Mr. Amerine filed his first BK Billing case for Amanda Kolle and another debtor the same day. More about the BK Billing AR Agreement later. But the email to Ms. Wattenbarger at the UST's office, which Mr. Amerine touts as evidence of his due diligence, was not until June 6, 2017, after he had already executed an agreement providing that Castle Law "shall sell" its accounts receivable to BK Billing.[118] And the email itself was disingenuous; it didn't ask whether the UST had a position on the "two-contract" fee model or factored fees.

Rather, Mr. Amerine asked a question that competent consumer debtors' lawyers in this district have known from the inception of this court's no look fee rules: that the UST has always allowed debtors' lawyers to file a case with a balance still owing on the fee charged for a chapter 7, so long as the split between the pre- and postpetition services was reasonable, as Ms. Wattenbarger had reaffirmed in her email response. Then, Mr. Amerine did not follow Ms. Wattenbarger's guidance: he neither fully disclosed the true amount of what he was charging or being paid and did not charge a reasonable fee for the pre- or postpetition split.

The court further finds Mr. Amerine's defense disingenuous because he could not have relied on the case authorities he says he relied on before embarking on the "revolutionary" factoring program. In Mr. Amerine's response to the court's OSC he stated that courts in Maryland,

---

[116] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A.
[117] *Kolle,* Case No. 17-41701, ECF No. 40-5, Exhibit 4-B.
[118] *Kolle,* Case No. 17-41701, ECF No. 40-6, Exhibit 5.

Delaware, Arizona and Utah, "to name a few," had approved of the two-contract factoring fee model. But he cited no cases from those jurisdictions in the first motion to approve the fees in the *Hughes* case (filed on November 14, 2018). And, as the court has already explained, none of the case authorities he cited in the *Hughes* motion were relevant or applicable.

The Delaware opinion Mr. Amerine attached as exhibit to the Response is dated November 8, 2018, more than a year and a half after Mr. Amerine signed the AR Agreement and began factoring.[119] Moreover, the only issue in that case was whether the fee was reasonable. The Delaware court found that the fee as increased by the factoring costs was not reasonable, and ordered the fee reduced. The Delaware court expressly declined to address the permissibility of the factoring arrangement.[120] The *Hazlett* opinion from Utah, which does permit factoring in limited circumstances (and which the court will discuss below) was not issued until April 10, 2019, almost two years after Mr. Amerine signed the AR Agreement and began factoring. In any event, Mr. Amerine has not cited any Maryland or Arizona authorities to this court, and this court has found none.[121]

In sum, when Mr. Amerine began factoring his debtor clients' accounts receivable, there was no applicable legal or equitable authority here or elsewhere authorizing him to do so. So why didn't he file a motion seeking clarification from this court at the inception when he filed the *Kolle* case in June 2017, instead of waiting for almost a year-and-a half to file the motion in *Hughes* in November 2018, some eight months after the UST filed the first adversary complaint? And why, after filing motions for approval of the factored fee arrangement in *Hughes* and four other cases

---

[119] *Kolle,* Case No. 17-41701, ECF No. 40-8, Exhibit 7.

[120] *Kolle,* Case No. 17-41701, ECF No. 40-8, Exhibit 7 (*In re Jordana Ndon*, Case No. 18-10333 (Bankr. D. Del. Nov. 8, 2018)).

[121] In fact, Arizona at the time had long standing guidance in the form of an ethics opinion that stated flatly "[i]t is unethical for a lawyer to enter into a factoring agreement calling for the outright sale of client accounts receivable because the agreement constitutes a sharing of legal fees by a lawyer with a non-lawyer." Arizona Ethics Opinion 98-05.

did Mr. Amerine later take the position in response to the court's OSC that he was not required to file a motion under the local rules? Mr. Amerine has never answered these questions, although the court directly asked his counsel at the first hearing.

The email threads attached to the full deposition transcripts (and not the excerpts Mr. Amerine originally provided the court) tell the tale. In late August 2017, another attorney at the UST's office, Adam Miller, emailed Mr. Amerine related to "cases in which no fees were paid upfront."[122] This appears to be the UST's first inquiry to Mr. Amerine about these cases. Mr. Miller's email to Mr. Amerine stated that, "[a]s you know, the Office of the United States Trustee routinely reviews cases to determine compliance with various applicable provisions of the Bankruptcy Code and Rules. During our review of cases filed in July, we noted four Chapter 7 cases in which your Rule 2016(b) disclosure statements indicated that your firm had not received any attorney's fees pre-petition, but that you had entered into an agreement for a substantial flat fee in these cases." Mr. Miller listed the four cases that would ultimately become the subject of the adversary complaints (*Hannah*, *Grant*, *Babikar* and *James*), listing the disclosed fees as $1,800, $1,500, $1,650 and $1,455, respectively.

After receiving Mr. Miller's email, Mr. Amerine emailed BK Billing's CEO, David Stidham, saying "Hi David before I respond to this I want to get any suggestions on what I may want to be sure and say here," later adding to the thread, "[t]his guy really stresses me out."[123] In an email a few days later, Mr. Miller thanked Mr. Amerine for providing fee agreements in the four cases, but said he wanted to review additional documents from the file and to schedule Rule 2004 examinations of the clients:

> We note specifically that each of the fee agreements you provided is inconsistent with the Rule 2016(b) disclosure statements you filed in the each of the four cases,

---

[122] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 182 (Deposition Exhibit 24).
[123] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 182 (Deposition Exhibit 24).

which appear to disclose a fee significantly less that the amounts set forth in the agreements. While I note that you have now filed amended statements (which appear prompted by our fee inquiry), in at least two cases the statement[s] are still inconsistent with the fee agreements you provided."[124]

Mr. Miller also noted that Mr. Amerine's earlier response had stated he had quick filed the cases because of impending garnishments, but that only in the *Hannah* case had there been any pending litigation. Mr. Miller said his office had also noted that the prepetition agreements in the *Grant*, *Babikar* and *James* cases were dated weeks before the bankruptcy filings, raising questions about why the cases were quick filed at all, and that he had not received the prepetition agreement in *Hannah*.

Mr. Amerine ran his proposed email response by BK Billing's President, Sean Mawhinney. The response said nothing about any alleged vetting about factoring, or confusion about the local rules and official disclosure form, or that the fee was presumptively reasonable. Instead, Mr. Amerine's proposed response stressed that the clients had opted for this additional "service" that Mr. Amerine didn't profit from:

> Adam I am out tomorrow however my files our [sic] open to your inspection. All these files are subject to factoring so I only listed the amount my office would actually receive thus I amended to include the factoring. Any other difference is my backing out the filing fees, classes, and credit report. All of my clients are given pay upfront options or file now for no fees and they all have opted for the latter to avoid potential garnishment. As you know impending garnishment doesn't necessitate a lawsuit in the minds of the debtor. Harassing phone calls are enough. I will send Hannah's pre retainer and check schedules with my clients for a 2004 Exam. I welcome a meeting with you in my office. No other law firm provides this service nor can they due to the labor and cost involved. I hope you see this is a service the debtors embrace and I make no more money on this.[125]

Mr. Mawhinney responded that Mr. Amerine had "every right" to file a skeletal petition under Rule 1007(c) and suggested Mr. Amerine "get off the 'quick filing' logic" and "not let them

---

[124] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 181 (Deposition Exhibit 24).
[125] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 181 (Deposition Exhibit 24).

beat you up on that."[126] The thread continued with Mr. Amerine letting Mr. Mawhinney know he had sent the proposed email but that Mr. Miller was pressing for a meeting the following week.

Mr. Mawhinney advised Mr. Amerine to see if he could push out the meeting "just so I'm back in town and ready to research or give you any information."[127] Mr. Amerine responded that he would try but that Mr. Miller was already demanding to inspect files on Tuesday "which I'm not worried about."[128] Mr. Amerine added, "I have that 5 page memo that was created for someone on this issue. Could I give him that???"[129] Mr. Mawhinney replied, "I would not give him a rough memo at this time. Let's see what he says. Remember your debtors had proper disclosure about your bifurcation process and loved the option of making payments over time. It was a life-saver for them and they understood what they were doing."[130]

The next email in the thread is Mr. Amerine's forwarding of a follow up email from Mr. Miller, stating he had not heard back about dates for the proposed Rule 2004 examinations. As part of that forwarded email, Mr. Amerine said to Mr. Mawhinney: "What do you want me to tell him? He examined our petitions last week and didn't say a word or file anything. Everything is in order as far as I can tell. Should I just tell him to subpoena my clients?"[131]

The court does not know when the Rule 2004 examinations were conducted, but in December 2017 Mr. Amerine was still emailing Mr. Mawhinney seeking advice on what to do. On December 15, 2017, he emailed Mr. Mawhinney asking for the password to BK Billing's research library on BK Billing's website,[132] also noting that a private lawyer who was helping him behind the scenes was researching the issues "and we are going to decide to either be proactive and send

---

[126] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 179 (Deposition Exhibit 22).
[127] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 180 (Deposition Exhibit 23).
[128] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 180 (Deposition Exhibit 23).
[129] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 180 (Deposition Exhibit 23).
[130] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 216 (Deposition Exhibit D).
[131] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 178 (Deposition Exhibit 21).
[132] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 183 (Deposition Exhibit 26).

a letter explaining our legal basis [or] lay in the weeds and be ready to defend."[133] Mr. Amerine and Mr. Mawhinney emailed in January 2018 and later in March and April 2018 (after the *James* adversary was filed), with Mr. Mawhinney emailing Mr. Amerine about UST challenges to factoring and settlements with attorneys in other districts such as Delaware, Utah, Idaho, Maryland and the Central District of California and in essence encouraging him to keep fighting.[134]

Mr. Amerine and Mr. Mawhinney continued to consult as the other adversary complaints were filed. In May 2018, Mr. Mawhinney forwarded Mr. Amerine an email from BK Billing's collection department, stating that one of Mr. Amerine's clients had advised she was no longer going to make payments to BK Billing because her chapter 7 trustee at the § 341 meeting had told her not to. Mr. Mawhinney asked Mr. Amerine if someone in his office could obtain the transcript of the meeting, saying "I would love to see that in writing. You could use it in your case."[135]

In June 2018, Mr. Amerine asked BK Billing what to charge in one of his cases. Mr. Amerine emailed Mr. Mawhinney on June 6, 2018 about another client, a "Ch 7 with you guys that the debtor ended up not qualifying for the 7 and she intends on converting to a 13."[136] Mr. Amerine said that BK Billing had advanced $1,440 to him on a $2,400 contract and the debtor had paid BK Billing a total of $500, and that he assumed the balance of the postpetition fees would be discharged. He noted that the no look chapter 13 fee was then $4,100 and asked whether he should charge $4,100 minus $500 paid or $4,100 minus $950 (the remaining balance due on the advance against $1,440). Mr. Mawhinney responded: "Can you take full fees on a conversion? I would take the $4100 because BK Billing's Ch. 7 fee has nothing to do with your new Chapter 13 fee." Mr.

---

[133] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 213 (Deposition Exhibit C).
[134] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF pp. 185-189 (Deposition Exhibits 28, 30 and 31).
[135] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 200 (Deposition Exhibit 36).
[136] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 204 (unmarked Deposition Exhibit).

Mawhinney added: "Other option could be continue her payments and credit those remaining payments toward the 13 but I don't think you need to risk trying new things in this one. Not worth it."[137]

The case Mr. Amerine and Mr. Mawhinney were discussing – not one of the ten in this OSC – was that of Concepion Sanchez, filed on February 28, 2018, as a shell chapter 7 filing.[138] Mr. Amerine's disclosure, filed along with the later filed schedules and statements, reflected he had charged $2,000 and received no payments. Ms. Sanchez's case deserved more scrutiny, however, since the Schedules I and J showed she netted $7,658.35 per month, with two nieces living with her. After the UST raised the issue of a presumption of abuse, Mr. Amerine filed Amended Schedules removing the two nieces as dependents. The UST's subsequent motion to dismiss Ms. Sanchez's case for abuse noted that the debtor had $56,000 of unsecured debts and $672.45 in monthly disposable income, meaning she clearly did not qualify for a chapter 7.

Ms. Sanchez's case was subsequently converted to a chapter 13. In the conversion schedules, filed on June 14, 2018, or nine days after he had emailed Mr. Mawhinney, Mr. Amerine disclosed he was charging Ms. Sanchez $4,100 for her chapter 13 case and had received $1,222 from her, leaving a balance due of $2,878. His disclosure did not disclose the $1,440 advance Mr. Amerine had received from BK Billing. The disclosure also appeared to be inaccurate in that Mr. Amerine apparently had not received $1,222; the SOFA Mr. Amerine filed for Ms. Sanchez stated that she had paid $1,222 to her former attorney.[139] The SOFA did not disclose the $500 Ms. Sanchez paid BK Billing. Her chapter 13 case is still pending, and her payments to BK Billing and the advance Mr. Amerine received from BK Billing have to this date not been disclosed, nor has

---

[137] *Kolle,* Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 203 (unmarked Deposition Exhibit).
[138] *In re Concepcion Sanchez,* Case No. 18-40486.
[139] *Sanchez,* Case No. 18-40486, ECF No. 38, p. 30.

Mr. Amerine filed a motion as required by the local rule to seek court approval of his fees which are in excess of the court's $4,100 no look amount for chapter 13 cases.

On August 29, 2018, Mr. Amerine emailed Mr. Mawhinney that he was meeting with the UST in the adjoining District of Kansas, where he also was factoring cases for chapter 7 clients. He requested Mr. Mawhinney's help on how to demonstrate to the UST there that his fees were reasonable. He told Mr. Mawhinney that he was going to tell the UST in Kansas that he collected the filing fee upfront and that his firm provided something called "720 credit and FCRA services as part of their bankruptcy to justify reasonableness. Anything else you can think of??[140]

The final email thread included in the exhibits was an email from Mr. Amerine to Mr. Mawhinney in early October 2018, after Mr. Amerine filed the *Hughes* case without certifying he had elected the RRA. Mr. Amerine asked Mr. Mawhinney what to do with the docket entry he received from the court, mentioned previously, that said: "Debtor(s) attorney declines the Rule 2016 no-look fee and will submit motions for compensation based on time records."[141] In the email, Mr. Amerine said, "As you know, there isn't a no look fee on a Ch 7 only a 13 so we need to figure out what to do on this to claim compensation."[142]

Mr. Amerine had the opportunity to introduce evidence of any alleged due diligence. He produced only three of the many deposition transcripts and incomplete email threads from the discovery from the adversaries. The court is allowed to draw a negative inference that the rest of the discovery does not support his argument. The bottom line, though, is that there is not a shred of evidence in what Mr. Amerine produced in support of his due diligence defense. Rather, the evidence overwhelmingly shows his attempts to "lay in the weeds," as he so aptly put it, and to

---

[140] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 207 (Deposition Exhibit 40).
[141] *Hughes*, Case No. 18-42590, ECF No. 2.
[142] *Kolle*, Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 205 (Deposition Exhibit 39).

continue to manufacture grounds to support what he was doing long after the fact, without ever looking at the Code, Rules and local rules, at the same time he was still actively concealing what he was doing. The court can only conclude that Mr. Amerine did not want the court and the UST to know what he was doing.

### 2. Mr. Amerine's defense that the UST refused to provide guidance and there was no guidance in the Eighth Circuit

That leads the court to the next issue the court finds stunning: Mr. Amerine's defense that because the UST refused to offer guidance and he found no case authorities in the Eighth Circuit, his efforts to try out the "new" process were well-intentioned such that he should not be sanctioned.

First, there was no evidence in this case that the UST refused to offer guidance. Rather, the record shows that Ms. Wattenbarger at the UST's office promptly responded to Mr. Amerine's inquiry about bifurcation of fees and the practice in the Western District of Missouri and that, in turn, Mr. Amerine tried to stall and delay when Mr. Miller began his investigation. The last email thread the court noted above, in October of 2018, reflects that more than a year after he began factoring in July 2017, Mr. Amerine still apparently had not read the local rule governing no look fees in chapter 7 cases.

Second, it is simply not true that there were no relevant authorities in the Eighth Circuit. Although the Eighth Circuit has not addressed whether factoring attorney fees in bankruptcy cases is appropriate, the Eighth Circuit has over many years issued numerous opinions upholding the authority of the bankruptcy court to sanction debtors' lawyers for issues related to nondisclosure and reasonableness of their fees.[143] As early as 2000, before Mr. Amerine began practicing law,

---

[143] *See, e.g., In re Ragar*, 3 F.3d 1174, 1178-79 (8th Cir. 1993) (holding that the bankruptcy court's criminal contempt order was within § 105(a)'s clear delegation of authority and that the use of a criminal or civil contempt power may be necessary or appropriate to enforce a violated order); *In re Mahendra*, 131 F.3d 750 (8th Cir. 1997) (affirming imposition of sanctions under Rule 9011 based on a conflict of interest); *In re Clark*, 223 F.3d 859, 864 (8th Cir. 2000)

the Eighth Circuit in the *Clark* case[144] upheld sanctions and disgorgement against an attorney who

had filed incomplete and inaccurate Rule 2016(b) disclosures. The Eighth Circuit specifically

rejected the lawyer's argument – like the argument Mr. Amerine makes here – that because "what

constitutes local practice is 'nebulous and undefined'" he could not be sanctioned.[145]

More importantly, Mr. Amerine completely ignores the applicable provisions of the

Bankruptcy Code, Bankruptcy Rules, and local rules, all of which expressly provide guidance.

That leads the court to what § 329 and the applicable national and local rules provide.

## A.  Section 329

Section 329(a) of the Bankruptcy Code establishes the requirement that debtors' attorneys

disclose fees for bankruptcy-related services:

> Any attorney representing a debtor in a case under this title, or in connection with
> such a case, whether or not such attorney applies for compensation under this title,
> shall file with the court a statement of the compensation paid or agreed to be paid,
> if such payment or agreement was made after one year before the date of the filing
> of the petition, for services rendered or to be rendered in contemplation of or in
> connection with the case by such attorney, and the source of such compensation.

If the attorney's compensation exceeds the "reasonable value" of the bankruptcy-related services,

§ 329(b) in turn authorizes the court to cancel the agreement or order the return of a payment to

the extent the payment is excessive.

---

(holding that § 105 gives bankruptcy courts broad power to implement provisions of the Bankruptcy Code and to
prevent abuse of the bankruptcy process, which includes the power to sanction for abuses of process); *In re Kujawa*,
270 F.3d 578 (8th Cir. 2001) (affirming award of sanctions under Rule 9011 and inherent authority); *In re Smith*, 212
Fed.Appx. 577, 578 (8th Cir. 2006) (holding that the bankruptcy court had the authority under § 105 to sanction an
attorney, regardless of whether the order was characterized as a sanctions order or a contempt order); *Isaacson v.
Manty*, 721 F.3d 533 (8th Cir. 2013) (affirming bankruptcy court's punitive sanctions for criminal contempt); *In re
Young*, 789 F.3d 872 (8th Cir. 2015) (affirming sanctions under Rule 9011); *In re Reed*, 888 F.3d 930 (8th Cir. 2018),
cert denied, 139 S.Ct. 461 (2018) (holding that bankruptcy courts have constitutional authority to impose contempt
sanctions on an attorney).

[144] 223 F.3d 859 (8th Cir. 2000).

[145] *In re Clark*, 223 F.3d 859, 863 (8th Cir. 2000).

### B.  Sections 526–528, the "Debt Relief Agency" Provisions

Added to the Code in 2005, the so-called "Debt Relief Agency" provisions govern attorneys' actions and agreements with certain individual debtor clients. Greatly summarized, a person who provides "bankruptcy assistance"[146] to individuals with primarily consumer debts and nonexempt assets below a certain threshold (otherwise known as "assisted persons"[147] or "prospective" assisted persons[148]) is defined as a "debt relief agency ("DRA").[149] Attorneys who are deemed to be DRAs must comply with certain proscriptions and prescriptions in connection with the services they provide their bankruptcy clients.[150] DRAs who violate these provisions – even merely negligently – are subject to potentially draconian sanctions, including disgorgement, damages, attorney fees, civil penalties, and injunctive relief.[151]

But of particular significance to factoring of legal fees, § 526(a)(4) prohibits a DRA from "advising an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney . . . a fee or charge for services performed as part of preparing for or representing a debtor in a case under this title." Specifically with respect to fee agreements, a DRA is required to "execute a written contract with such assisted person that explains clearly and conspicuously (A) the services such agency will provide to such

---

[146] Section 101(4A) broadly defines "bankruptcy assistance" to mean any goods or services sold or other provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditor's meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title."

[147] Section 101(3). The current threshold is $204,425 of nonexempt assets.

[148] The term "prospective" as it is used in connection with the defined term "assisted persons" in §§ 526 – 528 is itself not defined in the Code.

[149] A "DRA" is defined, as relevant here, in § 101(12A) as "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration."

[150] *E.g.,* §§ 526(a) (prohibiting the DRA from failing to perform certain services or making certain statements), 527 (requiring the DRA to make certain disclosures), and 528 (governing fee contracts and advertisements).

[151] Section 526(c). *See, e.g., In re Hanawahine*, 577 B.R. 573 (Bankr. D. Haw. 2017) (attorney who agreed to perform services for chapter 7 debtors but failed to do so ordered to disgorge and pay treble damages as a civil penalty).

assisted person; and (B) the fees or charges for such services, and the terms of payment [and] to

provide the assisted person with a copy of the fully executed and completed agreement."[152] The

DRA must also execute this written agreement within five business days of first providing any

"bankruptcy assistance" to the assisted person.[153]

### C.  Section 504

Also of relevance to any discussion of compensation is § 504, which provides that a person

receiving compensation or reimbursements under §§ 503(b)(2) or 503(b)(4) of title 11 may not

share or agree to share compensation or reimbursement with another person, except for members

or associates of the person's firm.

### D.  Rules 2016 and 2017

Section 329(a) is implemented by Rule 2016(b). Rule 2016(b) emphasizes that debtors'

attorneys must completely disclose the details of their fee agreements and timely supplement their

disclosures:

> Every attorney for a debtor, whether or not the attorney applies for compensation,
> shall file and transmit to the United States trustee within 14 days after the order for
> relief . . . the statement required by § 329 of the Code including whether the attorney
> has shared or agreed to share the compensation with another entity. The statement
> shall include the particulars of any such sharing or agreement to share by the
> attorney . . . *A supplemental statement shall be filed and transmitted to the United*
> *States trustee within 14 days after any payment or agreement not previously*
> *disclosed.*

(emphasis added).

Section 329(b) is implemented by Rule 2017. Rule 2017 gives the court broad authority to

examine payments made either before or after the bankruptcy case. Rule 2017(a) provides that

"[o]n motion by any party in interest or on the court's own initiative, the court after notice and a

---

[152] Sections 528(a)(1), (a)(2).
[153] Section 528(a)(1).

hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code . . . to an attorney for services is excessive."

Rule 2017(b) applies to payments or transfers made after the order for relief and is even broader. Rule 2017(b) provides "[o]n motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, *or any agreement therefor*, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made directly or indirectly, *if the payment, transfer, or agreement therefor is for services in any way related to the case.*" (emphasis added).

### E.  The Official Form B2030

To comply with the mandates of § 329 and Rule 2016(b), attorneys must file a "Disclosure of Compensation of Attorney for Debtor(s)," otherwise known as Official Form B2030. Form B2030 states in Part 1:

> Pursuant to 11 U.S.C. § 329(a) and Fed. R. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> | | |
> |---|---|
> | For legal services, I have agreed to accept | $_____ |
> | Prior to the filing of this statement I have received | $_____ |
> | Balance Due | $_____ |

In Parts 2 and 3 of Form B2030, the attorney must disclose the source of the compensation paid or to be paid, respectively, and whether the source is the debtor or "Other (specify)." Part 5 requires attorneys to state whether they have shared the disclosed compensation with persons other than members and associates of their law firm and, if so, to attach a copy of any fee-sharing agreement.

49

Part 6 states that, "[i]n return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
d. [Other provisions as needed]."

Part 7 in turn authorizes the attorney to disclose which services have been excluded from representation "[b]y agreement with the debtor(s)."

Finally, Form B2030 requires the attorney to sign and date the form with this certification: "I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding."

### F. Applicable Local Rule

The local rule in effect at the time, L.R. 2016-1,[154] in turn implemented § 329 (and § 330[155]) and Rules 2016 and 2017. Rule 2016-1.A provided:

> 11 U.S.C. §§ 329 and 330 and Fed. R. Bankr. P. 2016 and 2017 require or authorize the court to review and approve the compensation and expenses of attorneys in bankruptcy proceedings. Therefore, certain disclosures and applications are required. Pursuant to § 329 and Fed. R. Bankr. P. 2016(b), the attorney for the debtor shall file with the petition a disclosure of the amount and source of all retainers received by the attorney. The disclosure shall be served on the United States Trustee and any case trustee. *Unless excused pursuant to the provisions of subpart D of this Rule, all professionals shall:* (1) deposit all retainers (with the exception of earned on receipt retainers), whether received from the debtor or any other source, in the attorney's trust account pending an order of the court; and (2) with respect to all retainers and other payments made or fees sought, file an application seeking approval of such retainers, payments, and fees pursuant to §

---

[154] Effective December 1, 2019, L.R. 2016-1 was redrafted and now contains separate rules for chapter 7, chapter 13, and chapters 11 and 12, although the provisions related to the RRA, the no look fee, the requirement to update, and the requirement to file a motion for nonstandard fees are substantially similar if not identical to the previous version of the rule. Both the current version and the then-applicable version can be found on this court's website: www.mow.uscourts.gov/bankruptcy/rules.

[155] Section 330 governs compensation of professionals retained by the estate under § 327 and debtor's attorneys fees in chapters other than chapter 7.

330 and Fed. R. Bankr. P. 2016(a) (in the case of Chapter 11, 12, and 13 proceedings), or file an application to facilitate the court's review of the reasonableness of such retainers, payments and fees pursuant to § 329 and Fed. R. Bankr. P. 2017 (in the case of Chapter 7 proceedings.) *Until the case is closed by final decree, debtor's attorney is under a duty to disclose all subsequent payments by filing a supplement statement as required by Fed. R. Bankr. P. 2016(b).*

(emphasis added).

Part D of L.R. 2016-1 provided: "If debtor's attorney's total fee in a below median family income case is $3,000 or less, or if the total fee in an above median family income case is $3,500 or less, and if the attorney and the debtor(s) have signed the applicable Rights and Responsibilities Agreement (See Local Forms MOW 2016-1.3 or 2016-1.4) the disclosure of fees in initial filings is sufficient and it is unnecessary to file an application under subpart C of this rule."

### G.  The RRA

The RRA between chapter 7 debtors and their attorneys, substantially similar to the current RRA form, recites that it is important for people filing a chapter 7 bankruptcy case to understand their rights and responsibilities as well as their attorneys' responsibilities.[156] The RRA states clearly that, "[u]nless otherwise ordered by the Court, any attorney retained to represent you in a Chapter 7 case is responsible for representing you *on all matters arising in the case* unless otherwise agreed as to adversary proceedings and conversions to another Chapter of the Bankruptcy Code." (emphasis added). The RRA expressly provides that the attorney may not withdraw unless the client and attorney both agree to the withdrawal and another attorney has entered the case; the case is converted; or "the Court, after notice and a hearing, approves an attorney's motion for withdrawal or substitution of attorneys." In the very first paragraph, the RRA states that "[t]he signatures below indicate that the responsibilities outlined in the agreement have been accepted by the Clients and their attorneys."

---

[156] Form MOW 2016-1.3 (12/2016), available on the court's website.

In Part III of the RRA, governing the attorney's responsibilities before the case is filed, the attorney agrees personally to meet with the client, counsel the client about bankruptcy options, review the completed petition, schedules and statements, explain the attorney's fees being charged, how and when those attorney's fees are determined and paid, whether additional fees may be charged, and to provide a fully signed copy of the agreement to the client.

Part IV states in bold and capitalized letters: "**AFTER THE CASE IS FILED, YOUR ATTORNEY AGREES TO PROVIDE ALL SERVICES NECESSARY FOR REPRESENTATION, INCLUDING BUT NOT LIMITED TO:**" and sets out 19 separately numbered paragraphs describing those services.

Finally, Part V of the RRA, titled "Allowance and Payment of Fees" states: "You and your attorney agree that the fee for all legal services to be provided in this bankruptcy case will be $_____" and gives the parties the option of including or excluding representation in adversary proceedings and conversions. Part V reiterates that an attorney will not be allowed to withdraw until another attorney enters the case, unless good cause is shown for the withdrawal. Both the client and attorney sign the agreement, and the attorney's signature "certifies that, *before the case was filed*, he or she personally met with you and counseled and explained to you all the matters as required by this agreement (emphasis added)."

### H.  Case Authority Interpreting § 329 and the Rules

Congress and the bankruptcy courts have long overseen debtors' transactions with their attorneys.[157] Since 1898, courts have had broad authority to examine the debtor's prepetition attorney's fees.[158] Section 329 is in fact derived from sections in the Bankruptcy Act of 1898. The

---

[157] *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 237 (2010).
[158] *Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 477–479 (1933) (reviewing § 60(d) under the Bankruptcy Act of 1898)).

disclosure requirements of § 329 enable bankruptcy judges to perform their core and traditional role of overseeing lawyers who represent debtors.[159] Section 329 reflects Congress' concern of "the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure."[160]

But contrary to Mr. Amerine's argument that § 329 is "aimed solely" at preventing attorney overreaching, courts are also justified in overseeing debtors' attorneys' fees because of other concerns. First, "creditors can be denied their proper share of the bankruptcy estate if debtors (particularly those who believe they will net nothing from the nonexempt assets of the estate) direct money to their attorneys in preference to other creditors."[161] More importantly, accurate disclosure of fees is "the underpinning on which the integrity of the entire bankruptcy system rests[162]":

> This provision (329/Rule 2016) is derived in large part from the Bankruptcy Act and reflects Congress' concern that payments to attorneys in the bankruptcy context might be the result of evasion of creditor protections and provide the opportunity for overreaching by attorneys. Thus, Congress provided not only for extensive Court, trustee, and creditor scrutiny of the compensation to be paid to attorneys and professionals in general, but also for broad discretion in imposing sanctions for violations of these strictures.[163]

---

[159] *In re Stewart*, 970 F.3d 1255, 1258 (10th Cir. 2020) (citing Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 329.LH, at 329-34 (16th ed. 2020).

[160] *In re Wood & Henderson*, 210 U.S. 246, 253 (1908) (discussing former rule 60d of the Bankruptcy Act of 1898).

[161] *In re Stewart*, 970 F.3d 1255, 1259 (10th Cir. 2020) (citing *Bethea*, 352 F. 3d at 1127).

[162] *In re New England Caterers, Inc.*, 115 B.R. 724, 728 (Bankr. D. Mass. 1989) (citing *In the Matter of Futuronics Corporation,* 655 F.2d 463 (2d Cir. 1981)). *See also In re Mayeaux*, 269 B.R. 614, 627 (Bankr. E.D. Tex. 2001) ("Compliance with § 329 and Rule 2016 is crucial to the administration and disposition of cases before the bankruptcy courts.); *In re Laberge*, 380 B.R. 277, 284 (Bankr. D. Mass. 2008) (disclosure of attorney's fee arrangements no less important than debtors' full disclosure of their financial affairs); *In re Andreas*, 373 B.R. 864, 869 (Bankr. N.D. Ill. 2007) ("Timely disclosure under § 329 and Bankruptcy Rule 2016(b) is central to the integrity of the bankruptcy process.") (citing *In re TJN, Inc.,* 194 B.R. 400, 403 (Bankr. D. S.C. 1996))).

[163] *In re Redding*, 263 B.R. 874, 878–79 (B.A.P. 8th Cir. 2001), *amended on reh'g in part*, 265 B.R. 601 (B.A.P. 8th Cir. 2001) (citing H. Rep. 95–595, 95th Cong., 1st Sess. 329 (1977), U.S.Code Cong. & Admin.News 1978, p. 5963; Sen. Rep. No. 95–989, 95th *879 Cong., 2d Sess. 39–40 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

To that end, the requirement to disclose attorney's fees is not just permissive but mandatory.[164] The attorney's duty of disclosure is that of a fiduciary.[165] Moreover, it is expected that disclosures of attorney compensation are direct and comprehensive: disclosures that leave the court to "ferret out pertinent information from other sources are not sufficient."[166] Debtor's counsel must lay bare all their dealings regarding compensation.[167] The duty is placed entirely on the debtor's attorney to provide an "absolute and complete disclosure of all payments received, and that attorney assumes all of the risks arising from any miscalculation or omission."[168] Therefore, "it is imperative that every doubt in the mind of a debtor's attorney regarding the scope of § 329(a) must be construed in favor of disclosure and such an attorney must thereafter be diligent in supplementing any previous disclosure regarding compensation payments so that the statutory right of creditors and the statutory duty of the Court to conduct a fee examination might be effectively protected."[169]

The disclosure rules are applied literally, even if the results are sometimes harsh.[170] Negligent or inadvertent omissions do not vitiate the failure to disclose.[171] The disclosures must also be accurate: inaccurate disclosures, whether purposeful or merely a scrivener's error are considered a failure to disclose.[172] Attorneys who have failed to carefully proofread inadequate disclosure statements before filing them have been found negligent.[173] Because disclosure under

---

[164] *E.g., In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991).
[165] *In re Stewart*, 970 F.3d 1255, 1263 (10th Cir. 2020) (citing *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F. 3d 472, 480 (6th Cir. 1996)).
[166] *In re Campbell*, 259 B.R. 615, 626–27 (Bankr. N.D. Ohio 2001).
[167] *In re Park–Helena Corp.*, 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied*, 516 U.S. 1049 (1996) (internal quotations, citations omitted).
[168] *In re Mayeaux*, 269 B.R. 614, 627 (Bankr. E.D. Tex. 2001).
[169] *Id.*
[170] *In re Stewart*, 970 F.3d 1255, 1264 (10th Cir. 2020) (collecting cases).
[171] *In re Park-Helena Corp.* 63 F.3d 877, 881 (9th Cir. 1995).
[172] *In re Kowalski*, 402 B.R. 843, 848 (Bankr. N.D. Ill. 2009).
[173] *Id.*

§ 329(a) is central to the integrity of the bankruptcy process, failure to disclose is sanctionable; many courts punish defective disclosure by denying all compensation.[174] As one court has stated, "[a]bsent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy."[175]

A recent Tenth Circuit case underscores the damage incomplete or nondisclosure does to the integrity of the bankruptcy system. In *Stewart*, the Tenth Circuit rejected the bankruptcy court's reasoning that sanctions for nondisclosure should be analyzed using a Rule 9011 – least sanction necessary to deter future conduct – analysis.[176] The *Stewart* court observed that Rule 11 violations nearly all see the light of day whereas disclosure violations are unlikely to be uncovered.[177] Instead, analyzing the issue in accordance with breach of fiduciary duty standards, the court held that the presumptive sanction for an attorney's violation of fee disclosure obligations should by default be full disgorgement, in the absence of sound reasons for anything less and that any potential mitigating circumstances must be compelling ones.[178]

Noting that sanctions for nondisclosure must "sting hard," the *Stewart* court stated that the view underlying the imposition of total disgorgement for failure to disclose had been well-expressed by Bankruptcy Judge Terrence Michael:

> Ours is a system built upon the principle of full and candid disclosure. Debtors must truthfully and accurately list all of their assets and all of their liabilities. Counsel must honestly and completely disclose the full nature of their relationship with their clients. Creditors must honestly and correctly calculate and state their claims. It is these disclosures which allow the public to have confidence in the system, and hopefully to believe that bankruptcy laws exist to protect the "honest but

---

[174] *Id.*

[175] *In re Wright*, 591 B.R. 68, 87 (Bankr. N.D. Okla. 2018).

[176] *In re Stewart*, 970 F.3d 1255, 1266 (10th Cir. 2020).

[177] *Id.*

[178] *Id.* at 1267. The court cited two examples of mitigating circumstances: where disgorgement of the prepetition fees would be administratively unworkable, or where the breach was a technical one.

unfortunate" debtor, that those creditors who receive funds receive only their just and proper share, and that those who represent debtors perform a service beyond satisfaction of their selfish avarice. Without those beliefs, public confidence in the bankruptcy process, and perhaps far more, is placed at risk.

The fragility of the system is found in the fact that many of the required disclosures are difficult if not impossible to police, at least in a cost-effective manner.[179]

In the end, the Tenth Circuit in *Stewart* reversed and remanded, finding that the bankruptcy court had significantly under-sanctioned the attorney for his nondisclosures.

### I. Summary

As the foregoing explanation amply demonstrates, any attorney looking for "guidance" about bifurcation and factoring of fees with individual debtors should have been able to find it in the Code, Rules, local rules, and cases authorities. The payment of a factoring fee implicates a possible fee sharing violation under § 504. DRAs are required to provide a clear and conspicuous explanation of the fees and charges in the fee agreement under § 528(a)(1)(B). And the nature of the two-contract factoring calls into question whether the attorney is advising the debtor to incur debt in contemplation of filing bankruptcy and charging a prohibited fee under § 526(a)(4).

But even assuming a debtors' attorney might not realize the implications of fee sharing and the DRA provisions with respect to factoring and bifurcation, § 329(a), Rule 2016, and Form B2030 mandate full disclosure of all agreements relating to fees and all payments, period. Even assuming a debtors' attorney was confused by L.R. 2016-1, the RRA requires the attorney to represent the debtor pre- and postposition unless excused by court order, period. And Rule 2016 and the local rule require supplemental disclosures when the attorney receives payments, period. The fact that "factoring" is not specifically addressed in the Code, Rules, local rules and case

---

[179] *Id*. at 1265-66 (quoting *In re Lewis*, 309 B.R. 597, 602-03 (Bankr. N.D. Okla. 2004)).

authorities (and some would say is not contemplated, with good reason) should have been enough

of a clue that factoring fees for an additional cost and without disclosure might not be appropriate.

The court thus rejects Mr. Amerine's defense that he was unable to find guidance before

embarking on factoring fees with BK Billing. If it is true that Mr. Amerine reviewed these

authorities and found them to offer no guidance (which is not supported by the increasingly frantic

nature of the email threads), then why not seek the court's guidance promptly after he filed the

first factored fee case, instead of silently filing dozens of cases and waiting until many months

later and only after the UST had already sued him?

### 3. *The defense that Mr. Amerine did not violate the Code, Rules and Local Rules*

As the multiple authorities set forth above clearly establish, what the Code, Rules and local

rules provided (and still provide) in the Western District of Missouri with respect to fee agreements

between individual debtors and their attorneys is that:

1. All agreements made after one year before the filing of the case for services rendered or to be rendered related to representation of a debtor in a case under title 11 or in connection with a case must be disclosed pursuant to § 329(a), Rule 2016(b), Official Form B2030, and L.R. 2016-1.A;

2. All payments paid or agreed to be paid related to representation of a debtor in a case under title 11 or in connection with a case must be disclosed pursuant to § 329(a), Rule 2016, Official Form B2030, and L.R. 2016-1.A;

3. The source of the payments made or to be made must be disclosed pursuant to Official Form B2030 and the payments shared only as permitted by the Code, rules and applicable ethics rules;

4. The attorney's signature on the disclosure constitutes a certification that the disclosure is a complete statement of any agreement or arrangement for payment to the attorney pursuant to Official Form B2030;

5. All agreements and all payments must be reasonable pursuant to § 329(b);

6. Any change to agreements and any additional payments received by the attorney must be disclosed with the timely filing of a supplemental

disclosure until the case is closed pursuant to Official Form B2030, Rule 2016(b), and L.R. 2016-1.D;

7.  Attorneys must execute the RRA unless excused by court order pursuant to L.R. 2016-1.A;

8.  If the attorney executes the RRA and charges a total fee of less than the applicable no look amount, the fee will be deemed presumptively reasonable, but the attorney must represent the debtor for the disclosed fee for both the pre- and postpetition services set forth in the RRA pursuant to L.R. 2016-1.A and the RRA;

9.  If the attorney does not execute the RRA agreeing to represent the debtor for pre- and postpetition services or charges a total fee in excess of the no look, or otherwise agrees to a nonstandard fee agreement, the attorney must disclose whatever the agreement is, disclose whatever the payments have been or will be, file a motion to approve the agreement and payments, and hold any payments in trust, pending court approval pursuant to L.R. 2016-1.C; and

10.  A failure to comply with any of these requirements is subject to sanctions, disgorgement, or discipline pursuant to § 329(b), Rule 2017, and the court's inherent and equitable powers.

Based on a review of these principles, it is abundantly apparent to this court that Mr. Amerine has violated § 329, Rule 2016, and L.R. 2016-1.

In each of these ten cases, Mr. Amerine has failed to completely and accurately disclose his two fee agreements; the factoring of the second fee agreement; what payments he received; and the source of the payments. In addition, in none of these cases has Mr. Amerine met his burden of proving that his fees were reasonable.

The court starts with the fact that, in each of these ten cases, Mr. Amerine certified to the court that he had executed the RRA agreeing to represent the debtors for one legal fee for pre- and postpetition services. But because Mr. Amerine had already entered into an agreement with each debtor saying he would not represent them for postpetition services unless they signed a new

contract after the filing, his certification to the court in these ten cases was false and in violation of L.R. 2016-1.A.

An examination of the Rule 2016(b) Disclosures filed in these cases further illustrates the issues. Mr. Amerine filed disclosures of his fees using the official form B2030. As noted above, the official form B2030 requires the attorney to disclose how much he has agreed to accept for bankruptcy services, how much he has received before he files the disclosure, and the balance due.

In each of these ten cases, Mr. Amerine completed the blanks with a number he represented he had agreed to accept, ranging from $1,425 to $2,500. In each case he certified that prior to the statement he had received $0 in payments and that the full balance was due. But when the court examines the exhibit of BK Billing payments submitted as part of the motion to approve the settlement, it is apparent that Mr. Amerine's representations in every case were false.

The *Kolle* case is, again, illustrative. In the *Kolle* case, Mr. Amerine's sworn declaration states that he agreed to charge Ms. Kolle $2,500 for attorney fees plus expenses of $400 for filing a chapter 7 bankruptcy.[180] Ms. Kolle paid Castle Law $200 before filing.[181] Mr. Amerine also testified he applied the $200 to expenses and deposited the funds in his operating account.[182] The bankruptcy case was filed on June 26, 2017. Two days later, on June 28, 2017 (the "advance date" on BK Billing's records) BK Billing accepted an invoice of $2,700 factored by Castle Law, for a 25% factoring fee of $675.[183] We don't know how much Castle Law received of the $2,025 net ($2,700 - $675) since Mr. Amerine has never filed a Rule 2016(b) disclosure disclosing what he was paid. But, assuming that BK Billing put 15% of the gross in the holdback and paid 60% to

---

[180] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 14.
[181] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 14.
[182] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 87-88.
[183] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.

Castle Law, then Castle Law received approximately $1,620 on June 28, 2017, which Mr. Amerine testified was deposited in Castle Law's operating account.[184]

Mr. Amerine filed his first Rule 2016(b) disclosure on July 10, 2017, twelve days after the factoring.[185] He disclosed: "For legal services, I have agreed to accept $1,690." That was not true since he had agreed to charge Ms. Kolle $2,500. He disclosed: "Prior to the filing of this statement I have received $0." That was not true since he had received approximately $1,620 and treated the fee as fully earned by depositing it in the firm operating account, according to his deposition testimony.

Mr. Amerine disclosed that $335 of the filing fee had been paid. That was true. Ms. Kolle had not paid Castle Law enough to pay the full filing fee; Castle Law advanced the full filing fee when Mr. Amerine filed Ms. Kolle's case. But the court had no way of knowing that. The $200 Ms. Kolle paid Castle Law prepetition was not disclosed on the SOFA in response to Question No. 16.[186] Ms. Kolle was in effect, paying a 25% fee on the factored $200 in addition to the 25% fee on the $2,500 of attorney fees. But, again, the court had no way of knowing. The Schedule J of expenses did not reflect Ms. Kolle was making payments for postpetition legal services. In fact, her budget showed she had only $7.23 per month left over before accounting for what she had agreed to pay to BK Billing.[187]

Ms. Kolle paid a total of $2,900 for her simple, no asset chapter 7 case: $2,700 to BK Billing and $200 to Castle Law. She paid an extra $50 for the filing fee that she would not have had to pay if she had paid the filing fee in installments. The court still to this day does not know

---

[184] The court says "approximately" because, according to the BK Billing AR Agreement, BK Billing was entitled to deduct the $199 "onboarding fee" and a $25 processing fee from the amounts it advanced on the first factored contract.
[185] *Kolle,* Case No. 17-41701, ECF No. 8, p. 1.
[186] *Kolle,* Case No. 17-41701, ECF No. 8, Statement of Financial Affairs, p. 31.
[187] *Kolle,* Case No. 17-41701, ECF No. 8, Schedule J, p. 26.

how much Castle Law received because even the amended Rule 2016(b) disclosure filed on August 30, 2017, two months after the filing, still shows that Castle Law had received "$0." Mr. Amerine offered no explanation for why a legal fee of $2,500 for a simple no asset chapter 7 case was reasonable, except to say that cases filed as "shells" were more work for his office.

Mr. Amerine's justification for not disclosing the advance he received from BK Billing is that he understood he only had to disclose any payments received before he filed the bankruptcy case. The Rule 2016(b) disclosure, though, plainly requires a disclosure of the amounts received "prior to the filing of the statement," regardless of when the case was filed. He failed to offer any authority or basis for believing the official form should be read contrary to its plain language, other than to say the form was "confusing." And he wholly failed to offer an explanation as to why, if he truly believed he only had to disclose prepetition payments on the initial disclosure, he did not comply with Rule 2016(b) and the local rule, both of which expressly impose a duty to file supplemental statements upon receipt of additional payments.

The other cases are similarly troubling.

### The Gould Case

In the *Gould* case, Mr. Amerine's sworn declaration states that he charged Ms. Gould $2,000 in attorney fees plus expenses.[188] She paid $100 for expenses that were not disclosed in her SOFA.[189] Of the filing fee, $300 was factored for a total factored amount of $2,300.[190] The first disclosure, filed after the account receivable was sold, certified an agreed fee of $1,425 with $0 received; the second disclosed $2,000 with $0 received.[191] Mr. Amerine did not file a supplemental disclosure to show what Castle Law received, even though the factoring occurred before the filing

---

[188] *Kolle,* Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 14.
[189] *Gould*, Case No. 17-42125, ECF No. 9, pp. 35-36.
[190] *Kolle,* Case No. 17-41701, ECF No. 40-1, p. 13.
[191] *Gould*, Case No. 17-42125, ECF No. 9, p. 1; ECF No. 13.

of both Rule 2016(b) disclosures. Ms. Gould had seventy cents of monthly disposable income on her Schedule J without including any amounts to be paid to BK Billing.[192] Ms. Gould paid a total of $2,300 to BK Billing plus $100 to Castle Law.[193] Other than one fraudulent conveyance, which the trustee compromised, her case was a simple no asset case. The court does not know whether the situation with the fraudulent conveyance could have been avoided if Mr. Amerine had done a thorough prepetition analysis of the *Gould* case instead of doing a skeletal filing.[194] The court also still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable and the court finds it was not.

### Mackey Case

Mr. Amerine charged Ms. Mackey $2,000 for her attorney fees.[195] She paid $100 for expenses to Castle Law, which was not disclosed in her SOFA.[196] The first disclosure certified an agreed fee of $2,000 with $0 received, although the disclosure was filed before the factoring occurred.[197] Castle Law sold the $2,300 accounts receivable to BK Billing for a 25% factoring fee. Ms. Mackey had $0 per month left over in her budget and the postpetition payments to BK Billing were not disclosed on her Schedule J.[198] Ms. Mackey has paid $1,260 to BK Billing and is past due to BK Billing $1,040.[199] Mr. Amerine did not file a supplemental disclosure. Ms. Mackey's case was a simple no asset case and the court still does not know how much Mr. Amerine was paid

---

[192] *Gould*, Case No. 17-42125, ECF No. 9, Schedule J, p. 30.
[193] *Kolle*, Case No. 17-41701, ECF No. 35-1 *SEALED*.
[194] The debtor disclosed in the SOFA filed after the filing that she had sold real estate worth $50,000 for $1,300 on August 20, 2016, less than one year before the filing on August 8, 2017. The SOFA listed one possible collection lawsuit which she said had been paid in full. The trustee accepted $5,100 to settle the fraudulent conveyance. The opening of an estate, however, prevented the case from being closed. The court has previously explained the potential negative impact of a trustee opening an estate may have upon consumer debtors. *See In re Pigg,* 2015 WL 7424886, at *21-22 (Bankr. W.D. Mo. Nov. 20, 2015).
[195] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 14.
[196] *Mackey*, Case No. 17-42465, ECF No. 10, p. 34.
[197] *Mackey*, Case No. 17-42465, ECF No. 10, p. 1.
[198] *Mackey*, Case No. 17-42465, ECF No. 10, Schedule J, p. 28.
[199] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.

for his legal fees. There is no evidence that a legal fee of $2,000 for Ms. Mackey's case was reasonable and the court finds it was not.

### Long Case

Mr. Amerine charged Ms. Long $2,100 for legal fees.[200] Ms. Long paid no funds for expenses and Castle Law paid for her prepetition counseling, credit report and the filing fee for expenses totaling $400.[201] These payments were not disclosed on the SOFA.[202] BK Billing purchased a $2,500 accounts receivable before Mr. Amerine filed the Rule 2016(b) disclosure indicating an agreed-upon legal fee of $2,100 with $0 received.[203] Ms. Long had no monthly disposable income without even considering what she agreed to pay to BK Billing in postpetition payments.[204] Ms. Long was a single mother with two children with monthly income of $2,504.85.[205] That income put her below 150% of poverty level at the time she filed, meaning that she qualified for a waiver of the $335 filing fee and free credit counseling and financial management courses. She paid $2,403 to BK Billing and owes a balance of $97.[206] Her case was a simple no asset case and the court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,100 was reasonable, or that charging and factoring her expenses was reasonable and the court finds it was not.

### Franklin Case

Ms. Franklin paid no expenses to Castle Law and Castle Law charged her $2,000 for the bankruptcy case plus expenses and paid for her filing fee, credit reports and counseling courses.[207]

---

[200] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 15.
[201] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 15.
[202] *Long*, Case No. 17-43023, ECF No. 14, p. 37.
[203] *Long*, Case No. 17-43023, ECF No. 14, p. 1.
[204] *Long*, Case No. 17-43023, ECF No. 14, Schedule J, p. 32.
[205] *Long*, Case No. 17-43023, ECF No. 14, Schedules I and J, pp. 29-32.
[206] *Kolle*, Case No. 17-41701, ECF No. 35-1 *SEALED*.
[207] *Kolle*, Case No. 17-41701, ECF No. 40-1, p. 15.

These payments were not disclosed on the SOFA.[208] Castle Law sold a $2,400 accounts receivable to BK Billing after Mr. Amerine filed a Rule 2016(b) disclosure that said he had agreed to accept $2,000 and had received $0.[209] Mr. Amerine did not file a supplemental statement when Castle Law sold the account receivable and Castle Law received 60% of the $2,400. Ms. Franklin's Schedule J showed $6.77 in left over income and no postpetition payments to be paid to BK Billing.[210] Like Ms. Long, however, Ms. Franklin was a single mother with two children; her income of $2,592.77 placed her just above 150% of poverty level for a household of three.[211] Ms. Franklin paid $1,900 to BK Billing and owes $500.[212] Her case was a simple no asset case and the court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable or that factoring $400 of expenses was reasonable and the court finds it was not.

### Harvey Case

Ms. Harvey paid no expenses to Castle Law, which charged her a legal fee of $2,000 and advanced $400 of her expenses.[213] Mr. Amerine's Rule 2016(b) disclosure stated he had charged her $2,000 and received $0; the accounts receivable of $2,400 was factored after the disclosure was filed but Mr. Amerine did not file a supplement.[214] The Schedule J included $200 per month for "post filing legal fees," leaving her with a monthly disposable income of $5.18.[215] Ms. Harvey as a household of three with monthly income of $2,515.18 also would have qualified for a filing fee waiver and free credit counseling courses.[216] Ms. Harvey paid $1,209 to BK Billing and owes

---

[208] *Franklin*, Case No. 17-43313, ECF No. 9, p. 38.
[209] *Franklin*, Case No. 17-43313, ECF No. 9, p. 1.
[210] *Franklin*, Case No. 17-43313, ECF No. 9, Schedule J, p. 33.
[211] *Franklin*, Case No. 17-43313, ECF No. 9, Schedules I and J, pp. 30-33.
[212] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.
[213] *Kolle*, Case No. 17-41701, ECF No. 40-1, p. 16.
[214] *Harvey*, Case No. 18-40087, ECF No. 10, p. 1.
[215] *Harvey*, Case No. 18-40087, ECF No. 10, Schedule J, p. 29
[216] *Harvey*, Case No. 18-40087, ECF No. 10, Schedules I and J, pp. 26-29.

a balance of $1,191.[217] Her case was a simple no asset case and the court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable or that factoring $400 of expenses was reasonable and the court finds it was not.

### Anderson Case

Ms. Anderson paid no expenses to Castle Law, which charged her a legal fee of $2,000 and advanced her $400 of expenses.[218] These payments were not disclosed in the SOFA.[219] Mr. Amerine's Rule 2016(b) disclosure stated he had charged her $2,000 and received $0; the accounts receivable of $2,400 was factored before the disclosure was filed and Mr. Amerine did not file a supplement.[220] The Schedule J included $200 per month for "post petition legal payment," leaving her with a monthly disposable income of $2.37.[221] Although Ms. Anderson did not qualify for a fee waiver based on her household size, her $200 per month payments to BK Billing constituted 8% of her monthly expenses, based on her monthly net income of $2,467.[222] Ms. Anderson paid $95 to BK Billing and is past due $2,305. Her case was a simple no asset case and the court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable and the court finds it was not.

### Cook Case

Mr. Cook paid $335 of expenses to Castle Law before filing, which charged him a legal fee of $2,007.[223] Castle Law advanced the balance of the expenses, totaling $63. These payments were not disclosed in the SOFA.[224] Mr. Amerine's Rule 2016(b) disclosure stated he had charged

---

[217] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.
[218] *Kolle*, Case No. 17-41701, ECF No. 40-1, p. 16.
[219] *Anderson*, Case No. 18-40723, ECF No. 10, p. 38.
[220] *Anderson*, Case No. 18-40723, ECF No. 10, p. 1.
[221] *Anderson*, Case No. 18-40723, ECF No. 10, Schedule J, p. 33.
[222] *Anderson*, Case No. 18-40723, ECF No. 10, Schedules I and J, pp. 30-33.
[223] *Kolle*, Case No. 17-41701, ECF No. 40-1, p. 17.
[224] *Cook*, Case No. 18-41222, ECF No. 10, p. 30.

Mr. Cook $2,007 and received $0; the accounts receivable of $2,070 was factored after the disclosure was filed and Mr. Amerine did not file a supplement.[225] The Schedule J included $200 per month for "post petition legal payment," leaving him with a monthly disposable income of $2.44.[226] Although Mr. Cook did not qualify for a fee waiver based on his household size, his net income was only $1,992 per month making the $200 per month payments more than 10% of his budget.[227] Mr. Cook paid BK Billing $1,380 in addition to the $335 paid to Castle Law and owes a balance of $690.[228] Mr. Cook's case was a simple no asset case with no real estate or secured debt and only $20,000 of unsecured debt. The court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,007 was reasonable and the court finds it was not.

### Robinson Case

Ms. Robinson paid no expenses to Castle Law but Mr. Amerine, according to his Declaration, decided to waive most of her expenses and only charged her $70 for the filing fee.[229] The case was filed on November 14, 2017.[230] Mr. Amerine's Rule 2016(b) disclosure filed two weeks later disclosed he had agreed to charge her $2,000 and had received no payments.[231] Neither the Schedule J nor the SOFA included any disclosure of payment of the expenses or any payment for postpetition fees.[232] Ms. Robinson received her discharge on February 15, 2018.[233] Castle Law sold an accounts receivable to BK Billing seven months after the discharge and long after the case was closed, on September 12, 2018, for $2,070. Ms. Robinson as a household of two with monthly

[225] *Cook*, Case No. 18-41222, ECF No. 10, p. 1.

[226] *Cook*, Case No. 18-41222, ECF No. 10, Schedule J, p. 25.

[227] *Cook*, Case No. 18-41222, ECF No. 10, Schedules I and J, pp. 22-25.

[228] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.

[229] *Kolle*, Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 16.

[230] *Robinson*, Case No. 17-43094, ECF No. 1.

[231] *Robinson*, Case No. 17-43094, ECF No. 9, p. 1.

[232] *Robinson*, Case No. 17-43094, ECF No. 9, pp. 33, 38.

[233] *Robinson*, Case No. 17-43094, ECF No. 16.

income of $2,009.65 was below 150% of poverty level and would have qualified for a filing fee waiver and free credit counseling courses.[234] Ms. Robinson paid $460 to BK Billing and owes a balance of $1,610.[235] Her case was a simple no asset case and the court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable and the court finds it was not.

### *Washington Case*

Ms. Washington paid no expenses to Castle Law, which charged her a legal fee of $2,000 and advanced her $400 of expenses.[236] Mr. Amerine's Rule 2016(b) disclosure stated he had charged her $2,000 and received $0; the accounts receivable of $2,400 was factored after the disclosure was filed but Mr. Amerine did not file a supplement.[237] The Schedule J included $200 per month for "post petition legal payment," leaving her with a monthly disposable income of $0.[238] Ms. Washington, as a household of three with income of $2,364.52 would also have qualified for a filing fee waiver and free credit counseling courses.[239] Ms. Washington paid $2,400 to BK Billing.[240] Her case was a simple no asset case with no secured debt and $40,000 of unsecured debt. The court still does not know how much Mr. Amerine was paid for his legal fees. There is no evidence that a legal fee of $2,000 was reasonable and the court finds it was not.

### *The Rosa James Case (One of the Four Adversary Cases)*

One other case, not included in the court's OSC in this case, is worth examining as well, since Mr. Amerine elected to introduce exhibits related to that case in his response to the court's OSC.

---

[234] *Robinson*, Case No. 17-43094, ECF No. 9, Schedules I and J, pp. 30-33.
[235] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.
[236] *Kolle*, Case No. 17-41701, ECF No. 40-1, p. 16.
[237] *Washington*, Case No. 18-40264, ECF No. 9, p. 1.
[238] *Washington*, Case No. 18-40264, ECF No. 9, Schedule J, p. 25.
[239] *Washington*, Case No. 18-40264, ECF No. 9, Schedules I and J, pp. 22-25.
[240] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.

Ms. James retained Castle Law on January 31, 2017, for the purpose of filing a chapter 7. Castle Law charged her a total of $1,650, consisting of $1,250 of attorney fees plus $400 of expenses.[241] Mr. Amerine testified that $1,250 was the standard attorney fee Castle Law charged at that time. Ms. James paid Castle Law $100 down, and then made a series of small payments: $50 on February 14, $50 on May 2, and $25 on May 25, for a total of $225.[242] All the payments were deposited into the firm's operating account.[243]

As we know, on May 24, 2017, Mr. Amerine executed the agreement on behalf of Castle Law to factor Castle Law receivables with BK Billing. On June 28, there was a note in the Castle Law file that a lawyer contacted Ms. James about "financing" her fees.[244] Ms. James apparently agreed to the arrangement, because, on July 6, 2017, she signed an "Attorney-Client Retainer Agreement" with Castle Law, identical to the prepetition agreement in *Hughes*, except for the fact that the prepetition agreement referenced an agreement to pay $2,175 for postpetition legal services.[245] It is important to note, however, that Mr. Amerine's agreement with Ms. James was not for $2,175 in attorney fees; only $2,000 of that amount constituted attorney fees. The $175 was the balance of the expenses for the case, since Ms. James had only paid $225 towards her expenses.

Ms. James' petition was filed on July 25, 2017.[246] Ms. James signed the second fee agreement two days later, on July 27.[247] The second fee agreement is identical to the first

---

[241] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF pp. 17-18, 21, transcript pp. 68–69, 82-83.
[242] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF p. 19, transcript p. 74.
[243] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF p. 22, transcript p. 87.
[244] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF p. 19, transcript p. 75.
[245] *Kolle*, Case No. 17-41701, ECF No. 40-24, Exhibit 21.
[246] *James*, Case No. 17-41965, ECF No. 1.
[247] *Kolle*, Case No. 17-41701, ECF No. 40-25, Exhibit 22.

agreement, except that it was titled "Contract for Post-Petition Chapter 7 Legal Services" and
contained the following disclaimer in bold language:

> **Having been advised that I am not obligated to sign this agreement for legal
> services and having been advised that [sic] previous agreement to pay Castle
> Law Office any additional money is now unenforceable pursuant to my filing
> bankruptcy; and having been further advised that I can choose to retain
> another attorney apart from Castle Law Office, I agree to the following . . .**

Mr. Amerine certified when he filed the petition that he had executed the RRA.[248] The
RRA Ms. James signed, dated the day of the filing of the petition, stated that "you and your
attorney agree that the fee for all legal services to be provided in the bankruptcy case will be
$1,455."[249] The Rule 2016(b) disclosure filed on August 8, 2017 stated that Mr. Amerine had
agreed to charge $1,455 for legal services and had received no payments.[250] But, Castle Law had
already sold the *James* receivable of $2,175 on July 31 with a 25% factoring fee of $543.75.[251] As
will be discussed below, Ms. James at that point had agreed to pay BK Billing $85.00 biweekly,
or $184.16 per month.

The SOFA did not reflect the $225 in payments she had made to Castle Law before filing
bankruptcy.[252] The Schedules I and J reflected that, as a single mother with four dependent children
making $3,374.21 per month, Ms. James qualified for a filing fee waiver and free credit
counseling.[253] Her budget reflected $23.12 left over on a monthly basis with no payment for
postpetition legal fees being disclosed.[254]

---

[248] *James*, Case No. 17-41965, ECF No. 2.
[249] *Kolle*, Case No. 17-41701, ECF No. 47-1, ECF pp. 94-96.
[250] *James,* Case No. 17-41965, ECF No. 11, p. 1.
[251] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.
[252] *James,* Case No. 17-41965, ECF No. 11, p. 39.
[253] *James,* Case No. 17-41965, ECF No. 11, Schedules I and J, pp. 31-34.
[254] *James,* Case No. 17-41965, ECF No.11, Schedule J, p. 34.

Mr. Amerine later filed an amended Rule 2016(b) disclosure in the *James* case certifying he agreed to accept $2,000 in fees for his legal services and had received no payments.[255] In the meantime, Ms. James agreed to reaffirm her mortgage debt to Habitat for Humanity.[256] If the Schedules I and J show that a debtor has a negative monthly budget, as Ms. James's original Schedules I and J should have shown if the BK Billing payments were included, then the reaffirmation agreement is deemed to create a "presumption of undue hardship."[257] In that instance, the court is required to hold a hearing to determine if the reaffirmation is in the debtor's best interest.

Ms. James's original Schedule J showed a monthly mortgage expense of $348 and, as mentioned previously, $23.12 left over in her budget, without including any of the postpetition payments to BK Billing. But since the mortgage payment was actually $377.17 a month, based on the original Schedule J the reaffirmed debt would have created a presumed undue hardship. To his credit, Mr. Amerine filed an Amended Schedule J in support of the reaffirmation agreement that corrected the amount of the mortgage payment and adjusted other expenses. The Amended Schedule J showed Ms. James had $3.95 left over in her monthly budget, negating any presumption of undue hardship.[258] The court therefore approved the reaffirmation agreement without a hearing.

The rub, however? The Amended Schedule J still did not include the postpetition payments Ms. James was making to BK Billing. Mr. Amerine filed the Amended Schedule J in support of the reaffirmation agreement on December 7, 2017, after the UST had commenced his inquiry of

---

[255] *James*, Case No. 17-41965, ECF No. 16.
[256] *James*, Case No. 17-41965, ECF No. 24.
[257] 11 U.S.C. § 524(m).
[258] *James,* Case No. 17-41965, ECF No. 25.

Mr. Amerine's fee agreement in the *James* case and after he had noticed up Rule 2004 examinations of Ms. James and BK Billing.[259]

The chapter 7 trustee filed a no asset report and Ms. James ultimately received her discharge. Ms. James paid a total of $2,400 for her simple, no asset bankruptcy case, between the $2,175 she paid in full to BK Billing and the $225 she paid to Castle Law.[260] The court still does not know how much Castle Law received for its services in the *James* case and there is no evidence of why $2,400 for legal fees and factored expenses was reasonable for a simple chapter 7 no asset case. The court did not include the *James* case in its OSC, since the case was part of the settlement. If the court had included it, however, it would have found that fee was not reasonable.

Mr. Amerine has never explained the discrepancies in his agreements with Ms. James showing (on the RRA and the two fee agreements) that he was charging $2,175 in attorney fees when his disclosures with the court said first $1,455 for attorney fees and then $2,000 in attorneys fees. The most disturbing thing about Ms. James' case, however? Throughout these proceedings, Mr. Amerine has repeatedly assured the court that his clients had not signed documents agreeing to pay for postpetition services until after the bankruptcy case was filed. Mr. Amerine had stated in his sworn declaration attached to the first response that he met with the clients after the bankruptcy was filed to explain again their options for postpetition work, and if the client still wanted to use Castle Law, he then had the client sign the postpetition agreement and the forms "related to factoring the post-petition account receivable debt, including an automatic debit form."[261] But in reading Mr. Amerine's deposition, the court learned that, contrary to Mr.

---

[259] *James,* Case No. 17-41965, ECF No. 18 (examination of Ms. James filed on Sept. 26, 2017) and ECF No. 19 (examination of BK Billing filed on Oct. 17, 2017).
[260] *Kolle,* Case No. 17-41701, ECF No. 35-1 *SEALED*.
[261] *Kolle,* Case No. 17-41701, ECF No. 40-1 (Exhibit 1, Amerine Declaration) p. 5.

Amerine's sworn statement, Ms. James had signed the automatic debit form agreeing to pay BK

Billing $2,175 *before she filed bankruptcy*.[262]

The "Recurring Payment Authorization and Consent Form" Ms. James signed states, in

relevant part, "I, Rosa James, authorize . . . BK Billing, an independent billing company, to charge

my debit card or bank account $85.00 biweekly until the amount of $2,175 is paid in full."[263] The

agreement was dated July 6, 2017, more than two weeks before the bankruptcy filing on July 25th.

The RRA, specifying Ms. James' obligations and responsibilities before and after filing

bankruptcy, coincidentally was not signed until after the filing, even though Mr. Amerine had

certified to the court that the RRA had already been executed. And the *James* case was not the

only one in which this happened.[264]

Thus, not only did Castle Law advance prepetition expenses (a prepetition debt), but Mr.

Amerine knew Ms. James had agreed to pay BK Billing before the case was filed. Ms. James'

obligation to pay BK Billing was a prepetition agreement the collection of which was stayed by

the automatic stay and which was later discharged. The court also learned in reading the

depositions that it was Mr. Amerine – not BK Billing – who negotiated all his clients' payment

terms to BK Billing, something Mr. Amerine had never disclosed in any of his affidavits or

responses discussing how the factoring process worked.[265] Yet, this prepetition agreement was

---

[262] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF p.28, transcript p. 112.

[263] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition, ECF p. 25, transcript p. 98.

[264] Mr. Amerine admitted that in the *Grant* case, one of the four adversaries, the debtor had also signed the authorization agreeing to pay BK Billing before the bankruptcy was filed. *Kolle,* Case No. 17-41701, ECF No. 47-1, Exhibit 23, Amerine Deposition, ECF p. 51, transcript pp. 202-203. Similarly, in another of the adversary cases, *Babikar*, there was a discrepancy in the fee agreements about how Castle Law charged; Mr. Babikar was provided a prepetition fee contract for $2,200 and a postpetition contract for $2,400. Mr. Amerine admitted that was an error. *Kolle*, Case No. 17-41701 (Exhibit 23, Amerine Deposition), ECF p. 61, transcript pp. 241-242.

[265] *Kolle,* Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 71 (Deposition Exhibit 5), ECF pp. 195-197 (Deposition Exhibit 34). Mr. Stidham testified that BK Billing had no policy about when the first postpetition payment would be due and no involvement in setting the payment schedule, although later, because of defaults, BK Billing changed the length of payment terms and imposed an income requirement for qualifying debtors. *Kolle,* Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 19, transcript p. 75.

never disclosed in either Rule 2016 disclosure; the $225 Ms. James paid Castle Law was never disclosed in the SOFA; and the agreement to pay $85.00 biweekly that Mr. Amerine negotiated with his client was never disclosed in either Schedule J. That agreement was later increased to $127.50 biweekly, or $276 per month but Mr. Amerine testified he could not remember why.[266] That meant that the amount Ms. James was paying BK Billing constituted almost 75% of her subsidized mortgage payment.

Mr. Amerine testified he drafted and personally reviewed the Rule 2016(b) disclosures before they were filed.[267] Assuming that testimony is true, it is unfathomable to the court that Mr. Amerine could argue with a straight face that he did his best to follow the Code and Rules. The court only discovered that Ms. James agreed prepetition to pay BK Billing as though it was a postpetition debt after Mr. Amerine filed the supplemental response to the court's OSC. The court only discovered that Mr. Amerine quoted one attorney fee to Ms. James and a different amount to the court after the supplemental response was filed. The court only discovered that the reaffirmation agreement the court approved did in fact create a presumption of undue hardship on Ms. James after the supplemental response was filed. The court does not know if similar issues occurred in these ten cases because Mr. Amerine did not provide the court with copies of the fee agreements.

In sum, the court rejects Mr. Amerine's defense that his actions complied with the Code, Rules, and Local Rules. As is apparent from the examination of just these cases out of the more than 100 filed, the fees were unreasonable, inaccurately disclosed, and in some cases included disguised prepetition expenses. More importantly, in at least two cases, Mr. Amerine's clients

---

[266] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 36, transcript p. 143.
[267] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 31, 37, transcript pp. 122, 145.

entered into agreements prepetition to pay for dischargeable postpetition fees. The court also rejects the implication of Mr. Amerine's argument that any fee arrangement, regardless of whether it is disclosed, is beyond judicial scrutiny simply because the total amount of the fees fall below the "no look" amount. That has never been true in this District and to construe the local rule in such a way nullifies § 329(b) and Rule 2017.

### Part III: Should the Court Impose Sanctions on Mr. Amerine Based on its OSC in These Ten Cases?

Each of the Rule 2016(b) disclosures required Mr. Amerine to certify his disclosure was "a complete statement of any agreement or arrangement for payment to me of the debtor(s) in this bankruptcy proceeding." Mr. Amerine chose not to introduce as exhibits the signed RRAs, first and second fee agreements, and authorizations to pay BK Billing in the other cases the court selected to examine, although his deposition testimony shows that, as in the *James* case, there were other cases in which the debtors signed authorizations to pay BK Billing before they filed bankruptcy.

The court has no choice but to find based on the evidence submitted by Mr. Amerine in response to the court's OSC that Mr. Amerine's disclosures violated the Code, Rules, and Local Rules in these ten cases by (1) failing to disclose to the court what he had agreed to charge for his legal fees; (2) failing to disclose to the court what payments he received; (3) failing to disclose to the court a "complete statement" of his fee agreements and arrangements for payment with BK Billing; (4) failing to seek approval of the agreements under this court's local rule; and (5) failing to show that his fees were reasonable. Mr. Amerine also violated the RRA by failing to agree to provide pre- and postpetition services to these debtors for one fee.

Mr. Amerine has utterly failed to convince the court that he was well-intentioned and that the nondisclosures were inadvertent, particularly given the volume of the nondisclosures, the many

opportunities to correct the nondisclosures, the way the nondisclosures stained other matters in some cases, such as the court's consideration of the reaffirmation agreement in the *James* case, and the fact that, as of today, no accurate disclosures of how much Mr. Amerine has been paid have been filed. The email thread, although not implicating any of these ten cases specifically, shows that Mr. Amerine did not, contrary to his assertions, thoroughly vet the factoring process but rather that he went to great lengths, as the court's OSC posited, to conceal what he was doing, even assisting the clients in filing misleading and inaccurate schedules and statements. The court believes Mr. Amerine was fairly warned of the court's concerns about each of these failures in its OSC and therefore that some sanction is warranted.

Since Mr. Amerine has already agreed in his settlement with the UST in the four adversaries to disgorge fees in the amount of the factoring fee his clients paid and to pay a civil penalty, the court does not believe it would serve any deterrent purpose to impose a further monetary sanction.[268] With the disgorgement the court approved as part of Mr. Amerine's settlement, the impacted debtors will have paid a reasonable fee for the services they received. Mr. Amerine's failure to make complete, accurate and truthful disclosures of his fee agreements coupled with his failure to offer any reasonable and objective basis for the nondisclosures demands, however, a nonmonetary sanction. The court believes the appropriate sanction is in the form of a disciplinary referral to the Missouri Office of Disciplinary Counsel and the U.S. District Court for the Western District of Missouri en banc.

---

[268] The settlement agreement requires Castle Law to return to its debtor clients the amount of the factoring fees the clients paid over a period of 18 months, resulting in 88 of 106 clients receiving a refund. In addition, Castle Law agreed to a five-year injunction prohibiting it from violating §§ 526(a)(2), 528(a)(1), 329(a) or (b), and Rule 2016(b). *James*, Adv. No. 18-4168, ECF No. 104.

**Part IV: Are Additional Sanctions for the Newly Discovered Violations Appropriate?**

Unfortunately, however, this does not end the inquiry. The evidence submitted reveals numerous other potential ethical violations outside of the scope of concerns and issues the court expressed in its OSC, in these ten cases and in the cases involved in the adversary proceedings and others raised in the response. Nevertheless, the court has the jurisdiction and authority in addition to the duty to examine these other potential ethical violations under the authorities cited above.[269] Thus, the court outlines the other potential ethical violations as follows:

- ***MRPC 4-1.1: Competence***

Mr. Amerine is an experienced consumer bankruptcy lawyer. Yet, he knowingly allowed a third party to collect an unreasonable amount of fees against his bankruptcy clients, many of whom were below 150% of poverty level, pursuant to what he knew or should have known were unenforceable and discharged fee agreements under applicable bankruptcy law.[270] He further failed to request filing fee waivers for eligible clients.[271] He testified he relied on authorities which in no way supported his actions. For example, when examined by the UST's attorney during his deposition, Mr. Amerine said he had "no concerns" that having Ms. James sign a prepetition agreement allowing BK Billing to collect against her after she filed bankruptcy might violate her bankruptcy stay.[272]

---

[269] "Nonetheless, this Court has a duty to refer a lawyer who has violated the MRPCs to disciplinary authorities, as well as the inherent power to impose discipline against those lawyers admitted to practice before it. Such discipline may range from a mild sanction, such as a reprimand, to severe sanctions, such as a suspension." *In re Pigg*, 2015 WL 7424886, at * 20 (Bankr. W.D. Mo. 2015) (footnote and cites omitted).

[270] The court has found that Mr. Amerine charged an unreasonable fee in all ten of these cases. In addition, as will be discussed below, the fees charged the debtors involved in the four adversary proceedings were also unreasonable. As a reminder, in both the *James* and *Grant* cases the debtors signed the authorization to pay BK Billing prepetition. The court does not know about the other cases since it has not been provided the fee agreements and authorizations.

[271] The clients eligible for waivers of the court's $335 filing fee are *Long*, *Harvey*, *Robinson*, *Washington*, and *James*.

[272] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 20, transcript pp. 79-80.

When the UST asked Mr. Amerine if he had reviewed the local rules, he said "probably," but later stated he didn't know if he was familiar with the local rules and wasn't sure if he had read § 329 or reviewed the disclosure requirements.[273] His email to Mr. Mawhinney stating the court's local rule involving no look fees for chapter 7s suggests he had not read the local rule before he began factoring. Mr. Amerine was asked if he believed he could withdraw if a client didn't sign the second agreement, and he said he didn't know.[274] He was asked if he agreed that there was a discrepancy between his factored fee agreements and the RRA, and he said no.[275] He was asked if he provided advice to the clients about the RRA and he said he didn't remember.[276] Tellingly though, when confronted directly about whether the RRA or the fee agreements controlled, he said that it was "his agreement with his client and that is what he understood."[277]

Under MRPC 4-1.1, a lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. Although there is no precise definition of competence, whether a lawyer fulfills the duty of competence depends on the client's objectives in addition to other factors.[278] For lawyers who represent consumer debtors in bankruptcy proceedings, the duty of competence includes understanding the impact of the automatic stay, the nature of what debts are dischargeable, the necessity of filing accurate, truthful and complete schedules and statements, and the need to fully disclose the fee agreement and payments. A lawyer's failure in any of these areas means that the debtors may not get the protection or fresh start they deserve. Or, as is true in these

---

[273] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 27, transcript pp. 105–107.
[274] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 27, transcript p. 108.
[275] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 27-28, transcript pp. 108-109.
[276] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 28, transcript p. 111.
[277] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 28, transcript p. 110.
[278] MRPC 4-1.1, Comment 1. *See generally In re Seare*, 493 B.R. 158, 188–90 (Bankr. D. Nev. 2013).

cases, the debtors overpay for the services they receive, and the closing of their cases are delayed while litigation involving the reasonableness of the fees grinds on.[279]

The court questions whether, under these circumstances, Mr. Amerine competently represented his bankruptcy clients in these cases, in violation of MRPC 4-1.1.

- ***MRPC 4-1.2(c): Limitation on the Scope of Engagement & 4-1.4(b): Communication***

Under MRPC 4-1.4(b), a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. MRPC 4-1.2(c) in turn provides that a lawyer may limit the scope of representation if the client gives informed consent in a writing signed by the client to the essential terms of the representation and the lawyer's limited role. "Informed consent" as defined by MRPC 4-1.0(e) "denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

Mr. Amerine asserted he thoroughly explained the factoring process to his clients and that it was the clients who made the decision to enter into two fee agreements for their best interests, to avoid the so-called "sweatbox." If this were true, Mr. Amerine had the opportunity to include his clients' examination transcripts as part of his defense to the OSC, but he did not do so. The premise, however, that debtors who can't pay their attorney upfront have no other options is a faulty one, based on this court's experience both as a judge and from many years representing consumers.

---

[279] The court has previously explained how delay in closing a case may be harmful to a debtor. *In re Pigg*, 2015 WL 7424886, at *22 (Bankr. W.D. Mo. 2015) ("[O]nce a bankruptcy estate is opened, it may take months or even years before even the most expeditious of trustees is able to complete his or her duties and close the case. In the meantime, even though the debtor may have received a discharge, the debtor will have the duty to continue to cooperate with the trustee until the estate is closed, a process that may be time-consuming and wearing on the debtor, who will not truly have the "fresh start" until the bankruptcy case is over.").

To begin with, Mr. Amerine as a competent bankruptcy lawyer should have explained to his clients that their fear of "impending garnishment" was not warranted unless the creditors had already retained a collection lawyer or had filed lawsuits. Very few of these debtors listed pending lawsuits, as the UST had noticed with the first four cases he investigated. Mr. Amerine's email response to the UST suggests he made no efforts to assuage his clients' fears about "impending garnishment."

More importantly, it is simply not true that a debtor's only other option is to use a bankruptcy petition preparer or to file without the benefit of a lawyer. First, as we know from Ms. Wattenbarger's email, a lawyer in this district may file a bankruptcy case having received only partial payments, so long as the bifurcation between the amount paid upfront and the amount due for postpetition services is reasonable. Second, a lawyer may take an assignment of a tax refund as security for the fee. Third, a lawyer may work with the client to hold off creditors while the client accumulates the fee, such as by agreeing to a small retainer to handle creditor calls and dunning letters or even lawsuits. Fourth, a lawyer can advise clients to ask friends, family or their church or synagogue for assistance with the fee. Fifth, a lawyer can explore whether a chapter 13 is a better option since legal fees may be paid over time in the context of a chapter 13 plan.[280]

---

[280] Mr. Amerine describes filing a chapter 13 as a bad option for debtor clients. It is true that in some situations, debtors are better served by filing a chapter 7, but there are many benefits to filing chapter 13 besides paying fees over time, including the ability to strip an underwater second mortgage on a home, the ability to pay priority taxes back with the interest and penalty continuing to accrue, the ability to later convert to chapter 7 to deal with postpetition debts, the existence of the co-debtor stay, the relatively broader discharge provision, the ability to cramdown secured car or other personal property loans, to name a few. It is true there is authority in this district for the proposition that filing a "fee-only" chapter 13 may not be in good faith. *See In re Arlen*, 461 B.R. 550 (Bankr. W.D. Mo. 2011) (finding that a chapter 13 plan proposing to pay only the administrative expenses of the chapter 13 trustee and the court's no look full chapter 13 attorney fee to the attorney was not filed in good faith, based on judicial notice of the documents in the court file). Many courts have since changed their view on whether fee-only chapter 13 cases can be considered to be filed in good when the debtors' lawyers have presented evidence for all the reasons a chapter 13 was filed rather than a chapter 7. *E.g., In re Dugan*, 549 B.R. 790, 800-801 (Bankr. D. Kan. 2016) (disagreeing with *Arlen*); *In re Wark*, 542 B.R. 522 (Bankr. D. Kan. 2015) (finding after two days of testimony that fee-only chapter 13 plans are not on their face bad faith). *See also In re Baldwin*, 2021 WL 4592265, at *16 (Bankr. W.D. Ky. Oct. 5, 2021) (noting that while chapter 13 is not necessarily available to all debtors, chapter 13's flexibility is well-known and is quite often used when debtors cannot pay their lawyers the full chapter 7 fee up front).

A sixth option is that lawyers may voluntarily reduce their standard fee to an amount the client can afford to pay upfront or even to file the case pro bono. Seventh, a lawyer may accept installment payments until the fee is accumulated, as Mr. Amerine started to do with some of the clients in these cases. Eighth, a lawyer may refer eligible clients to a legal aid or other pro bono program. Ninth, a lawyer may advise clients about proper pre-bankruptcy estate planning, which may include debtors' sale or liquidation of nonexempt or even exempt assets to raise the fee. Tenth, a lawyer may consult with the client about stopping payments on cars or homes or other collateral the client intends to surrender in the bankruptcy and setting those payments aside to accumulate the fee. Eleventh, the lawyer may follow the procedure laid out in this court's L.R. 2016-1.C: to bifurcate reasonably and enter into a postpetition factoring agreement but hold all proceeds in trust pending the prompt filing of a motion with the court seeking to determine whether the arrangement is reasonable under the circumstances.[281] Twelfth, and although this option might require taking the long view, consumer lawyers individually or through their bar association may lobby Congress to legislatively fix this problem.[282]

While there may also be other options of which this court is unaware or which would not be authorized under this court's local rules, a lawyer who is unwilling to reduce the fee, to file without all or part of the fee upfront, to help the debtor stave off creditors pending payment of the full fee, or to consider any of the other options the court has laid out, always has the option of referring the client to another of the many bankruptcy lawyers in this district who are (and have

---

[281] By listing this as an option, the court is in no way opining on whether use of such an option would be approved by this court.

[282] *Final Report of the ABI Consumer Commission on Consumer Bankruptcy* § 3.01 Chapter 7 Attorney's Fees at 89 (American Bankruptcy Institute, 2017-2019). *See also In re Brown*, 631 B.R. 77, 85 (Bankr. S.D. Fla. 2021) (quoting *Bethea*'s observation that the judiciary's job is to enforce the law Congress enacted, not write a different one that judges think superior.).

shown themselves to be) willing to explore other options to help a client struggling to afford the cost of filing bankruptcy.[283]

Did Mr. Amerine explain these other options to these clients? More importantly, did he advise them that if they desired to go with the immediate filing and a factoring of the second, allegedly postpetition fee agreement, they would be paying an additional 25% or more over the typical cost for a bankruptcy case? And, for the debtors eligible for fee waivers and no-fee counseling and free credit reports, that they would be paying $500 or more for expenses and a factoring fee they otherwise would not have had to pay?

Other scope of engagement issues are apparent from the sloppiness of the two fee agreements Mr. Amerine attached as exhibits and their outright contradictions with the RRA. The *James* fee agreements do not disclose that BK Billing was charging Castle Law a 25% fee, or that an individual debtor's payments would be used to secure other clients' payments, or that the AR Agreement authorized BK Billing to charge an onboarding fee and processing fee to Castle Law.[284] Mr. Amerine's fee agreements provided that any prepetition agreement for fees would be unenforceable and any unpaid balances due discharged. Yet, Mr. Amerine clearly knew there were dischargeable prepetition agreements that he and BK Billing intended to enforce in violation of the express terms of the fee agreements and the Bankruptcy Code.

And what about the "right" of Castle Law to withdraw and the client's "right" to select another lawyer? That the RRA Mr. Amerine certified he and his clients executed required Mr.

---

[283] The court has seen all these options used in cases before it and notes that many lawyers in this district in particular charge reduced or no fee to clients in need of immediate bankruptcy relief. That being said, "[c]ertainly every case is different, and what advice may be appropriate in various circumstances varies widely depending on a number of factors, including the facts, the interests of the client, the law in the particular jurisdiction, among other relevant factors. The foregoing options are not intended to be offered as an advisory opinion and are not exclusive." *In re Pigg,* 2015 WL 7424886, at *22, n.50 (Bankr. W.D. Mo. Nov. 20, 2015).

[284] Mr. Stidham testified that BK Billing "rarely" charged the processing fee. *Kolle,* Case No. 17-41701, ECF 47-2 (Exhibit 24, Stidham Deposition), ECF p.7, transcript p. 27.

Amerine to complete the postpetition work regardless of whether the clients signed a postpetition agreement retaining him to do so? That this court's local rule as well as the RRA clearly state the bankruptcy court will not allow a lawyer to withdraw from an individual bankruptcy case unless another lawyer has entered an appearance? That it is highly unlikely the court would allow Mr. Amerine to withdraw having just filed the bankruptcy petition? That if not allowed to withdraw Mr. Amerine would have been bound by MRPC 4-1.16(c) to continue the representation until the bankruptcy was completed?

Even in the unlikely event this court would have allowed Mr. Amerine to withdraw, did he advise his clients that since their cases were filed as "shells," all remaining schedules, statements and related documents would be due to the court in 14 days or the cases would be dismissed? That debtors might seek an extension of the time to file the schedules, statements and related documents but that the Code limits the length of the extension?[285] That if their case was dismissed, they would have to file a motion to reinstate and that the court in its discretion might refuse to allow the case to be reinstated?[286] That debtors could file a new bankruptcy case but that there are disadvantages: they would have to pay a new court filing fee, perhaps be required to take another counseling course to be eligible,[287] might not have the protection of the automatic stay in the second case,[288] in addition to the fact they would have two bankruptcy cases marring their credit, among other considerations?

Did Mr. Amerine advise his clients that very few lawyers are willing to take a bankruptcy case filed by another lawyer and at a minimum would demand a fee up front (which the client was

---

[285] *See* 11 U.S.C. § 521(i).
[286] *See* L.R. 1017-1.E.
[287] *See* 11 U.S.C. § 109(h) (requiring counseling to be completed within the 180 days before the bankruptcy filing).
[288] *See* 11 U.S.C. § 362(c)(3) (automatic stay ceases to be in effect if a previous case was dismissed within the year unless extended upon a timely motion and proper evidentiary showing).

supposedly unable to do for Castle Law and why Mr. Amerine says the factoring of the fees and expenses was necessitated)? That attempting to represent oneself in a bankruptcy case is very difficult and full of pitfalls?[289] That because the factoring and bifurcation are, in Mr. Amerine's words, "revolutionary," the court, the trustee, the UST or some other party might question the procedure, which would subject the debtors to a Rule 2004 examination and potential delay in closing their cases?

When Mr. Amerine offered limited service fee agreements to these clients in violation of the RRAs, it was incumbent upon him to ensure that the clients were informed of "the material risks of and reasonably available alternatives to the proposed course of conduct" as required by MRPC 4-1.2(c). The two fee agreements on their face fail to comply with that Rule and belie Mr. Amerine's testimony that he "thoroughly explained" the options to his clients. As other courts have observed in finding such limited service fee agreements unethical in the context of consumer bankruptcy cases, "debtors are extremely vulnerable and, only in the most unusual cases, are able to say no to their lawyers when they need them the most."[290] The argument that these debtors fully understood their choices is also belied by Mr. Amerine's testimony that the debtors typically waited in the hall while the skeletal petition was filed before coming back in to sign the second fee agreement.[291]

Even if Mr. Amerine "thoroughly" explained the material risks and reasonable alternatives as required by MRPC 4-1.2 and 1.4 (of which there is no evidence), it is a fiction to say the debtors had a reasonable alternative to signing the postpetition agreement. In reality, it was an illusion of

---

[289] Besides dismissal for failure to comply with filing deadlines, court orders, and other Code requirements such as the need to take the second counseling course required by § 727(a)(11), pro se debtors risk loss of assets for failure to claim proper exemptions and denial of discharge for failure to cooperate with the trustee and may be unaware of their ability to avoid liens under § 522(f) or to reaffirm debts under § 524.

[290] *In re Baldwin*, 2021 WL 4592265, at *6 (Bankr. W.D. Ky. Oct. 5, 2021).

[291] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 48, transcript p. 191.

choice, or a "Hobson's Choice." What debtors, having just met with and hired a lawyer to file a bankruptcy case, and having heard the serious ramifications of proceeding pro se or finding another lawyer, are going to resist signing the second, allegedly postpetition agreement?

In sum, the record suggests violations of MRPC 4-1.2(c) and 4-1.4.[292]

- ***MRPC 4-1.5: Fees***

Both the Bankruptcy Code and MRPC 4-1.5(a) require legal fees and expenses to be reasonable. Regardless of how much Mr. Amerine was actually paid, the court has already found that Mr. Amerine failed to meet his burden of showing that the fee agreements he made with these ten debtors were reasonable, given that the fees and some of the expenses included a 25% factoring fee that made the cost of filing bankruptcy in these simple, no asset chapter 7 cases much higher than what other lawyers would have charged to provide the same services.

In addition, the Code in § 329 requires disclosure of the amounts charged and paid and § 528 as made applicable to "debt relief agencies" requires a clear and conspicuous explanation of the services provided, the fees or charges for the services, and the terms of payment.[293] MRPC 4-1.5(b) also requires the basis or rate of the fee and expenses for which the client will be responsible to be communicated to the client, preferably in writing. In the *James* case, the fee agreement inaccurately states that Castle Law is charging $2,175 for the attorney's fees, when that amount includes $175 of expenses. Besides the fact that the court can't fulfill its duty to determine if fees are reasonable if it doesn't know what the fees are, why does it make a difference from an ethical standpoint?

---

[292] The court notes that some courts have also flatly held that offering limited services representation to consumer debtors in bankruptcy is a breach of the duty of competence. *In re Seare*, 493 B.R. 158, 190-191, (Bankr. D. Nev. 2013); *In re Brown*, 631 B.R. 77, 94-98 (Bankr. S.D. Fla. 2021). *But see In re Slabbinck*, 482 B.R. 576 (Bankr. E.D. Mich. 2012) (limited services agreement was not a breach of attorneys' duty of competence).

[293] There is no dispute that in these cases Mr. Amerine would constitute a "debt relief agency" providing "bankruptcy assistance" to consumer debtors, and thus subject to the requirements of § 528. *See In re Pigg,* 2015 WL 7424886, at n.51 (Bankr. W.D. Mo. Nov. 20, 2015).

First, under MRPC 4-1.5 clients have a right to know what they are paying for legal services and what they are paying for expenses. In this case, Mr. Amerine presented Ms. James with an RRA that said his total legal fees would be $1,455 and also presented her a fee agreement saying that the legal fees would be $2,175. Second, and more importantly, treating expenses as legal services allowed Castle Law to obscure the fact that it was charging some of these debtors for expenses that were not necessary and allowed Castle Law to factor a prepetition dischargeable debt. Some of the debtors in these cases qualified for filing fee waivers and no-fee or reduced fee credit counseling and could possibly have obtained their credit reports at no charge.[294] Although there are advantages to the debtor's lawyer in pulling the credit report so that the creditors' addresses download directly into the lawyer's bankruptcy preparation software and Mr. Amerine testified he only charges the client for the cost he is charged, that should have been communicated to the client. The fact that the expenses are not set forth separately in the fee agreements is, in this court's view, a clear violation of MRPC 4-1.5.

Next, a lawyer has a right to provide pro bono service or to waive fees, of course. Mr. Amerine could legitimately and ethically have offered pro bono services to these clients for his prepetition services in meeting with them, counseling them about bankruptcy, reviewing their documents, and preparing and filing their petitions. Mr. Amerine says this is what he did. But, if Mr. Amerine had truly waived his prepetition fees for these services, then why didn't the total fee for legal services for filing a chapter 7 bankruptcy cost less instead of more than what he charges clients who pay upfront? The practice has the appearance of being a sham, as the court's OSC posited, solely for the purpose of allowing Castle Law to treat prepetition, dischargeable fees as

---

[294] All three credit reports are available at no cost once a year at: www.annualcreditreport.org.

postpetition so the account receivable could be factored, not as a benevolent pro bono service to the clients.

The court examined every chapter 7 case Mr. Amerine filed in 2017, the year he began factoring. Before he filed his first factored case in late June 2017, Mr. Amerine routinely charged $1,250 for simple, no asset chapter 7 cases. Pre-factoring, the court found one case – an asset case – in which Mr. Amerine charged $2,175,[295] several in which he charged $1,750 or something similar,[296] and a handful in which he charged slightly less than $1,250.[297] Mr. Amerine also filed several cases for no fees or a drastically reduced fee (recall, one of the options the court suggested is available),[298] as well as reduced fees for chapter 13 cases converted to chapter 7.[299] Of the approximately 75 cases commenced as chapter 7s before late June 2017, Mr. Amerine filed none as "shell" cases and charged $1,250 in approximately three-quarters of them.

Mr. Amerine continued to charge and receive around $1,250 for his legal fees for the rest of the 2017 year in the majority of his nonfactored chapter 7 cases, significantly all of which were filed with complete schedules and statements. By comparison, in a majority of the factored cases filed after late June 2017, Mr. Amerine factored accounts receivable contracts of typically either $2,300 or $2,400.[300] The court does not know how much Mr. Amerine charged these clients, whether the factored accounts were signed pre- or postpetition petition, whether the accounts

---

[295] *In re Barnett*, Case No. 17-40426.

[296] *In re Danahy*, Case No. 17-40056 ($1,750); *In re Gross*, Case No. 17-40245 ($1,750); *In re Knowles*, Case No. 17-40607 ($1,750); *In re Proctor*, Case No. 17-40677 ($1,650); *In re Williams*, Case No. 17-41349 ($1,750); *In re Mitchell*, Case No. 17-41222 ($1,450).

[297] *In re Henry*, Case No. 17-40015 ($1,200); *In re Taborn*, Case No. 17-40511 ($1,135); *In re Godley*, Case No. 17-40588 ($900); *In re Thomas*, Case No. 17-40606 ($1,110); *In re Toney*, Case No. 17-40824 ($1,195); *In re McGee*, Case No. 17-41343 ($1,145); *In re Conner*, Case No. 17-41444 ($1,125).

[298] *In re Fawcett*, Case No. 17-21091 ($0); *In re Brumbaugh*, Case No. 17-40052 ($0); *In re Clay*, Case No. 17-40589 ($0); *In re Smith*, Case No. 17-41654 ($20).

[299] *In re Stovall*, Case No. 17-40079 ($975); *In re Thomas*, Case No. 17-40172 ($975); *In re Holliness*, Case No. 17-40317 ($975); *In re Jackson*, Case No. 17-40565 ($1,000); *In re Johnson*, Case No. 17-41473 ($1,000); *In re Lewis*, Case No. 17-41658 ($850).

[300] *Kolle*, Case No. 17-41701, ECF No. 35-1 *SEALED*.

included any prepetition expenses, or how much Mr. Amerine ended up receiving, but the difference is stark: assuming no expenses were factored, these debtors were paying $1,000 more than a typical Castle Law non-factored chapter 7 debtor paid, or more than what would have been sufficient to cover the cost of the factoring. Assuming $400 of expenses were factored, along with an attorney fee of $2,000, these debtors were still paying $750 more than a debtor with a nonfactored fee agreement, all at a time when Mr. Amerine continued to file disclosures stating he had agreed to accept much less.[301]

Mr. Amerine offered no credible explanation for why he charged these clients more than other clients, contrary to his representation to the UST at the inception of the investigation that "I make no more money on this." The only conclusion the court can draw is that Mr. Amerine was shifting the cost of the factoring fee – plus some – to his clients. The court explicitly rejects the argument that filing shell cases costs more because it is more work, for several reasons.

First, it is an attorney's burden under both the Bankruptcy Code and the ethics rules to justify reasonableness. Mr. Amerine did not keep time records and could only vaguely explain the extra work allegedly involved. Second, in reviewing generally the chapter 7 cases, the record does not reflect any additional work involved. Third, the alleged additional work was only necessitated because of the need to make it appear that all work was being done postpetition, to avoid the consequences of the automatic stay and discharge provisions. Fourth, when Mr. Amerine filed a shell petition for chapter 7 debtors whose fees had not been factored, he did not charge significantly more and, in fact, in some instances charged the same $1,250.[302]

---

[301] The disclosures show fees of $1,375 or $1,400 with $0 received, *e.g., In re Lynch*, Case No. 17-41699 ($1,375 disclosed vs. $2,400 factored); *In re Conway*, Case No. 17-41768 ($1,400 disclosed vs. $2,400 factored); *In re Smith*, Case No. 17-41936 ($1,725 disclosed vs. $2,300 factored).
[302] *E.g., In re Oeum*, Case No. 17-42443 ($1,250); *In re Cates*, Case No. 17-43311 ($1,250).

Mr. Amerine offered factoring to debtors who were already struggling to make prepetition payments; he shifted the cost of the factoring plus charged extra for this "service" to his clients; he negotiated his clients' payment terms to the factor and allowed them to agree to payment terms the schedules he later drafted showed many could not afford; he presented clients with fee agreements that misstated the amount he was charging for his legal fees; he included reimbursement for prepetition expenses he advanced in the postpetition factored agreement, expenses which otherwise would have been discharged; and he charged expenses for some clients who otherwise would not have had to pay any expenses. In sum, these actions resulted in Mr. Amerine charging an unreasonable fee in violation of MRPC 4-1.5, regardless of whether Mr. Amerine was fully paid or not.[303]

- ***MRPC 4-1.6: Confidentiality***

MRPC 4-1.6 provides that a lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by Rule 4-1.6(b). Rule 1.6(b) says a lawyer may reveal information related to the representation of a client to the extent the lawyer believes reasonably necessary for various purposes, including securing legal advice about a lawyer's compliance with the ethics rules, establishing claims or defenses on behalf of the lawyer in a controversy between the lawyer and the client, or to comply with other law or a court order.

---

[303] Some courts in examining factored fees have queried whether paying a fee to a factor violates the Bankruptcy Code's prohibition in § 504(a) against fee sharing. *E.g., In re Wright*, 591 B.R. 68, 92 (Bankr. N.D. Okla. 2018); *In re Baldwin*, 2021 WL 4592265, at *14 (Bankr. W.D. Ky. Oct 5, 2021). MRPC 1.5(e) regulates divisions of fees among lawyers and therefore is not applicable here but will be discussed below in connection with MRPC 4-5.4, Professional Independence of a Lawyer.

Comment 12 provides in relevant part that MRPC Rule 4-1.6(b) permits disclosure only to the extent the lawyer reasonably believes the disclosure is necessary to accomplish one of the purposes specified. In any case, a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to accomplish the purpose. If the disclosure will be made in connection with a judicial proceeding, the disclosure should be made in a manner that limits access to the information to the tribunal or other persons having a need to know it, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.

The court has several concerns regarding the duty of confidentiality in these cases. The AR Agreement expressly states that Castle Law was not transferring Castle Law's attorney-client relationship to BK Billing.[304] But the Agreement did require as one of its conditions for buying the firm's accounts receivable that the clients had "explicitly consented in writing to the Firm's disclosure of certain Client information necessary for the collection of the accounts receivable, such as the Client's name, address and phone number together with a copy of the transferred account."[305] BK Billing in turn agreed "to only use client information provided under this Agreement for the collection of payments owed hereunder and shall use commercially reasonable efforts to safeguard such information."[306]

The "Consent and Release of Information" the client signed, however, was not in either of the fee agreements, but in the Recurring Payment Authorization and Consent Form. The Consent was not limited to the client's name, address, and social security number but appeared to allow Castle Law to share the client's entire file with BK Billing:

---

[304] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 6.2.
[305] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 4.2.
[306] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 5.2.

> I give my consent that the Law Firm may sell or factor the accounts receivable associated with my contract to BK Billing. I acknowledge my payments would then be made directly to BK Billing on behalf of the Law Firm. I authorize the Law Firm or BK Billing to communicate with me via mail, e-mail, text, and/or telephone. *I give my consent for the Law Firm to share my client file information,* including my Social Security Number, with BK Billing for the purpose of processing and reporting my payments. I acknowledge that my payments may be reported to the Credit Bureaus. I acknowledge that on-time payments may help my credit and late payments may hurt my credit.

(emphasis added).[307]

Leaving aside whether this brief "Consent and Release of Information" truly constitutes informed consent as defined by MRPC 4-1.0(e) – or, adequate information and explanation about the material risks and reasonably available alternatives – the client has apparently authorized Castle Law to release to BK Billing the entire file, not just to the extent of those items of information BK Billing would need for collection. A typical attorney file for a bankruptcy client would contain information not available in the public record and that would be helpful to BK Billing in pursuing collection, such as phone numbers, emails, account numbers and the like – which is apparently why BK Billing required such information from the clients.

More importantly, in attempting to defend himself in this case from allegations by the UST and the court, Mr. Amerine has included his firm's case notes for the four clients in the adversary proceedings. The court does not see how the case notes were authorized to be disclosed under the clients' signed consents, which only consented to information to be released to BK Billing, not to the UST or to the court. And the cases notes were not authorized to be disclosed under MRPC 4-1.6(b), because this is not a dispute between Mr. Amerine and his clients.

It is ironic that Mr. Amerine underdisclosed his nonconfidential fee agreements when it came to disclosures he was required to make to the court, then overdisclosed his clients'

---

[307] *E.g., Kolle,* Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 92 (*Babikar*). The court notes that the exemplars provided are not high-quality copies, but appears this language is not even bolded.

confidential information in attempting to defend the nondisclosures. One of the dangers of failing to seek approval of a "revolutionary" new fee model is that it is tempting for lawyers to release their case notes or entire client files to defend their actions, as Mr. Amerine did here, in apparent violation of MRPC 4-1.6.[308] More importantly, the agreements on their face authorized a broad release of client information, also in apparent violation of MRPC 4-1.6(b)'s requirement that any release of client information be limited to what is reasonably necessary.

- ***MRPC 4-1.7: Conflict of Interest: Current Clients***

MRPC 4-1.7(a) prohibits lawyers from representing clients if there is a concurrent conflict of interest. A "concurrent conflict of interest" under MRPC 4-1.7(a)(2) exists when there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to a third person or by a personal interest of the lawyer. Notwithstanding the existence of a concurrent conflict of interest under Rule 4-1.7(a), however, the lawyer may represent the client under MRPC 4-1.7(b) if several factors are met:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing.

There are several reasons why the court believes that the factoring process Castle Law used in these cases created a concurrent conflict of interest under Rule 4-1.7.

First, the court questions how a lawyer could reasonably believe he would be able to provide competent and diligent representation to these debtor clients when structuring the engagement so that all the real work was performed after filing. In § 707(b)(4)(D), the Bankruptcy

---

[308] *See In re Pigg,* 2015 WL 7424886, at n.2 (Bankr. W.D. Mo. Nov. 20, 2015).

Code imposes Rule 11-like duties of factual and legal investigation upon lawyers filing consumer bankruptcy cases. The lawyer's signature on the petition is a certification that:

> I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, the United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after inquiry that the information in the schedules filed with petition is incorrect.[309]

Mr. Amerine asks the court to believe that, on the hand, he "thoroughly" spends time with the clients to ensure they are eligible to file chapter 7 and understand the factoring process, but on the other hand, that all the work in the case except for the filing of the shell petition is done postpetition, such that ascribing $0 of value for the prepetition legal services is reasonable. He cannot have it both ways: either he is complying with his duties to perform a Rule 11 investigation before the client files a chapter 7 bankruptcy or he is not. And if he is performing a Rule 11 investigation pre-bankruptcy and waiving those prepetition fees when the debtor files then, again, why is the debtor charged more for the postpetition fees; shouldn't the amount of time spent prepetition be deducted from the fees quoted for the allegedly all postpetition services?

A second conflict of interest has been explained by another court in the recent *Baldwin* case.[310] There is a "clear conflict of interest" between Mr. Amerine's interest, on the one hand, in

---

[309] 11 U.S.C. § 707(b)(4)(B) authorizes the court to assess a civil penalty against a debtor's attorney, payable to the Trustee or UST, if the court, on its own motion or the motion of a party in interest, and in accordance with Rule 9011 procedures, finds that the attorney has violated Rule 9011.Section 707(b)(4)(C) in turn provides that the signature of an attorney on a petition shall constitute a certification that the attorney has performed a reasonable investigation into the circumstances that gave rise to the petition, and has determined that the petition is well grounded in fact, warranted by existing law, and does not constitute an abuse under § 707(b)(1). Section 707(b)(4)(D) states that "[t]he signature of an attorney on the petition shall constitute a certification that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect." Courts have observed that Congress intended § 707(b)(4)(C) and (D) be read together, such that the requirement of a reasonable investigation should apply to the information in the petition as well as the schedules and statements. *See Orton v. Hoffman (In re Kayne),* 453 B.R. 372, 381–82 (B.A.P. 9th Cir. 2011). *In re Pigg,* 2015 WL 7424886, at *6 (Bankr. W.D. Mo. Nov. 20. 2015) (footnote omitted).
[310] *In re Baldwin*, 2021 WL 4592265, at *6 (Bankr. W.D. Ky. Oct. 5, 2021).

receiving payment for his services with the creation and factoring of the postpetition fee agreement

and the debtors' right, on the other hand, to decline signing that agreement and to insist Mr.

Amerine "fulfill his duties under the Bankruptcy Code and the Court's local rules" to complete the

chapter 7 bankruptcy representation, regardless of payment. The *Baldwin* court also calls out the

"serious conflict of interest" in the fact that the postpetition factoring is "wholly beneficial for

counsel and disturbingly expensive for his clients."[311]

There is yet another glaring conflict of interest that the court sees with respect to those

clients whose filing fees Castle Law factored. It would have been in those clients' best interests

for Mr. Amerine to have filed an application to pay the fee in installments under Rule 1006(b) over

120 and up to 180 days rather than to pay an extra 25% financing fee on top of the $335 filing fee.

Many lawyers prefer not to have their consumer clients pay the court filing fee in installments,

since many debtors struggle to make the installment payments and missing an installment payment

results in the case being dismissed. Theoretically, that consideration should not have applied in

these cases since all these debtors agreed to make payments monthly in much higher amounts than

the installment payments would have been. But here is the problem: if a debtor pays the filing fee

in installments, Castle Law and BK Billing could not have collected or gotten paid until the filing

fees were paid in full under Rule 1006(b)(3).

Fourth, there is an apparent conflict of interest in the fact that Mr. Amerine testified he

only offered the factoring program to clients who were already struggling to pay the fees and

expenses upfront. Recall that Ms. James, for example, paid Castle Law $100 down, and then small

payments of $50 and $25 over the course of several months but never paid more than $225 of the

---

[311] *Id*. at *9. The *Baldwin* case involved a different factoring company and a different factoring agreement. The court expresses no opinion on the specifics of the factoring agreement in that case, to the extent it differs from BK Billing's factoring agreement.

$1,650 she agreed to pay ($1,250 for the attorney fee and $400 for the expenses). How could a lawyer reasonably believe that committing to later pay $2,175 to BK Billing over the course of nine months in addition to the $225 she had already paid Castle Law could be in her best interest? The answer cannot be that debtors would be in a better position to pay the fees after shedding themselves of debt, since Mr. Amerine has insisted the clients whose fees he was factoring had already stopped paying debts and were "in the sweatbox" – unless, of course, that allegation was not factually true.

Finally, there is another conflict arising from Mr. Amerine's obligations to BK Billing under the express provisions of the AR Agreement and his interest in having clients pay BK Billing so he could receive his 15% holdback. Mr. Stidham candidly testified that although BK Billing ultimately had the responsibility to collect from the debtors, the existence of the holdback meant that the attorney had an incentive "to have the contracts perform."[312] BK Billing's underwriting guidelines effective May 2018 and attached as an exhibit to Mr. Mawhinney's deposition clearly state that recourse only applies to those attorneys who maintain negative holdback balances.[313]

Under the terms of the AR Agreement, Mr. Amerine and Castle Law were expressly obligated to keep the AR Agreement confidential and to not disclose its contents. So it is likely unknown to Ms. James and the other clients that the AR Agreement also required Castle Law "to cooperate with the collections by BK Billing of the Transferred Accounts, including but not limited to providing evidence reasonably required for any legal action, arbitration, or mediation instituted by BK Billing for collection purposes, and permitting BK Billing to use the Firm's name, address, and telephone number for collection purposes."[314] The AR Agreement authorized BK Billing to

---

[312] *Kolle,* Case No. 17-41701, ECF No. 47-2 (Exhibit 24, Stidham Deposition), ECF p. 33, transcript p. 130.
[313] *Kolle,* Case No. 17-41701, ECF No. 47-3 (Exhibit 25, Mawhinney Deposition), Exhibit 34, ECF p. 169.
[314] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 4.4.

make negative reports on a client's credit report after the account was past due 90 days.[315] Mr. Amerine testified that he did not remember if he had disclosed the possibility of negative credit reporting to any of his clients.[316]

Mr. Amerine also testified that it was not his understanding he had any duties to assist BK Billing in collecting from his clients, notwithstanding the plain language of the BK Billing Agreement.[317] The court finds that testimony disingenuous, however. On January 18, 2018, BK Billing emailed Mr. Amerine, advising him that BK Billing was attempting to collect "on the contracts that were behind" and recommending Mr. Amerine reach out to each of his clients. Mr. Amerine's response by email was, "Would you agree given the state of things here it would be best if I don't attempt to make any collection attempts on missed payments?"[318]

The AR Agreement also required Castle Law to indemnify and hold harmless BK Billing in the event Castle Law breached any of its duties under the agreement.[319] If a client later disputed whether Mr. Amerine had earned the fee, there would be no remedy for the client other than to stop paying BK Billing and face negative credit reporting and possible collection from BK Billing, with the assistance of Castle Law under the terms of the AR Agreement. How can that not be a concurrent conflict of interest? Indeed, courts have recognized that factoring agreements raise a conflict of interest by "both creating a nondischargeable debt through the use of a postpetition agreement and a conflict arising from the attorney's desire to maintain a favorable relationship with [the factor] while representing the client."[320]

---

[315] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 5.4.

[316] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 9, transcript p. 33.

[317] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 8, transcript p. 29; ECF No. 40-4, Exhibit 4-A, ¶ 4.4.

[318] *Kolle,* Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 196.

[319] *Kolle,* Case No. 17-41701, ECF No. 40-4, Exhibit 4-A, ¶ 4.7.

[320] *In re Baldwin,* 2021 WL 4592265, at *14 (Bankr. W.D. Ky. Oct. 5, 2021), (citing *In re Wright*, 591 B.R. 68, 89-99 (Bankr. N.D. Okla. 2018)).

One of Mr. Amerine's defenses in this case is that so many of his clients defaulted on their payments that he never got paid the holdback, or, as he put it, the firm "ended up factoring the post-petition account receivable debt for a disappointing 40% cost."[321] In this court's view, the high default rate is reflective of the fact that so many clients were saddled with a postpetition debt they could not afford, based on their budgets. Mr. Amerine, though, had a personal interest based on his agreement with BK Billing that the clients pay BK Billing, even if it was not in the clients' best interest.

In sum, it is apparent to the court that Mr. Amerine's duties to his bankruptcy clients were materially limited by his self interest in getting paid quickly and by his obligations to BK Billing. These conflicts may have been waivable if fully disclosed. If any of these clients were informed of these conflicts and consented in writing as required by MRPC 4-1.7, however, there is no evidence in the record of it.

- ***MRPC 4-1.8: Conflict of Interest: Prohibited Transactions***

MRPC 4-1.8 contains two provisions applicable here. MRPC 4-1.8(b) provides that a lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules. The court's explanation of the AR Agreement and Castle Law's contractual duty to assist BK Billing in collecting suggests a possible violation of MRPC 4-1.8(b). More importantly, though, is the clear violation of MRPC 4-1.8(e).

MRPC 4-1.8(e) provides that a lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation . . . ; and
(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

---

[321] *Kolle,* Case No. 17-41701, ECF No. 40, p. 37.

Comment 10 to MRPC 4-1.8(e) explains the reasoning behind this prohibition:

> Lawyers may not subsidize lawsuits or administrative proceedings brought on behalf of their clients, including making or guaranteeing loans to their clients for living expenses, because to do so would encourage clients to pursue lawsuits that might not otherwise be brought and because such assistance gives lawyers too great a financial stake in the litigation. These dangers do not warrant a prohibition on a lawyer lending a client court costs and litigation expenses, including the expenses of medical examination and the costs of obtaining and presenting evidence, because these advances are virtually indistinguishable from contingent fees and help ensure access to the courts. Similarly, an exception allowing lawyers representing indigent clients to pay court costs and litigation expenses regardless of whether these funds will be repaid is warranted.

Castle Law's factoring arrangement on its face violates this rule. As already discussed, MRPC 4-1.5 distinguishes between fees for legal services and expenses. The court assumes for the sake of argument that chapter 7 bankruptcy clients would be considered indigent under Missouri law such that it would not violate MRPC 4-1.8(e) for a bankruptcy attorney to advance the expenses of a chapter 7 filing, typically consisting of the court filing fee and any counseling or credit report fees. Nonetheless, expenses advanced on or before filing constitute a prepetition debt that is discharged under bankruptcy law.[322] So, effectively, an attorney who advanced expenses as Mr. Amerine's firm did in these cases is not entitled to be reimbursed, unless the client does so voluntarily.[323]

Nothing in MRPC 4-1.8(e), though, authorizes attorneys to arrange for financing of their *legal fees* for the representation. Factoring is a type of financing,[324] typically used when a business with outstanding payables decides it needs cash immediately.[325] Factored accounts are subject to

---

[322] *See In re Brown*, 631 B.R.77, 101-102, (Bankr. S.D. Fla. 2021); *In re Baldwin*, 2021 WL 4592265, at *8 (Bankr. W.D. Ky. Oct. 5, 2021) finding factoring of the filing fee violated Kentucky Supreme Court Rule 3.130(1.8)(e)(1).
[323] 11 U.S.C. § 524(f).
[324] *See* Mary H. Rose, *American Factoring Law,* AMERICAN BANKRUPTCY INSTITUTE JOURNAL, Oct 2011, pp. 48-49 (reviewing AMERICAN FACTORING LAW by David B. Tatge, et al).
[325] *See generally In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 620 (Bankr. M.D. Pa. 2015).

the Uniform Commercial Code.[326] A factor under the UCC receives a "security interest" as a buyer of the accounts and must "perfect" the security interest by filing a UCC financing statement. A factor that fails to perfect its ownership interest will lose to a perfected lien creditor as well as to the interest of a trustee in bankruptcy under the strong-arm provisions of § 544 of the Bankruptcy Code.[327]

The strong-arm provisions aren't applicable here. But what Castle Law did in this case is in effect to tell the clients: "You are having trouble paying the fee and I would like to get paid for my services now so I've arranged for the financing of your fee." How is it different from a lawyer telling the client, "I'll take a cash advance on my credit card for the fee; you just pay my credit card and the interest back directly"? How is that permissible under MRPC 4-1.8(e)?

The court's further examination of the true nature of the factoring arrangement as financing – arranged by Castle Law for the alleged benefit of its clients – has made the court realize it erred in one respect in its OSC. The court posited that the source of the payments Mr. Amerine received was BK Billing, not the debtors, as Mr. Amerine contends. But the source of the payments in these cases was neither BK Billing nor the debtors: it was Castle Law itself based on the financing it arranged. Or, to the extent Castle Law received payments from the holdback, the source could have been other Castle Law clients, since the holdback account consisted of commingled client funds. The court doesn't know because Mr. Amerine has never disclosed in any of his Rule 2016(b) disclosures how much he received.[328]

The court found no Missouri cases construing MRPC 4-1.8(e) or addressing the propriety of litigation funding in Missouri. The court is aware that some other bankruptcy courts have found

---

[326] Mo. Rev. Stat. § 400.9-109(a)(3) (Article 9 applies to any sale of accounts or chattel paper).
[327] Mary H. Rose, *American Factoring Law,* AMERICAN BANKRUPTCY INSTITUTE JOURNAL, Oct 2011, p. 48.
[328] Mr. Amerine testified, however, that he never received any money from the holdback account, notwithstanding that some clients, such as Ms. Kolle, fully paid BK Billing.

the use of bifurcated and factored fee agreements in representing chapter 7 clients to be ethical under their applicable state rules of conduct and not prohibited by the Code or their local rules. The *Hazlett* case from Utah, cited and relied on by Mr. Amerine, is one example.[329] The *Hazlett* case is distinguishable, however.

The court in *Hazlett* was careful to note that the lawyer there had provided adequate explanations and disclosures of the options to his client, including which options involved different levels of costs, services, and methods of payments.[330] The lawyer's agreement did not constitute unbundling and did not violate local rules, because the lawyer had agreed to represent the client for postpetition services contingent on the client signing the postpetition agreement, which the client did. The lawyer had also not directly or surreptitiously slipped fees for prepetition services into the postpetition fee agreement, and the overall fee agreement, including the 30% factoring fee, was reasonable.[331] And, significantly, the lawyer had agreed to charge the same price ($2,400) regardless of what payment option the debtor chose and disclosed the full $2,400 fee, not the "net" amount like Mr. Amerine disclosed in many of these cases.

The *Hazlett* court noted that the Utah State Bar had recently issued an ethics opinion finding that bifurcation of fee agreements was ethical under Utah rules of conduct, so long as certain elements and standards were met: that the "unbundling," as the Bar described it, was reasonable under the individual client's circumstances and was the exception and not the rule; that the lawyer not engage in any false or misleading communications about the fee agreement and scope of engagement; that the fee and financing terms were reasonable; that the potential conflict of interest between the lawyer, the client and the financer was disclosed and consented to in writing

---

[329] *In re Hazlett*, 2019 WL 1567751 (Bankr. D. Utah April 10, 2019).
[330] *Id.*, at *14.
[331] *Id.*, at *9.

by the client; and that the lawyer maintained confidentiality and loyalty to the client.[332] The *Hazlett* court observed that although the Utah Opinion had been issued after the bankruptcy case was filed, the debtor's lawyer had substantially complied with all the Utah standards and requirements set forth in the Opinion.[333]

In these cases, by contrast, the fee agreements themselves as already discussed are misleading and inadequate and there were no written disclosures or waivers of the conflict of interest. The agreements to pay the postpetition fees were in some cases agreed to prepetition, not post, and neither the agreements nor the payments were disclosed to the court. The postpetition amount appears to have been calculated to include fees for prepetition work, and the total amount of the fees were unreasonable for simple, no asset cases. The fee agreements violated this court's local rule and the RRA. The court cannot therefore conclude that the *Hazlett* case, issued almost two years after Mr. Amerine signed the AR Agreement, absolves Mr. Amerine of his actions in these cases under Missouri's Rules of Professional Conduct. And, other opinions, issued both before and after *Hazlett*, have continued to cast doubt on the propriety of factoring consumer chapter 7 debtors' fees or at a minimum have placed strict conditions on when they may be allowed.[334]

---

[332] Utah Ethics Advisory Opinion Committee, Opinion Number 17-06 (Revised), issued August 16, 2018.

[333] *In re Hazlett*, 2019 WL 1567751, at *12 (Bankr. D. Utah April 10, 2019).

[334] *See, e.g., In re Wright*, 591 B.R. 68, 99 (Bankr. N.D. Okla. 2018) (holding that sloppy disclosures were sanctionable); *In re Prophet*, 628 B.R. 788, 803 (Bankr. D. S.C. 2021) (holding that bifurcation and unbundling were prohibited under court's local rules and ordering disgorgement of postpetition fees); *In re Brown*, 631 B.R.77 (Bankr. S.D. Fla. 2021) (holding that bifurcation allowed under limited circumstances, including a requirement of adequate pre-filing investigation and for the attorney to provide pre- and postpetition "core" services, in addition to strict compliance with the court's order and local rules). *Compare In re Allen*, 628 B.R. 641, 644, n.4 (B.A.P. 8th Cir. 2021) (holding the bankruptcy judge did not abuse his discretion in reducing the attorney fees to the amount the attorney would have charged if the debtors had paid the attorney before filing bankruptcy, and declining to express an opinion on the validity of bifurcation agreements generally or problems associated with unbundling since the only issue before the court was reasonableness of the fee).

In sum, the record suggests that Mr. Amerine's use of factored fee agreements to help his clients file chapter 7 bankruptcy cases violated MRPC 4-1.8.

- ### *MRPC 4-1.15: Trust Accounts & Property of Others*

MRPC 4-1.15 governs attorney trust accounts. Among other detailed provisions, it requires that a lawyer hold property of a client separate from a lawyer's property. In 2017 and 2018, when these cases were filed, Rule 4-1.15(c) provided that a lawyer "shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn only as fees are earned or expenses incurred."[335] The Rule also requires that lawyers keep detailed records regarding trust account deposits, transfers, and expenditures.

Mr. Amerine testified that all the fees and expenses he received in these cases, whether from the debtors or from the sale of his accounts receivable, were deposited in Castle Law's operating account.[336] He testified he kept no independent records of the accounts the firm factored or even a list of his factored Missouri clients.[337] The court was unaware of this when it issued its OSC. The problem is two-fold: in the cases in which the debtors were making small payments, Mr. Amerine was treating those as earned and thus was not in violation of MRPC 4-1.15(c) when he deposited the payments in the firm operating account. When the clients later "elected" the factoring model, however, he unilaterally allocated those fees towards anticipated expenses, such as the filing fee, credit report, and counseling fees. Those payments should have then been deposited into the trust account and not withdrawn until the expenses were incurred.

---

[335] Effective November 19, 2019, an exception was added that exempted advanced flat fees not exceeding $2,000, although the exception does not change the language about holding expense reimbursements paid in advance in trust until the expense is incurred.

[336] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 18, 22, transcript pp. 70, 87-88.

[337] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF p. 10, transcript pp. 38–40.

The flip side is that if, in truth, the second agreement is for postpetition services to be rendered throughout the course of the postpetition representation, then when Castle Law factored the accounts receivable – in some cases a few days after the bankruptcy filing and before any work was yet done – the fees likewise had not been earned and should have been deposited into the trust account to be withdrawn as they were earned. Mr. Amerine has emphasized repeatedly that the reason the postpetition fee was higher was because he had done no work except the "shell" when the case was filed and all the work was yet to be accomplished. He testified that Castle Law would do no postpetition work before the clients signed the postpetition contract.[338]

Mr. Amerine cannot have it both ways. The record suggests violations of MRPC 4-1.15(c) for the failure to deposit expense reimbursements and unearned fees for services in the firm trust account.

- ### *MRPC 4-5.4: Professional Independence of a Lawyer*

MRPC 4-5.4(a) provides that a lawyer or law firm shall not share legal fees with a nonlawyer, excepted in limited circumstances not applicable here. MRPC 4-5.4(c) provides that a lawyer shall not permit a person who pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

Bankruptcy courts have raised valid legal questions about whether the Code's prohibition against fee sharing applies to factoring agreements.[339] The court declines to express an opinion in the context of this case because it is an issue of federal bankruptcy law that has not been raised in any of these cases and therefore would be inappropriate to serve as a basis for a disciplinary referral. In the context of MRPC 4-5.4, however, what is apparent from the record is that Mr. Amerine allowed BK Billing under its underwriting guidelines to determine the repayment terms

---

[338] *Kolle*, Case No. 17-41701, ECF No. 47-1 (Exhibit 23, Amerine Deposition), ECF pp. 15, 35, transcript pp. 59, 138.
[339] *In re Baldwin*, 2021 WL 4592265, at *14 (Bankr. W.D. Ky. Oct 5, 2021).

of the fee agreement and in one case, to set the amount of the fee.[340] Notwithstanding the provision in the AR Agreement that said BK Billing was not responsible for Mr. Amerine's attorney-client relationship, by accepting BK Billing's underwriting guidelines and repayment terms as they applied to his bankruptcy clients, Mr. Amerine was allowing BK Billing to impact such decisions as when the bankruptcy was filed and what chapter was filed, in addition to the terms of the payment.

That raises serious issues regarding the use of factoring and a lawyer's independence.

- ### *MRPC 4-3.3: Candor Towards the Tribunal*

MRPC 4-3.3(a)(1) provides that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal. MRPC 4-3.3(a)(2) provides that a lawyer shall not offer evidence the lawyer knows to be false. The court is concerned with several candor issues in these cases.

First, Mr. Amerine testified in his deposition that he prepared and reviewed every Rule 2016(b) disclosure. He knew the firm had or was going to factor fees for these debtors. He knew that in most of the cases the firm had received payments. He knew that his Rule 2016(b) disclosures were not, as he certified, "a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding" but were instead grossly misleading as to what he charged his clients, what he had been paid, and the source of the payments. To date, Mr. Amerine has failed to file amended and accurate Rule 2016(b) disclosures.

More importantly, he knew that his firm had received payments from many of these clients and that his firm had paid for the prepetition expenses. He knew his clients had agreed to make significant postpetition payments to BK Billing that he himself had negotiated. Yet he allowed his

---

[340] *Kolle*, Case No. 17-41701 (Exhibit 24, Stidham Deposition), ECF p. 203 (Deposition Exhibit 37).

clients to sign under penalty of perjury schedules and statements that were false. The fact that no party sought to deny these debtors a discharge under § 727(a)(4)(A) for making a false oath does not excuse his conduct in filing false and misleading schedules and statements with the court.

Second, Mr. Amerine signed an affidavit representing to the court that his clients did not agree to the second fee agreement until after they filed bankruptcy. We know now that in at least two cases, the debtors signed a document agreeing to pay BK Billing before the bankruptcy was filed and that the two fee agreements in the record both represent a prepetition agreement to pay postpetition services. The court would not have known that Mr. Amerine's representations on this issue were false or a minimum grossly misleading had the UST's attorney not interjected when Mr. Amerine's counsel was arguing this point. Mr. Amerine's affidavits have not been corrected.

Third, Mr. Amerine filed each of these ten cases certifying to the court that he had executed the RRA, thus agreeing to represent the clients for both pre- and postpetition services for one fee. We know now that his certification was false, since he had not so agreed. In connection with the *Hughes* case, in which he did not execute the RRA, he nonetheless certified to the court that he would file a motion for approval of his fees based on time records, which we know now he did not keep.

There is a final candor issue that the court raises in a more general sense. Mr. Amerine portrays his actions as in the best interests of his clients, calling it an access to justice issue and even going so far as to tell the UST in an early email that he was providing a service to the clients and that he was not making money from it. But the entirety of the record reveals otherwise. The factoring model was marketed to Mr. Amerine not as a service to his clients but as a way to charge more money and enhance his revenue.[341] He first knew from the point at which he emailed Ms.

---

[341] *Kolle*, Case No. 17-41701, ECF No. 47-3, Exhibit 25.

Wattenbarger in June 2017 there were probable issues with what he was doing. Ms. Wattenbarger provided him a clear path: make a reasonable bifurcation of fees and disclose it to the court and the clients. But he chose to ignore this guidance or to avail himself of the other obvious remedy: to file a motion with the court.

Mr. Amerine's increasingly frantic emails, his shifting defenses and explanations, his "lay in the weeds" attitude to the UST's reasonable inquiry, his unwarranted impugning of the UST's motives, his borderline frivolous and disingenuous arguments before this court, and his utter failure to come completely clean in the response to the first OSC and only then to supplement the earlier misleading representations after he was called out on it by the UST coupled with the failure to completely disclose even as of today – all belie his protestations any "mistakes" he made were inadvertent and unintentional.

- ### *MRPC 4-8.4: Misconduct*

The last MRPC the court examines is MRPC 4-8.4 (although there may be other professional rules the court has not considered). MRPC 4-8.4(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The Missouri Supreme Court has in fact cited the importance of honesty and integrity as chief among the virtues that the public has the right to expect of any lawyer.[342] Questions of honesty go to the heart of fitness to practice law.[343]

Proper administration of any bankruptcy case is utterly dependent upon the debtors and their counsel providing complete, accurate, and truthful information.[344] Indeed, the Eighth Circuit, noting the sheer volume of bankruptcy cases and hearings, has observed that "[t]he potential for

---

[342] *See In re Carey*, 89 S.W.3d 477, 498 (Mo. banc 2002) (citation omitted).
[343] *In re Donaho*, 98 S.W.3d 871, 874 (Mo. banc 2003) (citation omitted).
[344] *In re Pigg*, 2015 WL 7424886, at *21 (Bankr. W.D. Mo. Nov. 20, 2015).

mischief to be caused by an attorney who is willing to skirt ethical obligations and procedural rules is enormous."[345] These cases are an example of such mischief.

Mr. Amerine's actions, misrepresentations, and failures to disclose have wasted hundreds of hours of this court's time and of the UST's, not to mention any stress he may have caused his clients. For all the reasons listed above, the Court believes Mr. Amerine's conduct exhibits a lack of honesty and integrity, in violation of MRPC 4-8.4.

## Conclusion

The court takes no joy in the conclusion it reaches. The court would have far preferred that Mr. Amerine remedy his nondisclosures and comply with the Code, Rules and local rules, in which case nothing further would have likely happened. Yet as of today, the court still has no clear understanding of how much Mr. Amerine charged his clients or was paid, even after reading and rereading hundreds of pages over the course of many months. Instead, with each subsequent response, Mr. Amerine dug himself into a deeper and deeper hole – blaming the court's local rules, the UST, the judiciary's official forms – leaving the court no choice but to reach the result it reaches today.

The court's OSC in this case warned Mr. Amerine that, in these ten cases, his fee agreements and payments did not appear to be adequately disclosed or reasonable. Mr. Amerine was ordered to show cause why sanctions should not be imposed. Mr. Amerine has not convinced the court in his response and supplemental response why a sanction should not be imposed for the specific issues raised in the court's OSC. The evidence submitted amply supports a factual finding that Mr. Amerine violated § 329, Rule 2016 and L.R. 2016-1 and that neither his fee agreement nor his fees were reasonable. But the response and supplemental response raise a host of new

---

[345] *In re Young*, 789 F.3d 872, 879 (8th Cir. 2015) (quoting *In re Armstrong*, 487 B.R. 764, 774 (E.D. Tex. 2012)).

concerns and even more troubling failures, as the court has outlined in Part IV of this opinion. To sanction Mr. Amerine on the basis of the new violations the court believes the record demonstrates would require the issuance of a new OSC. As noted, the court has already wasted countless hours attempting to discern the truth and has already approved a settlement requiring disgorgement and payment of a civil penalty. Just to resolve the issues in this OSC has taken more than a year.

The court therefore declines to exercise its discretion to order monetary sanctions in connection with the issues raised in the ten cases that are the subject of its OSC and instead will make a disciplinary referral to the Office of Chief Disciplinary Counsel ("OCDC") of the State of Missouri based on its findings and to the U.S. District Court for the Western District of Missouri en banc based on its findings of fact and conclusions of law in Part III of this opinion.

With respect to the newly discovered disclosure and other apparent ethical violations as raised by the court's review of the response and supplement response in Part IV, the court likewise declines to issue an OSC. Rather, based on its duty to report pursuant to MRPC 4-8.3(a), the court will also refer those issues raised in the *James* case and in Part IV of this opinion for investigation and any action to the OCDC and the Court en banc. Since Mr. Amerine has not had the opportunity to respond to the violations the court believes the record demonstrates, the court is careful to note that it is not making factual findings of the newly discovered violations, only that the record demonstrates ethical violations that the OCDC and the Court en banc should investigate.

s/ Cynthia A. Norton
U.S. Bankruptcy Judge Cynthia A. Norton

Dated: December 10, 2021